## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

TODD COURSER
     Plaintiff

v.

KEITH ALLARD; BENJAMIN GRAHAM; JOSHUA CLINE; JOSEPH GAMRAT; MICHIGAN HOUSE OF REPRESENTATIVES, KEVIN G. COTTER, in his official capacity as Speaker of the Michigan House of Representatives (District 99) and in his individual capacity; TIM L. BOWLIN, in his official capacity as Business Director/CFO and in his individual capacity; BROCK SWARTZLE, in his official capacity as Chief of Staff/General Counsel and in his individual capacity; NORM SAARI, in his official capacity as former Chief of Staff and in his individual capacity; EDWARD McBROOM, in his official capacity as Representative for District 108 and in his individual capacity; ANDREA LaFONTAINE, in her official capacity as Representative for District 32 and in her individual capacity; ROB VERHEULEN, in his official capacity as Representative for District 74 and in his individual capacity; HASSAN BEYDOUN, in his official capacity as legal counsel of the Michigan House of Representatives and in his individual capacity; KURT HEISE, in his official capacity as Representative for District 20 and in his individual capacity; DAVID HORR; VINCENT KRELL; RADISSON HOTELS INTERNATIONAL, INC.; RADISSON GROUP, INC. CARLSON REZIDOR HOTEL GROUP; CHAD LIVENGOOD, in his official capacity as a reporter for the Detroit News and in his individual capacity; THE DETROIT NEWS, INC.; the MICHIGAN STATE POLICE; KRAIG BRITVEC, in his official capacity as Detective with the Michigan State Police and in his individual capacity; JEREMY BREWER, in his official capacity as Detective with the Michigan State Police and in his individual capacity;

Case No. _____

HON. _____

## CLAIM OF CIVIL RIGHTS VIOLATION AND UNCONSTITUTIONALITY

## JURY TRIAL DEMANDED

DAVID DWYER, in his official capacity as
Detective with the Michigan State Police and in
his individual capacity; and WILLIAM
SCHUETTE, the MICHIGAN ATTORNEY
GENERAL, in his official capacity and in his
individual capacity,

      Defendants

---

**THERE ARE TWO (2) OTHER PENDING AND UNRESOLVED CIVIL ACTIONS ARISING OUT OF THE TRANSACTIONS OR OCCURRENCE ALLEGED IN THIS COMPLAINT:**

1. *Keith Allard and Benjamin Graham v Todd Courser, in his official capacity as a former Member of the Michigan House of Representatives and in his individual capacity, and Cindy Gamrat, in her official capacity as a former Member of the Michigan House of Representatives and in her individual capacity*, **State of Michigan, Ingham County, Case No. 15-000819, filed on or about October 2, 2015.**

2. *Keith Allard and Benjamin Graham v Michigan House of Representatives*, **United States District Court for the Western District of Michigan, Southern Division, Case No. 1:15-cv-01259, filed on or about December 7, 2015.**

## COMPLAINT AND JURY DEMAND

NOW COMES Plaintiff, TODD COURSER ("COURSER"), by and through his attorneys, DePERNO LAW OFFICE, PLLC and for his Complaint against the KEITH ALLARD; BENJAMIN GRAHAM; JOSHUA CLINE; JOSEPH GAMRAT; MICHIGAN HOUSE OF REPRESENTATIVES; KEVIN COTTER, in his official capacity as Speaker of the Michigan House of Representatives (District 99) and in his individual capacity; TIM L. BOWLIN, in his official capacity as Business Director/CFO and in his individual capacity; BROCK SWARTZLE, in his official capacity as Chief of Staff/General Counsel and in his individual capacity; NORM SAARI, in his official capacity as former Chief of Staff and in his individual capacity; EDWARD McBROOM, in his official capacity as Representative for District 108 and in his individual capacity; ANDREA LaFONTAINE, in her official capacity as Representative for District 32 and in her individual capacity; ROB VERHEULEN, in his official

2

capacity as Representative for District 74 and in his individual capacity; HASSAN BEYDOUN, in his official capacity as legal counsel of the Michigan House of Representatives and in his individual capacity; KURT HEISE, in his official capacity as Representative for District 20 and in his individual capacity; DAVID HORR; VINCENT KRELL; RADISSON HOTELS INTERNATIONAL, INC.; RADISSON GROUP, INC.; CARLSON REZIDOR HOTEL GROUP; CHAD LIVENGOOD, in his official capacity as a reporter for the Detroit News and in his individual capacity; THE DETROIT NEWS, INC.; the MICHIGAN STATE POLICE; KRAIG BRITVEC, in his official capacity as Detective with the Michigan State Police and in his individual capacity; JEREMY BREWER, in his official capacity as Detective with the Michigan State Police and in his individual capacity; DAVID DWYER, in his official capacity as Detective with the Michigan State Police and in his individual capacity; and WILLIAM SCHUETTE, the MICHIGAN ATTORNEY GENERAL, in his official capacity and his individual capacity, states as follows:

## NATURE OF THE ACTION

1.      This is an action pursuant to 42 U.S.C. §§ 1983 and 1985 and the due process and equal protection clause of the Fourteenth Amendment to the United States Constitution and similar provisions of the Constitution of Michigan of 1963 seeking to redress the wrongful actions and the immediate consequences of the Defendants and other related torts under state law, including, but not limited to, the right to be free from unreasonable search and seizure.

2.      This is an action pursuant to the First Amendment of the United States Constitution and similar provisions of the Constitution of Michigan of 1963 seeking violation of the right to free speech.

DePerno Law Office, PLLC • 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) • 269-353-2726 (fax)

3.      This action also arises out of COURSER's claims to enforce their rights arising out of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq*, as amended.

4.      This action also arises out of COURSER's other claims, including, but not limited to selective enforcement of laws[1], selective indemnification (civilly and criminally)[2], violations of separation of powers[3], false imprisonment[4], conspiracy[5], extortion[6], illegal wiretapping[7], invasion of privacy[8], misconduct in office[9], misuses of office[10], violations of RICO[11], and other provisions of both Federal and State law.

5.      COURSER also requests Declaratory Relief and a Writ of Mandamus as set forth herein.

## JURISDICTION AND VENUE

6.      This Court also has jurisdiction pursuant to 28 U.S.C. Section § 1331 (as this action involves a federal question and the laws of the United States) and 28 U.S.C. Section § 1343 (as this action involves the right to recover damages for injury and the deprivation of rights and privileges.)

7.      Jurisdiction is also conferred upon this Court by 28 U.S.C. § 1343(a)(3) and (4), 28 U.S.C. § 2201 & 2202, and 42 U.S.C. § 1983, 1985, and 1988, this being an action for declaratory judgment and equitable relief authorized by law to redress deprivations and

---

[1] *Id.*
[2] *Id.*
[3] Michigan Const. 1963, Art. III, Sec. 2
[4] MCL 750.349b
[5] MCL 750.157a and 18 U.S.C. 371
[6] MCL 750.213
[7] MCL 750.539c and 18 U.S.C. 119, and 18 U.S.C. Sec. 2511
[8] MCL 750.539a
[9] MCL 767.4 and 750.505c
[10] MCL 750.118 and MCL 750.505c
[11] 18 U.S.C. Sec. 1961, *et seq.*

4

violations under color of law of rights, privileges, and immunities secured by the United States Constitution and Michigan Constitution of 1963, as amended[12]. COURSER also seeks declaratory and injunctive relief as authorized by Rules 57 and 65 of the Federal Rules of Civil Procedure and by the general legal and equitable powers of this Court.

8.   This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over COURSER's state-law claims that are related to, and form part of, the same case or controversy. It is appropriate that this Court exercise supplemental jurisdiction over the state law claims because they involve the same parties and operative facts as the federal claims. Therefore, the Court's exercise of supplemental jurisdiction will further economy, convenience, and fairness to the parties.

9.   Declaratory Relief is authorized Fed. R. Civ. P. 57.

10.   Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

11.   COURSER requests trial by jury, pursuant to Fed. R. Civ. P. 38.

## PARTIES

12.   Plaintiff TODD COURSER ("COURSER") is an individual residing in Lapeer County, Michigan. COURSER was the duly elected State Representative for the 82nd District and, as such, a member of the Michigan House of Representatives, until he was unlawfully forced to resign his position on September 11, 2015.

13.   Upon information and belief, Defendant KEITH ALLARD ("ALLARD") is a resident of Kent County, Michigan and was a staff member for the 80th District office, until the House terminated his employment on July 6, 2015.

---

[12]

5

14.     Upon information and belief, Defendant BENJAMIN GRAHAM ("GRAHAM") is a resident of Genesee County, Michigan and was a staff member for the 82nd District office, until the House terminated his employment on July 6, 2015.

15.     Upon information and belief, Defendant JOSHUA CLINE ("CLINE") is a resident of Lapeer County, Michigan and was a staff member for the 82nd District office, until he quit his position on April 14, 2015.

16.     Upon information and belief, Defendant JOSEPH GAMRAT ("JOE GAMRAT") is a resident of Allegan County, Michigan and is the husband of Cindy Gamrat. Cindy Gamrat ("Gamrat") was the duly elected State Representative for the 80th District and, as such, a member of the Michigan House of Representatives, until THE HOUSE voted to expel her from office on September 11, 2015.

17.     Defendant MICHIGAN HOUSE OF REPRESENTATIVES ("THE HOUSE") is one of two chambers of the legislative body of the State of Michigan created by the Michigan Constitution. THE HOUSE conducts its business in Lansing, Michigan, in Ingham County. Its members are elected from 110 districts covering the entire State of Michigan to represent constituents in each of those districts.

18.     Upon information and belief, Defendant KEVIN COTTER ("COTTER") is a resident of Isabella County, Michigan and was the duly elected State Representative for the 99th District and, as such, a member of the Michigan House of Representatives. He was also elected by the House membership as Speaker of the Michigan House of Representatives.

19.     Upon information and belief, Defendant TIM L. BOWLIN ("BOWLIN") is a resident of Ingham County, Michigan and was the duly appointed Business Director/CFO for the House.

6

20.     Upon information and belief, Defendant BROCK SWARTZLE ("SWARTZLE") is a resident of Ingham County, Michigan and was the duly appointed Chief of Staff/General Counsel to COTTER.

21.     Upon information and belief, Defendant NORM SAARI ("SAARI") is a resident of Ingham County, Michigan and was the duly appointed Chief of Staff to COTTER.

22.     Upon information and belief, Defendant EDWARD McBROOM ("McBROOM") is a resident of Vulcan, Michigan and was the duly elected State Representative for the 108th District and, as such, a member of the Michigan House of Representatives. McBROOM was the Chairman of the House Select Committee to examine the qualifications of COURSER.

23.     Upon information and belief, ANDREA LaFONTAINE ("LaFONTAINE") is a resident of Columbus Township, Michigan and was the duly elected State Representative for the 32nd District and, as such, a member of the Michigan House of Representatives. LaFONTAINE was a member of the House Select Committee to examine the qualifications of COURSER.

24.     Upon information and belief, ROB VERHEULEN ("VERHEULEN") is a resident of Walker, Michigan and was the duly elected State Representative for the 74th District and, as such, a member of the Michigan House of Representatives. VERHEULEN was a member of the House Select Committee to examine the qualifications of COURSER.

25.     Upon information and belief, HASSAN BEYDOUN ("BEYDOUN") is a resident of Ingham County, Michigan and was the duly appointed Majority Legal Counsel to THE HOUSE and specifically the attorney for COURSER.

26.     Upon information and belief, KURT HEISE ("HEISE") is a resident of Plymouth Township, Michigan and was the duly elected State Representative for the 20th District and, as

7

such, a member of the Michigan House of Representatives. He was also the Vice-Chairman of the House Select Committee to examine the qualifications of COURSER.

27.     Upon information and belief, Defendant DAVID HORR ("HORR") is and was at all relevant times a resident of Fort Gratiot, Michigan and was employed as a security guard at Domtar Paper.

28.     Upon information and belief, Defendant VINCENT KRELL ("KRELL") is and was at all relevant time a resident of Fort Gratiot, Michigan and was employed as a security guard at Domtar Paper.

29.     Upon information and belief, Defendant RADISSON HOTELS INTERNATIONAL, INC. ("RADISSON HOTELS") is a Delaware corporation with its headquarters located at 701 Carlson Parkway, Minnetonka, MN 55350. RADISSON HOTELS does business in Michigan and operates the Radisson Hotel Lansing at the Capitol.

30.     Upon information and belief, Defendant RADISSON GROUP, INC. ("RADISSON GROUP") is a Minnesota corporation with its headquarters located at 701 Carlson Parkway, Minnetonka, MN 55350. RADISSON HOTELS does business in Michigan and operates the Radisson Hotel Lansing at the Capitol.

31.     Upon information and belief, Defendant CARLSON REZIDOR HOTEL GROUP "CARLSON") in an international company with headquarters located at 701 Carlson Parkway, Minnetonka, MN 55350. CARLSON does business in Michigan and operates RADISSON HOTELS and RADISSON GROUP.

32.     RADISON HOTELS, RADISSON GROUP, and CARLSON are sometimes referred to herein as "RADISSON".

DePerno Law Office, PLLC • 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) • 269-353-2726 (Fax)

33.     Upon information and belief, Defendant CHAD LIVENGOOD ("LIVENGOOD") is a resident of Ingham County and is a reporter for the Detroit News.

34.     Upon information and belief, Defendant THE DETROIT NEWS, INC. ("DETROIT NEWS") is a corporation registered in the State of Michigan.

35.     Upon information and belief, Defendant MICHIGAN STATE POLICE ("MSP") is the body that investigated the incident of extortion against COURSER and the "matter" surrounding COURSER and Gamrat in THE HOUSE.

36.     Upon information and belief, Defendant KRAIG BRITVEC ("BRITVEC") is a resident of Ingham County and was a member of Capitol Security in Lansing with the MSP.

37.     Upon information and belief, Defendant JEREMY BREWER ("BREWER") is a resident of Ingham County and is a Detective Sergeant with the MSP.

38.     Upon information and belief, Defendant DAVID DWYER ("DWYER") is a resident of Ingham County and is a Special Agent with the Michigan Department of Attorney General.

39.     Defendant WILLIAM SCHUETTE ("SCHUETTE") is the Attorney General of the State of Michigan. He is responsible for the enforcement of state laws and the Michigan Constitution. As Attorney General he is also responsible for defending state laws and the Michigan Constitution against challenges to their constitutionality. See MCL §§ 14.28 and 14.29. In addition, as Attorney General he is responsible for "supervis[ing] the work, consul[ing] and advis[ing] the prosecuting attorneys, in all matters pertaining to the duties of their office." MCL § 14.30. Defendant SCHUETTE is sued in his official capacity and individual capacity.

40.     COURSER reserves the right to name additional defendants as they become known through discovery.

9

## FACTS

### *OUTLINE OF THE INITIAL CONSPIRACY TO REMOVE COURSER FROM OFFICE*

41.    At all relevant times, the Defendants listed throughout this Complaint and in each individual Count acted maliciously, recklessly, intentionally, or by reason of gross negligence or violation of the law and are therefore liable to COURSER. They acted with gross disregard for the rights afforded to COURSER and they did so for their own financial and political goals.

42.    Article 1, § 1 of the Michigan Constitution states that "All political power is inherent in the people. Government is instituted for their equal benefit, security, and protection."

43.    Article IV, § 16 of the Michigan Constitution states, in part, that "[e]ach house shall be the sole judge of the qualifications, elections and returns of its members, and may, with the concurrence of two-thirds of all the members elected thereto and serving therein, expel a member." This section is unconstitutionally vague and conflict with Article IV, § 7 of the Michigan Constitution.

44.    Article IV, § 7 of the Michigan Constitution sets forth the qualifications to be a Legislator and limits the scope of the Legislature's ability to decline or reject a legislator elected. This section states that:

> Each senator and representative must be a citizen of the United States, at least 21 years of age, and an elector of the district he represents . . . . No person who has been convicted of subversion or who has within the preceding 20 years been convicted of a felony involving a breach of public trust shall be eligible for either house of the legislature.

45.    On September 11, 2015, THE HOUSE, COTTER, BOWLIN, SWARTZLE, SAARI, McBROOM, LaFONTAINE, VERHEULEN, BEYDOUN, and HEISE constructively, illegally, and unconstitutionally expelled COURSER from THE HOUSE by forcing him to resign his office.

DePerno Law Office, PLLC • 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) • 269-353-2726 (Fax)

46.     THE HOUSE, COTTER, BOWLIN, SWARTZLE, SAARI, McBROOM, LaFONTAINE, VERHEULEN, BEYDOUN, and HEISE were without power or authority to exclude from membership in THE HOUSE a person who has been duly elected by the voters as a Representative and who meets the age, citizenship, and criminal requirements. THE HOUSE, COTTER, BOWLIN, SWARTZLE, SAARI, McBROOM, LaFONTAINE, VERHEULEN, BEYDOUN, and HEISE illegally removed COURSER from office by forcing him to resign.

47.     This constructive expulsion took place based on the knowingly false testimony of ALLARD, GRAHAM, and CLINE.

48.     This constructive expulsion took place based on the knowingly illegal information obtained through illegal wiretapping and eavesdropping, conducted and authorized by ALLARD, GRAHAM, CLINE, JOE GAMRAT, KRELL, HORR, THE HOUSE, COTTER, SWARTZLE, SAARI, McBROOM, and BEYDOUN, and also potentially authorized by other Defendants.

49.     This constructive expulsion also took place based on the knowingly illegal information obtained through illegal and surreptitious surveillance and reporting conducted and authorized by ALLARD, GRAHAM, CLINE, JOE GAMRAT, KRELL, HORR, THE HOUSE, COTTER, SWARTZLE, SAARI, McBROOM, BEYDOUN, RADISSON HOTELS, RADISSON GROUP, CARLSON, LIVENGOOD, and DETROIT NEWS, and also potentially authorized by other Defendants.

50.     MSP, BRITVEC, BREWER, DWYER, and SCHUETTE then completed the conspiracy when they illegally, unethically, and unconstitutionally charged COURSER with crimes, while not charging others with same or similar crimes MSP, BRITVEC, BREWER, DWYER, and SCHUETTE knew about, for the purpose of insulating and covering up the behavior of all Defendants.

11

51.     Given COURSER met the qualifications under the Michigan Constitution then the ability to remove a Representative rests solely with the district from which he derived his seat, through "a recall effort" as allowed under Michigan Law.

52.     On its face, without the "qualifications" section of Article IV Sec 7, then Article IV, § 16 of the Michigan Constitution is vague, overbroad, and limitless without any constitutional safeguards. As written and presently applied, THE HOUSE can remove any duly elected Representative, regardless of the reason, so long as the reason is entered in the journal. Article IV, Sec. 16 explains that THE HOUSE is limited to being the sole judge ONLY of the "qualification" as listed and limited in Art. IV Sec 7. COURSER met these qualifications requirement. Therefore, THE HOUSE, COTTER, BOWLIN, SWARTZLE, SAARI, McBROOM, LaFONTAINE, VERHEULEN, BEYDOUN, and HEISE unconstitutionally removed him from office by forcing him to resign. At the time of this unconstitutional removal, THE HOUSE, COTTER, BOWLIN, SWARTZLE, SAARI, McBROOM, LaFONTAINE, VERHEULEN, BEYDOUN, and HEISE illegally denied voters their right to representation.

53.     Prior to the expulsion actions against COURSER there was no independent finding by any judicial body of criminal conduct by COURSER. In fact, THE HOUSE, COTTER, BOWLIN, SWARTZLE, SAARI, McBROOM, LaFONTAINE, VERHEULEN, BEYDOUN, and HEISE unconstitutionally violated COURSER's constitutional and legal rights.

54.     This was the first time in Michigan history that a sitting Representative was removed prior to any criminal charges being brought or any conviction. In fact, other Representatives who had been convicted of crimes were never removed. This demonstrates a violation of the equal protection clause of the United States Constitution and Michigan Constitution. For instance:

12

a.  Representative Brian Banks currently is seated in THE HOUSE and had several felonies prior to being seated as a legislator. Then, while in office, he was sued for sexual harassment. He was also charged with felonies while in office, yet he was not expelled and there was no action by THE HOUSE to either expel him or judge his qualifications. THE HOUSE also paid his legal fees and provided funds to settle the lawsuit by the former staffer. All this occurred while THE HOUSE was working to expel COURSER. This fact alone demonstrates a high level of suspicion in the motivations of THE HOUSE, COTTER, BOWLIN, SWARTZLE, SAARI, McBROOM, LaFONTAINE, VERHEULEN, BEYDOUN, and HEISE.

b.  Senator Vigil Smith fired an AK-47 at his ex-wife in the street in front of his home. He was charged and pled to felonies but was not expelled from office. In total, he was charged with felonious assault, malicious destruction of property, possessing a firearm during the commission of a felony, and domestic violence. These charges stemmed from an incident when he fired a reported ten shots at his ex-wife.

c.  Milo Dakin was the first legislator in Michigan history to be expelled. He was expelled in 1887 for trying to bribe his colleagues. He was not expelled until AFTER charges were made. Then there was a trial on the floor and THE HOUSE appropriated money to Mr. Dakin for him to hire an attorney.

d.  Monte Geralds was expelled from THE HOUSE in 1978, but only AFTER being convicted of embezzling from a law client.

e.  David Jaye was expelled from the Senate in 2001, but only AFTER his second and third drunk driving convictions while in office and AFTER he was charged with criminal domestic assault for beating his girlfriend. To top it off, Mr. Jaye was accused of harassment of staffers and using his state computer to store sexually explicit photographs. However, he wasn't just removed from office; rather, THE HOUSE conducted a multiple day trial on the floor. Mr. Jaye was allowed to present a defense to counter the allegations.

55.  COURSER was and is being treated differently than Brian Banks, Virgil Smith, Milo Dakin, Monte Geralds, and David Jaye. COURSER was forced to endure a process that robbed him of his ability to defend himself in any meaningful way and the voters of his district were denied their right to representation.

13

56.     In every other expulsion case in this State's history the individual being expelled was given adequate notice, some amount of an independent investigation by those charged with law enforcement powers, fair arbiters of the facts conducting the investigation, time and access to review the facts that were being put forward, subpoena powers, the chance to cross examination, and the chance to defend themselves. In fact, during the hearings on Mr. Jaye, SCHUETTE, then a Michigan Senator, raised concerns that the Senate was setting a new standard by not requiring a felony conviction prior to expulsion.

57.     COURSER was and is being treated as a criminal with regard to enforcement of THE HOUSE rules and criminalization of supposed "breaking of THE HOUSE rules". This is an illegal and unconstitutional act by THE HOUSE, COTTER, BOWLIN, SWARTZLE, SAARI, McBROOM, LaFONTAINE, VERHEULEN, BEYDOUN, HEISE, MSP, BRITVEC, BREWER, DWYER, and SCHUETTE.

58.     THE HOUSE, COTTER, BOWLIN, SWARTZLE, SAARI, McBROOM, LaFONTAINE, VERHEULEN, BEYDOUN, HEISE, MSP, BRITVEC, BREWER, DWYER, and SCHUETTE are now trying to criminalize "breaking of HOUSE Rules" which they have never done against anyone else and will never do against anyone else in the future.

59.     In fact, COTTER and other Representatives have broken THE HOUSE Rules multiple times but THE HOUSE, COTTER, BOWLIN, SWARTZLE, SAARI, McBROOM, LaFONTAINE, VERHEULEN, BEYDOUN, HEISE, MSP, BRITVEC, BREWER, DWYER, and SCHUETTE have refused to investigate or prosecute. THE HOUSE, COTTER, BOWLIN, SWARTZLE, SAARI, McBROOM, LaFONTAINE, VERHEULEN, BEYDOUN, and HEISE have refused to remove these Representatives from office or otherwise judge their qualifications.

14

MSP, BRITVEC, and SCHUTEET have refused to investigate or charge anyone else with misconduct in office.

60.     THE HOUSE, COTTER, BOWLIN, SWARTZLE, SAARI, McBROOM, LaFONTAINE, VERHEULEN, BEYDOUN, HEISE, MSP, BRITVEC, BREWER, DWYER, and SCHUETTE have refused to prosecute "their witnesses" and co-defendants who have also broken THE HOUSE Rules and who have committed multiple felonies including but not limited to, perjury, wiretapping, invasion of privacy, illegal surveillance, illegal entry, misuse of taxpayer resources, misconduct in office, false imprisonment, forgery, and RICO violations; to name some of the crimes.

61.     All of the Defendants in this case, working in conjunction with one-another created a plan of extortion, perjury, illegal wiretapping, and other illegal conduct (including malicious prosecution) all for political power, retribution, and personal gain. All Defendants have engaged in these conspiracies as described herein.

### *COURSER AND CINDY GAMRAT CHALLENGE THE PROGRESSIVE GOP ESTABLISHMENT*

62.     As strong Conservative advocates and leaders in the "grassroots movement" in Michigan, COURSER and Gamrat were staunch opponents against GOP policies of increasing taxes and growing government. COURSER and Gamrat were well known to be completely committed to voting and advocating publicly against any tax or spending increases and protecting against attacks on civil liberties; unwilling to compromise on these core issues.

63.     At the 2013 Republican Party State Convention, both COURSER and Gamrat took a bold and unprecedented step in challenging the Michigan Republican Party leadership, coming just 32 votes shy of overtaking the party from the Governor's selected and incumbent candidate for the Chairmanship and the Co-chairmanship positions.

15

64.    After losing the vote for the Chairmanship and Co-chairmanship positions, COURSER and Gamrat ran for State Representatives in the 82nd and 80th Districts, respectively.

65.    It was well known that during their campaigns, COURSER and Gamrat strongly opposed Proposal 15-1 because it amounted to the largest tax increase in Michigan history.[13]

66.    Proposal 15-1 was created to fund Michigan roads and consisted of an amendment to the Michigan Constitution of 1963, House Joint Resolution UU of 2014 ("HJR UU"). In conjunction with the amendment were 10 associated bills (Public Acts 467 through 476 of 2014)[14]. Proposal 15-1 and the 10 associated bills were passed on the last day of the 97th Legislature on Michigan, December 19, 2014. Proposal 15-1 and the 10 additional bills that were passed and signed into law contained enacting clauses that stipulated they would only take effect if HJR UU was adopted by voters.

67.    During their primaries in the summer of 2014, COURSER and Gamrat were both heavily attacked and outspent by the power brokers and special interest lobbyists of the establishment arm of the Republican Party but were able to overcome and win their primary elections in August of 2014.

68.    Upon information and belief, before and at the time of the 2014 primary, COTTER supported opponents of COURSER.

---

[13] Proposal 15-1 was proposed tax increase designed to create funding to repair Michigan roads. It was heavily supported by Gov. Rick Snyder (R). Proposal 15-1 was put on the May 5, 2015 ballot and was overwhelmingly voted down by Michigan voters.

After Proposal 15-1 was overwhelmingly voted down by the people, COTTER (R) released the House Roads Package to the Republican controlled House of Representatives. The House Roads Package was a tax increase similar to Proposal 15-1. Initially, the House Roads Package was voted down by the Michigan House of Representative, primarily due opposition from Democrats and the critical "NO" votes of COURSER and Gamrat. After COURSER and Gamrat were removed from the House of Representatives, the House Roads Package passed by 1 vote; which in essence forced into effect a tax hike that had recently been voted down by the people of Michigan.

[14] Act No. 467 (HB 4539); Act No. 468 (HB 5477); Act No. 469 (SB 847); Act No. 470 (HB 4630); Act No. 471 (HB 5167); Act No. 472 (HB 4251); Act No. 473 (HB 5460); Act No. 474 (HB 5492); Act No. 475 (HB 5493); Act No. 476 (HB SB 80).

69.     Upon information and belief, before and at the time of the 2014 primary, COTTER was aware of COURSER and Gamrat's commitments to voting against and advocating against any tax or spending increases and fighting against any intrusions on civil liberties.

70.     Upon information and belief, COTTER knew that COURSER and Gamrat were part of the "grassroots movement" in Michigan and committed to a limited government and decreasing taxes.

71.     During the general election campaign for Michigan State Representative in the fall of 2014, ALLARD volunteered and served on Gamrat's political campaign.

72.     During the election campaign for Michigan State Representatives and beyond, GRAHAM was a paid political consultant and served on both COURSER and Gamrat's political campaigns both during the primaries and the general elections.

73.     During the election campaign for Michigan State Representatives and beyond, CLINE was a paid political consultant and served on both COURSER and Gamrat's political campaigns both during the primaries and the general elections.

74.     On August 5, 2014, COURSER won the election primary for the State Representative seat for the 82nd District of Michigan with 37% of the vote.

75.     On August 5, 2014, Gamrat won the election primary for the State Representative seat for the 80th District of Michigan with 41% of the vote.

76.     On November 4, 2014, COURSER won the general election for the State Representative seat for the 82nd District of Michigan with 55% of the vote.

77.     On November 4, 2014, Gamrat won the general election for the for the State Representative seat for the 80th District of Michigan with 63% of the vote.

17

78.     In November 2014, Defendant McBROOM proposed that he teach COURSER and Gamrat how to be "good" HOUSE members. His offer was declined. Upon information and belief, this insulted McBROOM.

## STAFFING DISTRICT OFFICES

79.     In November 2014, in anticipation of COURSER and Gamrat taking office, CLINE, a paid political consultant of COURSER and Gamrat, suggested that if ALLARD, GRAHAM, and CLINE were all hired by THE HOUSE and appointed to COURSER and Gamrat's separate District Offices, a "joint staffing arrangement" could be established which would overlap duties of staff, decrease overhead costs, save taxpayer dollars, and allow the staff to be compensated at a higher rate due to only having three staff members for two Representatives, rather than four staff members.

80.     On October 15, 2014, in anticipation of COURSER and Gamrat taking office, ALLARD requested that he be permitted to serve in the capacities as both the political campaign liaison for COURSER and Gamrat and also as the "District Office Chief of Staff" for both COURSER and Gamrat.

81.     On October 15, 2014, ALLARD sent an email to COURSER, Gamrat, GRAHAM, and CLINE laying out what he felt would be the appropriate political and official duties and expectations of ALLARD, GRAHAM, and CLINE under a "joint staffing" arrangement.

82.     ALLARD, GRAHAM, CLINE, COURSER, and Gamrat had multiple conversations in anticipation of this possible "joint staffing" arrangement and understood that political work could not be done in THE HOUSE office or on State time.

18

83.     ALLARD, GRAHAM and CLINE had their own outside (paid and non-paid) political endeavors while acting as State employees for COTTER and THE HOUSE.

84.     In fact, GRAHAM and CLINE operated a political consulting business out of COURSER's private office building. This business was called Bellwether Strategies, LLC. The registered office for Bellwether Strategies, LLC was the same address of COURSER's Lapeer law office.

85.     In fact, GRAHAM billed COURSER for this political consulting work, which work was separate from his work as a State employee. GRAHAM and CLINE also used COURSER's Lapeer law office to do political work through their political consulting business, Bellwether Strategies, LLC.

86.     In November and December 2014, ALLARD, GRAHAM, and CLINE assured COURSER and Gamrat that they wanted to work in both roles of assisting politically as well as working as staff for THE HOUSE officially, and they would do so following the standard of not overlapping political and official work during State time or on State property.

87.     ALLARD, GRAHAM, and CLINE told COURSER and Gamrat that separating "political" from "official" would not be a problem because they would do staff work in the House office and use other locations when working on political work; giving assurances that they would do their outside political work off-site during their lunch or other breaks – as is the custom among HOUSE staffers, to go to the Biggby Coffee shop located directly downstairs from the House Anderson Building and work on political items on their own personal devices, off State time and off State property. In fact, emails demonstrate that ALLARD, GRAHAM, and CLINE were in charge of both the political and the legislative sides of COURSER and Gamrat offices, despite any of their testimony to the contrary.

19

88. ALLARD AND GRAHAM were employed by THE HOUSE from on or about January 2, 2015 until July 6, 2015. See H.R. Res. 1 (2015).

89. COTTER assigned ALLARD to the 80th District Office (Gamrat's office), which was located on the north side, 10th floor, of the House Anderson Building.

90. COTTER assigned GRAHAM to the 82nd District Office (COURSER's office), which was located on the south side, 11th floor, of the House Anderson Building.

91. COTTER also assigned CLINE, another HOUSE employee, to the 82nd District Office (COURSER's office).

92. COURSER and Gamrat agreed to try the joint staffing arrangement (suggested and advocated by CLINE) because ALLARD, GRAHAM, and CLINE had all been hired by THE HOUSE.

93. In an effort to separate personal from official work, COURSER and Gamrat directed ALLARD, GRAHAM, and CLINE to forward all contacts they received from family members directly to them so that COURSER and Gamrat could properly address them.

### *COURSER AND GAMRAT ADVOCATE THEIR CONSERVATIVE PLATFORM THROUGHOUT 2015*

94. As a newly elected Representative, it was important to COURSER to work hard to keep his campaign promises to do all he could to be a strong voice for the people in his district and for the People of the State of Michigan; i.e. the voters who had elected him.

95. COURSER ran on a strong conservative platform and resided in a conservative district which he would be representing.

96. On January 10, 2015, COURSER and Gamrat released their "Contract for Liberty" as a "roadmap to restore our Founder's intent for the proper role of government."

97. The Contract for Liberty outlined COURSER and Gamrat's legislative agenda that they had promised their districts during their campaigns.

20

98.     Upon information and belief, this upset COTTER and the balance of the Republican caucus because COTTER was set to release his plan the following week.

99.     On January 9th and 10th of 2015, COURSER and Gamrat conducted a two-day statewide conference of over 400 of the top conservative grassroots activists and leaders from around Michigan in order to promote their legislative agenda. This event, called the "PowWow", was the fifth such event they had coordinated and demonstrated to the GOP party and to Lansing the strength of the massive grassroots movement in Michigan and the network across the State that COURSER and Gamrat had established over the years.

100.    It would become clear in the following months that the GOP establishment in Lansing would see COURSER and Gamrat's network around the State as a threat to their progressive agenda to increase taxes and grow government.

101.    On January 9 and 10, 2015, the PowWow was held at the Soaring Eagle Resort in Mt. Pleasant, Michigan where it had been held in previous years, which happened to be in COTTER's district.

102.    On January 15, 2015, at the first off site Republican Caucus, COTTER told COURSER that he was not permitted to hold any events (including the Pow Wow) in COTTER's District without his permission, despite the fact that other Representatives held events in COURSER's District without his permission.

### *COTTER STARTS PROCESS TO "DIG UP DIRT" ON COURSER AND GAMRAT*

103.    Upon information and belief, unbeknownst to COURSER and Gamrat, shortly after the 2014 primary, COTTER began a process to "dig up dirt" against COURSER and Gamrat. He assigned this task to SAARI and SWARTZLE. This process included surveillance.

104.    Upon information and belief, during the second week of January, 2015, SAARI continued this plan when he initiated a private meeting with ALLARD, GRAHAM, and CLINE

21

and other Defendants and directed them to issue reports directly to SAARI and SWARTZLE about COURSER and Gamrat.

105. Upon information and belief, at these meetings throughout 2015, ALLARD, GRAHAM, and CLINE were actively seeking promotions from SAARI. In turn, SAARI required that ALLARD, GRAHAM and CLINE keep him informed regarding COURSER and Gamrat. This was a mutually beneficial arrangement. On the one hand, SAARI wanted the information. On the other hand, ALLARD, GRAHAM, and CLINE were more than happy to provide information because they were actively requesting and pursuing new employment positions within COTTER's team and THE HOUSE. Upon information and belief, ALLARD, GRAHAM, and CLINE accepted these conditions of employment because they wanted to advance their own political career.

106. Upon information and belief, ALLARD and GRAHAM, as employees of THE HOUSE, were directed by COTTER, SAARI, SWARTZLE, and THE HOUSE to illegally and unethically gather information against COURSER and Gamrat and report that information back to COTTER, SAARI, SWARTZLE and THE HOUSE.

107. Upon information and belief, after the meeting in January 2015, ALLARD, GRAHAM, and CLINE began to immediately and covertly issue reports to SAARI and SWARTZLE about COURSER and Gamrat.

108. Upon information and belief, these reports turned into constant and continuous communications regarding the surveillance and extortion plot to remove COURSER and Gamrat from office. In fact, in early February 2015, ALLARD texted to others in the conspiracy that the first objective was to get COURSER removed from office.

22

109. ALLARD, GRAHAM, and CLINE began to intensify their efforts by communicating with JOE GAMRAT.

110. At or around February 11, 2015, JOE GAMRAT told ALLARD, GRAHAM, and CLINE that he believed that Gamrat was having an affair with COURSER.

111. Upon information and belief, since as early as the spring of 2014, JOE GAMRAT and KRELL had been secretly conducting wiretapping of Gamrat in her office, her purse, her car, her home, her bedroom, and her campaign headquarters by placing secret and illegal wiretapping devices in these locations. JOE GAMRAT and KRELL were also secretly monitoring phone calls, downloading emails both inbound and outbound, and voicemails between herself and anyone else. These wiretapping and eavesdropping efforts were illegal.

112. JOE GAMRAT then began to forward this information both directly and anonymously to people who knew Gamrat, including her friends, her pastor, and her colleagues in THE HOUSE, and began providing updates to THE HOUSE, COTTER, and SAARI through ALLARD, GRAHAM, CLINE and others.

113. At the same time, ALLARD, GRAHAM, and CLINE were also obtaining information through illegal wiretapping and eavesdropping devices. ALLARD and GRAHAM have already admitted to engaging in illegal wiretapping and eavesdropping and have also acknowledged that the offices of COURSER and Gamrat were bugged.

114. In exchange for the information provided by JOE GAMRAT, KRELL, ALLARD, GRAHAM, and CLINE provided information to JOE GAMRAT and HORR.

115. ALLARD, GRAHAM, and CLINE were directed by THE HOUSE, COTTER, SAARI, and SWARTZLE to illegally plant and retrieve wiretapping and eavesdropping devices

23

around COURSER and Gamrat; making THE HOUSE, COTTER, SAARI, and SWARTZLE part of the illegal wiretapping and eavesdropping conspiracy.

116.    In addition, GRAHAM provided to JOE GAMRAT, ALLARD, and CLINE most, if not all of COURSER and Gamrat's private passwords for their email accounts both personally and officially.

117.    In February of 2016, SCHUETTE filed charges against COURSER and Gamrat. The Preliminary Conference was held in May/June of 2016. During this Preliminary Conference, GRAHAM perjured himself several times, including when he denied providing passwords for COURSER and Gamrat's email accounts to others.

118.    GRAHAM, during this same Preliminary Conference, also perjured himself when he was asked if he had been conducting surveillance on COURSER and Gamrat. He stated no, but the texts in late June of 2015 from ALLARD to JOE GAMRAT show that ALLARD and/or GRAHAM had followed COURSER and Gamrat over 100 miles, during the day, during work hours on HOUSE time, to Tim Horton's in Oxford, Michigan where COURSER and Gamrat were interviewing someone to replace GRAHAM and/or ALLARD.

119.    ALLARD and GRAHAM were desperate to keep their employment and knew through their various illegal wiretapping and eavesdropping operations that both COURSER and Gamrat were looking to replace ALLARD, GRAHAM, and CLINE.

120.    Because ALLARD, GRAHAM, and CLINE had access to all of COURSER and Gamrat's communications, phone, texts, and emails – without the knowledge of COURSER or Gamrat, they were well aware of COURSER and Gamrat's dissatisfaction with ALLARD and GRAHAM's work performance throughout 2015 and their active efforts to find suitable replacements.

DePerno Law Office, PLLC ● 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) ● 269-353-2726 (Fax)

121. During these meetings, ALLARD, GRAHAM and CLINE claimed COURSER and Gamrat were misusing their offices, their staff and taxpayer resources. COURSER was, at this point, relying on ALLARD, GRAHAM and CLINE as their staff and as their friends in THE HOUSE.

122. Neither THE HOUSE, SAARI, COTTER, SWARTZLE, BEYDOUN, or anyone at their direction ever informed COURSER of the secretly held meetings with the staff members who were assigned to his office or of the allegations of wrongdoing that were being claimed by ALLARD, GRAHAM, and CLINE.

123. This illegal and unethical scheme came to fruition when COTTER was able to withhold evidence of the conspiracy, withhold evidence of those involved, and convince members of THE HOUSE to deny the will of the voters by forcing COURSER to resign from public office, without due process, under excess distress, falsely imprisoned, and in violation of the United States Constitution and Michigan Constitution.

124. In order to effectuate this process, THE HOUSE, COTTER, BOWLIN, SWARTZLE, SAARI, McBROOM, LaFONTAINE, VERHEULEN, BEYDOUN, and HEISE used the unsworn and unrecorded testimony of ALLARD, GRAHAM, and CLINE.

125. THE HOUSE and COTTER and his staff later claimed that ALLARD, GRAHAM, and CLINE were liars; which demonstrates that the entire expulsion efforts were based on lies.

### *EXTORTION TEXTS*

126. In early May of 2015 COURSER and Gamrat and selected members of their families and friends began to receive disturbingly intimate extortion texts requiring COURSER and Gamrat to resign. Between May and August of 2015 over 100 such texts were received. The

texts displayed an intimate knowledge of their lives; their phone records, their communications, their travel, their pasts, and their family relationships.

## ILLEGAL SEATING ASSIGNMENTS – IN VIOLATION OF MCL 4.61

127.    On or about January 14, 2015, the day COURSER and Gamrat were to be sworn into office as members of the Michigan House of Representatives, COTTER held a Republican Caucus[15] immediately before the swearing in ceremony.

128.    It was during this Republican Caucus that COTTER and McBROOM (Dean of THE HOUSE) unethically and unlawfully violated the law on seat assignments, amounting to misconduct in office (MCL 750.505c).

129.    MCL § 4.61 (Act 58 of 1893) outlines a specific process for seat selection in THE HOUSE and requires that seating of new Representatives shall be selected by blind, random draw.

130.    The seat selection statute prevents seat selection from being used as a tool for bribery or punishment by those in power.

131.    The seat selection statute also prevents the Speaker from playing political games; such as preventing Representatives with similar values and affiliations from sitting together, which could be a potential threat to THE HOUSE leadership.

132.    During the pre-swearing in Republican Caucus, with the State Capitol filled with media and public and just minutes before the swearing in ceremony was about to begin, McBROOM informed the Republican Representatives that all Republican Caucus members would not be following Michigan's law of a randomly selected lottery on the seat assignments as

---

[15] A "Caucus" is when the Representatives from each party's membership meets together in a private room where they conduct meetings confidential from the public.

DePerno Law Office, PLLC ● 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) ● 269-353-2726 (fax)

outlined in MCL § 4.61; but instead, instructed all Republican Representatives that their seat had been pre-determined by McBROOM at the direction of COTTER.

133. This intentional action of violating the statute on seat selection amounted to misconduct in office by both COTTER and McBROOM. This action was a clear abuse of power and these intentional acts were part of the effort and conspiracy to deprive voters of representation and were done to gain unlawful power over the Representatives. Ultimately, this power was used to force the constructive expulsion of COURSER.

134. McBROOM, at the direction of COTTER, instructed the Representatives to remain silent regarding the seat violation. They were told that if any member told the public or violated the confidentiality of the Caucus, "it would not go well."

135. This was a clear threat. The Representatives were told (1) they could be removed from the Republican Caucus, (2) they could lose committee assignments, (3) any bills introduced by them could be sent to "dead" committees that never took them up, (4) they could lose office allowances, office space, staff expenses, and lose funding from lobbyists groups that tailor their support based on COTTER and THE HOUSE leadership recommendations.

136. This would destroy them politically. This was a clear abuse of their positions amounting to misconduct in office. All of this was done while the public waited for the Representatives to enter the chamber from the backroom and select their seats in what appeared to be in compliance with the statute.

137. Upon information and belief, the purpose of COTTER and McBROOM's seat assignment was the following: (1) deceive the public to make it appear that the seat selection process was conforming to MCL § 4.61 as a random lottery, even though the seating had already been determined by the leadership; (2) keep party members segregated by Democrats and

27

Republicans; (3) split up certain Representatives that COTTER did not want to "caucus" during sessions; (4) allow COTTER to select a "mentor" to sit with the new representatives, hand picking who COTTER wanted to "assist and influence" them with their questions and voting; and (5) allow the leadership to have the seats of their choosing.

138.    McBROOM also told the Republican Representatives, including COURSER and Gamrat, that time and expense had already been expended to set up the voting boards to correlate each Representative's name with the new assigned seat number that was enclosed in the envelope on their temporary desks.

139.    McBROOM and COTTER then instructed each Republican Representative, including COURSER and Gamrat, to request the seat number that was given to them in the envelope when they were called by the clerk of THE HOUSE. To the people in the audience, it would appear that the seats were being randomly selected.

140.    COURSER and Gamrat were alarmed that COTTER and McBROOM were directing them to unethically deceive the public on their very first day.

141.    COTTER and McBROOM's actions made it clear to COURSER and Gamrat that the Republican Representatives were expected to submit to COTTER's directions over their Districts or conscience.

142.    After these instructions, Gamrat stood for her first time in the Republican Caucus and respectfully addressed the leadership and her fellow Republican Representatives with her concerns that the process was not in line with State law.

143.    McBROOM quickly dismissed Gamrat's concerns in front of the Republican Caucus and proceeded with the illegal seating; unethically and unlawfully presenting the false seating chart to the public.

28

144.    These intentional, unlawful, and unethical directions from COTTER and McBROOM, along with a future pattern of their abuse of power, destroyed any trust COURSER had in the leadership of COTTER and McBROOM.

145.    These actions were illegal and amounted to misconduct in office by both COTTER and McBROOM in clear violations of law. Nevertheless, despite knowledge of these actions, the MSP and BRITVEC have refused to investigate. SCHUETTE has refused to issue charges. This amounts to selective prosecution, an abuse of power, violations of the equal protection clause of the United States Constitution and the Michigan Constitution, and has created a "pay-to-play" system of government. In a phrase, this seating violation and the conspiracy to cover it up, is political corruption.

146.    COTTER and McBROOM were forcing the rest of the Republican Representatives to conspire with them to defraud the public into believing that they had indeed complied with State Law. Speaking out meant (and continues to mean) that the Republican Representatives risked political retribution by COTTER and MCBROOM.

147.    COURSER later met with COTTER and asked that he correct the seating assignments.

148.    COURSER felt that COTTER had started down a path of hiding this illegal conduct. By forcing such capitulation, COTTER would later be able to force Republican Representatives to participate in whatever scheme was necessary to defraud the people of their liberties and their treasury. In other words, COTTER was building his "political capital" to spend later. The voters would be deprived of their right to representation.

149.    When COTTER refused to correct the violation, COURSER sent an email explaining to the public what COTTER had done.

DePerno Law Office, PLLC • 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) • 269-353-2726 (Fax)

150.    Upon information and belief, COURSER's comments and email infuriated COTTER and the Republican Caucus and was seen by COTTER and the Republican Caucus as a violation of confidentiality. This was grounds for removal from the Republican Caucus. It was clearly not seen by COTTER as an act of breaking State law or defrauding the voters who had entrusted each Republican Representative with their positions; but rather was an act of pay-to-play politics and "trading in influence".

151.    Upon information and belief, COTTER also met with Gamrat when she voiced opposition to the illegal seat assignments. She asked him to come forward with a remedy that would resolve the illegality of the situation.

152.    COTTER never remedied the situation but instead held it against COURSER and Gamrat for not falling in line with his instructions.

153.    Upon information and belief, other than COURSER and Gamrat, no other Representatives spoke up because to do so could mean retribution from COTTER.

154.    The expulsions on September 11, 2016 would be additional retribution by COTTER upon COURSER and Gamrat for their unwillingness to submit to his authority regarding their voting privileges as duly elected Michigan State Representatives of their respective Districts .

155.    After these events transpired, on or about January 14, 2015, COURSER and Gamrat were sworn into office as members of THE HOUSE, at which time they became employees of THE HOUSE.

DePerno Law Office, PLLC ● 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) ● 269-353-2726 (Fax)

**COTTER ABUSES HIS POWER AND AUTHORITY AGAIN AND DIRECTS REPRESENTATIVES TO CONCEDE THEIR VOTE TO HIM, VIOLATING MCL 750.122, 750.125, AND 750.505C**

156. On January 15, 2015, the day after being sworn into office, all Republican members were directed to attend an offsite Republican Caucus.[16]

157. At this initial off-site Caucus, COTTER forced the Republican Representatives to sign a secret pledge as a requirement for Republican Caucus membership (the "Caucus Pledge").

158. If a Republican Representative refused, he/she would not be allowed to be a part of the Republican Caucus in the State House.

159. The Caucus Pledge included promises to (a) notify COTTER through the Whip[17] any time the Representative would be voting no; (b) notify COTTER in advance of any major action on legislation or events; (c) stand with the Caucus (COTTER) on any difficult issues or votes; and (d) never tell the public about the Caucus Pledge.

160. The Caucus Pledge also required that everything said or done in Caucus was to remain confidential and secret, not to be revealed to the public, including the Caucus Pledge itself.

161. The Caucus Pledge – mandated by COTTER – amounted to misconduct in office by COTTER and was done to secretly garner political leverage over the Republican Representatives without the public having any knowledge that their representation was compromised. In other words, COTTER required that all Republican Representatives submit their voting privileges to his authority. The voters were denied their right to representation.

---

[16] There is a Republican and a Democrat Caucus that meets at times off-site of the Capitol and at times in the State House on State Property behind closed doors with the assistance of State paid employees – these meetings are not subject to FIOA.

[17] "Whips" are essentially a party's "enforcers," who typically offer inducements and threaten a parties' members to ensure that they vote according to the official party policy. The Whips would report back to COTTER and inform him how Representatives were going to vote on certain issues/bills before they were officially presented for vote on the House floor.

31

162.    COTTER was again building political capital through a pay-to-play system of political corruption.

163.    COURSER and Gamrat felt the Caucus Pledge clearly put the desires of COTTER ahead of the desires of the voters in their Districts, creating a situation where the Republican Representatives would be held secretly accountable to COTTER first and foremost above their Districts, which had the effect of turning them into government pawns pushing the agenda of COTTER.

164.    The requirement to sign the Caucus Pledge, imposed by COTTER, eliminated the independence of the Republican Representatives to represent their Districts without undue influence – this requirement forced Representatives to submit to COTTER or face both official and political retribution. Without signing the pledge the Republican Representatives would be in jeopardy of losing their office allotment, their committee assignments, their ability to bring a bill forward to be heard on THE HOUSE floor and their ability to politically receive funding for their future campaigns.

165.    Both COURSER and Gamrat were offended that they were being directed to hand over the votes of their Districts because the Caucus Pledge did a complete disservice to their constituents and their interests.

166.    Both COURSER and Gamrat felt that COTTER's directions with the Caucus Pledge were illegal and unethical. COURSER felt strongly that it was illegal and unethical for Representatives to be forced under the cloak of confidentiality to hand over the votes of his District to COTTER.

167.    COURSER and Gamrat refused to sign the Caucus Pledge, unless the Caucus Pledge was modified to put their Districts first before the Caucus. In fact, COURSER and

32

Gamrat shared their concerns with their colleagues that the Caucus Pledge put the Republican Caucus in priority ahead of their District.

168.    Upon information and belief, no other Representatives requested any modifications; but instead signed the Caucus Pledge as directed by COTTER.

169.    When COURSER refused to sign the Caucus Pledge, he was visited by COTTER and SWARTZLE and was pressured to sign. Upon information and belief, COTTER and SWARTZLE also visited Gamrat when she refused to sign the Caucus Pledge and pressured her to sign.

170.    COURSER was told by COTTER that he had to sign and turn in the Caucus Pledge before he could go home that day.

171.    COURSER then made modifications to the Caucus Pledge to put the people of his Districts first before the Republican Caucus. Only then did he sign the Caucus Pledge. Upon information and belief, Gamrat also made modifications to the Caucus Pledge before she signed it.

172.    Upon information and belief, COTTER took personal offense to this as an attack on his position as Speaker of the House.

173.    COTTER, by these actions, used his official position to garner personal and political advantage at the expense of the other Republican Representatives and the people of their respective Districts; depriving the voters of their right to representation.

174.    In their first two days in office, COURSER and Gamrat were directed by COTTER, McBROOM, and other members of THE HOUSE to participate in unethical and illegal activity, some of it directly affecting their representation of the voters of their District.

175. These unethical and illegal directions from COTTER prevented COURSER from being able to have trust in his leadership and directions.

176. By taking these actions, COTTER violated House Rule 74(2) when soliciting signatures for the Caucus Pledge which is clearly designed to influence the manner in which the legislator performs their duties.

177. House Rule 74(2) states, "A Member shall not use his or her position in any matter to solicit or obtain anything of value for himself or herself, house employees or any other Member, which tends to influence the manner in which the Member performs his or her official duties."

178. COTTER and McBROOM were abusing their authority by intentionally manipulating and disenfranchising the people's rights to uncorrupted representation in the Democratic process.

179. COTTER's actions of forcing, as a condition of membership in the Republican Caucus, the signing of a secret pledge of the votes of the Districts amounted to misconduct in office and violated House Rule 74(2).

180. The actions of COTTER and MCBROOM both during the seating assignment situation and also with regard to the Caucus Pledge amounted to using their positions to garner personal and political advantage and breaking both State law and THE HOUSE Rules. This is misconduct in office. This is "pay-for-play" politics and political corruption.

### THE "LIBERTY RESPONSE"

181. On January 22, 2015, COURSER and Gamrat responded publicly to Governor Snyder's State of the State address with their "Liberty Response", detailing their concerns about Proposal 15-1, a tax increase that the Governor and Republican establishment favored.

34

182.    Upon information and belief, after this Liberty Response, SAARI and SWARTZLE met with ALLARD, GRAHAM, and CLINE and informed them that it was improper behavior to oppose Proposal 15-1 "on taxpayer time." This was a "get in line" message delivered by COTTER through SAARI to COURSER and Gamrat through their staff.

183.    Each Representative was asked to support the passage of Proposal 1 by doing mailings paid for by State funds. The mailers clearly advocated for the passage of Proposal 1, even though COURSER opposed it. This amounted to the misuse of government taxpayer funds to advocate for increased taxes and spending because it was directed by COTTER behind the unethical and illegal veil created by the Caucus Pledge.

184.    COURSER did not send out the mailers paid for by State funds because the mailers were a deception on the taxpayers.

185.    Meanwhile, ALLARD, GRAHAM, and CLINE had (unbeknownst to COURSER), set up a political effort to defeat Proposal 15-1 in their own names and at their own direction. This was odd considering that they worked for COURSER and Gamrat. Nevertheless, they decided to fund a campaign through their own political company.

186.    ALLARD had also appeared on a television show called "Off The Record" and began raising money for his own political operation without approval or knowledge of COURSER.

187.    ALLARD had announced on "Off the Record" that he intended to raise 10 million dollars to defeat Proposal 15-1.

188.    By creating this political operation, GRAHAM, ALLARD, and CLINE demonstrated that they operated as political operatives outside of their day jobs as staffers at THE HOUSE.

35

189.    Once COURSER found out about his "staffer's" political efforts, he was concerned because it was understood by everyone in the office that all outside political efforts were supposed to be approved by COTTER as a requirement of employment with THE HOUSE.

190.    COURSER and Gamrat confronted ALLARD, GRAHAM and CLINE with concerns that they had not disclosed to them, or THE HOUSE, per THE HOUSE Rules, that they were pursing such a massive political effort while COURSER and Gamrat were working to get settled into their roles as newly elected State Representatives.

191.    These actions by ALLARD, GRAHAM, and CLINE demonstrated that their own political efforts on such a massive operation (that could interfere with their duties as staffers in Districts 80 and 82) would be put in front of the needs of the Districts.

### *COTTER, SAARI, AND THE HOUSE CONDUCT ILLEGAL SURVEILLANCE ON COURSER*

192.    Upon information and belief, unbeknownst to COURSER, during a period of time beginning almost immediately after he was sworn into office, ALLARD, GRAHAM, and CLINE began illegally taping COURSER's telephone, office, and personal conversations and they began accessing his personal emails and communications. They also broadcast access to COURSER's passwords and internal emails in the overall effort against COURSER. These actions by ALLARD, GRAHAM, and CLINE are described throughout this Complaint. Upon information and belief, these actions and illegal acts were also taken against Gamrat.

193.    The actions of each of the Defendants are so intertwined with the others that it is impossible to separate their efforts; these efforts must be construed as being the actions of an illegally integrated and cohesive conspiracy to remove COURSER (and Gamrat) from office and to develop a sensational story for personal gain and to further their political agendas.

194.    In fact, COTTER, SAARI, and SWARTZLE requested that ALLARD, GRAHAM, and CLINE act as listening agents to procure illegally obtained information

36

regarding COURSER and Gamrat. ALLARD, GRAHAM, and CLINE concurrently developed relationships with JOE GAMRAT, KRELL, HORR, LIVENGOOD, and the DETROIT NEWS to push the extortion ring outside of THE HOUSE. ALLARD, GRAHAM, CLINE, JOE GAMRAT, KRELL, and HORR also developed an illegal "electronic and physical net" surrounding COURSER and Gamrat to gather illegally obtained information and send it to THE HOUSE, COTTER, BOWLIN, SWARTZLE, SAARI, McBROOM, LaFONTAINE, VERHEULEN, BEYDOUN, HEISE, LIVENGOOD, and DETROIT NEWS for political and personal use and for illegal distribution. Further, COTTER, SAARI, and SWARTZLE required that ALLARD, GRAHAM, and CLINE act as agents in their effort to remove COURSER and Gamrat.

195.    Upon information and belief, ALLARD, even though he was assigned to Gamrat's office as staff by COTTER, was acting as COTTER's agent to procure evidence to further COTTER's goal of gathering damaging information against COURSER and Gamrat.

196.    ALLARD stated on November 2, 2015 that there was illegal wiretapping and eavesdropping within THE HOUSE office of Gamrat; yet he did not inform COURSER or Gamrat of this this illegal wiretapping and eavesdropping.

197.    Upon learning this information, neither the MSP, BRITVEC, or SCHUETTE conducted an investigation because it did not fit within their political agenda.

### *RADISSON HOTELS, RADISSON GROUP, AND CARLSON ASSIST IN EXTORTION, WIRETAPPING, INVASION OF PRIVACY, AND ILLEGAL SURVEILLANCE AND GRANTS ILLEGAL ACCESS*

198.    In the winter of 2015, at the beginning of the first term of office for COURSER and Gamrat, it came to the attention of COURSER and Gamrat that surveillance was being conducted on them at RADISSON HOTELS, RADISSON GROUP, and CARLSON.

37

199.   RADISSON HOTELS, RADISSON GROUP, and CARLSON, during all of 2015, broke numerous laws and acted in a malicious and grossly negligent manner when it allowed access to both COURSER and Gamrat's separate accounts with RADISSON HOTELS, RADISSON GROUP, and CARLSON and their separate rooms to further surveillance of the conspiracy and the extortion plot. For instance,

   a.   Fictitious emails were added to each of their personal RADISSON accounts several times compromising statements and access to their personal information.

   b.   An extortion text was sent to COURSER and Gamrat which revealed that staff members of the RADISSON were being paid to provide information, monitor COURSER and Gamrat's rooms, and provide physical access to their rooms.

   c.   Text messages from different co-conspirators revealed that certain Defendants had access to emails from the hotel, physical access to the rooms and updates from RADISSON staff on the rooms themselves – even after both COURSER and Gamrat met separately with the RADISSON management and were assured no information about their staying at the RADISSON was being broadcast, the information and access was still being provided to the Defendants.

   d.   The RADISSON staff were actively providing private information illegally to certain Defendants and hotel room access to certain Defendants.

   e.   Updates, provided to certain Defendants involved in the extortion plot by the RADISSON employees, included emails to the Defendants regarding hotel accounts, temperature of hotel rooms, lights in the hotel rooms, curtains in the hotel rooms, luggage placements in the rooms, listening devices, audio and video, as well as physical entry and exiting the hotel.

200.   Upon information and belief, Gamrat was told by RADISSON staff that her personal information, including reservations information, room number, and payment information were automatically sent to the unauthorized email addresses attached to her account.

38

201.     COURSER was told by RADISSON staff that his personal information including reservations information, room number, and payment information were automatically sent to the unauthorized email addresses attached to his account.

202.     Upon information and belief, later through a MSP investigation it was determined that certain Defendants and others were gaining illegal access to COURSER's RADISSON hotel rooms and hotel information via the staff of the hotel. Upon information and belief, the MSP also determined that that certain Defendants and others were gaining illegal access to Gamrat's RADISSON hotel rooms and hotel information via the staff of the hotel.

203.     Deleted texts taken from KRELL and JOE GAMRAT's phone by the MSP reveal the following texts in connection with the RADISSON surveillance:

a.     "I just think it's strange that both beds are used. I typically sleep in one and put my suitcase or bag on the other. You? Heat was high too which is just the way Cindy likes it."

b.     "Housekeeping usually makes both beds when they clean each day so both beds used yesterday?"

c.     "FYI She checked in at 1:29a and he checked in at 7:51a Tuesday morning."

d.     "Hotel room is considered private."

e.     "Hotel has now told me that his reservation is for Tuesday and Wednesday, not Monday and Tuesday. S"

f.     "By the way, he obviously didn't take a shower this am as the shower curtain was ""out"" of the tub? Must have had a bath last night?"

204.     COURSER and Gamrat each met separately several times with the managers of the RADISSON to share their concerns about the breach of security of their privacy.

205.     COURSER was assured that the failures and security breaches would not be repeated. However, COURSER's personal information continued to be released by the RADISSON. Upon information and belief, Gamrat was also assured that the failures and security

39

breaches would not be repeated. However, Gamrat's personal information continued to be released by the RADISSON

206.    Upon information and belief, Gamrat met with the RADISSON manager and was instructed to use an alias and pay in cash in order to protect her privacy.

### *ALLARD, GRAHAM, AND CLINE'S POOR WORK PERFORMANCE*

207.    By the end of January, issues with substandard work performance of ALLARD, GRAHAM, and CLINE were apparent. This substandard work performance is described throughout this Complaint.

208.    For example, on January 26, 2015, a request was sent to Gamrat's office from Michigan Radio offering Gamrat an opportunity to comment on their reports regarding an education series they were going to air the week of March 30, 2015. Gamrat served on the Education Appropriations committee and would have eagerly accepted the invitation.

209.    However, without notifying Gamrat of the opportunity, ALLARD instructed GRAHAM, "Just don't respond".

210.    In addition, upon information and belief, on February 5, 2015, a constituent contacted Gamrat's office to follow up on some information the constituent had sent Gamrat about fracking. However, GRAHAM and ALLARD both withheld this information and Gamrat was not made aware of it until later when Anne Hill was reviewing the communication files and brought it to Gamrat's attention.

211.    In addition, upon information and belief, on February 19, 2015, GRAHAM intercepted an invitation to an event from Representative Yonker's office sent to Gamrat's office. GRAHAM sent ALLARD a message saying, "Should/Will Cindy go to this?" However, neither GRAHAM nor ALLARD notified Gamrat about the event.

DePerno Law Office, PLLC • 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) • 269-353-2726 (fax)

212. Upon information and belief, ALLARD, GRAHAM, and CLINE were not properly filing important legislative documents.

213. ALLARD, GRAHAM, and CLINE would regularly leave the office in disarray with scattered papers and trash.

214. Substandard work issues with ALLARD, GRAHAM, and CLINE continued and worsen in many ways; including, but not limited to: (a) not communicating with many constituent contacts to COURSER and Gamrat; (b) at times not responding to directions or emails regarding legislation; (c) at times failing to keep official calendars accurate and up to date (for instance, having COURSER or Gamrat being the only one to show up for a committee hearing that had been canceled by the Chair); and (d) at times failing to follow through on basic administration of major legislative projects.

215. Upon information and belief, during her time serving as State Representative, Gamrat contacted Bob Genetski, former State Representative of District 80 a number of times seeking his advice on dealing with the poor work performance of ALLARD, GRAHAM, and CLINE.

216. Upon information and belief, Representative Genetski gave Gamrat advice during the calls and later submitted testimony to BOWLIN regarding this in the House Business Report.

217. COURSER and Gamrat continued to try to find solutions to improve the work performance of ALLARD, GRAHAM, and CLINE given their personal friendships, to allow them in good faith a time of adjustment to their new jobs.

218. Even so, COURSER and Gamrat had a number of discussions regarding possible solutions to the continuing substandard work from ALLARD, GRAHAM, and CLINE.

DePerno Law Office, PLLC • 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) • 269-353-2726 (Fax)

219.    COURSER had erroneously assumed these staff had the intentions and desire to perform for his district admirably. COURSER did not know at the time that ALLARD, GRAHAM and CLINE were intentionally deceiving COURSER (and Gamrat) in the following ways and more particularly described herein: (a) ALLARD, GRAHAM, and CLINE had been regularly meeting secretly with COTTER, SAARI and SWARTZLE, (b) ALLARD, GRAHAM, and CLINE had made multiple requests for alternative employment from COTTER, SAARI and SWARTZLE; (c) ALLARD, GRAHAM, and CLINE were being held in their staff positions in order to investigate COURSER and Gamrat (including placing illegal wiretapping and listening devices) for COTTER, SAARI and SWARTZLE as they built political ammunition against COURSER and Gamrat; and (d) ALLARD, GRAHAM, and CLINE were regularly and covertly communicating official and personally information about COURSER and Gamrat to outside sources such as JOE GAMRAT and to COTTER, SAARI, and SWARTZLE.

220.    As the work of ALLARD and GRAHAM continued to decline, COURSER and Gamrat began to interview for new staff on March 20, 2015. However, over the following months, ALLARD, GRAHAM, and CLINE resisted attempts to bring in or train new staff hired by THE HOUSE to fill the needs of the District 80 and 82 offices.

221.    A tipping point was reached for COURSER when ALLARD, GRAHAM, and CLINE failed to inform him that a VA meeting in Muskegon was canceled; and COURSER drove across the state in a snow storm for 5 hours only to be told that the event was canceled the week before. Neither ALLARD, GRAHAM, nor CLINE would take responsibility for this major scheduling failure. CLINE was the point person for COURSER's scheduling with ALLARD overseeing.

DePerno Law Office, PLLC • 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) • 269-353-2726 (Fax)

222.    Upon information and belief, unbeknownst to COURSER and Gamrat at this time ALLARD, GRAHAM, and CLINE continued to seek new job positions in THE HOUSE but COTTER's office continued to refuse their transfers and insisted on being kept informed about the details surrounding both COURSER and Gamrat; a tactic used to get information that could then be used by COTTER on his political enemies.

223.    If THE HOUSE, COTTER, BOWLIN, SAARI, SWARTLZE, BEYDOUN, or McBROOM were meeting with ALLARD, GRAHAM, and CLINE to obtain information for official purposes, then THE HOUSE, COTTER, BOWLIN, SAARI, SWARTLZE, BEYDOUN, or McBROOM or their team or designees would not have had to meet off-site and would have informed COURSER and Gamrat of the meetings, the accusations of the staff and taken steps to address it. This is also true for SWARTZLE and BEYDOUN who were acting as attorneys for COURSER.

224.    THE HOUSE, COTTER, BOWLIN, SAARI, SWARTLZE, BEYDOUN, McBROOM, ALLARD, GRAHAM, and CLINE intentionally withheld from COURSER and Gamrat that these meetings were taking place as well as the content and context and accusations being collected and formulated against them.

225.    Upon information and belief, in March and throughout the spring of 2015, SAARI continued to meet secretly with ALLARD, GRAHAM, and CLINE in order to gather information about COURSER and Gamrat.

226.    During this time, ALLARD and GRAHAM refused to come to work on certain days or to do the tasks to service the Districts. This was later documented by the other staff members later in the "House Business Report."

43

227.    Upon information and belief, SAARI continued to direct that ALLARD and GRAHAM keep COTTER and THE HOUSE informed while at the same time SAARI and COTTER continued to promise ALLARD and GRAHAM that they would work on other employment advancement.

228.    Upon information and belief, during this time, ALLARD and GRAHAM continued seeking other positions in THE HOUSE but COTTER and THE HOUSE refused any transfer, wanting to keep ALLARD and GRAHAM in a position to illegally record conversations and report back to him.

229.    On June 3, 2015, after ALLARD and GRAHAM met with SAARI and SWARTZLE, they received raises from the House Business Office. These raises were approved by COTTER and THE HOUSE.

230.    Upon information and belief, COTTER, SAARI, and SWARTZLE were using ALLARD, GRAHAM, and CLINE in order to gain political ammunition to stop COURSER and Gamrat from impeding COTTER's progressive legislative agenda of increased spending and taxes.

231.    Throughout this time, COURSER did not know that ALLARD, GRAHAM, and CLINE and possibly others, were secretly monitoring his communications, following him, and disseminating that information, including private emails that were between family members. Certainly, COURSER did not know this illegal surveillance and conspiracy was directed by COTTER, SAARI, SWARTZLE, THE HOUSE, JOE GAMRAT, KRELL, HORR, and others.

232.    Throughout this time, issues regarding work productivity and quality of ALLARD and GRAHAM continued to worsen.

44

233.    COURSER saw evidence of ALLARD and GRAHAM skipping work and covering for each other.

234.    Many times when ALLARD and GRAHAM were in the office, they would leave the lights off and the doors locked, making it look like the office was unmanned.

235.    GRAHAM was also found in COURSER's back office with the lights off and the door locked. GRAHAM would sleep in COURSER's back office with the lights off and the door locked during regular business hours.

236.    ALLARD and GRAHAM did a poor job at following through on official projects and important tasks for the District offices such as the bookmark contest project for students to encourage reading.

237.    GRAHAM took home boxes to be delivered to the libraries of District 82 and he never delivered them. He left early to perform the task but didn't complete the delivery and then kept it hidden until it was found out after he had been fired by COTTER.

238.    Upon information and belief, Gamrat received a complaint from another representative that ALLARD had been treating him disrespectfully.

239.    On one occasion, ALLARD drew a pornographic cartoon during a staff meeting and intentionally left the very graphic cartoon for female staffers to find.

240.    Many other work performance issues related to GRAHAM and ALLARD were also documented by other staff in the office along with COURSER and Gamrat and included in the House Business Report.

241.    COURSER and Gamrat discussed making a request to THE HOUSE to transfer ALLARD and GRAHAM but did not feel they could do that until new staff were trained to replace them.

45

*EXTENT OF THE CONSPIRACY AND EXTORTION PLOT; MOTIVES*

242. ALLARD, GRAHAM, and CLINE acted as employees and co-conspirators of the THE HOUSE, COTTER, BOWLIN, SWARTZLE, SAARI, McBROOM, LaFONTAINE, VERHEULEN, BEYDOUN, and HEISE under the leadership and direction of COTTER, SAARI, and SWARTZLE to gather information against COURSER and Gamrat and furthered their efforts with assistance both from and to JOE GAMRAT, KRELL, HORR, and RADISSON HOTES, RADISSON GROUP, and CARLSON.

243. Upon information and belief, from at least the summer of 2014, JOE GAMRAT was undermining Gamrat's political endeavors by secretly texting and calling supporters, colleagues and friends with disparaging remarks about her in order to undermine her politically and professionally; some of this was done directly and some was done under fictitious names and phones.

244. In fact, JOE GAMRAT and KRELL planted as many as a dozen listening devices and GPS tracking devices in her car and tracked her phone, all done to undermine Gamrat and her efforts to become a Michigan State Representative and to later force her to resign from the position.

245. Upon information and belief, during the length of the extortion plot, Gamrat (not knowing it was indeed partly her husband who was sending the disturbing texts) confided to him several times that she was so distraught over the extortion texts and the demands that she was considering killing herself.

246. JOE GAMRAT stated to another co-conspirator at that time, "hopefully I don't have to find her body in the house."

247. ALLARD stated to JOE GAMRAT, "I want to take this moment and scare the fucking shit out of them."

46

248. ALLARD also stated to JOE GAMRAT and other Defendants just after meeting with COTTER's team that "now that we are here the first thing we need to do is get COURSER impeached."

249. JOE GAMRAT and KRELL formed alliances within THE HOUSE and with ALLARD, GRAHAM, CLINE, and HORR who acted as a surveillance team for other Defendants.

250. ALLARD, GRAHAM and CLINE, partnered with JOE GAMRAT, KRELL, and HORR and participated both in conducting and directing illegal wiretapping and eavesdropping; they also sent and received information from illegal wiretapping and eavesdropping from JOE GAMRAT and other co-conspirators.

251. JOE GAMRAT and KRELL also planted listening devices in their home, their bedroom, Gamrat's car, her campaign headquarters, and finally her official government office. He passed his surveillance information to ALLARD, GRAHAM, CLINE, and COTTER and they in turn passed back their surveillance to him. This conducted was illegal and violated Michigan's eavesdropping and wiretapping statutes; for example, MCL 750.539c, 750.539d, and 750.539e.

252. JOE GAMRAT and KRELL were also accessing and downloading Gamrat's live calls, voicemails, emails (personal, professional, and political). He did all of this while he was publicly claiming his innocence to the media and to MSP, BRITVEC, BREWER, DWYER, and SCHUETTE; and lying to Gamrat.

253. In fact, while he was conducting this illegal surveillance, JOE GAMRAT acted the part of a supportive and loving husband, standing at her side during a press conference.

DePerno Law Office, PLLC • 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) • 269-353-2726 (Fax)

254. Upon information, Gamrat sought help from law enforcement in 3 separate counties – all directed her back to MSP and BRITVEC and she was told repeatedly by MSP and BRITVEC that there was not a prosecutor or law enforcement office in the state that would help her. Certainly, the MSP and BRITVEC refused to investigate.

255. Upon information and belief, the extortion texts came from a phone registered to LIVENGOOD. Upon information and belief, the phone used in the extortion plot was placed in LIVENGOOD's name in May of 2015.

256. The person in possession of the phone, possibly HORR or JOE GAMRAT texted that he was in possession of audio and video tapes from the RADISSON of COURSER and Gamrat and that if COURSER and Gamrat did not resign that LIVENGOOD would "get it all"; including what ALLARD and GRAHAM had acquired on COURSER and Gamrat.

257. In fact, ALLARD and GRAHAM later delivered the illegal wiretap tape to LIVENGOOD and the DETROIT NEWS in August of 2015, in violation of MCL 750.539d and 750.539e.

258. Upon information and belief, this eventually led to Gamrat fearing for her life, extreme emotional and mental torment and destruction of her life including being afraid to live in her own house and it forced her for a time to living in her car in Wal-Mart/Meijer parking lots out of fear of being recorded.

259. The Defendants' false statements and lies about COURSER concerning misconduct in office, misuse of taxpayer resources, and lies concerning forcing staff to cover up his relationship and forge signatures destroyed his reputation both personally and professionally, as well as destroyed his law practice, nearly costing him his law license, and has done irreparable harm to his family and his life; forcing him to endure two separate criminal actions in two

separate counties, a grievance commission investigation, a Michigan Unemployment Audit, and actions by the Michigan Secretary of State.

260. JOE GAMRAT and KRELL's communications to ALLARD, GRAHAM and CLINE were not revealed to COURSER and Gamrat because ALLARD, GRAHAM and CLINE were benefiting from JOE GAMRAT and KRELL's illegal surveillance and JOE GAMRAT and KRELL were benefiting from the illegal surveillance of ALLARD, GRAHAM and CLINE. LIVENGOOD and the DETROIT NEWS benefited from the illegal surveillance. HORR also benefitted from the illegal surveillance.

261. ALLARD, GRAHAM and CLINE were seeking promotions within THE HOUSE from the very first moments of January of 2015 – in their first meetings and throughout their efforts of providing illegally obtained information to THE HOUSE, COTTER, BOWLIN, SWARTZLE, SAARI, McBROOM, LaFONTAINE, VERHEULEN, BEYDOUN, and HEISE they were requesting promotions.

262. COTTER, SAARI, and SWARTZLE were seeking information to further their own political agenda and were using their official positions over ALLARD, GRAHAM and CLINE and the potential of further employment to force them to continue the surveillance on COURSER and Gamrat (a violation of numerous state and federal laws).

263. JOE GAMRAT and KRELL were furthering the conspiracy to force COURSER to resign from office.

264. HORR and KRELL were a co-workerd of JOE GAMRAT and illegally conspired in the extortion plot to force COURSER and Gamrat to resign.

265. The person in possession of the phone, possibly HORR or JOE GAMRAT texted that he was in possession of audio and video tapes from the RADISSON of COURSER and

49

Gamrat and that if COURSER and Gamrat did not resign that LIVENGOOD would "get it all"; including what ALLARD and GRAHAM had acquired on COURSER and Gamrat.

266.   Upon information and belief, HORR and JOE GAMRAT sent over 100 extortion texts to further the extortion plot to force COURSER and Gamrat to resign through this phone.

267.   HORR, KRELL, and JOE GAMRAT hid their involvement from police.

268.   HORR, KRELL, and JOE GAMRAT later destroyed the phone from which the extortion texts were sent, obstructing the investigation.

269.   Upon information and belief, HORR, KRELL, and JOE GAMRAT sought out ways to cover the tracks of their involvement and were counseled to destroy the phone.

270.   On August 31, 2015, THE HOUSE, COTTER, BOWLIN, SWARTZLE, SAARI, McBROOM, LaFONTAINE, VERHEULEN, BEYDOUN, and HEISE published a report called the "Report on the Investigation of Alleged Misconduct by Representative Todd Courser and Representative Cindy Gamrat" (the "HBO Report"). The statements set forth in this report were based on the illegally obtained wiretapping and eavesdropping conspiracy by the Defendants including lies concerning felonious conduct by COURSER, misconduct in office, misuse of taxpayer resources, forced forgery, forcing staffers to lies, retribution against employees, and extortion and blackmail.

271.   This report also rebroadcast the illegally obtained information, in violation of MCL 750.539d and 750.539e.

272.   Between August of 2015 and December of 2015 LIVENGOOD and the DETROIT NEWS published a series of articles that included repeated rebroadcasting of the lies from the HBO Report and also rebroadcast of the illegally obtained information. These articles (based in part on illegally acquired information) were based on the illegally obtained wiretapping

50

and eavesdropping conspiracy by the Defendants including lies embodied in the HBO Report, lies concerning felonious conduct by COURSER, misconduct in office, misuse of taxpayer resources, forced forgery, forcing staffers to lies, retribution against employees, and extortion and blackmail.

273. LIVENGOOD and the DETROIT NEWS violated the wiretapping and eavesdropping statutes and furthered the extortion conspiracy by using illegally obtained tapes of COURSER, that were made by GRAHAM at the direction of ALLARD, THE HOUSE, COTTER, SAARI, SWARTZLE, McBROOM, BEYDOUN (and potentially other Defendants), in a series of media stories. LIVENGOOD and the DETROIT NEWS violated MCL 750.539d and 750.539e.

274. The DETROIT NEWS made millions of dollars in additional sales. These stories were broadcast around the world through every major media outlet worldwide.

275. LIVENGOOD works as a reporter for the DETROIT NEWS and benefited by becoming an overnight media figure. He was invited on multiple media programs and received awards for his articles related to COURSER and Gamrat. He personally benefited from the defamatory statements in these stories.

  a.  LIVENGOOD was named as the person to whom the phone that sent the extortion texts was registered.

  b.  LIVENGOOD met with ALLARD, GRAHAM and CLINE.

  c.  It was stated by HORR and JOE GAMRAT that ALLARD and GRAHAM had other audio and video, which they would provide to LIVENGOOD if COURSER and Gamrat did not resign, including illegally obtained tapes, emails, and other materials.

  d.  ALLARD and GRAHAM provided the illegally obtained tapes to LIVENGOOD and the DETROIT NEWS, who then ran them in a series of news stories in the DETROIT NEWS in September 2015 and after, just as HORR and JOE GAMRAT stated they would.

DePerno Law Office, PLLC • 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) • 269-353-2726 (Fax)

276. MSP, BRITVEC, BREWER, DWYER, and SCHUETTE were motivated to lock down the investigation and hide the evidence that showed that the extortion was anything more than a jealous husband. In fact, texts that were eventually released by MSP, BRITVEC, BREWER, DWYER, and SCHUETTE, after many months of demands, showed that ALLARD and GRAHAM were conducting surveillance on COURSER and Gamrat while under THE HOUSE government employment and direction by the THE HOUSE, COTTER, BOWLIN, SWARTZLE, SAARI, McBROOM, LaFONTAINE, VERHEULEN, BEYDOUN, and HEISE.

277. Upon information and belief, much of the information and evidence obtained by MSP, BRITVEC, BREWER, DWYER, and SCHUETTE has never been released.

278. MSP, BRITVEC, BREWER, DWYER, and SCHUETTE have refused to investigate or even ask any of the Defendants of their involvement in the extortion plot, their illegal surveillance, their illegal wiretapping and eavesdropping, and their misuse of taxpayer resources in their extortion actions; even after testimony at the preliminary hearing proved that information was obtained illegally.

279. MSP, BRITVEC, BREWER, DWYER, and SCHUETTE have refused requests from COURSER and Gamrat to have the evidence released that showed some of the Defendants had been conducting surveillance on State time to further the extortion plot and their political goals.

280. It took months and an order from a judge to force the evidence to be released. Yet upon and information and belief, they have still refused to allow COURSER access to evidence to defend himself against criminal charges; including, but not limited to, access to phone information acquired, emails acquired, computer download information acquired and a great many more items acquired thru and during the multiple investigations surrounding these events.

52

This has denied COURSER his right to access the evidence against him and is a "Brady Violation" by SCHUETTE. This has done irreparable and ongoing harm to COURSER.

281.     Republican Select Committee Members – MCBROOM, HEISE, VERHULEN, and LaFONTAINE, all who voted to expel COURSER and Gamrat, were motivated by their pledge to vote with COTTER under the Caucus Pledge. In fact, they were obligated to vote with COTTER. By pledging their vote to COTTER, these Representatives were reduced to government bureaucrats involved in government corruption. All four of these Defendants sold their votes to COTTER, which represents misconduct in office and political corruption.

282.     Other Republican HOUSE Caucus Members who voted to expel COURSER were motivated by their pledge to vote with COTTER under the Caucus Pledge, even if they had to violate COURSER's Constitutional Rights.

### *BILL 4006*

283.     On February 18, 2015 Representative HEISE sponsored HB 4006 which would allow the government to ping and locate a personal cell device without a warrant or notifying the owner of the phone.

284.     COURSER (along with Gamrat) believed HB 4006 violated the privacy and Constitutional protections of the people.

285.     COTTER determined that HB 4006 had enough legislative support in THE HOUSE to pass. COTTER scheduled the bill to come to THE HOUSE floor for a vote.

286.     As he had promised the voters of his District and the State of Michigan, COURSER sent out a legislative alert on HB 4006.

287.     Within 24 hours, calls and emails flooded into THE HOUSE offices from voters concerned about HB 4006.

DePerno Law Office, PLLC • 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) • 269-353-2726 (Fax)

288.    Upon information and belief, this pressure from the voters around the state with awareness of HB 4006, caused HB 4006 to lose support from a number of Representatives.

289.    Nearly overnight, the support of HB 4006 deteriorated and it was not brought to THE HOUSE floor for a vote.

290.    Upon information and belief, the direct effort of COURSER and Gamrat to alert the public had a direct impact in stopping Representative HEISE's bill HB 4006 from passing.

291.    Upon information and belief, Representative HEISE personally took offense against COURSER and Gamrat for stopping his bill and carried this animosity towards them into his role as a member of the Select Committee formed in August to recommend expulsion for COURSER and Gamrat.

292.    Upon information and belief, the Members of THE HOUSE, including COTTER, recognized the direct impact COURSER and Gamrat had through their communications with the public.

### COTTER BREAKS RULE 41

293.    COTTER abused his authority and violated HOUSE Rule 41 in an effort to undermine COURSER and Gamrat's legislative efforts. This was misconduct in office.

294.    Later COURSER and Gamrat were charged criminally with breaking "House" Rule 41. During later sworn testimony, it was confirmed that COTTER had broken the same House rule, but was never charged.

295.    During her campaign, Gamrat promised her constituents that the first bill she would enter into legislation would be a "Life at Conception" bill.

296.    On Thursday, February 26, 2016 Gamrat entered to the Clerk's office, HB 4279 and followed through on the promise to her constituents. Gamrat entered her first bill as a legislator called the "Life at Conception" Act.

54

297.    Gamrat obtained over 20 co-sponsors on her first bill.

298.    Upon information and belief, COTTER was offended by her efforts because Gamrat did not get his permission to enter this bill as the Caucus Pledge directed Republican Representatives to do.

299.    COTTER used his illegal influence of the "Caucus Pledge" and took steps to immediately block Gamrat's bill and to destroy her politically within the Caucus, in her District, and across the State.

300.    Upon information and belief, COTTER personally contacted Representatives who had signed HB 4279 and demanded that they take their names off the bill. Almost all of them did so.

301.    Although COTTER had Gamrat's personal cell number and email, he did not contact Gamrat personally to address any concerns, offer any remedies, or let Gamrat know he was directing Representatives to remove their names from her bill.

302.    Upon information and belief, Gamrat was notified about COTTER's actions when she received a call from a fellow Representative while on her way to Lansing for the next Tuesday's session.

303.    When Gamrat arrived to session on March 4, 2015 she approached the Clerk to inquire why her bill was not receiving its first reading as was required under House Rule 41(4). Upon information and belief, the clerk informed Gamrat that COTTER had directed him to withhold the reading and committee appointment of her bill into the House Journal of First Readings in order to give more time for Representatives to remove their names as co-sponsors of her bill.

55

304. HOUSE Rule 41(4) states, "The Speaker shall refer all bills and joint resolutions to a standing committee no later than one House legislative day after being submitted to the clerk."

305. In violation of HOUSE Rule 41, COTTER did not allow Gamrat's bill, HB 4279, to be read and assigned to committee until Wednesday, March 5, 2015.

## COURSER AND GAMRAT CONTINUE THEIR CONSERVATIVE AGENDA

306. COTTER, using his illegally obtained power and influence over the Republican Representatives from the Caucus Pledges signed by the Representatives, stated that Representatives should not openly object nor advocate against the Governor's plan of Proposal 15-1.

307. Upon information and belief, THE HOUSE, COTTER, BOWLIN, SWARTZLE, SAARI, McBROOM, LaFONTAINE, VERHEULEN, BEYDOUN, and HEISE were upset with COURSER and Gamrat because they would not support Proposal 15-1 and vote "yes" on increasing taxes.

308. COURSER and Gamrat, who served on multiple committees, spent many hours reading and studying Michigan's budget and felt there were many places within the budget that could be streamlined or cut to cover funding for the roads.

## CLINE RESIGNS

309. In a private conversation, COURSER and Gamrat discussed asking THE HOUSE to reassign CLINE due to continued work performance issues.

310. Unbeknownst to COURSER and Gamrat; ALLARD, GRAHAM, and CLINE were illegally "listening" to this communication and receiving intercepted conversations between them. These intercepted communications violated the wiretapping and eavesdropping statutes.

56

311.    Upon information and belief, through these illegal wiretaps, CLINE was "tipped off" about COURSER and Gamrat's dissatisfaction with his work.

312.    Upon information and belief, on April 14, 2014, CLINE, without warning, quit his position before he was potentially fired by THE HOUSE.

313.    Upon information and belief, CLINE then tried to get another job with THE HOUSE but no one would hire him.

314.    On or about April 15, 2015 COURSER and Gamrat instructed ALLARD and GRAHAM to remove CLINE's privileges and passwords to all legislative calendars, emails, and any other access.

315.    Upon information and belief, GRAHAM and ALLARD disregarded these instructions and continued to give CLINE access to unauthorized accounts.

***COTTER REMOVES GAMRAT FROM CAUCUS***

316.    On April 15, 2015, Gamrat spoke on the Capitol lawn at an event opposing Proposal 15-1 funding.

317.    On or about April 16, 2015, Gamrat posted a message on Facebook[18] questioning the fiscal responsibility of the establishment Republican budget, which was led by COTTER and Representative Pscholka.

318.    Upon information and belief, in retaliation of Gamrat's speech on the Capitol lawn and her Facebook post regarding her disappointment with the proposed Republican budget, COTTER removed Gamrat from the Republican Caucus.

319.    Gamrat was removed from the Republican Caucus without notice, without a vote from the members, and without giving Gamrat an opportunity to address the members.

---

[18] "Listening to subcommittees reviewing their budget. How do we get to free market solutions when our starting point is Medicaid and more and more government programs being funded, from daycare to dental programs to planned parenting."

57

320. At this time, Gamrat was leading in the polls for Republican National Committeewoman above the other candidates by a wide margin and was within reach of taking the seat of National Committeewoman for the Republican Party; however, COTTER's actions which brought a storm of immediate negative news media in her district and around the state helped kill her opportunity for Republican National Committeewoman.

321. Upon information and belief, in order to justify his actions, COTTER conducted an interview with LIVENGOOD from the DETROIT NEWS. COTTER told LIVENGOOD that he removed Gamrat because of a "series of leaks of confidential information." This statement was knowingly false.

322. LIVENGOOD then printed a story stating that Gamrat's removal was due to a series of leaks of confidential information. No evidence was ever provided to support the story.

323. Upon information and belief, Gamrat personally requested that COTTER publicly correct this misrepresentation. COTTER refused to publicly correct his public misrepresentation of Gamrat, which led the news on television and in the paper in Gamrat's district for the next several weeks.

324. COTTER never produced any evidence to support his statements of "leaks of confidential information." As a result of COTTER's false statements, Gamrat's voters and fellow Representatives wrongly believed that she was regularly leaking confidential information from the Republican Caucus.

325. Upon information and belief, COTTER's retaliation blacklisted Gamrat from her colleagues and caused Gamrat's poll numbers for Republican National Committeewoman to drop.

58

326. COTTER repeated his statements, without providing any evidence, within the Caucus, regarding the Gamrat "leaks". This amounted to illegal misconduct in office by COTTER. It also demonstrated COTTER's willingness to attack another Caucus member who did not follow his orders and demands.

327. Upon information and belief, COTTER's retaliation helped kill Gamrat's opportunity as the Republican National Committeewoman.

328. Upon information and belief, on April 19, 2015 in good faith, Gamrat reached out to COTTER by sending an email requesting to meet regarding her removal from Caucus. COTTER refused to meet with Gamrat or give her an opportunity to discuss solutions to the incident until nearly a month later, intentionally using his official position as Speaker of the State House to illegally and unethically further the damage to her reputation. This amounted to illegal misconduct in office by COTTER.

### COURSER AND GAMRAT SPEAK AGAINST THE INCREASED SPENDING IN THE NEW PROPOSED BUDGET

329. On April 23, 2015, COURSER and Gamrat were panelists at the Ottawa County Patriots event to speak against Proposal 15-1.

330. The majority of the people of COURSER's district were against Proposal 15-1 and COURSER was working hard to represent his district. Nevertheless, his efforts infuriated COTTER because they were contrary to his and the Governor's progressive agenda.

331. On April 23, 2015, in anticipation of Proposal 15-1 being voted down by the voters, COTTER formed a new HOUSE panel to pass a new road bill without the need for a vote by the people.

DePerno Law Office, PLLC ● 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) ● 269-353-2726 (Fax)

332.    On April 26, 2015, former HOUSE staff member CLINE informed a member of COTTER's staff that COURSER was going to be sending out an email regarding the upcoming budget legislation that would be voted on soon.

333.    Upon information and belief, ALLARD or GRAHAM were the person or people who passed on this official and confidential information from COURSER's office to CLINE (who was no longer on staff in the office and should not have had access to this information). Nevertheless, CLINE continued to act as an agent ferrying information between the various co-conspirators.

334.    The referendum on Proposal 15-1 was held on May 5, 2015 and was defeated by the voters (approximately 20% of Michigan citizens voting "yes" and 80% voting "no").

### *COURSER FIGHTS PROPOSAL 1*

335.    COURSER was in a daily conflict with COTTER's intention to assist the Governor in the passing of Proposal 1 and the largest budget in State history and the highest proposed tax increase in 40 years. COURSER refused to "get permission" from COTTER for these activities and this infuriated THE HOUSE, COTTER, and McBROOM.

336.    COURSER sent out emails to thousands of supporters to energize their actions against COTTER and the Governor's proposal.

337.    COURSER did media interviews to explain to the voters that there was plenty of money in the largest budget in State history to fund the roads, and that in reality COTTER and the Governor were really attempting to divert taxpayer funds to Obamacare.

60

*GAMRAT SPEAKS OUT AGAINST BUDGET*

338.  On April 28, 2015 Gamrat entered over 25 Amendments to the Omnibus Budget[19] legislation during its second reading.

339.  COTTER directed that all Amendments be gaveled down and not allowed a vote.

340.  On April 28, 2015, Gamrat spoke on the House floor against the budget which increased spending of taxpayer dollars and actually cut funding needed for the roads.

341.  By cutting funding for the roads in the budget, COTTER and other Republican supporters set a platform to discreetly pass tax hikes that were disfavored by the people.

*COTTER DEMANDS REPRESENTATIVES WHO OPPOSE PROPOSITION 1 REMAIN SILENT. PRESSURE BEGINS FOR REPRESENTATIVES TO SUPPORT TAX INCREASE LEGISLATION*

342.  After Proposal 15-1 was defeated, COTTER released his new proposal to fund road improvements on or about May 13, 2015. This new package was generally referred to as the "House Road Package" and consisted of House Bills 4605 through 4616. The House Road Package later consisted of House Bills 4370, 4614, 4616, 4736, 4737, 4738, and Senate Bill 414.

343.  The House Road Package drew fierce criticism from Democrats, human welfare organizations, and some business groups.

344.  Among other provisions, the House Road Package proposed raising the tax on diesel fuel, increasing vehicle registration fees, and increasing the motor fuel tax.

345.  The House Road Package also drew criticism from COURSER and Gamrat who opposed the tax and fee increases as they had promised their constituents they would do if elected.

346.  At the time COTTER released his proposed House Road Package, there were 63 Republicans and 46 Democrats in the House.

---

[19] The Omnibus Budget is a spending bill that consists of many smaller appropriations spending bills and generally sets forth the governmental spending allotted for the year.

DePerno Law Office, PLLC • 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) • 269-353-2726 (Fax)

347.     In May 2015 THE HOUSE was not close to passing the House Road Package, and Republican leadership began to intensify the pressure on getting the votes and cutting deals to get the necessary votes.

348.     As the legislative season progressed COURSER and Gamrat continued to be vocal opponents of the House Road Package, against COTTER's wishes.

### CONSPIRACY, ALLIANCES, AND UNDERCOVER SURVEILLANCE OPERATIONS

349.     During this time, GRAHAM and ALLARD alone, or in conjunction with others, gained access to COURSER and Gamrat's cellular phone, text messages, emails, and calendars without COURSER or Gamrat's permission.

350.     GRAHAM and ALLARD were illegally and secretly recording conversations involving COURSER and Gamrat.

351.     In some cases, GRAHAM and ALLARD were admittedly not part of the recorded conversations.

352.     In some cases, those people directing GRAHAM and ALLARD to record the conversations were not part of the recorded conversations.

353.     Upon information and belief, GRAHAM, ALLARD, or others were recording the conversations at the request of THE HOUSE leadership; including COTTER, McBROOM, SAARI, and/or SWARTZLE.

354.     On a number of occasions, ALLARD commented to COURSER and Gamrat and other staff that the District 80 office was "bugged".

355.     Upon information and belief, these illegally obtained recorded conversations, stolen communications, text messages, and the information therein, were delivered by the staffers to THE HOUSE, COTTER, BOWLIN, SWARTZLE, SAARI, McBROOM, LaFONTAINE, VERHEULEN, BEYDOUN, and HEISE.

DePerno Law Office, PLLC • 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) • 269-353-2726 (Fax)

356.    Some of this information was then used in an effort to force COURSER and Gamrat, to resign.

357.    Upon information and belief, although no longer an employee of THE HOUSE, CLINE continued to be copied on emails and had password access to COURSER's email accounts, in direct violation of state and federal law.

358.    Upon information and belief, CLINE acted as a go-between for ALLARD, GRAHAM, JOE GAMRAT, KRELL, HORR, COTTER, SAARI, and SWARTZLE

359.    ALLARD, GRAHAM, and CLINE had also been secretly communicating with JOE GAMRAT, on a regular basis; without knowledge of COURSER and Gamrat.

360.    Unbeknownst to COURSER or Gamrat, an alliance had been formed between ALLARD, GRAHAM, CLINE, and JOE GAMRAT, who became another participant in the conspiracy that stemmed from COTTER's office through the staff to JOE GAMRAT and HORR; then to LIVENGOOD at the DETROIT NEWS. The information that was gleaned was eventually used in a series of extortion texts sent by "trigger man" HORR.

361.    The MSP report details that ALLARD, GRAHAM, and CLINE were involved in the plot before, during, and after each text was sent.

362.    During the time of these secret meetings and recordings, COURSER and Gamrat did not know that ALLARD, GRAHAM, and CLINE had also been secretly communicating with JOE GAMRAT, on a regular basis.

363.    ALLARD, GRAHAM, and CLINE kept these communications hidden from COURSER.

DePerno Law Office, PLLC • 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) • 269-353-2726 (Fax)

*EXTORTION EFFORT BEGINS TO FORCE COURSER AND GAMRAT TO RESIGN*

364.    During this time COURSER and Gamrat began receiving what would be a series of anonymous extortion texts demanding that COURSER and Gamrat resign from office; which included personal and confidential information such as live call conversations, texts, information from private emails, and GPS locations of them and their families.

365.    Later in the fall of 2015, the MSP discovered that extortion texts were sent from a phone that was in the possession of HORR, whom neither COURSER nor Gamrat had ever met.

366.    The MSP reports shows that ALLARD, GRAHAM, and CLINE were regularly communicating with JOE GAMRAT, who was relaying information they gathered to HORR and KRELL for the texts.

367.    The MSP report also shows that JOE GAMRAT was in communication with THE HOUSE.

368.    The MSP and BRITVEC police report also documented the constant communication between ALLARD and JOE GAMRAT before, during, and after the extortion texts. All these communications intentionally kept hidden by ALLARD and GRAHAM from COURSER; including the following:

> a.    May 16, 2015: HORR sent a text to JOE GAMRAT at 6:38 A.M. stating: "Burner phone audio evidence time to have an impartial party (ME!) reach out to Courser camp",
>
> b.    May 16, 2015: JOE GAMRAT responded at 6:46 A.M. asking, "How quick is the turn around on the audio do you think?"
>
> c.    May 16: 2015: HORR responded at 6:46 A.M., "Not sure."
>
> d.    May 19, 2015: Police report shows that ALLARD calls JOE GAMRAT at 3:57 P.M. during work time on a session day. The call lasts about 31 minutes.
>
> e.    May 19, 2015: Police report shows that at 4:28 P.M., JOE GAMRAT calls ALLARD. The call lasts about 42 minutes.

64

f.      May 19, 2015: Police report shows that JOE GAMRAT and HORR have communications back and forth.

g.      May 19, 2015: Police report shows extortion texts sent to Gamrat at 9:23 P.M.

h.      May 19, 2015: Police report shows extortion "burner phone" calls Gamrat's Lansing office at 9:30 P.M. and 9:32 P.M.

i.      May 19, 2015: Police report shows that JOE GAMRAT and HORR communicate at 9:34 P.M. and 9:36 P.M.

j:      May 19, 2015: Police report shows that Gamrat and COURSER receive extortion text at 9:41 P.M. which reads, "Boo! The phone is a burner . . . don't bother trying."

k.      May 19, 2015: Police Report shows that Gamrat and COURSER receive extortion text at 9:44 P.M. that reads, "Cindy sounds like she is great in the sheets. You however, have no stamina."

l.      May 19, 2015: Police Report shows that Gamrat and COURSER receive extortion text at 10:30 P.M. which reads, "Extortion texts to Todd and Cindy – Silence in this case can be VERY detrimental. Careers, political arena and of course families, Georgeann, Joe, Fon, Dan . . . whew, it could be disastrous really, and of course the kids."

m.      June 30, 2015: JOE GAMRAT sent a text to ALLARD at 1:07 P.M. stating, "It isn't a lie if she meets with him for lunch. He 'is' a friend. If that happens I need a picture of the cars or something if he can do it. Thanks."

n.      June 30, 2105: JOE GAMRAT sent another text to ALLARD at 11:52 P.M. asking, "Did you know where they were suppose to stay tonight? Or where the event sent them up? Thx."

o.      July 5, 2015: ALLARD sent a text to JOE GAMRAT at 3:05 P.M asking, "Can I call you later today or evening." JOE GAMRAT replied, "Yes."

o.      July 8, 2015: JOE GAMRAT sent a text to ALLARD at 7:01 P.M. stating, "I told Cindy I would be 2+ hours tip home so not sure what you're going to text her. Maybe we can discuss that message when you get here?"

369.    Without having the knowledge of their covert and deceptive activities, COURSER and Gamrat felt compelled to recommend a raise for ALLARD and GRAHAM due to the increase workload of having only 2 staff members for 2 offices due to CLINE's departure.

DePerno Law Office, PLLC • 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) • 269-353-2726 (Fax)

370.    Upon information and belief, also on May 19, 2015, GRAHAM and ALLARD submitted requests for pay increases to THE HOUSE.

371.    Also on May 19, 2015, at the direction of ALLARD; GRAHAM secretly recorded an off-site, private after-hours conversation with COURSER at his law office where GRAHAM and CLINE still ran their political consulting business Bellwether Strategies, LLC.

372.    COURSER requested to meet with GRAHAM in his capacity as a consultant as COURSER had done numerous times before, at his office and in the evening, seeking advice on dealing with these extortion texts and a difficult personal situation, not knowing that GRAHAM was part of the conspiracy or that he would record the meeting.

373.    The MSP and BRITVEC police report shows that GRAHAM called CLINE before the meeting and went to his home immediately following. Unbeknownst to COURSER, GRAHAM was accessing his personal information in his personal email account and broadcasted items to other co-conspirators.

374.    CLINE stated during the investigation that GRAHAM called him regarding COURSER's request to meet and that he discussed with GRAHAM whether he should tape his meeting with COURSER. GRAHAM taped the conversation. This is illegal wiretapping, eavesdropping, and conspiracy. However, MSP, BRITVEC, and SCHUETE have refused to investigate or prosecute these claims.

375.    ALLARD, who was the direct supervisor over GRAHAM at the time of the taping of COURSER, stated multiple times that he directed GRAHAM to tape COURSER during the meeting. This is illegal wiretapping, eavesdropping, and conspiracy, However, MSP, BRITVEC, BREWER, DWYER, and SCHUETTE have refused to investigate or prosecute these claims.

66

376. After GRAHAM left COURSER's private office and his own private office, GRAHAM played the tape to CLINE and ALLARD. This act was illegal.

377. This illegally obtained information was then used in the extortion texts by HORR, JOE GAMRAT and rebroadcast by LIVENGOOD and the DETROIT NEWS.

378. MSP and BRITVEC stated in secret police tapings that they believed ALLARD directed GRAHAM to tape the conversation and also stated that ALLARD, GRAHAM, and CLINE were involved in the extortion plot against COURSER and Gamrat. However, they refused to charge any crime.

379. The MSP and BRITVEC police report shows that communication between ALLARD, GRAHAM, CLINE, and JOE GAMRAT continued surrounding the time frame of the extortion texts; which HORR and KRELL sent.

380. There were also other texts that were deleted from the phones of HORR and JOE GAMRAT that were later recovered that also show evidence of stalking and extortion:

      a. (from HORR's phone): "Yes, actually just got off the phone. And what I can't tell you is get rid of it. But if you get rid of it, you wouldn't be doing it for me.

      b. (from HORR's phone): "I did this for 14 years with Target as a lead investigator . . . intrigues me even now, and I'm co-authoring the made-for-TV mini series . . . I wouldn't call it fun yet though."

      c. (from HORR's phone): "There may come a time to confess but stay strong."

      d. (from HORR's phone): "I worked wayyy to hard to buy a house for Amy and I only to have this bullshit happen . . . brainstorm some outs for me . . . helping a friend, he paid for everything, zero motive on both parts (he simply wanted them to break it off and separate offices and staff) . . . fear of retaliation.

381. Other deleted texts from HORR's phone suggest he was working directly with individuals other than JOE GAMRAT that were involved in the conspiracy against COURSER:

a.  (from HORR's phone): "If Joe told him I did, he would have simply asked…I think he already knows where it was bought and maybe by whom…leading questions…mabey he's wondering why in the world would I use it…hence his "did you give joe the phone?"

382.  Many of these communications occurred during the day when ALLARD and GRAHAM were working for THE HOUSE and paid by THE HOUSE to conduct surveillance in furtherance of the conspiracy:

a.  May 20, 2015: Police report shows ALLARD calls or texts JOE GAMRAT at 3:15 P.M. (during work hours).

b.  May 20, 2015: Police Report shows COURSER and Gamrat receive extortion text at 3:20 P.M. that reads, "Relax. I'm not leaking anything . . . yet. Pay people better to keep quiet. I pay them better for info. #Radisson"

c.  May 20th, 2015: Police Report shows at 3:39 P.M. JOE GAMRAT calls ALLARD. The call lasts for 9 minutes.

d.  May 20, 2105: Police report shows that at 4:16 P.M. JOE GAMRAT calls GRAHAM.

e.  May 20, 2015: Police report shows that at 4:23 P.M., COURSER and Gamrat receive text from extortionist that reads, "Let me make this CRYSTAL CLEAR. I need some open dialogue. I've heard from you Cindy...better tell Todd to man up. As long as I'm appeased, my cargo will never reach port so to speak. Can I please get confirmation."

383.  BRITVEC said there were 255 communications between ALLARD and JOE GAMRAT. BRITVEC also stated that ALLARD might be named as the extortionist. BRITVEC also stated that he believed ALLARD directed GRAHAM to tape COURSER. ALLARD was the Chief of Staff over GRAHAM and CLINE. However, no charges were ever brought against these "key" witnesses.

384.  Upon information and belief, the next day, on May 21, 2015, ALLARD and GRAHAM met with SAARI, SWARTZLE, and COTTER again to provide secretly recorded information from GRAHAM's private meeting with COURSER and to provide information harvested from COURSER's private email account.

68

*COTTER AND HIS TEAM CONTINUE TO HAVE INFORMANT MEETINGS WITH ALLARD AND GRAHAM; THESE MEETINGS ARE HIDDEN FROM COURSER AND GAMRAT*

385.    During this time, ALLARD and GRAHAM refused to come to work on certain days or to do the tasks to service the District. This was later documented by the other staff members later in the HBO Report.

386.    COURSER later discovered, through an email sent by someone else, that the staff members engaged in this illegal activity were ALLARD and GRAHAM, working in conjunction with COTTER, to secretly provide the leadership with new information regarding both COURSER and Gamrat.

387.    SAARI continued to demand that ALLARD and GRAHAM keep COTTER informed. SAARI and COTTER continued to promise ALLARD and GRAHAM that they would work on other employment. ALLARD and GRAHAM continued to gather information on COURSER and Gamrat.

388.    During this time, ALLARD and GRAHAM continued to seek other positions in THE HOUSE but COTTER refused any transfer, wanting to keep ALLARD and GRAHAM in a position to illegally record conversations and report back to him.

389.    On June 3, 2015, after ALLARD and GRAHAM met with SAARI and SWARTZLE, they received raises from the House Business Office. These raises were approved by COTTER.

390.    COURSER would regularly see SAARI on the House floor each week during session.

391.    SARRI never revealed to COURSER anything about his meetings with ALLARD and GRAHAM nor about the allegations they were claiming against COURSER.

DePerno Law Office, PLLC ● 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) ● 269-353-2726 (Fax)

392. COURSER would regularly see COTTER on the House floor each week during session.

393. COTTER never revealed to COURSER anything about his meetings with ALLARD and GRAHAM nor about the allegations they were claiming against COURSER.

394. The meetings between COURSER's staff and THE HOUSE leadership were unusual. Other staff had worked in Lansing for years without ever meeting privately with COTTER's office.

395. ALLARD, GRAHAM, and CLINE continued as informants to COTTER's team to give COTTER political ammunition to stop his greatest impediments to passing a series of bills that increased spending and taxing and undermined his authority as leader of THE HOUSE.

396. ALLARD, GRAHAM, and CLINE continued to secretly and illegally monitor COURSER's communications and whereabouts and broadcast this information, including but not limited to: accessing and broadcasting their private emails, following them to take pictures and then broadcasting that information to others. Some of this information were private conversations between family members.

397. Many of ALLARD, GRAHAM, and CLINE's monitoring activities were done on State time, as agents of COTTER in furtherance of the conspiracy.

398. ALLARD received communication from other Defendants to follow and take pictures of COURSER and Gamrat's vehicles.

399. This monitoring activity was done without knowledge or authorization of COURSER.

DePerno Law Office, PLLC ● 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) ● 269-353-2726 (Fax)

400.   The surveillance activity conducted by COTTER, SAARI, SWARTZLE, ALLARD, GRAHAM, and CLINE on State time and using State resources was a misuse of taxpayer dollars.

401.   The surveillance conducted by COTTER, through his directions to his agents and employees, SAARI, SWARTZLE, ALLARD, GRAHAM, and CLINE was an abuse of his position and misconduct in office.

402.   Fair process and procedures along with fiduciary responsibility dictate that the allegations made by ALLARD and GRAHAM along with their meetings with COTTER, SAARI, and SWARTZLE, should have been revealed to COURSER and Gamrat, at multiple occasions over the months they served, in order that they could be afforded the opportunity to take the appropriate steps to address them.

### *COTTER ABUSES HIS POWER IN THE LEGISLATIVE PROCESS BY TARGETING COURSER AND GAMRAT. COTTER ACTS WITH GROSS NEGLIGENCE.*

403.   It became very clear that COTTER had decided to treat COURSER differently than the other Representatives because he would not fall in line as COTTER demanded.

404.   COURSER believed he should work to follow through on his campaign promises that he made to the people in his District; however COTTER seemed only interested that COURSER do his bidding, regardless if it ran contrary to COURSER's conservative platform.

405.   COTTER abused his authority with how COURSER was treated. COTTER, SAARI, and SWARTZLE acted with malice and gross negligence; amounting to gross misconduct.

406.   When Representatives supported COTTER and his policies, they were handed bills that COTTER gave the green light to go through the legislative process. Having bills passed plays a big role in helping the Representatives get re-elected.

71

407.   For example, upon information and belief, when Gamrat asked Representative Barrett how many bills he had passed already as a Freshman legislator, he responded, "Four, they give me the easy ones because of the District I live in."

408.   COURSER and Gamrat's staff were instructed by COTTER to take days off and close District 80 and 82 offices so they could knock on doors and politically campaign for Representatives loyal to COTTER.

409.   COURSER and Gamrat's bills were not allowed to be heard in committee and none of their bills were allowed a vote. Every attempt was made by COTTER to thwart any legislation from COURSER and Gamrat to move through the process.

410.   In an attempt to put forward a road solution which did not raise taxes, COURSER and Gamrat put in motion a series of bills that would fund the highway without any increases in taxes. These bills were H.B. 4317 and 4318.

411.   These bills were sent to the "death committee" called "governmental affairs", which was known as the committee where bills were sent to "die" and frequently used to "hold up" legislation. The "government affairs" committee met during the term but never allowed COURSER's legislation to come up for a hearing or vote.

412.   COTTER was using his official position as leader of THE HOUSE to single out and destroy the legislative efforts of COURSER and Gamrat and using his power over the staff to build political capital against them.

413.   COTTER used the bill assignment process to effectively kill COURSER and Gamrat's legislation in retribution for their efforts during the term to stop COTTER from passing a highway package that included a tax increase.

72

414.    In essence COTTER used his official position to alienate and eliminate all chances of COURSER and Gamrat from having any legislative accomplishments in their first term.

415.    In spite of other bills under the same topic area being sent to other committees, COURSER and Gamrat bills were being singled out and pushed into the "death committee."

416.    Once COURSER was unlawfully and forcibly removed from office, his "Straight Party Ticket" bill was taken out of the "death committee" and given to other sponsors and passed through THE HOUSE by COTTER.

417.    Once Gamrat was unlawfully and forcibly expelled, her "Constitutional Carry" bills were given to other sponsors and are allowed to proceed through THE HOUSE by COTTER.

## ISSUES WITH ALLARD AND GRAHAM'S WORK PERFORMANCE MOUNT.

418.    Throughout this time, issues regarding work productivity and quality of ALLARD and GRAHAM continued to worsen.

419.    COURSER saw evidence of ALLARD and GRAHAM skipping work and covering for each other.

420.    Many times when ALLARD and GRAHAM were in the office, they would leave the lights off and the doors locked, making it look like the office was unmanned.

421.    ALLARD and GRAHAM did a poor job at following through on official projects and important tasks for the district offices such as the bookmark contest project for students to encourage reading.

422.    Upon information and belief, Gamrat received a complaint from another representative that ALLARD had been treating him disrespectfully.

73

423.    Many other work performance issues related to GRAHAM and ALLARD were also documented by other staff in the office along with COURSER and Gamrat and included in the House Business Report.

424.    It is now known that ALLARD and GRAHAM engaged in the illegal activity, working in conjunction with other Defendants to secretly provide the leadership with new information regarding both COURSER and Gamrat.

425.    Even though ALLARD and GRAHAM had been making their allegations for months, they and COTTER, SAARI, SWARTZLE and BOWLIN, purposefully hid these allegations and their meetings from COURSER and Gamrat.

426.    Fair process and procedures along with fiduciary responsibility dictate that the allegations made by ALLARD and GRAHAM along with their meetings with COTTER, SAARI, and SWARTZLE, should have been revealed to COURSER and Gamrat, at multiple occasions over the months they served, in order that they could be afforded the opportunity to take the appropriate steps to address them.

### NEW STAFF PLACED IN THE DISTRICT 80 AND 82 OFFICES; ALLARD AND GRAHAM WORK PROBLEMS CONTINUE

427.    ALLARD and GRAHAM were employees of COTTER, being directed by COTTER. ALLARD and GRAHAM's objectives were to win the approval of COTTER, SAARI, and SWARTZLE so as to procure further employment by COTTER.

428.    In May, 2015, COURSER and Gamrat requested that their staff be separated.

429.    COTTER placed Karen Couture as a staff member of COURSER's office and Anne Hill as a staff member of Gamrat's office.

74

430.    ALLARD and GRAHAM were alerted through illegal surveillance and recordings that COURSER and Gamrat were asking the House Business Office to move or replace ALLARD and GRAHAM.

431.    In response, ALLARD and GRAHAM attempted to conduct off-site meetings with Anne Hill. These meetings were initiated by ALLARD and GRAHAM in order to push out the new staff members and force COURSER and Gamrat to rely only on ALLARD and GRAHAM.

432.    ALLARD and GRAHAM resisted separating the staff overlap and did not take any real steps to implement the process until weeks later; just before they were terminated.

433.    ALLARD and GRAHAM preferred to spend most of their time hanging out together in the offices.

434.    Ms. Hill and Ms. Couture, with their many years of office and management experience, were a huge help in assisting and administering the two offices, given all of the work issues that were still ongoing with GRAHAM and ALLARD.

435.    For example, upon information and belief, GRAHAM haphazardly scheduled Gamrat's "coffee hour"[20] on the Memorial Day holiday and did not realize it before it was too late to reschedule it.

436.    ALLARD and GRAHAM entered the wrong addresses of events that COURSER and Gamrat were supposed to attend, making them late to a number of events.

437.    Constituents complained that the office was not responding to their calls and emails. Many of the complaints were from contacts not documented by ALLARD or GRAHAM.

***ALLARD INITIATES AND CONTINUES THE FLOW OF INFORMATION WITH THE EXTORTIONISTS***

[20] A "coffee hour" is an opportunity for the public to meet and discuss matters with Representatives at various locations around their District, rather than travel all the way to Lansing, Michigan to voice concerns.

75

438. The MSP police report details that most of the communications between ALLARD and JOE GAMRAT were initiated by ALLARD.

439. Many of these communications ALLARD initiated took place during the day (work hours):

    a.    June 3, 2015: (A Session or work day) - Police report shows at 9:12 A.M. ALLARD calls JOE GAMRAT and the call lasts about 19 minutes;

    b.    June 3, 2015: Police report shows at 9:40 A.M. JOE GAMRAT called ALLARD which lasts about 12 minutes;

    c.    June 3, 2015: Police report shows at 3:03 P.M. JOE GAMRAT calls/texts ALLARD, contact lasts about 26 seconds.

    d.    June 3, 2015: Police report shows ALLARD calls/texts JOE GAMRAT at 4:43 P.M., contact lasts about 26 seconds.

    e.    June 3, 2015: Police report shows at 5:43 P.M. ALLARD calls/texts JOE GAMRAT, contact lasts about 3 seconds

    f.    June 4, 2015: Police report shows at 8:39 A.M. ALLARD calls JOE GAMRAT, call lasts about 9 minutes.

    g.    June 9, 2015: at 7:58 A.M. ALLARD calls JOE GAMRAT, call lasts about 12 minutes.

    h.    June 11, 2015: Police report shows at 4:28 P.M. ALLARD calls JOE GAMRAT, call lasts about an hour and 10 minutes;

    i.    June 15, 2015: Police report shows at 11:10 A.M. ALLARD calls JOE GAMRAT, call lasts about 22 minutes;

    j.    June 18, 2015: Police report shows at 8:59 A.M. ALLARD calls JOE GAMRAT, call lasts about 22 minutes.

440. Between June 22, 2015 and July 6, 2015, the police report shows ALLARD had 21 separate communications with JOE GAMRAT; 13 that ALLARD himself initiated. These communications lasted over a total of 408 minutes.

DePerno Law Office, PLLC ● 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) ● 269-353-2726 (Fax)

*ALLARD AND GRAHAM THREATEN NEW STAFF*

441.    Ms. Hill and Ms. Couture reported that ALLARD and GRAHAM intentionally created obstacles in the training of Ms. Hill and Ms. Couture; driving them to lean on each other and the various HOUSE staff to get trained and caught up to speed.

442.    On June 7, 2015, in frustration, Gamrat sent an email to ALLARD and GRAHAM outlining some of the multiple issues in their work that continued to go uncorrected.

443.    In this June 7, 2015 email, Gamrat also reiterated her desire to separate the overlap of a joint staff.

444.    Upon information and belief, it was evident by everyone in the office that the work of ALLARD and GRAHAM was detrimental to the functioning of the office.

445.    In June 2015, COURSER and Gamrat had conversations together that once Anne Hill and Karen Couture were trained and "up to speed" with the administration of the offices, that they would make a request to BOWLIN to transfer ALLARD and GRAHAM from their respective District offices.

446.    Upon information and belief, GRAHAM and ALLARD realized they were not going to be able to continue to get away with the things they had been doing and the way they had been doing them, including their surveillance activities, skipping work, and sloppy work habits.

447.    On July 2 2015, seeing Anne Hill as a threat to their jobs, ALLARD and GRAHAM, under false pretenses, removed Anne Hill from the office to do an off-site meeting on the Capitol lawn.

448.    Later that day, Ms. Hill called Gamrat, upset and stating that she felt ALLARD and GRAHAM were trying to intimidate her into leaving.

77

449. Upon information and belief, Ms. Hill was not comfortable discussing her concerns at the office because ALLARD had told her that the office was "bugged."

450. Gamrat agreed to speak with Ms. Hill about the incident off site at a place of her choosing where she was more comfortable.

451. COURSER and Gamrat met with Ms. Hill to discuss the improper meeting directed by ALLARD and GRAHAM.

452. During this meeting many concerns about the work performance of ALLARD and GRAHAM surfaced and were relayed to COURSER and Gamrat from Ms. Hill.

453. Ms. Hill shared that in her experience of nearly 30 years of management, she felt that ALLARD and GRAHAM were not only incompetent but were intentionally causing harm, dysfunction, and disruption in the office. Ms. Hill said in her opinion she believed they were acting in an effort to sabotage the offices.

454. COURSER and Gamrat decided that it was time to bring in the House Business Office to address these matters with ALLARD and GRAHAM.

### *ALLARD AND GRAHAM ARE FINALLY TERMINATED*

455. On July 6, 2015, Gamrat approached BOWLIN and asked how to deal with issues regarding staff.

456. Pursuant to House Rule 9, which states that the Speaker (COTTER) has the sole authority to hire or fire any staff members, BOWLIN, the designee of COTTER, terminated the employment of ALLARD and GRAHAM.

457. On July 6, 2015, BOWLIN escorted ALLARD to his office; whereby BOWLIN notified ALLARD that COTTER and THE HOUSE were terminating his employment.

78

458. On July 6, 2015, BOWLIN also escorted GRAHAM to his office; whereby BOWLIN notified GRAHAM that COTTER and THE HOUSE were terminating his employment.

459. At this time, COURSER did not know that the January and February 2015 meetings between SAARI, SWARTZLE, COTTER, ALLARD, and GRAHAM had taken place, nor of the directives from COTTER and his team.

460. Upon information and belief, on July 6, 2015 just hours after their termination, ALLARD and GRAHAM again met with BOWLIN, SAARI, and SWARTZLE (via phone conference) and again reported information and discussed COURSER and Gamrat, including accusations of misuse of taxpayer dollars.

461. SWARTZLE was at all relevant times the attorney for COURSER yet acted against COURSER's interests for his entire term in office; conspiring with ALLARD, GRAHAM, and CLINE and not informing COURSER of the accusations being made against them.

462. Even after months of secret meetings and allegations between ALLARD, GRAHAM, CLINE, SAARI, SWARTZLE, COTTER, and BOWLIN, at no time was COURSER ever approached by leadership or Human Resources with concerns or complaints about the processes and procedures in his office, until COTTER demanded the investigation on August 7, 2015 immediately following the DETROIT NEWS release.

463. During the time between July 6, 2015 and August 6, 2015, after GRAHAM and ALLARD were terminated, at no time did Human Resources or leadership approach COURSER with concerns or issues regarding the processes and procedures of his office.

DePerno Law Office, PLLC • 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) • 269-353-2726 (Fax)

464. After the termination of ALLARD and GRAHAM, the office of COURSER ran much smoother and constituent issues were addressed more quickly and appropriately than ever before.

### *ALLARD AND GRAHAM FOLLOW THROUGH ON THE EXTORTIONISTS THREATS AND SET MEDIA STORM IN MOTION TO DESTROY COURSER AND GAMRAT*

465. In early August 2015, ALLARD, GRAHAM, CLINE, JOE GAMRAT, KRELL, and HORR followed through on the threat to take their illegal tapes of COURSER to LIVENGOOD and the DETROIT NEWS.

466. The extortion texts threatened to expose personal information in the media, specifically to destroy COURSER and Gamrat, if they did not resign. Some of this information was illegally obtained.

467. It was ALLARD, GRAHAM, and other Defendants who put in motion the media campaign against both COURSER and Gamrat.

468. COURSER and Gamrat received a text from the extortionist on July 8, 2015 at 1:00 P.M. that read, "Wow! Firing staff...be careful, the boys have A TON on you...they know everything. I saw you recently. Flint then near Great Lakes Crossing later. You guys are easy but idiots. Oh the Speaker is meeting with me on 8/3."

469. The phone used to send this text was registered in the name of LIVENGOOD.

470. On August 3, 2015, COURSER was first notified by LIVENGOOD that he was writing a story about COURSER and GAMRAT; the same day the extortionist confirmed he would be meeting with COTTER.

471. In September of 2015, LIVENGOOD and the DETROIT NEWS did a series of articles and then LIVENGOOD did multiple interviews claiming that COURSER had committed misconduct in office by misusing state resources. However, COURSER was never charged with

80

misusing state resources, even after 9 months of investigation by THE HOUSE, COTTER, BOWLIN, SWARTZLE, SAARI, McBROOM, LaFONTAINE, VERHEULEN, BEYDOUN, HEISE, LIVENGOOD, DETROIT NEWS, MSP, BRITVEC, BREWER, DWYER, and SCHUETTE.

472.    Upon information and belief, on or prior to August 3, 2015, GRAHAM, ALLARD, and CLINE fraudulently and intentionally reported information to LIVENGOOD and the DETROIT NEWS that they knew was false, inaccurate, and/or misleading about COURSER. This caused irreparable harm to COURSER including the destruction of his reputation, such as:

    a.    that COURSER retaliated against GRAHAM for not sending an email;

    b.    that COURSER misused taxpayer resources;

    c.    that COURSER required ALLARD and GRAHAM to do political work on state time

473.    The stories written by LIVENGOOD and the DETROIT NEWS were extremely detrimental to COURSER and were based upon the accusations from ALLARD and GRAHAM that were later determined to be false.

474.    The DETROIT NEWS and LIVENGOOD stories included false and misleading accusations from ALLARD and GRAHAM in order to paint a false and misleading persona of COURSER.

475.    The DETROIT NEWS and LIVENGOOD broadcast illegally obtained taped conversations of COURSER to the public, in violation of wiretapping and eavesdropping statutes.

476.    The DETROIT NEWS and LIVENGOOD issued the story knowing the information was false and that the recordings were done illegally and with malice and they were grossly negligent in using the illegally obtained recordings by GRAHAM and ALLARD.

81

477.    Given the severity and scandalous nature of the claims against COURSER, LIVENGOOD and the DETROIT NEWS were very aware that his story would explode and be picked up around the State and nation.

478.    On August 7, 2015 at 3:59 P.M., COURSER received a text that read, "It went global fast. Resign NOW Todd and Candy has asked...ASKED. You too Cindy, spare the kids and Joe. Resign, both of you, TODAY. Chad has scratched the surface...Ben has lots of audio...intriguing, damning. I have steamy audio, pics, video from DC. Resign, or Chad gets it all."

## COTTER CALLS FOR HIS OWN AGENTS AND CO-CONSPIRATORS TO INVESTIGATE COURSER AND GAMRAT

479.    Within moments of the DETROIT NEWS article breaking on August 7, 2015, COTTER requested and directed the House Business Office, specifically BOWLIN, to "investigate" and prepare a report on alleged misconduct by COURSER and Gamrat. COTTER did not ask the Sergeant at Arms to conduct the investigation of the alleged misconduct.

480.    Upon information and belief, COTTER and SWARTZLE had forewarned knowledge about the DETROIT NEWS and LIVENGOOD article before it was released.

481.    COTTER illegally acted as a police investigator.

482.    BOWLIN, at the direction of COTTER, did an investigation into the alleged misuse of taxpayer resources. He based his report, which was approved by COTTER, on the unsubstantiated and knowingly false testimony of ALLARD, GRAHAM, and CLINE. Weeks after the expulsion votes, in a secret MSP/BRITVEC/SCHUETTE interview, BOWLIN called ALLARD and GRAHAM "f'ing liars"[21] who were not to be trusted, but by then it did not matter,

---

[21] "But since everyone was denying that they even knew, at least at certain times, it was we never knew, then it's we knew in February, then it's we didn't know, this is Allard and Graham, then we knew this

82

because COURSER had been forced to resign and the new "highway funding bill" had been passed by 1 vote. This information was not part of the HBO Report.

483.    Upon information and belief, at the direction of COTTER, both BOWLIN and SWARTZLE stated (totally contradicting their committee testimony) in the secret MSP/BRITVEC/SCHUETTE tapes, that there was no illegality found in their investigation of COURSER.

484.    SWARTZLE also stated in the secret MSP/BRITVEC/SCHUETTE tapes that there was no forgery by COURSER, totally contradicting the report presented to the public and to the other members of THE HOUSE.

485.    Before THE HOUSE investigation, Gamrat had asked Chief Dixon to investigate the extortion plot; however, Chief Dixon turned the investigation over to BOWLIN, an employee of COTTER with no law enforcement authority.

486.    BOWLIN was acting totally under COTTER and THE HOUSE's authority. BOWLIN was given no law enforcement authority to investigate and had no subpoena power to compel testimony or evidence.

487.    BOWLIN refused to investigate the extortion plot, stating that it was "immaterial".

488.    BOWLIN then had ALLARD and GRAHAM interviewed together for the official investigation.

489.    In order to remove COURSER, COTTER was directing BOWLIN to investigate the very conspiracy that COTTER had put in place, yet none of the co-conspirators were investigated for their role in the conspiracy and BOWLIN refused to investigate the extortion.

after the husband told us and then well we didn't know definitively until he talked to us in May, I was like you're f'ing liars."

83

Case 1:16-cv-01108 ECF No. 1 filed 09/08/16 PageID.84 Page 84 of 182

490. This was done despite the fact that HOUSE staff had been involved in the secret meetings.

491. In essence, BOWLIN was investigating his own handling of the matter for COTTER, including his own terminations of ALLARD and GRAHAM.

492. Shortly after COTTER called for the investigation, the computers and property in COURSER's office were illegally seized, without a warrant. This included computers used by ALLARD, GRAHAM, and CLINE and which contained illegal wiretapping and eavesdropping information, recordings, and emails.

493. COURSER was never granted access to these items or the evidence from these items for either his defense during the ensuing expulsion hearing or the criminal cases against him.

494. Upon information and belief, this information on these computers has disappeared.

495. COURSER was not read his rights or "mirandized" even though BOWLIN knew at the beginning of his investigation that he was conducting a criminal investigation and COTTER was acting as law enforcement.

496. Upon information and belief, in October of 2015, after the expulsion votes were complete, BOWLIN stated during his interview with the MSP/BRITVEC that during the "investigation" BOWLIN asked COTTER and other Members how low they wanted the bar to be set for the expulsion of COURSER.[22]

---

[22] "In my mind on that issue the bar was pretty questionable as to what had to be the level for expulsion and I said to the people that I talked to, the members that I talked to, as to how low do you want that bar to be for a member's behavior to be set, it wasn't in the constitution as to be felonious behavior but where do you want that bar to be. They set it the way they wanted to set it but that wasn't my decision."

DePerno Law Office, PLLC • 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) • 269-353-2726 (Fax)

497.    BOWLIN also later stated that he wanted more time to investigate but COTTER and THE HOUSE refused, only giving him a rushed two weeks to investigate.

498.    Upon information and belief, the HBO Investigation was not fair and impartial.

499.    Upon information and belief, prior to the expulsion votes, COTTER was aware that SCHUETTE was already investigating COURSER. SCHUETTE was also aware that COTTER was investigating COURSER. Yet SCHUETTE allowed COTTER to illegally obtain information, without a warrant, because he knew he could then get that information from COTTER.

500.    COTTER turned over illegally seized information to SCHUETTE, which SCHUETTE then used to prosecute COURSER.

501.    Upon information and belief, shortly after COTTER called for the investigation, BOWLIN directed staff members Anne Hill and Karen Couture to report directly and only to him.

502.    Upon information and belief, as part of the investigation, BOWLIN conducted a series of interviews with several of the key players but never recorded the interviews, but instead asked two staff members to "take notes".

503.    Upon information and belief, COTTER partially directed the questions that BOWLIN would ask in the interview.

504.    Upon information and belief, on August 17, 2015 Gamrat met with BOWLIN, BEYDOUN, and two other House staff for her interview.

505.    Upon information and belief, on August 17, 2015 COURSER met with BOWLIN, BEYDOUN, and two other House staff for his interview.

85

506.    In these meetings, BOWLIN informed COURSER and Gamrat that he was simply taking statements at that time, that they were not under oath, and that they would not be released to the public, referencing that the legislature was exempt from disclosure. BOWLIN did not alert COURSER to the criminal investigation that BOWLIN was part of.

507.    Upon information and belief, BOWLIN told Andrew Abood, Gamrat's attorney that he could not tape the interviews, but instead assured Gamrat and Abood that two HOUSE staff were present to "take notes". From those notes, BOWLIN stated that he would prepare "statements."

508.    BOWLIN refused to initially give COURSER or Gamrat a copy of their alleged "statements".

509.    When Gamrat was able to see a copy of her "statement" produced by BOWLIN and THE HOUSE, she identified a number of errors and omissions from THE HOUSE produced statement from their "notes".

510.    When COURSER was able to see a copy of his "statement" produced by BOWLIN and THE HOUSE, he identified a number of errors and omissions from THE HOUSE produced statement from their "notes".

511.    COURSER's corrections were not included in the final copy of the statements. COURSER was not given a final copy of the statement prepared by BOWLIN before it was submitted to the Select Committee. COURSER did not sign the statements that BOWLIN had prepared during his investigation.

512.    COURSER gave his statements in an attempt to work out a settlement and resolution with COTTER and THE HOUSE.

86

513. Upon information and belief, at 9:00 A.M. On August 18, 2015, GRAHAM and ALLARD were interviewed together by BOWLIN, unlike all other parties who were interviewed separately.

514. On August 19, 2015, under COTTER's direction and before the conclusion of BOWLIN's "investigation", THE HOUSE passed a Resolution (H.R. 129) to form a Select Committee by a voice vote. This prevented the Committee from having the authority to subpoena witnesses.

515. This was done as a crucial step to keep ALLARD, GRAHAM, and CLINE (with whom COTTER, SAARI, and SWARTZLE had secret meeting) from being questioned in public under oath, and possibly exposing COTTER, SAARI, and SWARTZLE's involvement in the wiretapping, surveillance, misuse of state resources as well as to deprive COURSER of his constitutional rights.

*GAMRAT AND **COURSER** ARE **DENIED** ACCESS TO THE "**EVIDENCE**"*

516. As outlined by the National Conference of State Legislatures in Section 6, The General Legislative Process: "*Modern court cases establish that a legislator who is subject to disciplinary proceedings has the **right to due process.** Therefore, any special procedures set by a legislative chamber should be built upon the basic elements of a fair disciplinary process.*"

517. Upon information and belief, many Democrat Representatives, including Chirkin, Liberati, and Singh questioned the process, the lack of witnesses, the lack of subpoenas, the lack of due process, and the lack of any substantial evidence on the record.

518. An article by the Michigan House Democrats on September 11, 2015 states "Among the many issues within the Select Committee to Examine the Qualifications of Representatives Cindy Gamrat and Todd Courser, key were the striking of significant testimony

DePerno Law Office, PLLC • 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) • 269-353-2726 (Fax)

and the refusal to call necessary witnesses. Democratic committee members frequently requested more information and were denied by the Republican chair."

519.    Throughout the HBO investigation, the issuing of the HBO Report, the Select Committee Hearings on character and fitness of COURSER to serve, and finally through the expulsion votes that happened on September 10 and 11, 2015, COURSER was denied his right to a) due process, b) to have access to allegations and evidence against them, and c) to have copies of evidence to prepare a defense, d) to have adequate time to prepare a defense, e) to call witnesses, or f) to cross examine witnesses.

520.    COURSER was treated markedly different from other expulsion actions in the past and was treated without equal protection when compared to even current or recently departed Representatives from the House or those in the Senate. This is clearly in violation of both due process and equal protection.

521.    Although BOWLIN had informed COURSER that they would be allowed to know what the accusations were against him and see the evidence, multiple attempts made by COURSER and his attorneys to see the evidence were denied.

522.    Upon information and belief COTTER instructed BOWLIN and BEYDOUN, Majority Legal Counsel of the House of Representatives, to refuse COURSER access to the "evidence" portion of the HBO Report until it was all released to the public and just a few days before the committee.

523.    These actions by BOWLIN at the direction of COTTER denied COURSER any ability to know the charges being leveled against him before the charges broke in the public. At that point they had no access to the supposed evidence to defend themselves. This caused immeasurable and irreparable harm to COURSER.

88

524. The actions of withholding the "evidence" by THE HOUSE, COTTER, BOWLIN, SWARTZLE, SAARI, McBROOM, LaFONTAINE, VERHEULEN, BEYDOUN, and HEISE; and even withholding the allegations against COURSER, clearly put COURSER at a disadvantage to be able to prepare any sort of defense for himself.

525. On August 19, 2015, Gamrat texted BOWLIN requesting that her attorney would like a copy of her statement. At 1:40 P.M. BOWLIN texted back saying, "Sorry but I cannot let the documents off site at the time."

## HOUSE REPORT RELEASED WITH FALSE AND MISLEADING STATEMENTS

526. On August 31, 2015, the House Business Office completed and delivered its report to COTTER.

527. On August 31, 2015, following his review of the report, before COURSER had the opportunity to view the report or "evidence", COTTER issued a statement to the media saying "there is troubling evidence of misconduct".

528. On August 31, 2015 The House Business Office released the "HBO Report".

529. The HBO Report included only statements of findings and recommendations; it did not include an "evidence" packet to back up those findings.

530. The HBO Report included statements made as fact which were directly from the allegations of ALLARD and GRAHAM.

531. Upon information and belief, ALLARD and GRAHAM knew some of the statements they gave were false when they gave them.

532. Upon information and belief, THE HOUSE, COTTER, BOWLIN, SWARTZLE, SAARI, McBROOM, LaFONTAINE, VERHEULEN, BEYDOUN, and HEISE knew some of the statements by ALLARD and GRAHAM were false.

89

533. The HBO Report included many false statements and was produced from an investigation that was neither fair nor independent.

534. The HBO Report, issued by COTTER and put together by his agent BOWLIN, went to great lengths to protect COTTER, BOWLIN, SAARI, SWARTZLE, and THE HOUSE from any perception of wrongdoing.

535. COTTER, BOWLIN, SWARTZLE, and SAARI used the HBO Report to "investigate" their own conspiracy, insulate themselves and absolve themselves of wrongdoing, and deprive COURSER of his constitutional rights.

536. In the HBO Report COTTER, BOWLIN, SWARTZLE and SAARI falsely stated that COTTER "had no knowledge of work-related issues concerning GRAHAM or ALLARD prior to termination" even though he and his team had been secretly meeting with ALLARD, GRAHAM, and CLINE since the beginning of the term and met with them the day after BOWLIN sent COTTER his request to terminate their employment.

537. The HBO Report surmised that it was COURSER and Gamrat who were deceitful because their testimony did not match the testimonies of ALLARD and GRAHAM; but the "Report" refused to acknowledge the testimony of the other staffers who agreed with COURSER.

538. COTTER, BOWLIN, SWARTZLE and SAARI in Finding #1 in the HBO Report alleged that ALLARD and GRAHAM (the agents of COTTER and THE HOUSE) were credible witnesses and COURSER and Gamrat were not, but COTTER soon after the conclusion of the expulsion said, "In fact, during the criminal investigation by the Michigan State Police, it became clear that Mr. Allard and Mr. Graham repeatedly lied to House Business Office investigators and lawyers about their knowledge and involvement in a convoluted, month-long extortion plot

90

against their own supervisors." Yet it was based on these very lies that COTTER set in motion an expulsion vote and effort against COURSER and Gamrat. None of the Defendants have ever corrected or retracted the statements in the HBO Report.

539. Upon information and belief, COTTER knew that ALLARD and GRAHAM had lied and that the basis for removing his political enemies was based on those lies. COTTER did not inform the committee or the public during the hearings or before the votes to remove that he knew ALLARD and GRAHAM had lied or were not trustworthy.

540. Upon information and belief, COTTER and BOWLIN made ALLARD, GRAHAM, and CLINE (who were disgruntled, substandard employees who continuously lied to their supervisors and had been involved in nefarious surveillance operations and an extortion plot against their supervisors) as the standard of which to measure COURSER's honesty.

541. Testimony from Anne Hill and Karen Couture which lined up with that of Gamrat and COURSER, and which also attested to the lack of credibility, bizarre behavior, and poor work performance of ALLARD and GRAHAM, was ignored.

542. The HBO Report and THE HOUSE, COTTER, BOWLIN, SWARTZLE, SAARI, McBROOM, LaFONTAINE, VERHEULEN, BEYDOUN, and HEISE recklessly reported false and misleading statements made by ALLARD and GRAHAM regarding COURSER as if they were fact.

543. Upon information and belief, these statements produced by THE HOUSE, COTTER, BOWLIN, SWARTZLE, SAARI, McBROOM, LaFONTAINE, VERHEULEN, BEYDOUN, and HEISE were then intentionally pushed out to the media to be reported around the world through press statements given by BOWLIN and COTTER.

91

544.     These false statements which brought clear and irreparable harm to COURSER were used as the foundation for his forced resignation.

545.     In the HBO Report, COTTER, BOWLIN, SWARTZLE and SAARI state that COURSER and Gamrat "misused their offices, the office staff, other state resources for their own political advantage. Testimony of Keith Allard and Graham and Joshua Cline document the misuse." Again, demonstrating the HBO findings were based on the allegations of ALLARD and GRAHAM.

546.     The HBO Report evidence and committee process were used to deny COURSER of his due process and equal protection.

547.     Upon information and belief, COTTER directed BOWLIN to use the words, "Deceptive, Deceitful, and Dishonest" in the HBO Report to describe COURSER, knowing these words would be quickly picked up and circulated in the media before COURSER ever had a chance to respond.

548.     THE HOUSE, COTTER, BOWLIN, SWARTZLE, SAARI, McBROOM, LaFONTAINE, VERHEULEN, BEYDOUN, and HEISE refused to investigate or even subpoena ALLARD and GRAHAM so that their involvement in the extortion plot could be vetted.

549.     Later when ALLARD and GRAHAM sued THE HOUSE and COTTER, COTTER stated in regards to ALLARD and GRAHAM: "In fact, during the criminal investigation by the Michigan State Police, it became clear that Mr. Allard and Mr. Graham repeatedly lied to House Business Office investigators and lawyers about their knowledge and involvement in a convoluted, months-long extortion plot against their own supervisors."

DePerno Law Office, PLLC • 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) • 269-353-2726 (Fax)

550.     However, earlier in the HBO Report, THE HOUSE, COTTER, BOWLIN, SWARTZLE, SAARI, McBROOM, LaFONTAINE, VERHEULEN, BEYDOUN, and HEISE claimed with gross negligence and with malice that staff were forced by COURSER to forge signatures, that the staff were forced to do political work, that the staff was forced to enter official information in political databases, and that COURSER misused taxpayer resources.

551.     However, in its motion for summary judgment in a separate federal litigation against claims brought by ALLARD and GRAHAM, THE HOUSE stated, "The allegation that employees in the most political branch of government were asked to send 'political emails' during normal work hours is too vague to suggest a violation of law, and their doing so is not necessarily a violation of law, in any event." This position contradicts the HBO Report.

552.     In its motion for summary judgment THE HOUSE further states "that some legislative staff work is inherently (and legitimately) political in nature. Thus, claiming that someone is doing 'political work' is simply not sufficient to raise a claim of unlawful activity." This statement contradicts the HBO Report and the criminal charges brought against COURSER.

553.     The HBO Report also found that the terminations of ALLARD and GRAHAM were related to work performance and not retaliation.

### PRESSURE BUILDS FOR HOUSE TO PASS ROAD PACKAGE AND TAX HIKES

554.     On or around this time, the pressure from Governor Snyder and COTTER on the Representatives increased to pass the House Road Package that included huge tax and fee increases.

555.     Upon information and belief, during the time COTTER was pushing the Governor's Proposal 15-1, Governor Snyder had meetings with COTTER and a "roads task force committee" of selected Representatives.

DePerno Law Office, PLLC • 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) • 269-353-2726 (Fax)

556. Upon information and belief, COTTER and Governor Snyder knew that no amount of political arm twisting would work to get COURSER to change his NO votes against tax and fee increases.

557. Upon information and belief, COTTER and Governor Snyder knew the vote count to pass his road package was insufficient by only a slim margin of 1 or 2 votes via information gathered from the whip count of the members.

558. COTTER took advantage of this as an opportunity to remove COURSER and Gamrat's votes against the tax and fee increase bills.

559. Upon information and belief, as long as COURSER and Gamrat were in THE HOUSE publicly advocating to their voters and statewide grassroots network against raising taxes with this package, COTTER and his team would have trouble passing the House Road Package.

560. Upon information and belief, COTTER and Governor Snyder would benefit if COURSER and Gamrat were removed from their seats because then the number of votes needed to pass the House Road Package would decrease to a manageable number.

561. Shortly after COURSER was constructively expelled by THE HOUSE, COTTER, BOWLIN, SWARTZLE, SAARI, McBROOM, LaFONTAINE, VERHEULEN, BEYDOUN, and HEISE, the House Road Package that increased vehicle registration fees by 40% passed through the House of Representatives by only 1 vote.

562. Had COURSER and Gamrat still been in office, the tax and fee increase legislation would not have passed.

94

**THE SELECT COMMITTEE TO EXAMINE THE QUALIFICATION OF GAMRAT AND COURSER FORMED**

563. On September 1, 2015 The House Select Committee, formed by HR 129, to examine the qualifications of COURSER and Gamrat met at 9:00 A.M. for 7 minutes to adopt the rules of the committee.

564. Upon information and belief, all committee members were handpicked or approved by COTTER.

565. The members of the committee were as follows: McBROOM, VERHEULIN, HEISE, LAFONTAINE, and Democrats Chirkin and Liberati.

566. Upon information and belief, all the Republican committee members had prior legislation that COURSER and Gamrat could not support because they expanded government when COURSER and Gamrat had campaigned on platforms of decreasing government.

567. In particular, upon information and belief, McBROOM who was the chair of the committee, had on their first day of swearing in instructed all the Representatives to obfuscate State law with the seating assignments. It was COURSER and Gamrat who spoke out against his illegal directive.

568. Upon information and belief, earlier in the year, HEISE had attempted to pass what COURSER referred to as the "Warrantless Wiretapping Bill."

569. When COURSER and Gamrat notified their grassroots network in Michigan, the calls and emails that poured in shut down HEISE's bill.

570. Upon information and belief, LaFONTAINE and VERHEULIN were the main Sponsors of the bills to increase the road package taxes and fees, which COURSER and Gamrat adamantly opposed on behalf of the wishes of the majority of people in their respective districts.

DePerno Law Office, PLLC • 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) • 269-353-2726 (Fax)

571. Upon information and belief, the rules of the committee that were adopted did not allow for COURSER or Gamrat to call, question, or cross examine witnesses.

572. In an article in the Detroit Free Press by Kathleen Gray and Paul Egan on September 1, 2015, HEISE stated, "I don't want to see this drag on over the Labor Day holiday...It won't be done tomorrow, but certainly by the end of the week."

573. Upon information and belief, HEISE, as a member on the Select Committee, was more interested in the hearing being finished for his Holiday, than he was of making sure a thorough discovery was allowed with due respect for the people of Michigan and especially for those in District 80 and 82.

574. Upon information and belief, COURSER and Gamrat were slated for expulsion before the hearing began.

575. Upon information and belief, the HBO Report was used by THE HOUSE for review of the Select Committee formed by COTTER to determine whether COURSER and Gamrat should be expelled from THE HOUSE. In other words, the HBO Report (which COTTER commissioned and instructed BOWLIN to prepare) was used by THE HOUSE Select Committee (which members were hand-picked by COTTER) in order to remove COURSER and Gamrat at a time when his tax increase package was two votes shy of passing. After removal, the tax increase passed by one vote.

### GAMRAT AND COURSER FIND FALSE AND MISLEADING "EVIDENCE" IN THE HOUSE BUSINESS REPORT "EVIDENCE"

576. Upon information and belief, on September 4, 2015, Gamrat was finally permitted to see the "evidence" that had been collected during BOWLIN's "investigation" for limited time during business hours only.

577. Gamrat was not allowed to make copies of the documents or audio.

DePerno Law Office, PLLC • 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) • 269-353-2726 (Fax)

578.    The limited time given was not adequate to review all the hours of audio and hundreds of pages of submitted documents.

579.    With no copy being afforded to her, a quick skim of the material was all that was allowed.

580.    The limited access and time prevented Gamrat from being able to prepare any sort of defense over the Holiday weekend before the committee hearings were to begin the following Tuesday.

581.    COURSER was not allowed to review the "evidence" until Friday September 4, 2015.

582.    COURSER was given the same instructions. He was not allowed to make copies of the evidence to allow him to prepare any sort of defense over the weekend before the committee hearings were to begin the following Tuesday.

583.    With no copy being afforded to COURSER, a quick skim of the material was all that was allowed.

584.    On September 4, 2015, BEYDOUN (as Majority Legal Counsel for THE HOUSE and counsel for COURSER) responded to COURSER's request for copies of interviews and documents found in the "evidence packet". BEYDOUN responded, "Pursuant to the Select Committee Rules, only evidence and testimony relevant to the objectives established in House Resolution 129 will be considered by the Committee. While you are free to examine the full evidentiary record, the record itself remains confidential. Accordingly, please state specifically which pages of the evidentiary record that you would like to request copies of, along with a statement for each stating the relevance of such to COURSER's qualifications."

97

585.    COURSER and Gamrat were not allowed access to, at any time, other evidence collected by THE HOUSE which could provide evidence for their defense such as the computers in their offices which were used by them and the staff members.

### COURSER AND GAMRAT OFFERED CENSURE

586.    Leading up to the committee hearings on September 10 and 11, 2015, both COURSER and Gamrat meet separately with BEYDOUN.

587.    During this meeting BEYDOUN advised COURSER to sign and prepare a statement admitting to all of the alleged wrongdoing in exchange for censure. BEYDOUN told COURSER he needed to be contrite and offer an apology. Upon information and belief, BEYDOUN also requested the same from Gamrat.

588.    BEYDOUN told COURSER that THE HOUSE had the votes against him to expel him.

589.    COURSER believed this to be true because all the Representatives had signed the Caucus Pledge to vote according to what COTTER wanted.

590.    BEYDOUN stated that he believed that that censure was more appropriate for him than expulsion.

591.    COURSER was fatigued and under an incredible amount of pressure and stress and refused to sign BEYDOUN's prepared statement because the statement stated that all facts and findings set forth in the entire HBO Report were accurate.

592.    However, COURSER and BEYDOUN then worked jointly on a statement COURSER would read to THE HOUSE committee. BEYDOUN made changes to the statement and offered advice to COURSER.

593.    In the end, COURSER refused to admit to the entire HBO Report because there were many things he believed were untrue.

98

594.    BEYDOUN assured COURSER that censure was in play and appropriate.

595.    BEYDOUN also told COURSER that the audio recordings made by GRAHAM of him speaking with people in his office about personal matters broke House Rule 74 and was considered a misuse of state resources.

596.    Exhausted, broken, having undergone incredible emotional trauma over the past several weeks, and under extreme pressure from THE HOUSE, and under advised from BEYDOUN (his legal counsel), COURSER agreed to appear before THE HOUSE committee and read a statement, which had been revised by BEYDOUN.

597.    COURSER later found out after having the time to research on his own that House Rule 74 did not apply as BEYDOUN had fraudulently told him.

598.    Indeed, BEYDOUN did not show COURSER the House Rules or reveal that House Rule 74(a) allows for a personal privilege, and states, "Matters involving personal privilege are limited and include only the following (a) Anything tending to subject a Member to ridicule or contempt."

599.    Under House Rule 74(a) COURSER was permitted to discuss with his staff these personal matters that sure enough led to ridicule and contempt.

600.    Upon information and belief, BEYDOUN was aware of this personal exemption in House Rule 74(a) but did not tell COURSER and instead misled him to believe that he violated House Rule 74.

601.    COURSER had been misled regarding House Rule 74 so that THE HOUSE could now report that COURSER in some way admitted to misuse of taxpayer resources.

DePerno Law Office, PLLC • 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) • 269-353-2726 (Fax)

602.     McBROOM and BEYDOUN later advised COURSER that when it was his turn to testify, he should read a statement along with a sincere apology, and from the Republicans on the committee the questions would be light.

603.     McBROOM and BEYDOUN suggested that if COURSER was remorseful and contrite, it would all go fine and that he would be censured. This turned out to be false.

### SPECIAL COMMITTEE HEARINGS TAKE PLACE; DENIES DUE PROCESS TO COURSER AND GAMRAT

604.     On Tuesday, September 8, 2015 at 10:30 A.M. the Special Committee Hearings began under the auspices to examine the qualifications of COURSER and Gamrat.

605.     Upon information and belief, although the committee is carried out to give the appearance of a fair hearing, the committee members have previously signed the Caucus Pledge to stand with COTTER.

606.     Upon information and belief, the votes of the Republican committee members were determined by the way COTTER directed them to vote, not on the basis of evidence.

607.     The special committee hearings were held in the Capitol with a very large media presence focused on Gamrat and COURSER.

608.     By the time the committee hearings begin on Tuesday, September 8, 2015, COURSER and Gamrat had each only been allowed a quick review of the hundreds of pages of documents and audio, and had been denied the opportunity to make copies of any of the evidence in the HBO Report that was now the foundational evidence of the special committee hearings of which they would have to testify to.

609.     The select committee was conducted Tuesday, September 8, 2015 for approximately 2 hours; as recorded in the committee minutes from 10:30 A.M. to 12:07 P.M. and then again from 1:07 P.M. to 1:30 P.M.

DePerno Law Office, PLLC ● 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) ● 269-353-2726 (fax)

610.   SWARTZLE gave an opening statement to the committee where he repeated language used in the HBO Report to describe COURSER and Gamrat.

611.   On Wednesday, September 9, 2015 the Special Committee met from 10:30AM - 11:25AM, then again from 11:40AM - 1:00PM, and again from 4:30PM - 4:55PM.

612.   The committee hearing included the playing of some of the audio tape that had been secretly recorded by GRAHAM of a private conversation between him and COURSER at COURSER's law office and GRAHAM's business office.

613.   Upon information and belief, the small amount of evidence released to the public was selectively chosen to try and paint COURSER and Gamrat in a poor light to the public and to the committee.

614.   During the hearing on September 9, 2015, SAARI was called to give a statement and take questions. The Democrats asked questions.

615.   McBROOM and the Republicans objected to many of the questions asked by the Democrats.

616.   McBROOM then removed SAARI's statement from the record stating "irrelevance", even though SAARI had been one of the key people meeting secretly with ALLARD, GRAHAM, and CLINE for several months, the main accusers of COURSER and Gamrat.

617.   Upon information and belief, COTTER directed McBROOM to strike down the testimony of SAARI.

618.   Upon information and belief, COTTER directed SAARI's testimony to be stricken to protect him and SAARI regarding their involvement within the coordinated effort directed against Gamrat and COURSER.

DePerno Law Office, PLLC ● 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) ● 269-353-2726 (Fax)

619.    On Wednesday, September 9, 2015 COURSER was called to make a statement and answer questions from the committee.

620.    On Thursday, September 10, 2015, the last hour of committee hearings for COURSER and Gamrat was conducted, from 9:30 A.M. to 10:30 A.M.

621.    In Thursday's committee hearing McBROOM falsely stated that COURSER and Gamrat had both admitted to everything in the HBO Report.

622.    Actually, during the hearing, COURSER stated that he did not have time to read the entire report and so he could not admit to it.

623.    Upon information and belief, McBROOM was aware when he made these false statements that they were false and made with malice.

624.    Upon information and belief, BEYDOUN, who was assisting McBROOM during the hearings and seated at the left side of McBROOM during the committee, was also aware that McBROOM's statements were false.

625.    BEYDOUN did not correct McBROOM's false statements.

626.    BEYDOUN did not correct the statements of several of the other committee members who repeated that COURSER and Gamrat admitted to the entire HBO Report, even though he was aware that was false.

627.    COURSER was not given an opportunity in Thursday's committee hearing to address or correct McBROOM's false statements or the false statements repeated by several of the committee members.

628.    McBROOM's false statements were treated as fact and repeated as fact by (a) other members of the committee; (b) media outlets around the world; (c) McBROOM himself on

the House floor when he advocated for his colleagues to expel COURSER and Gamrat; and (d) by other Representatives who were basing their votes on McBROOM's false statement.

629.    When the Democrat Representatives requested to question ALLARD, GRAHAM, and CLINE, they were told by McBROOM that ALLARD, GRAHAM, and CLINE refused to testify.

630.    Later, ALLARD and GRAHAM stated that they did not refuse to testify.

631.    Upon information and belief, McBROOM said that ALLARD and GRAHAM, if called would "claim the fifth" because of their criminal exposure.

632.    Later ALLARD and GRAHAM said that this was not true.

633.    The credibility of ALLARD, GRAHAM, and CLINE, as accusers, was not allowed to be questioned by any of the committee members, nor by COURSER and Gamrat.

634.    Upon information and belief, during the committee hearings, SWARTZLE in his testimony before the committee, claimed that the loss of misused taxpayer resources to be in the thousands, if not tens of thousands of dollars, but failed to show any missing funds nor did they call anyone to testify to account for said missing funds.

635.    Upon information and belief, during the committee hearings, SWARTZLE also stated that it would take more money to actually calculate any misuse of dollars than the actual misuse itself; indicating that the misuse of funds that COURSER and Gamrat were being charged with was negligible.

636.    Upon information and belief, no dollar amount was ever actualized as to the claims of misuse of taxpayer funds that were being leveled against COURSER and Gamrat.

637.    Upon information and belief, BOWLIN and SWARTZLE incorrectly interpreted emails as political and incorrectly took quotes out of context to fit their allegations in Exhibit 3

103

of the Report of the Select Committee to Examine the Qualifications of Representatives Cindy Gamrat and Todd Courser submitted by BOWLIN and SWARTZLE.

638.    Upon information and belief, when BOWLIN and SWARTZLE spoke to the Select Committee to explain their findings from their investigation, they misrepresented the evidence that they cited as misuse of state funds as political, when it was actually regarding official HOUSE business.

639.    COURSER and Gamrat were never questioned on this evidence used to support THE HOUSE's claim of misuse of taxpayer funds to explain its erroneous application by BOWLIN and SWARTZLE.

640.    The HBO Report was based primarily upon the accusations alone of ALLARD, GRAHAM, and CLINE.

641.    These accusations of ALLARD, GRAHAM, and CLINE were not taken under oath, however they were accepted as sworn evidence in the HBO Report and also in the Committee hearings. ALLARD, GRAHAM, and CLINE were never called to take the stand or to be questioned under oath as to the veracity of their accusations.

642.    The HOUSE relied on these allegations made by ALLARD, GRAHAM, and CLINE when they were not under oath during the HBO "investigation".

643.    ALLARD, GRAHAM, and CLINE were never called to take the stand or to be questioned under oath as to their surveillance on COURSER and Gamrat as a condition of their employment for COTTER, which involved private information of the Representatives and their communications with their respective families.

644.    ALLARD, GRAHAM, and CLINE were never called to take the stand or to be questioned under oath as to their numerous calls between them and JOE GAMRAT who was

DePerno Law Office, PLLC ● 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) ● 269-353-2726 (Fax)

shown in a MSP investigation report to be conducting an extortion plot that said if COURSER and Gamrat did not resign he would send all audio, video, texts and emails to LIVENGOOD, who eventually broke the story.

645.   ALLARD, GRAHAM, and CLINE were never called to take the stand or to be questioned under oath as to their multiple secretly conducted meetings with COTTER, SAARI, SWARTZLE, and BOWLIN.

646.   None of ALLARD, GRAHAM, and CLINE's nefarious and illegal activities, which would speak to their credibility as accusers, were presented to the committee, the public, or the other Representatives voting on expulsion.

647.   Upon information and belief, COTTER made false statements publicly denying that there was any conspiracy against COURSER. These statements were knowingly false and made with malice.

648.   Upon information and belief, COTTER was aware during the time he made these statements that they were false and made with malice.

649.   COURSER was not allowed to counter these accusations of ALLARD, GRAHAM, and CLINE. COURSER was not provided resources by THE HOUSE to hire an attorney or time to review the alleged evidence. COURSER was not indemnified.

650.   Upon information and belief, COTTER directed McBROOM to not allow ALLARD, GRAHAM, and CLINE to testify in order to cover up his conspiracy.

651.   Upon information and belief, COTTER, did not want ALLARD, GRAHAM, and CLINE to be questioned because they would have exposed the months of secret meetings and surveillance COTTER, SAARI, SWARTZLE, ALLARD, GRAHAM, JOE GAMRAT, KRELL,

DePerno Law Office, PLLC • 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) • 269-353-2726 (Fax)

and HORR had been conducting on COURSER and Gamrat. This cover-up was a misuse of state funds and resources.

652.    McBROOM later said, when asked what level of credibility ALLARD and GRAHAM had he responded, "Precious little." Yet these were the witnesses upon which COTTER, BOWLIN, SWARTZLE, and McBROOM based all their decision to expel COURSER and Gamrat.

653.    During the committee hearings, evidence and potential testimony by other staff Anne Hill and Karen Couture which corroborated COURSER and Gamrat and discredited ALLARD and GRAHAM was not presented by McBROOM, BEYDOUN, COTTER, SWARTZLE, or THE HOUSE.

654.    Upon information and belief, COTTER directed that key information directly related to the allegations and evidence in the HBO Report be kept hidden by COTTER, SAARI, BOWLIN, and SWARTZLE and not divulged to COURSER, Gamrat, nor to the committee members, public, and voting Representatives such as:

    a.    The accusers ALLARD, GRAHAM, and CLINE whose testimony was the foundation of the House Business Report, had been having secret meetings with the Speaker and his team that had been ongoing for months;

    b.    The undercover surveillance and spying ALLARD, GRAHAM, and CLINE were involved in to relay private information regarding Representatives Courser and Gamrat to the Speaker and to additional individuals conducting further surveillance;

    c.    The false statement made by COTTER and reported by BOWLIN on page 2 of the House Business Report that states that COTTER did not know of any work related issues before the Detroit News article on August 7, 2015.

    d.    Belief of COTTER and THE HOUSE that the accusers ALLARD and GRAHAM had been repeatedly lying to THE HOUSE in the HBO Report. Once ALLARD and GRAHAM were fired and they filed suit against COTTER and THE HOUSE, COTTER stated, "In fact, during the criminal investigation by the Michigan State Police, it became clear that Mr. Allard and Mr. Graham repeatedly lied to the Home Business Office investigators

106

and lawyers about their knowledge and involvement in the convoluted, months-long extortion plot against their own supervisors."

e.   That the Republican committee members themselves and all the other Republican Representatives had already signed a pledge to stand with COTTER on all major issues which came before the caucus, which expulsion of two members would certainly qualify under.

655.   BOWLIN, McBROOM, SWARTZLE, SAARI, BEYDOUN, LaFONTAINE, HEISE, and VERHEULEN were not impartial but under the direct control of COTTER, appointed to their positions by COTTER, and under an illegal voting agreement (the Caucus Pledge).

656.   Upon information and belief, many Democrat Representatives, including Chirkin, Liberati, and Singh questioned the process, the lack of witnesses, the lack of subpoenas, lack of due process, and the lack of any substantial evidence on the record.

657.   Upon information and belief, in the Minutes of the House Select Committee to Examine the Qualifications of Representatives Cindy Gamrat and Todd Courser on Wednesday, September 9, 2015 at 9:30 A.M., there are omissions. Liberati stated that he talked with ALLARD who was willing to testify before the Select Committee. He was shut down by McBroom, and it was omitted from the Minutes.

658.   Upon information and belief, there was also a vote to subpoena ALLARD and GRAHAM as witnesses, which did not pass with the 4 Republicans voting no and the 2 Democrats voting yes, which was omitted from the committee minutes.

659.   On or around 10:30 A.M. on Wednesday September 10, 2015 McBROOM placed before the special committee HR 139 a resolution to expel COURSER.

660.   A roll call of HR 139 was taken. Voting YEAH were MCBROOM, HEISE, VERHEULEN, and LaFONTAINE. Voting NAY was none. Voting PASS was Representatives Chirkun and Liberati.

DePerno Law Office, PLLC • 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) • 269-353-2726 (Fax)

661.    The motion for HR 139 prevailed by a vote of 4-0-2.

662.    On or around 10:30 A.M. on Wednesday September 10, 2015 McBROOM placed before the special committee HR 141 a resolution to expel Gamrat.

663.    A roll call of HR 141 was taken. Voting YEAH was MCBROOM, HEISE, VERHEULEN, and LaFONTAINE. Voting NAY was none. Voting PASS was Representatives Chirkun and Liberati.

664.    The motion for HR 141 prevailed by a vote of 4-0-2.

665.    Upon information and belief, although BEYDOUN agreed that the committee would recommend censure for Gamrat during the prior meetings, the committee instead recommended expulsion for Gamrat.

666.    Upon information and belief, COTTER had directed BEYDOUN to obtain the censure statement from Gamrat under the guise of offering a censure in order to take her words on the statement out of context to be used against herself and COURSER during the committee.

## *FULL HOUSE EXPULSION VOTE TAKEN*

667.    Session for the House of Representatives convened on Thursday, September 10, 2015 for the House of Representatives on or about an hour after the Select Committee recommended expulsion and adjourned.

668.    Both COURSER and Gamrat met the qualifications outlined under the Michigan Constitution and were therefore unlawfully and unconstitutionally removed from office.

669.    The proper process for removing a legislator "outside of the legislature's role" of being the sole judge of the "qualifications of the members," is for the voters to conduct a "recall action" of their representation.

DePerno Law Office, PLLC • 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) • 269-353-2726 (Fax)

670.    It had only been about 48 hours since the evidence was released for the full body of THE HOUSE, who were responsible for voting on the expulsion of COURSER and Gamrat, to review the 833 pages of submitted alleged evidence and hours of audio recordings. There was very little time given to all of the Representatives, especially given the severity of the decision to expel two duly elected sitting Representatives and to take away the representation of over 180,000 Michigan citizens.

671.    Upon information and belief, COTTER did not want to allow for more time for people to review the evidence because the lack of evidence inside of the report would have been discovered and questioned.

672.    Upon information and belief, COTTER did not want to allow for more time in fear that his involvement along with that of SAARI, SWARTZLE and BOWLIN would have been discovered and exposed. COTTER wanted the expulsions to happen quickly before he was exposed.

673.    Upon information and belief, COTTER had the authority to a) determine leadership assignments of Representatives, b) determine committee assignments of representatives, c) determine representative's legislation that would be heard and allowed a vote, d) determine if representatives would have staff, and e) the office budget of each representative.

674.    Upon information and belief, all Republican Representatives had many potential incentives to vote according to COTTER's wishes and expel Gamrat and COURSER, while adversely, many disincentives to disobey COTTER's wishes.

675.    Upon information and belief, a number of Representatives did not want to vote for expulsion but felt they had to because of the Caucus Pledge and fear of losing what they had.

109

676.    The first Resolution to expel COURSER was put forward first before the Resolution to expel Gamrat.

677.    The first vote taken on the Resolution to expel COURSER failed to obtain the 2/3rds majority vote needed to pass the Resolution.

678.    The second vote taken on the Resolution to expel COURSER failed to obtain the 2/3rds majority vote needed to pass the Resolution.

679.    All Republicans voted in favor of expulsion except for Representative Howyrlack.

680.    Many Democrats withheld their vote as a protest speaking out against the lack of time and due process, lack of time devoted to consider the expulsions, and lack of time to even read the nearly 1,000 pages of supposed evidence put forward publicly less than 2 days before; the lack of access to interview witnesses; a lack of subpoena power; and the lack of criminal charges or otherwise levied against COURSER and Gamrat.

681.    Upon information and belief, Representatives who withheld their vote in protest were not allowed to use the bathroom until they voted.

682.    Upon information and belief, at midnight on Wednesday, September 10, 2015 the voting board was cleared and a new day was begun on Thursday September 11, 2015 in THE HOUSE at 12:01 A.M; however, the voting board had been left up from the previous day and not cleared.

683.    Upon information and belief, COTTER announced that the Representatives could not leave THE HOUSE floor and must stay in their seats. In essence the Representatives were under "lock down" and were not going to be allowed to leave until COTTER got what he wanted, which was the members to vote to expel COURSER and Gamrat.

DePerno Law Office, PLLC • 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) • 269-353-2726 (Fax)

684.    This put COURSER in jeopardy again, in violation of the United States and Michigan Constitutions, because the first two votes to expel had failed and because the voting board was not cleared.

685.    This second and third vote violated the House Rules which require the vote to be adjourned until the next day and that the same item could not be called for a vote twice in the same occurrence.

686.    Upon information and belief, COTTER intended to put forward the resolutions for expulsion and keep the Representatives in their seats until he obtained the votes he needed to get COURSER and Gamrat expelled.

687.    COTTER later reported to the Detroit News, "To me, it didn't make a difference of how we got there as we got to the result of both of these members no longer being a member of the body."

688.    On September 11, 2015, Representative Singh objected to the process used by COTTER. He stated that his members did not even have access to information until September 8, 2015. Rep. Singh further stated the following:

    a.    The constitution allows us the right to expel members, not staff . . . I don't believe it's the role of the staff to do that. Because again, that piece is really up to the member. It is our constitutional duty. I also was concerned with the flow of information.

    b.    We never had the opportunity to see [information] until the full report was actually presented to the media.

    c.    I had to go to a media site to get access to it. If people were sent it, I wasn't. I never received that. And then to expect all of us to read through the 800 pages and the 5 hours of video. I can't imagine unless you've been on the committee that you've had time since Tuesday to actually read every single page and listen to all 5 hours of the audio, and I have not had that opportunity and that's why it makes it very difficult for me to move that process forward at this time.

111

d.   Also, there were people who were on the list of witnesses that we wanted to have come forward. Now, we've been told time and time again, 'Well everything is in the 800 pages.' We have two whistleblowers who had the opportunity obviously to speak with the legal counsel, as well as with our House Business Office Director, and put things into a record. They were not under oath, they did not have any members that I'm aware of that were part of that process. Again, we're expelling somebody and no member was sitting in that and, Mr. Speaker, if you were sitting there, I apologize, but my understanding was there was not a single member in those conversations and those interviews. So how did we actually now get to a level of expulsion when not a single member has actually heard testimony from these individuals?

e.   Now, I keep hearing it's in the report, but these individuals, if you had subpoenaed them, would have been under oath. That to me is the most important piece. That is one of the pieces that is missing here today. That the two whistleblowers were not under oath, did not have an opportunity to testify. Again, we have talked a lot about the timeliness of information, we talked a lot about the time we have had to review this. So my question is why are we doing this today? This was not even on our agenda today, right? We did not know we were coming here today to vote on this. Why couldn't we have been given the weekend to go through the 800 pages and 5 hours of audio. Don't we owe that to this state, don't we owe it to 90,000 people before we nullify an election? I think so and that is why you have heard some of my members that are concerned.

f.   I think the last thing that was probably the most disturbing to me was the testimony we had yesterday. The testimony of the former chief of staff of the Speaker who came forward and then we struck out of the public record his comments.

g.   But until I have the two people that started this whole thing under oath, then I don't think we've done our due diligence. Then for the historical precedence, allow the Secretary of State, the Attorney General, and the State Police to do their work so we understand the criminal charges. Again, we're going to take the most extreme action, which is to nullify the vote of the people. We do not have all of the information, we do not know all of the facts, and we have time to make sure we do this right, that we have these facts, that we have people under oath, and we bring them in and subpoena.

h.   So our work is not done here today, it might be done in a week, two weeks, maybe three months, but we need to make sure we do all of our due diligence, because I will not make the most extreme action that the constitution allows without having all of the facts.

DePerno Law Office, PLLC ● 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) ● 269-353-2726 (Fax)

689.    Representative Singh stated on September 11, 2015 that there was not time to "do all of our due diligence."

690.    An article by LIVENGOOD and the DETROIT NEWS on September 11, 2015, reported, "Twenty-seven Democrats had withheld their votes in protest of how the GOP majority had investigated and sought the ousters of the two freshmen Republicans. Democrats contended Republicans were rushing to expel Courser and Gamrat without forcing their former aides to testify under oath about misconduct in which the freshmen representatives engaged."

691.    THE HOUSE leaders under COTTER's direction took 14 hours and 3 votes, refusing the Representatives to go to the bathroom, to leave the chambers, or to eat unless they voted. The Democrats protested. As the third vote began in an incredibly hostile and caustic environment after 3:00 A.M. in the morning on September 11, 2015 in violation of House Rules, COURSER was forced to resign without due process, equal protection, and other violations of the United States and Michigan Constitutions; knowing that he was not allowed to leave.

692.    Within the hour at or around 4:00 A.M. on September 11, 2015 Gamrat was expelled from THE HOUSE membership.

693.    Under the conditions set forth in THE HOUSE Resolution to remove Gamrat, COTTER cut a deal with the Democrats. The Democrats would only vote for expelling Gamrat if COTTER submitted a request to SCHUETTE for SCHUETTE to investigate. Out of the SCHUETTE investigation, post expulsion, a series of interviews were conducted by MSP, BRITVEC, BREWER, DWYER, and SCHUETTE and what was said post expulsions differed greatly from what was being said by COTTER, SAARI, SWARTZLE and BOWLIN during their efforts to expel COURSER and Gamrat.

113

694.    During these interviews by the MSP, BRITVEC, BREWER, DWYER, and SCHUETTE, the police completely glossed over the testimony and evidence of illegal conduct by the Defendants, including illegal wiretapping, eavesdropping, extortion, conspiracy, misuse of taxpayer resources, misconduct in office.

695.    ALLARD stated that he got a call from JOE GAMRAT (his co-conspirator) and JOE GAMRAT stated he was "listening" through a device to conversations in the State office building; yet MSP/BRITVEC/SCHUETTE did not then question JOE GAMRAT on this or investigate it.

696.    ALLARD and GRAHAM stated they left work and followed COURSER to take pictures of him which furthered the extortion plot; yet there are no MSP/BRITVEC/SCHUETTE questions regarding this in their tapes.

697.    GRAHAM assisted in illegally accessing COURSER's emails and phone data and had been passing this information to ALLARD and CLINE; yet no MSP/BRITVEC/SCHUETTE questions regarding this in their tapes.

698.    JOE GAMRAT also stated that GRAHAM and ALLARD had left work and had followed COURSER and Gamrat to Flint, then to Tim Horton's in Oxford, and Clarkston; yet no MSP/BRITVEC/SCHUETTE questions regarding this in their tapes.

699.    ALLARD and GRAHAM had a conversation witnessed by another staffer where they discussed following COURSER during work hours at the State HOUSE in hopes of taking pictures of him; yet no MSP/BRITVEC/SCHUETTE questions regarding this in their tapes.

700.    ALLARD and GRAHAM remove Anne Hill from THE HOUSE office building under false pretenses and they tried to intimidate her into quitting and told her that THE HOUSE

114

offices she was working in were "bugged"; yet no MSP/BRITVEC/SCHUETTE questions or investigation into this.

701.    MSP/BRITVEC/SCHUETTE found ALLARD, GRAHAM and CLINE to have been involved in the extortion plot but then refused to seek warrants to get their phones, or phone records, or to pursue any other investigation into ALLARD, GRAHAM and CLINE's involvement into the extortion plot. MSP/BRITVEC/SCHUETTE asked no questions regarding their involvement into the plot and sought no warrants to pursue further discovery.

702.    MSP/BRITVEC/SCHUETTE questioned JOE GAMRAT several times and he lied regarding his involvement in the extortion plot and his involvement with ALLARD, GRAHAM and CLINE; yet no charges have been brought.

703.    Gamrat took several recording devices she had found to the MSP/BRITVEC/SCHUETTE and she was told that there was not a prosecutor in the state who would help her. No warrants have been sought and no charges have been brought.

704.    HORR destroyed the "Extortion Phone" and lied to MSP/BRITVEC/SCHUETTE and no charges have been brought and no warrants have been sought by the MSP/BRITVEC/SCHUETTE investigators.

### CRIMINAL CHARGES FILED TO COVER UP CONSPIRACY

705.    On or about February 26, 2016 charges were filed against COURSER.

706.    COURSER who was charged with four felony counts: one of perjury for unsworn statements in front of Select Committee and 3 counts of misconduct in office for a crime at common law under 750.505.

DePerno Law Office, PLLC ● 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) ● 269-353-2726 (Fax)

707.    During the "swear to" hearing on February 26, 2016, BREWER and DWYER did not testify truthfully to the investigation that took place between August 1, 2015 and September 1, 2015. In particular, they stated:

    a.    That COURSER said "his staff told him they had engaged and checked with the House leadership and were told that it was acceptable for him, being an aide, to sign the representatives names to a blue back bill." COURSER never made such claims.

    b.    "This was not an acceptable practice with the Michigan House to sign a representative's name – an aide to sign a representative's name to a bill." To the contrary Allard testified both in the MSP police investigation and in the preliminary conference that it was a practice among staff to sign on behalf of legislators.

    c.    That COURSER lied under oath when he claimed that he (COURSER) had checked with CLINE if it was acceptable for CLINE to sign COURSER's name. In fact, COURSER never made this statement.

    d.    That "Mr. Cline told him he had checked with the House Business Off or the House Rules Committee and said it was fine to sign his name." Again, COURSER never made such claims.

    e.    That COURSER stated in the investigation by the HBO that "Ms. Gamrat did not know about a salacious email." This was false. COURSER never stated that Gamrat did not know about the email itself.

    f.    That staff were instructed to sign the blue backs. No evidence was presented during the preliminary hearing to support this statement.

    g.    That Josh Cline stated that he was "told to sign both of their names." During the preliminary hearing, CLINE stated that he was never instructed to sign the names of either COURSER or Gamrat.

    h.    That the false flag email was sent from within the City of Lansing.

708.    Upon information and belief, BREWER and DWYER made these false statements in order to convince the district court judge to sign the warrants. These statements were not based on the truth or actual facts.

709.    Judge Clarke cleared COURSER on 2 of the 4 counts.

116

710.    During the Preliminary Conference it was shown by sworn testimony that COTTER had broken the same rule that COURSER was charged with breaking.

711.    Later, in mid-August, 2016, after a criminal report was filed against COTTER, the MSP issued a police report stating that "the breaking of HOUSE Rules is not a crime" and refused to prosecute COTTER; yet COURSER is still facing criminal prosecution under this very rule and is to stand trial on this very accusation as "misconduct in office" under MCL 750.505c. If this is not a crime, then why hasn't SCHUETTE dismissed the charges. These false charges have caused COURSER irreparable harm to him, his business, and his family.

712.    During the preliminary hearing in Ingham County, in May of 2016, under Judge Clarke, in sworn testimony, GRAHAM perjured himself multiple times; yet law enforcement refused to investigate and SCHUETTE refused to prosecute the perjury of his own witnesses.

713.    Also during the preliminary hearing, CLINE admitted to forgery; yet MSP, BRITVEC, BREWER, and DWYER refused to investigate and SCHUETTE refused to prosecute the perjury of his own witnesses.

714.    Also during the preliminary hearing, ALLARD and GRAHAM admitted to illegal wiretapping and eavesdropping; yet law enforcement refused to investigate and SCHUETTE refused to prosecute the perjury of his own witnesses.

## *COURSER AND GAMRAT'S CONSTITUTIONAL RIGHTS ARE VIOLATED*

715.    Upon information and belief, the timeline for the expulsion was rushed to fit a political agenda and to cover up a conspiracy. In fact, BOWLIN has stated that he needed and wanted more time to conduct his investigation.

716.    The Representatives voted to remove two of their Members without time or access to read the supposed 833 pages of evidence.

117

717. With the case of Representative Brian Banks as a backdrop, it is clear that COURSER and Gamrat were being singled out by the leadership in an arbitrary and capricious way for political elimination. This was a "political hit" to manipulate the Republican Caucus numbers in order to pass a tax increase.

718. This process was in stark contrast to the processes used against David Jaye, Virgil Smith, or Brian Banks.

719. COURSER was removed without an independent finding of any of the allegations for which THE HOUSE accused him and in a committee system that operated over 2.5 days without any due process or equal protection; nor any ability to defend themselves.

720. In a prior expulsion case, Senator David Jaye's expulsion from Michigan's legislature, lasted 3 weeks had 8 committee hearing days encompassing on or around 30 hours of committee time to go through the process of removing 1 legislator. The Special Committee in the Jaye expulsion case allowed over 10 times the amount of time looking at evidence before recommending expulsion for David Jaye, who had a number of prior criminal convictions, than COURSER and Gamrat, who had no prior criminal records nor had any criminal charges been brought or criminal investigation been concluded. Upon information and belief, Jaye was afforded both subpoena power and was allowed to question both witnesses and testimony; whereas COURSER was not afforded subpoena power to call or question witnesses. Upon information and belief Jaye was afforded the due process to cross examine witnesses; whereas COURSER and Gamrat were not allowed to cross examine witnesses called by THE HOUSE during the committee hearings.

721. However in the process for removing 2 legislators, COURSER and Gamrat, the special committee hearings spanned only 2.5 days and on or around 7 hours, or just 3.5 hours per

DePerno Law Office, PLLC • 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) • 269-353-2726 (fax)

each legislator. Reasonable expectations would expect that the process for the removal of 2 separate elected officials would take not less time but more than the removal of one.

722. The MSP/BRITVEC report was held and not released until November 30, 2015 and then with only a small portion of the evidence collected released, which negatively and irreparably harmed COURSER.

723. The MSP, BRITVEC, and SCHUTTE were in possession of the evidence to clear COURSER of involvement in the extortion plot and implicate ALLARD, GRAHAM, CLINE, and JOE GAMRAT. However, this information was not released by the MSP, BRITVEC, or SCHUETTE until a few days before the special election primaries to fill COURSER's vacant seat on or about November 3, 2015.

### ALLARD AND GRAHAM FILE WHISTLEBLOWER LAWSUIT AND A SEPARATE LAWSUIT AGAINST THE HOUSE

724. On or about October 7, 2015 ALLARD and GRAHAM filed a lawsuit in Ingham County against COURSER and Gamrat alleging that they were retaliated against and wrongfully terminated from their employment at THE HOUSE for engaging in "Whistleblower" activity, terminated in violation of public policy, and suffered libel and slander (the "State Case").

725. On or about December 7, 2015, ALLARD and GRAHAM filed another lawsuit based on the same or very similar factual allegations against THE HOUSE for retaliation and wrongful termination pursuant to the same "Whistleblower" activity that was alleged in the State Case (the "Federal Case").

726. The two lawsuits stand in stark contrast to each other; making contrary allegations in each case, filed in separate forums; amounting to nothing more than forum shopping.

727. THE HOUSE did not and has not, as required by law, indemnified COURSER and Gamrat in the State Case.

119

728. This lack of indemnification has caused tremendous hardship on COURSER and furthered the baseless allegations of COTTER and THE HOUSE that COURSER was the employer of ALLARD and GRAHAM and that he had "fired" these staffers. Neither COURSER nor Gamrat had any authority to hire or fire anyone during their time as State Representatives.

### *COTTER AND THE HOUSE FINALLY PASS THE HOUSE ROAD PACKAGE*

729. A few weeks after COURSER and Gamrat were removed, the House voted to pass the House Road Package by just one vote.

730. This created 1.2 Billion in annual fee increases, a large portion of which deceptively went to fund Medicaid payments and Obamacare; not the roads. In fact, the voters were deceived and were denied their right to representation.

731. Representative Singh stated on September 11, 2015 that there was time to "do all of our due diligence."

732. What Representative Signh did not know or understand – and he acknowledged that he was kept out of meetings – was that COTTER, SWARTZLE, SAARI, and BOWLIN had long ago started a conspiracy to remove COURSER and Gamrat in order to pass this House Road Package.

733. If COURSER and Gamrat were still members of THE HOUSE, the House Road Package would not have passed. Their removal was too important for COTTER and his co-conspirators to allow due process or the Constitution to get in the way.

120

**COUNT 1**
**VIOLATION OF CONSTITUTIONAL AND CIVIL RIGHTS UNDER 42 U.S.C. § 1983**
**(Due Process, Equal Protection, Double Jeopardy, Unlawful Search and Seizure,**
**Deprivation of Salary, and Other Violations)**

**(as to the House, Cotter, Bowlin, Swartlze, Saari, McBroom, LaFontaine, VerHeulen,**
**Beydoun, Heise, MSP, Britvec, Brewer, Dwyer, and Schuette)**

734.    COURSER restates and incorporates the preceding paragraphs as though set forth fully herein.

735.    Based on the facts set forth herein and in the proceeding paragraphs, THE HOUSE, COTTER, BOWLIN, SWARTZLE, SAARI, McBROOM, LaFONTAINE, VERHEULEN, BEYDOUN, HEISE, MSP, BRITVEC, BREWER, DWYER, and SCHETTE are liable to COURSER for violation of his civil rights under 42 U.S.C. § 1983. This includes THE HOUSE, COTTER, BOWLIN, SWARTZLE, SAARI, BEYBOUN, McBROOM, LaFONTAINE, VERHEULEN, HEISE, MSP, BRITVEC, BREWER, DWYER, and SCHUETTE.

736.    These Defendants are all state actors acting under the color of law.

737.    The conduct of these Defendants, under the color of law, offends the community's sense of fair play and decency.

738.    These Defendants acted maliciously, recklessly, intentionally, or by reason of gross negligence or violation of the law and are therefore liable to COURSER.

739.    COURSER was not afforded the same protections afforded to past legislators.

740.    COURSER was constructively expelled and forced to resign on September 11, 2015 after two failed votes and intense pressure of 15 hours of voting, during which he was not allowed to leave. COURSER was forced to endure 15 hours on the floor while those Representatives who would not vote were not allowed to leave, eat or go to the bathroom. As the

121

session progressed no one was allowed to leave their seat. No Representatives' health conditions were taken into account, such as COURSER's heart condition.

741.   Earlier that day, THE HOUSE was 73 votes short of the number needed to remove COURSER.

742.   Republicans then called for a reconsideration of the vote and the board stayed open until it was cleared shortly before midnight, so THE HOUSE could adjourn for the day and reconvene a minute later. In fact, Republicans invoked Rule 32, which requires members, including COURSER, to stay in their seats indefinitely.

743.   COTTER then repeatedly ran down the list of Democrat members who weren't voting to ask if they changed their mind. When the first vote failed 67-14, with 26 Democrats not voting and two Democrats absent, they tried again; reconsidering the vote and keeping the board open with the hopes that they could come up with the necessary 73 votes.

744.   The pressure and arm-twisting placed on COURSER came while the MSP was actively investigating the blackmail and extortion claims related to the text messages received by COURSER and Gamrat.

745.   In fact, on September 11, 2015, Magistrate Greg Wise of 71A District Court in Lapeer issued a search warrant at the request of the Michigan State Police, confirming that a police investigation into COURSER's blackmail claims was active as THE HOUSE deliberated over whether to expel COURSER and Gamrat.

746.   A legislative body, including THE HOUSE must provide procedural due process to a member, including COURSER, when considering whether to expel or discipline. This means the accused member must receive adequate notice, formal charges, and a public hearing with the right to cross-examine witnesses.

122

747.    These Defendants did not give COURSER adequate notice, did not file any formal charges against COURSER, and did not conduct a public hearing with the right to cross-examine witnesses; thereby depriving COURSER of due process of law so comprehensively as to "shock the conscience" in violation of the due process clause of the United States Constitution and the Michigan Constitution.

748.    These Defendants violated COURSER's rights under the Fourteenth Amendment's guarantee that these Defendants, when acting under color of State law, must respect fundamental human rights and personal immunities.

749.    This guarantee was violated when Defendants' conduct deprived COURSER of liberty and failed to respect decencies of civilized conduct to the extent that it "shocks the conscience."

750.    These Defendants violated COURSER's substantive rights under the Due Process Clause of the Fourteenth Amendment not to be deprived of liberty and property without due process of law.

751.    These Defendants also violated COURSER's substantive rights under the Equal Protection Clause of the Fourteenth Amendment not to be deprived of equal protection of the laws.

752.    Further, Article I § 17 of the Michigan Constitution states that no person shall be compelled in any criminal case to be a witness against himself, nor deprived of life, liberty, or property, without due process of law. COURSER was not provided with due process of law.

753.    Article I § 17 further states that, "The right of all individuals, firms, corporations, and voluntary associations to fair and just treatment in the course of legislative and executive investigations and hearings shall not be infringed."

123

754.    These Defendants' process for expulsion of COURSER constituted disparate treatment compared to other equally situated past and present legislators.

755.    These Defendants also violated COURSER's rights under the Fourth Amendment to be secure in their person and property and free of unreasonable seizure over a tremendous length of time while COURSER was held by THE HOUSE and these Defendants during the expulsion vote on September 11 2015; which created unreasonable anxiety and duress and caused damages, both personal and professional.

756.    These Defendants also violated COURSER's rights under the Fourth Amendment to be secure in their person and property and free of unreasonable seizure when they illegally and unlawfully confiscated and seized COURSER's computers without a warrant or probable cause.

757.    These Defendants also violated the double jeopardy clauses of the United States Constitution and Michigan Constitution when COURSER was forced to endure vote after vote; taken in an effort to expel COURSER.

758.    COTTER wore down those who opposed him in his effort to remove COURSER. Until he got enough "yes" votes on COURSER, COTTER would not allow anyone to leave and had the Sergeant at Arms bar the doors.

759.    Further, COTTER had required all Republican Representatives to give him their vote, through the Caucus Pledge; essentially creating a pay-to-play atmosphere and political corruption within the caucus and THE HOUSE.

760.    COURSER was constructively removed after 15 hours of voting. There was no way for the other Representatives who were detained to say "no" or they were simply going to be forced to remain until COTTER got the "yes" votes he needed.

124

761.    COURSER was not "Mirandized" during the "investigation", which COTTER, THE HOUSE, SWARTZLE, SAARI, and BOWLIN all acknowledged was a criminal investigation from the start, conducted in conjunction with the MSP, BRITVEC, BREWER, DWYER, and SCHUETTE.

762.    COURSER was not allowed to subpoena witnesses, testimony, or evidence. COURSER was not allowed to cross examine witnesses. COURSER was not given a copy of the so called "evidence" in order to prepare for the hearing or defend himself.

763.    COURSER was not allowed to see the HBO Report until it had been released to the public; bringing irreparable harm to him and his family, despite repeated requests.

764.    COURSER was not given adequate notice, an opportunity to conduct an independent investigation, time and access to review the facts that would be put forward, subpoena powers, rules to allow for cross examination, and rules that allowed him to defend himself. Rather, these Defendants refused COURSER every opportunity for due process, equal protection, or a fair hearing. It was clearly the intent of these Defendants to not permit due process or a fair hearing.

765.    Rather than have the Sergeant at Arms conduct the investigation, COTTER handpicked his team of investigators, which included BOWLIN, McBROOM, LaFONTAINE, VERHEULEN, and HEISE who conducted the investigation without due process.

766.    In fact, the entire investigation and process was rushed in order to get rid of COURSER before the deadline to create a special election and in time to pass the House Road Package.

767.    COURSER is being treated differently now with regard to criminalization of THE HOUSE Rules, which is now being raised to the level of a felony, even though the MSP has now

admitted that violation of THE HOUSE rules cannot be criminal. SCHUETTE is now trying to criminalize the "breaking of a rule" so as to justify the removal of COURSER, because he was removed before any criminal charges had been brought.

768.    The equal protection clause of the Fourteenth Amendment requires that states treat in a similar manner all individuals who are similarly situated. Here, others within THE HOUSE, including COTTER, have violated Rule 41; yet MSP/BRITVEC/SCHUETTE have decided only to prosecute COURSER.

769.    COURSER has not been indemnified, which is his right, and his legal fees have not been paid.

770.    Other public officials have been indemnified for acts while in public office and have had representation afforded to them for their actions while in office.

771.    Even though THE HOUSE and these Defendants claimed COURSER misused state resources in the amount of "upwards of ten thousand dollars" there was never any actual evidence submitted. Further, SCHUETTE didn't charge him with misusing state resources. These Defendants repeatedly lied in stating COURSER had misused state resources and none were ever found to have been missing.

772.    COTTER used his official position to secretly use staff both in his office and in the offices of COURSER as spies to build his political leverage.

773.    COTTER used other state employees to treat COURSER differently. This misuse of state resources in order to satisfy his own agenda (and possibly the agenda of others in positions of greater authority) is misconduct.

DePerno Law Office, PLLC • 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) • 269-353-2726 (Fax)

774.    COURSER was forced from office without due process or equal protection (and other Constitutional violations) and was forced to endure loss of salary, income, and future prospects, including loss of his seat for the remainder of the term.

775.    COURSER is now in jeopardy of losing his law license, his law practice, and his commercial building. His accounting practice/law practice has been completely destroyed by the actions of these Defendants. His practice is now in jeopardy due to the ongoing stain and stigma and the further actions by THE HOUSE and these Defendants to now arbitrarily and capriciously criminalize "breaking the rules." He has suffered irreparable harm economically, mentally, emotionally, personally, and professionally.

776.    These Defendants are jointly, severally, and/or alternatively liable to COURSER for all of his injuries and damages.

777.    As a direct and proximate cause of the violations described in this Complaint, COURSER has suffered and continues to suffer from, including but not limited to, severe and permanent emotional distress, embarrassment, legal expenses, and loss of earning capacity. COURSER is entitled to compensatory, exemplary, and punitive damages.

### COUNT 2
### VIOLATION OF 42 U.S.C. § 1985
### (Conspiracy to Violate Constitutional Rights)

### (as to All Defendants)

778.    COURSER restates and incorporates the preceding paragraphs as though set forth fully herein.

779.    Based on the facts set forth herein and in the proceeding paragraphs, all of the Defendants are liable to COURSER for conspiracy to violate his constitutional rights under 42 U.S.C. § 1985.

DePerno Law Office, PLLC • 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) • 269-353-2726 (Fax)

780.   These Defendants acted maliciously, recklessly, intentionally, or by reason of gross negligence or violation of the law and are therefore liable to COURSER.

781.   The actions by these Defendants demonstrate a well-organized plan involving at least ten people to dig up "evidence" they needed to expel COURSER from office because he would not blindly support Proposal 1 and vote "yes" on increasing taxes on the House Road Bill.

782.   These Defendants and/or an agent thereof engaged in a concerted action.

783.   The action was designed to accomplish either a criminal or unlawful purpose, or a lawful purpose by criminal or unlawful means.

784.   These Defendants and/or an agent thereof illegally, maliciously, and wrongfully conspired with one another with the intent to and for the illegal purpose of conducting surveillance and disseminating information regarding COURSER.

785.   These Defendants and/or an agent thereof illegally, in combination, conspired to improperly obtain information, publicly humiliate, harass, embarrass, and otherwise cause COURSER to lose his employment as a Representative.

786.   This conspiracy resulted in the illegal, unlawful, or tortious activity of illegally surveying, improperly disseminating private information, and improper removal of Gamrat and COURSER from THE HOUSE.

787.   As a result of the conspiracy and Defendants and/or an agent thereof illegal, wrongful, or tortious acts, COURSER sustained damages.

788.   These Defendants are jointly, severally, and/or alternatively liable to COURSER for all of his injuries and damages.

789.   As a direct and proximate cause of the violations described in this Complaint, COURSER has suffered and continues to suffer from, including but not limited to, severe and

DePerno Law Office, PLLC • 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) • 269-353-2726 (Fax)

permanent emotional distress, embarrassment, legal expenses, and loss of earning capacity. COURSER is entitled to compensatory, exemplary, and punitive damages.

## COUNT 3
## UNCONSTITUTIONAL VAGUENESS

### (as to Article IV, § 16 of the Michigan Constitution)

790.    COURSER restates and incorporates the preceding paragraphs as though set forth fully herein.

791.    Article IV, § 16 of the Michigan Constitution is unconstitutionally vague and overbroad on its face and in its application, violates the First and Fourteenth Amendments, and is not sufficiently definite to provide adequate protection to the voting citizens of the State of Michigan.

792.    Pursuant to Article IV, § 16 of the Michigan Constitution:

Each house, except as otherwise provided in this constitution, shall choose its own officers and determine the rules of its proceedings, but shall not adopt any rule that will prevent a majority of the members elected thereto and serving therein from discharging a committee from further consideration of any measure. Each house shall be the sole judge of the qualifications, elections and returns of its members, and may, with the concurrence of two-thirds of all the members elected thereto and serving therein, expel a member. The reasons for such expulsion shall be entered into the journal, with the votes and names of the members upon the question. No member shall be expelled a second time for the same cause.

793.    However, Article 1, § 1 of the Michigan Constitution states that "All political power is inherent in the people. Government is instituted for their equal benefit, security, and protection."

794.    Article IV, § 7 of the Michigan Constitution sets forth the qualifications to be a Legislator and states that:

Each senator and representative must be a citizen of the United States, at least 21 years of age, and an elector of the district he represents… No person who has been convicted of subversion or who has within the preceding 20 years been

129

convicted of a felony involving a breach of public trust shall be eligible for either house of the legislature.

795. THE HOUSE, COTTER, BOWLIN, SWARTZLE, SAARI, McBROOM, LaFONTAINE, VERHEULEN, BEYDOUN, and HEISE are without power to exclude from its membership a person who has been duly elected as a Representative and who meets the age, citizenship, and criminal requirements.

796. On its face, Article IV, § 16 of the Michigan Constitution is vague and overbroad because, as written and applied in the instant case, the power vested to the members of THE HOUSE is in direct conflict with the power vested in the people.

797. As written and presently applied, THE HOUSE can remove any duly elected Representative, regardless of the reason, so long as the reason is entered in the journal. Therefore,

798. Because COURSER was duly elected by the people and meet the age, citizenship, and criminal requirements to serve as a Representative for his district, THE HOUSE did not have the power to revoke his membership. Rather, only the people his district had the power to revoke his membership.

799. Article IV, § 16 of the Michigan Constitution unconstitutionally abridges freedom of speech and expression; does not further a compelling interest as written, is not the least restrictive means to further a governmental interest, compelling or otherwise, and is unconstitutionally vague and overbroad.

800. For these reasons, Article IV, § 16 of the Michigan Constitution must be declared unconstitutional on its face and a temporary restraining order and preliminary injunction must enter; and after a final hearing, a permanent injunction precluding THE HOUSE, or any its agents, from enforcing Article IV, § 16 of the Michigan Constitution.

130

## COUNT 4
## UNCONSTITUTIONAL VAGUENESS

### (as to MCL 750.505)

801.     COURSER restates and incorporates the preceding paragraphs as though set forth fully herein.

802.     MCL 750.505 is unconstitutionally vague and overbroad on its face and in its application, violates the First and Fourteenth Amendments, and is not sufficiently definite to provide adequate protection to the voting citizens of the State of Michigan.

803.     Pursuant to MCL 750.505:

Any person who shall commit any indictable offense at the common law, for the punishment of which no provision is expressly made by any statute of this state, shall be guilty of a felony, punishable by imprisonment in the state prison not more than 5 years or by a fine of not more than $10,000.00, or both in the discretion of the court.

804.     However, this statute does not define "any indictable offense at the common law"; apparently leaving that up to SCHUETTE to decide what possible "catch-all" crimes he can charge people with based on the unknown criteria of what was indictable at common law. In fact, MCL 750.505 does not define any actual crime, yet imposes a penalty of 5 years imprisonment.

805.     Certainly, violation of a House Rule was not indictable at common law because the House Rules did not exist at that time.

806.     Likewise, solicitation of a state employee to send a false email was not indictable at common law.

807.     On its face, MCL 750.505 is vague and overbroad because, as written and applied in the instant case, because the specific indictable offenses at the common law are not listed. In fact, MCL 750.505 does not take into account the nature of the underlying "common law" crime which the statute makes a felony.

131

808.   The Defendants simply considered COURSER's actions morally reprehensible and stated they wanted to control the membership within THE HOUSE. However, in Michigan, the alleged crimes of violating a House Rule and soliciting a state employee to send an email are not common law crimes.

809.   The doctrine of unconstitutional vagueness imposes a "fair notice" requirement to prevent the State from holding an individual criminally responsible for conduct which he could not reasonably understand to be proscribed. *Rose v Locke*, 423 U.S. 48, 96 S. Ct. 243, 46 L. Ed. 2d 185 (1975).

810.   There is no evidence that any past Representative has been charged criminally with violating a HOUSE Rule or for soliciting a state employee to send an email. In fact, the MSP has stated that there is nothing criminal about violating a HOUSE rule. Further, there is nothing wrong with asking another to send an email. Therefore, there is nothing within the common law that would have provided COURSER with fair notice that doing either act was a crime in Michigan.[23]

811.   Because SCHUETTE is bringing charges against COURSER in this manner – under some obscure interpretation of MCL 750.505 that permits criminal charges for non-criminal conduct – such charges do not pass constitutional muster.

---

[23] COURSER does not concede that he violated a HOUSE rule or solicited a state employee to send a false email. COURSER vigorously asserts that he did neither of these acts.

DePerno Law Office, PLLC ● 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) ● 269-353-2726 (Fax)

**COUNT 5**
**NEGLIGENCE and NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

**(as to RADISSON HOTELS, RADISSON GROUP, and CARLSON)**

812.    COURSER restates and incorporates the preceding paragraphs as though set forth fully herein.

813.    At all relevant times, RADISSON HOTELS, RADISSON GROUP, and CARLSON owned, operated, controlled, maintained, managed, supervised, handled reservations for and/or were otherwise responsible for the Radisson Hotel Lansing at the Capitol.

814.    At all relevant times, RADISSON HOTELS, RADISSON GROUP, and CARLSON were the agents and/or joint venturers of the Radisson Hotel Lansing at the Capitol and each other, and at all relevant times herein were, as such, acting within the course, scope, and authority of said agency, and/or venture and were negligent in the selection, hiring, training, and supervision of each and every employee as an agent.

815.    Additionally, RADISSON HOTELS, RADISSON GROUP, and CARLSON were associated entities with the goal of carrying out a specific enterprise for profit and had a community of interest in the Radisson Hotel Lansing at the Capitol, a proprietary interest in the Radisson Hotel Lansing at the Capitol, a right to govern the policies of the Radisson Hotel Lansing at the Capitol, and they shared in the profits and losses of the Radisson Hotel Lansing at the Capitol.

816.    At all relevant times herein, COURSER made reservations and stayed at the Radisson Hotel Lansing at the Capitol on a regular basis with the expectation of privacy.

817.    Upon information and belief, Gamrat also made reservations and stayed at the Radisson Hotel Lansing at the Capitol on a regular basis with the expectation of privacy.

DePerno Law Office, PLLC ● 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) ● 269-353-2726 (Fax)

818. From January 2015 through August 2015, upon information and belief, ALLARD, GRAHAM, CLINE, JOE GAMRAT, KRELL, HORR, THE HOUSE, COTTER, SAARI, SWARTZLE, and BEYDOUN (and potentially other Defendants) did receive information from employees of RADISSON HOTELS, RADISSON GROUP, and CARLSON to identify when COURSER and Gamrat would be staying at the Radisson Hotel Lansing at the Capitol.

819. After the date was identified as to when COURSER and Gamrat would be staying at the Radisson Hotel Lansing at the Capitol, employees of RADISSON HOTELS, RADISSON GROUP, and CARLSON provided specific information to ALLARD, GRAHAM, CLINE, JOE GAMRAT, KRELL, HORR, THE HOUSE, COTTER, SAARI, SWARTZLE, and BEYDOUN (and potentially other Defendants), such as whether the showered had been used and whether the sheets had been turned down.

820. As described herein, RADISSON HOTELS, RADISSON GROUP, and CARLSON allowed access to both COURSER and Gamrat's separate RADISSON accounts and their separate rooms to further surveillance of the conspiracy and the extortion plot.

821. During this period, RADISSON employees made telephone calls to ALLARD, GRAHAM, CLINE, JOE GAMRAT, KRELL, HORR, THE HOUSE, COTTER, SAARI, SWARTZLE, and BEYDOUN (and potentially other Defendants) and provided private email and account information to ALLARD, GRAHAM, CLINE, JOE GAMRAT, KRELL, HORR, THE HOUSE, COTTER, SAARI, SWARTZLE, and BEYDOUN (and potentially other Defendants).

822. The dissemination of this information to ALLARD, GRAHAM, CLINE, JOE GAMRAT, KRELL, HORR, THE HOUSE, COTTER, SAARI, SWARTZLE, and BEYDOUN

DePerno Law Office, PLLC • 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) • 269-353-2726 (Fax)

(and potentially other Defendants) has caused and continues to cause COURSER great emotional distress and embarrassment.

823. RADISSON HOTELS, RADISSON GROUP, and CARLSON through their agents and as a joint venture had a duty to exercise reasonable and ordinary care and caution in an about the ownership, management, maintenance, supervision, control, and operation of the Radisson Hotel Lansing at the Capitol and its reservation system, privacy policies, and each of their employees, agents, servants, and independent contractors, all to the benefit of guests, patrons, business invitees, and persons like COURSER.

824. RADISSON HOTELS, RADISSON GROUP, and CARLSON, by and through their agents, employees, servants, and/or independent contractors, were negligent in their acts and/or omissions by, amongst other things, revealing that COURSER would be a guest at the Radisson Hotel Lansing at the Capitol, by revealing COURSER's room number, describing details of his stay, and providing other private and personal information to ALLARD, GRAHAM, CLINE, JOE GAMRAT, KRELL, HORR, THE HOUSE, COTTER, SAARI, SWARTZLE, and BEYDOUN (and potentially other Defendants).

825. At all relevant times, RADISSON HOTELS, RADISSON GROUP, and CARLSO acted maliciously, recklessly, intentionally, or by reason of gross negligence or violation of the law and are therefore liable to COURSER.

826. As a direct and proximate cause of the conduct of Defendants RADISSON HOTELS, RADISSON GROUP, and CARLSON as described in this Complaint, COURSER has suffered and continues to suffer from, including but not limited to, severe and permanent emotional distress, embarrassment, legal expenses, and loss of earning capacity. Courser is entitled to compensatory, exemplary, and punitive damages.

DePerno Law Office, PLLC • 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) • 269-353-2726 (Fax)

## COUNT 6
## INVASION OF PRIVACY and PUBLIC DISCLOSURE OF PRIVATE FACTS
### (as to RADISSON HOTELS, RADISSON GROUP, and CARLSON)

827.    COURSER restates and incorporates the preceding paragraphs as though set forth fully herein.

828.    The acts of RADISSON HOTELS, RADISSON GROUP, and CARLSON by and through their agents, employees, servants, and/or independent contractors, revealed private information about COURSER, including but not limited to, room number, describing details of his stay, and providing other private and personal information to ALLARD, GRAHAM, CLINE, JOE GAMRAT, KRELL, HORR, THE HOUSE, COTTER, SAARI, SWARTZLE, and BEYDOUN (and potentially other Defendants).

829.    The intrusions of RADISSON HOTELS, RADISSON GROUP, and CARLSON were and are objectionable and offensive to a reasonable person, including COURSER.

830.    As set forth in this Complaint, the intrusions of RADISSON HOTELS, RADISSON GROUP, and CARLSON were specific to COURSER's private information and private matters.

831.    As set forth in this Complaint, RADISSON HOTELS, RADISSON GROUP, and CARLSON, by and through their agents, employees, servants, and/or independent contractors, disseminated private information about COURSER to others and this information made its way to the Internet, news outlets, and other sources of distribution.

832.    The dissemination of this information detailed COURSER's private moments about his hotel visits.

833.    The disclosure of the information would be highly offensive to a reasonable person.

DePerno Law Office, PLLC ● 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) ● 269-353-2726 (Fax)

834. The information disclosed was of no legitimate concern to the public.

835. The actions of RADISSON HOTELS, RADISSON GROUP, and CARLSON violated Michigan's Identity Theft Protection Act, MCL 445.61, *et seq.*, including but not limited to MCL 445.65, MCL 445.67, MCL 445.67a, MCL 445.69, and MCL 445.71 and civil damages are appropriate for Defendant's illegal and fraudulent conduct.

836. In essence, Michigan's Identity Theft Protection Act provides that a person my not fraudulently use, conceal, misrepresent, or attempt to use the personal identifying information of another person in order to obtain goods, services, money, property, personal information, or commit another illegal or wrongful act.

837. The actions of RADISSON HOTELS, RADISSON GROUP, and CARLSON violated Michigan's Fraudulent Access to Computers, Computer Systems, and Computer Networks Act, MCL 752.791, *et seq.*

838. In essence, Michigan's Fraudulent Access to Computers, Computer Systems, and Computer Networks Act provides that a person shall not access a computer, computer program, computer system, or computer network in order to defraud or obtain money, property, or a service by a false or fraudulent pretense, representation, or promise.

839. "Michigan has long recognized the common-law tort of invasion of privacy." *Lewis v. LeGrow*, 258 Mich.App 175, 193; 670 NW2d 675 (2003).

840. At all relevant times, RADISSON HOTELS, RADISSON GROUP, and CARLSO acted maliciously, recklessly, intentionally, or by reason of gross negligence or violation of the law and are therefore liable to COURSER.

841. As a direct and proximate cause of the intrusion and seclusion and invasion of privacy by Defendants RADISSON HOTELS, RADISSON GROUP, and CARLSON as

DePerno Law Office, PLLC • 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) • 269-353-2726 (Fax)

described in this Complaint, COURSER has suffered and continues to suffer from, including but not limited to, severe and permanent emotional distress, embarrassment, legal expenses, and loss of earning capacity. COURSER is entitled to compensatory, exemplary, and punitive damages.

## COUNT 7
## VIOLATION OF FEDERAL WIRETAPPING ACT AND MICHIGAN'S EAVESDROPPING STATUTE

### (as to Allard, Graham, Cline, Joe Gamrat, Krell, Horr, The House, Cotter, Bowlin, Swartzle, Saari, McBroom, LaFontaine, VerHeulen, Beydoun, Heise, Livengood, Detroit News, MSP, Britvec, Brewer, Dwyer, and Schuette)

842.   Courser restates and incorporates the preceding paragraphs as though set forth fully herein.

843.   Throughout the aforementioned time frame, ALLARD, GRAHAM, CLINE, JOE GAMRAT, KRELL, HORR, THE HOUSE, COTTER, BOWLIN, SWARTZLE, SAARI, McBROOM, LaFONTAINE, VERHEULEN, BEYDOUN, HEISE, LIVENGOOD, DETROIT NEWS, MSP, BRITVEC, BREWER, DWYER, and SCHUETTE and other non-named parties, acting as co-conspirators, had been spying on COURSER and Gamrat.

844.   Upon information and belief, these Defendants and/or members of THE HOUSE were working with and/or directing JOE GAMRAT, KRELL, HORR, ALLARD, and GRAHAM and other unidentified persons to conduct surveillance activities.

845.   Among other things, ALLARD, GRAHAM, CLINE, JOE GAMRAT, KRELL, HORR, THE HOUSE, COTTER, BOWLIN, SWARTZLE, SAARI, McBROOM, LaFONTAINE, VERHEULEN, BEYDOUN, and HEISE and/or their agents at their direction, unlawfully placed listening devices, tracking devices, and engaged in other inappropriate and illegal surveillance activities. These actions occurred by agents or employees of THE HOUSE and at the direction of members, agents, and employees of THE HOUSE.

138

846.   THE HOUSE, COTTER, BOWLIN, SWARTZLE, SAARI, McBROOM, LaFONTAINE, VERHEULEN, BEYDOUN, and HEISE had a duty to exercise reasonable care and control over its employees and agents, including ALLARD, GRAHAM, CLINE, JOE GAMRAT, KRELL, and HORR. They did not exercise reasonable care and control. THE HOUSE, COTTER, BOWLIN, SWARTZLE, SAARI, McBROOM, LaFONTAINE, VERHEULEN, BEYDOUN, and HEISE were negligent when they failed to properly supervise themselves or ALLARD, GRAHAM, CLINE, JOE GAMRAT, KRELL, and HORR; or directed ALLARD, GRAHAM, CLINE, JOE GAMRAT, KRELL, or HORR to place listening devices on and around COURSER in order to engage in illegal surveillance activities.

847.   Upon information and belief, surveillance activities began around June of 2014, before COURSER and Gamrat took office.

848.   Upon Information and belief, surveillance activities continued after COURSER and Gamrat took office on January 14, 2015.

849.   Upon information and belief, ALLARD, GRAHAM, CLINE, JOE GAMRAT, KRELL, HORR, THE HOUSE, COTTER, BOWLIN, SWARTZLE, SAARI, McBROOM, LaFONTAINE, VERHEULEN, BEYDOUN, and HEISE supplied COURSER and Gamrat's private information to third parties.

850.   Upon information and belief, ALLARD, GRAHAM, CLINE, JOE GAMRAT, KRELL, HORR, THE HOUSE, COTTER, BOWLIN, SWARTZLE, SAARI, McBROOM, LaFONTAINE, VERHEULEN, BEYDOUN, and HEISE and/or their agents, attempted to blackmail, extort, and threaten COURSER and Gamrat.

851.   Upon information and belief, ALLARD, GRAHAM, CLINE, JOE GAMRAT, KRELL, HORR, THE HOUSE, COTTER, BOWLIN, SWARTZLE, SAARI, McBROOM,

DePerno Law Office, PLLC ● 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) ● 269-353-2726 (Fax)

LaFONTAINE, VERHEULEN, BEYDOUN, and HEISE and other agents of THE HOUSE spoke regularly with JOE GAMRAT before, during, and after the surveillance and blackmail was occurring.

852.    Upon information and belief, ALLARD, GRAHAM, CLINE, JOE GAMRAT, KRELL, HORR, THE HOUSE, COTTER, BOWLIN, SWARTZLE, SAARI, McBROOM, LaFONTAINE, VERHEULEN, BEYDOUN, and HEISE and other agents of THE HOUSE spoke regularly with ALLARD and GRAHAM before, during, and after the surveillance and blackmail was occurring.

853.    Upon information and belief, ALLARD, GRAHAM, CLINE, JOE GAMRAT, KRELL, HORR, THE HOUSE, COTTER, BOWLIN, SWARTZLE, SAARI, McBROOM, LaFONTAINE, VERHEULEN, BEYDOUN, and HEISE also spoke directly with LIVENGOOD in whose name the extortion phone was registered, whom the extortionist repeatedly mentioned as the recipient of the illegally obtained information and whom the agents of THE HOUSE ultimately took their story for COTTER.

854.    ALLARD, GRAHAM, CLINE, JOE GAMRAT, KRELL, HORR, THE HOUSE, COTTER, BOWLIN, SWARTZLE, SAARI, McBROOM, LaFONTAINE, VERHEULEN, BEYDOUN, and HEISE violated MCL 750.540 when they, in conjunction with others (including other Defendants) and in order to aid the conspiracy described herein, willfully and maliciously tapped or otherwise made an unauthorized connection to an electronic medium of communication of COURSER.

855.    ALLARD, GRAHAM, CLINE, JOE GAMRAT, KRELL, HORR, THE HOUSE, COTTER, BOWLIN, SWARTZLE, SAARI, McBROOM, LaFONTAINE, VERHEULEN, BEYDOUN, and HEISE violated MCL 750.539c when they, in conjunction with others

(including other Defendants) and in order to aid the conspiracy described herein, willfully used a device to eavesdrop upon the conversations of COURSER without the consent of all parties to the conversation.

856.   Further, ALLARD, GRAHAM, CLINE, JOE GAMRAT, KRELL, HORR, THE HOUSE, COTTER, BOWLIN, SWARTZLE, SAARI, McBROOM, LaFONTAINE, VERHEULEN, BEYDOUN, and HEISE each, at one time or another, knowingly aided, requested, or employed others (including other Defendants) to eavesdrop on the conversations of COURSER without the consent of all parties to the conversation.

857.   ALLARD, GRAHAM, CLINE, JOE GAMRAT, KRELL, HORR, THE HOUSE, COTTER, BOWLIN, SWARTZLE, SAARI, McBROOM, LaFONTAINE, VERHEULEN, BEYDOUN, and HEISE violated 18 U.S.C. § 2511 when they intentionally intercepted, endeavored to intercept, or procured other people (including other Defendants) to intercept or endeavor to intercept, wire, oral, and electronic communication of COURSER.

858.   ALLARD, GRAHAM, CLINE, JOE GAMRAT, KRELL, HORR, THE HOUSE, COTTER, BOWLIN, SWARTZLE, SAARI, McBROOM, LaFONTAINE, VERHEULEN, BEYDOUN, and HEISE further violated 18 U.S.C. § 2511, when they intentionally used, endeavored to use, or procured other people (including other Defendants) to use or endeavor to use an electronic, mechanical, or other device to intercept oral communications of COURSER. ALLARD, GRAHAM, CLINE, JOE GAMRAT, KRELL, HORR, THE HOUSE, COTTER, BOWLIN, SWARTZLE, SAARI, McBROOM, LaFONTAINE, VERHEULEN, BEYDOUN, and HEISE did so when they placed recording devices (or authorized the placement of recording devices) in COURSER's offices and other private places and then transmitted those communications through a wire, cable, or other connection.

141

859.     ALLARD, GRAHAM, CLINE, JOE GAMRAT, KRELL, HORR, THE HOUSE, COTTER, BOWLIN, SWARTZLE, SAARI, McBROOM, LaFONTAINE, VERHEULEN, BEYDOUN, and HEISE also violated 18 U.S.C. § 2511, because they knew or had reason to know that the recording devices (or any component) had been sent through the mail or transported in interstate or foreign commerce.

860.     ALLARD, GRAHAM, CLINE, JOE GAMRAT, KRELL, HORR, THE HOUSE, COTTER, BOWLIN, SWARTZLE, SAARI, McBROOM, LaFONTAINE, VERHEULEN, BEYDOUN, and HEISE also violated 18 U.S.C. § 2511, because (a) their actions to record and/or transmit conversations of COURSER took place on the premises of a business or commercial establishment the operation of which affects interstate or foreign commerce or (b) their actions to record and/or transmit conversations of COURSER where obtained for the purposes of obtaining information relating to the operations of any business or other commercial establishment the operations of which affect interstate or foreign commerce.

861.     ALLARD, GRAHAM, CLINE, JOE GAMRAT, KRELL, HORR, THE HOUSE, COTTER, BOWLIN, SWARTZLE, SAARI, McBROOM, LaFONTAINE, VERHEULEN, BEYDOUN, and HEISE violated MCL 750.539d when they installed listening devices in a private place without the consent of COURSER (and others) who were entitled to privacy in order to observe, record, transmit, or eavesdrop upon the sounds events in that place.

862.     ALLARD, GRAHAM, CLINE, JOE GAMRAT, KRELL, HORR, THE HOUSE, COTTER, BOWLIN, SWARTZLE, SAARI, McBROOM, LaFONTAINE, VERHEULEN, BEYDOUN, and HEISE further violated MCL 750.539d when they distributed and disseminated or transmitted for access a recording they knew to be obtained in violation of such section. For instance, this occurred when GRAHAM played the recording from COURSER's office to

DePerno Law Office, PLLC • 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) • 269-353-2726 (Fax)

ALLARD and GRAHAM. Another violation occurred when ALLARD and GRAHAM transmitted the recordings to LIVENGOOD and the DETROIT NEWS.

863.    LIVENGOOD and the DETROIT NEWS violated MCL 750.539d when they distributed and disseminated or transmitted for access the same recordings they knew to be obtained in violation of such section. For instance, this occurred when LIVENGOOD and the DETROIT NEWS transmitted the recordings to the world.

864.    MSP, BRITVEC, BREWER, DWYER, and SCHUETTE violated MCL 750.539d when they distributed and disseminated or transmitted for access the same recordings they knew to be obtained in violation of such section. For instance, this occurred when they conducted interviews and held press conferences and issued charges detailing the contents of the illegally obtained recordings.

865.    ALLARD, GRAHAM, CLINE, JOE GAMRAT, KRELL, HORR, THE HOUSE, COTTER, BOWLIN, SWARTZLE, SAARI, McBROOM, LaFONTAINE, VERHEULEN, BEYDOUN, HEISE. LIVENGOOD, DETROIT NEWS, MSP, BRITVECE, and SCHUETTE violated MCL 750.539e when they used or divulged information they knew or reasonably should have known was obtained in violation of MCL 750.539b, 539c, or 539d.

866.    ALLARD, GRAHAM, CLINE, JOE GAMRAT, KRELL, HORR, THE HOUSE, COTTER, BOWLIN, SWARTZLE, SAARI, McBROOM, LaFONTAINE, VERHEULEN, BEYDOUN, HEISE. LIVENGOOD, DETROIT NEWS, MSP, BRITVECE, and SCHUETTE further violated 18 U.S.C. § 2511, when they intentionally disclosed or endeavored to disclose to other people the contents of the wire, oral, or electronic communications, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of 18 U.S.C. § 2511.

143

867.    ALLARD, GRAHAM, CLINE, JOE GAMRAT, KRELL, HORR, THE HOUSE, COTTER, BOWLIN, SWARTZLE, SAARI, McBROOM, LaFONTAINE, VERHEULEN, BEYDOUN, HEISE. LIVENGOOD, DETROIT NEWS, MSP, BRITVECE, and SCHUETTE further violated 18 U.S.C. § 2511, when they intentionally used or endeavored to use the contents of the wire, oral, or electronic communications, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of 18 U.S.C. § 2511.

868.    ALLARD, GRAHAM, CLINE, JOE GAMRAT, KRELL, HORR, THE HOUSE, COTTER, BOWLIN, SWARTZLE, SAARI, McBROOM, LaFONTAINE, VERHEULEN, BEYDOUN, HEISE. LIVENGOOD, DETROIT NEWS, MSP, BRITVECE, and SCHUETTE further violated 18 U.S.C. § 2511, when they intentionally disclosed or endeavored to disclose the contents of the wire, oral, or electronic communications intercepted by authorized means but knowing or having reason to know that the information was obtained through the interception of such a communication in connection with a criminal investigation, having obtained or received the information in connection with a criminal investigation, and with intent to improperly obstruct, impede, or interfere with a criminal investigation.

869.    At all relevant times, the Defendants listed in this Count acted maliciously, recklessly, intentionally, or by reason of gross negligence or violation of the law and are therefore liable to COURSER.

870.    As a direct and proximate cause of the violations described in this Complaint, COURSER has suffered and continues to suffer from, including but not limited to, severe and permanent emotional distress, embarrassment, legal expenses, and loss of earning capacity. COURSER is entitled to compensatory, exemplary, and punitive damages.

DePerno Law Office, PLLC • 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) • 269-353-2726 (Fax)

## COUNT 8
## IDENTIFY THEFT, INVASION OF PRIVACY, AND HACKING

### (as to the Allard, Graham, Cline, Joe Gamrat, Krell, Horr, the House, Cotter, Bowlin, Swartzle, Saari, McBroom, LaFontaine, VerHeulen, Beydoun, and Heise)

871.    COURSER restates and incorporates the preceding paragraphs as though set forth fully herein.

872.    ALLARD, GRAHAM, CLINE, JOE GAMRAT, KRELL, HORR, THE HOUSE, COTTER, BOWLIN, SWARTZLE, SAARI, McBROOM, LaFONTAINE, VERHEULEN, BEYDOUN, and HEISE and/or an agent thereof, intruded upon the seclusion, solitude, or private affairs of Gamrat and COURSER by gaining access, without permission, to their email account, computers, cellular phone and tablets, and by recording personal and private telephone conversations.

873.    The matters that ALLARD, GRAHAM, CLINE, JOE GAMRAT, KRELL, HORR, THE HOUSE, COTTER, BOWLIN, SWARTZLE, SAARI, McBROOM, LaFONTAINE, VERHEULEN, BEYDOUN, and HEISE and/or an agent thereof intruded upon were private to COURSER.

874.    COURSER had the right to keep certain matters private.

875.    ALLARD, GRAHAM, CLINE, JOE GAMRAT, KRELL, HORR, THE HOUSE, COTTER, BOWLIN, SWARTZLE, SAARI, McBROOM, LaFONTAINE, VERHEULEN, BEYDOUN, and HEISE and/or an agent thereof, invaded COURSER's privacy by obtaining information about matters by a method that would be objectionable to a reasonable person.

876.    ALLARD, GRAHAM, CLINE, JOE GAMRAT, KRELL, HORR, THE HOUSE, COTTER, BOWLIN, SWARTZLE, SAARI, McBROOM, LaFONTAINE, VERHEULEN,

DePerno Law Office, PLLC ● 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) ● 269-353-2726 (Fax)

BEYDOUN, and HEISE and/or an agent thereof, disclosed and/or published embarrassing private facts embarrassing facts regarding COURSER.

877. The disclosure of the information would be highly offensive to a reasonable person.

878. The information disclosed was of no legitimate concern to the public.

879. ALLARD, GRAHAM, CLINE, JOE GAMRAT, KRELL, HORR, THE HOUSE, COTTER, BOWLIN, SWARTZLE, SAARI, McBROOM, LaFONTAINE, VERHEULEN, BEYDOUN, and HEISE's actions violated Michigan's Identity Theft Protection Act, MCL 445.61, *et seq.*, including but not limited to MCL 445.65, MCL 445.67, MCL 445.67a, MCL 445.69, and MCL 445.71 and civil damages are appropriate for Defendant's illegal and fraudulent conduct.

880. In essence, Michigan's Identity Theft Protection Act provides that a person my not fraudulently use, conceal, misrepresent, or attempt to use the personal identifying information of another person in order to obtain goods, services, money, property, personal information, or commit another illegal or wrongful act.

881. ALLARD, GRAHAM, CLINE, JOE GAMRAT, KRELL, HORR, THE HOUSE, COTTER, BOWLIN, SWARTZLE, SAARI, McBROOM, LaFONTAINE, VERHEULEN, BEYDOUN, and HEISE's actions violated Michigan's Fraudulent Access to Computers, Computer Systems, and Computer Networks Act, MCL 752.791, *et seq.*

882. In essence, Michigan's Fraudulent Access to Computers, Computer Systems, and Computer Networks Act provides that a person shall not access a computer, computer program, computer system, or computer network in order to defraud or obtain money, property, or a service by a false or fraudulent pretense, representation, or promise.

146

883.    "Michigan has long recognized the common-law tort of invasion of privacy." *Lewis v. LeGrow*, 258 Mich.App 175, 193; 670 NW2d 675 (2003).

884.    ALLARD, GRAHAM, CLINE, JOE GAMRAT, KRELL, HORR, THE HOUSE, COTTER, BOWLIN, SWARTZLE, SAARI, McBROOM, LaFONTAINE, VERHEULEN, BEYDOUN, and HEISE have intruded into COURSER's seclusion or solitude and into their private affairs by hacking their email accounts, computer, cellular phone and tablets, and recording their telephone conversations.

885.    ALLARD, GRAHAM, CLINE, JOE GAMRAT, KRELL, HORR, THE HOUSE, COTTER, BOWLIN, SWARTZLE, SAARI, McBROOM, LaFONTAINE, VERHEULEN, BEYDOUN, and HEISE used this information to disclose the information to others in order to extort, blackmail, and harass COURSER.

886.    ALLARD, GRAHAM, CLINE, JOE GAMRAT, KRELL, HORR, THE HOUSE, COTTER, BOWLIN, SWARTZLE, SAARI, McBROOM, LaFONTAINE, VERHEULEN, BEYDOUN, and HEISE's use of this information has placed COURSER in a false light.

887.    At all relevant times, the Defendants listed in this Count acted maliciously, recklessly, intentionally, or by reason of gross negligence or violation of the law and are therefore liable to COURSER.

888.    As a direct and proximate cause of the intrusion and seclusion and invasion of privacy by ALLARD, GRAHAM, CLINE, JOE GAMRAT, KRELL, HORR, THE HOUSE, COTTER, BOWLIN, SWARTZLE, SAARI, McBROOM, LaFONTAINE, VERHEULEN, BEYDOUN, and HEISE as described in this Complaint, COURSER has suffered and continues to suffer from, including but not limited to, severe and permanent emotional distress,

DePerno Law Office, PLLC • 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) • 269-353-2726 (Fax)

embarrassment, legal expenses, and loss of earning capacity. COURSER is entitled to compensatory, exemplary, and punitive damages.

**COUNT 9**
**EXTORTION and BLACKMAIL**

**(as to the Allard, Graham, Cline, Joe Gamrat, Krell, Horr, the House, Cotter, Bowlin, Swartzle, Saari, McBroom, LaFontaine, VerHeulen, Beydoun, and Heise)**

889. COURSER restates and incorporates the preceding paragraphs as though set forth fully herein.

890. ALLARD, GRAHAM, CLINE, JOE GAMRAT, KRELL, HORR, THE HOUSE, COTTER, BOWLIN, SWARTZLE, SAARI, McBROOM, LaFONTAINE, VERHEULEN, BEYDOUN, and HEISE and/or an agent thereof, harassed, extorted, blackmailed, and otherwise engaged in tortuous conduct against COURSER.

891. Through a series of emails and/or texts, in order to achieve the goals of the conspiracy described herein, ALLARD, GRAHAM, CLINE, JOE GAMRAT, KRELL, HORR, THE HOUSE, COTTER, BOWLIN, SWARTZLE, SAARI, McBROOM, LaFONTAINE, VERHEULEN, BEYDOUN, and HEISE sent or caused to be sent text messages to COURSER demanding that he resign from office and take other actions against his will.

892. As a direct and proximate cause of the violations described in this Complaint, COURSER has suffered and continues to suffer from, including but not limited to, severe and permanent emotional distress, embarrassment, legal expenses, and loss of earning capacity. COURSER is entitled to compensatory, exemplary, and punitive damages.

148

## COUNT 10
## ABUSE OF PROCESS / MISCONDUCT IN OFFICE / MISUSE OF OFFICE

### (as to the House, Cotter, Bowlin, Swartzle, Saari, McBroom, LaFontaine, VerHeulen, Beydoun, Heise, MSP, Britvec, Brewer, Dwyer, and Schuette)

893.    COURSER restates and incorporates the preceding paragraphs as though set forth fully herein.

894.    THE HOUSE, COTTER, BOWLIN, SWARTZLE, SAARI, McBROOM, LaFONTAINE, VERHEULEN, BEYDOUN, HEISE, MSP, BRITVEC, BREWER, DWYER, and SCHUETTE have abused their positions in government to exact political retribution without any effort to provide due process, equal protection, or Constitutional protections.

895.    THE HOUSE, COTTER, BOWLIN, SWARTZLE, SAARI, McBROOM, LaFONTAINE, VERHEULEN, BEYDOUN, and HEISE used state employees to illegally monitor, wiretap, eavesdrop, stalk, and required their agents (including ALLARD, GRAHAM, and CLINE) to conduct these illegal acts. MSP, BRITVEC, BREWER, DWYER, and SCHUETTE then used that information they knew to be illegally obtained, or should have known was illegally obtained after reasonable inquiry, for their own financial and political gain.

896.    THE HOUSE, COTTER, BOWLIN, SWARTZLE, SAARI, McBROOM, LaFONTAINE, VERHEULEN, BEYDOUN, and HEISE misused state employees (including ALLARD, GRAHAM, and CLINE) in an effort to turn them into their own surveillance team against COURSER and Gamrat. MSP, BRITVEC, BREWER, DWYER, and SCHUETTE then used that information they knew to be illegally obtained, or should have known was illegally obtained after reasonable inquiry, for their own financial and political gain.

897.    THE HOUSE, COTTER, BOWLIN, SWARTZLE, SAARI, McBROOM, LaFONTAINE, VERHEULEN, BEYDOUN, and HEISE misused state resources in their expulsion efforts when they failed to provide due process and equal protection to COURSER and

149

Gamrat and forced them to endure unfounded allegations as the basis of their expulsions. MSP, BRITVEC, BREWER, DWYER, and SCHUETTE then used that information they knew to be illegally obtained, or should have known was illegally obtained after reasonable inquiry, for their own financial and political gain.

898.   THE HOUSE, COTTER, BOWLIN, SWARTZLE, SAARI, McBROOM, LaFONTAINE, VERHEULEN, BEYDOUN, and HEISE abused their positions to break laws and to unfairly and unequally treat COURSER and Gamrat in an effort to cause destruction to them prior to, during, and after their positions as Representatives. MSP, BRITVEC, and SCHUETTE then used that information they knew to be illegally obtained, or should have known was illegally obtained after reasonable inquiry, for their own financial and political gain.

899.   At all relevant times, the Defendants listed in this Count acted maliciously, recklessly, intentionally, or by reason of gross negligence or violation of the law and are therefore liable to COURSER.

900.   As a direct and proximate cause of the violations described in this Complaint, COURSER has suffered and continues to suffer from, including but not limited to, severe and permanent emotional distress, embarrassment, legal expenses, and loss of earning capacity. COURSER is entitled to compensatory, exemplary, and punitive damages.

## COUNT 11
## PROMISSORY ESTOPPEL

### (as to The House, Cotter, Bowlin, Swartzle, Saari, McBroom, LaFontaine, VerHeulen, Beydoun, and Heise)

901.   COURSER restates and incorporates the preceding paragraphs as though set forth fully herein.

150

902.    COURSER met with agents of COTTER and was assured that if he appeared at the committee hearing and met with BOWLIN he would only be censured by THE HOUSE for his alleged actions; and not expelled.

903.    COURSER met with BEYDOUN regarding this censure, who were also acting as his attorney. COURSER had met with SCHWARTZLE previously regarding the censure.

904.    Relying on these assurances, COURSER appeared at the committee hearing and gave a statement and answered questions.

905.    COTTER and THE HOUSE did not censure COURSER as promised, but instead moved for his expulsion.

906.    The agreement between the parties was clear and definite in nature.

907.    COURSER did not receive the important and essential benefits for which the parties' agreements were made.

908.    As a direct and proximate cause of the violations described in this Complaint, COURSER has suffered and continues to suffer from, including but not limited to, severe and permanent emotional distress, embarrassment, legal expenses, and loss of earning capacity. COURSER is entitled to compensatory, exemplary, and punitive damages.

## COUNT 12
## INDEMNIFICATION

### (as to the House)

909.    COURSER restates and incorporates the preceding paragraphs as though set forth fully herein.

910.    Pursuant to MCL § 691.1408(1), whenever a claim is made or a civil action is commenced against a Representative for injuries caused in the course of their employment, THE

DePerno Law Office, PLLC • 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) • 269-353-2726 (fax)

HOUSE shall compromise, settle, pay claims, compromise judgments, and otherwise indemnify the Representative.

911.    Pursuant to MCL § 691.1408(2), when a criminal action is commenced against a Representative based upon conduct in the course of their employment, THE HOUSE shall pay for, engage, furnish services of an attorney, and reimburse the Representative for legal expenses.

912.    COURSER has been sued by Defendants ALLARD and GRAHAM in State Court regarding Whistleblower and other claims derived from acts stemming from COURSER's employment as a Representative.

913.    Because the facts and circumstances regarding the Defendants ALLARD and GRAHAM's State Court claims stem from COURSER's actions as a member of the Michigan House of Representatives, COTTER and THE HOUSE are required to indemnify COURSER and provide him with a defense.

914.    COURSER is also being criminally prosecuted for actions stemming from his employment as a Representative.

915.    Because the facts and circumstances regarding the criminal charges against COURSER stem from his actions as a member of THE HOUSE, COTTER and THE HOUSE are required to indemnify COURSER.

916.    To date, COTTER and THE HOUSE have not indemnified or offered to indemnify COURSER.

917.    Upon information and belief, COTTER and THE HOUSE are refusing to indemnify COURSER in malicious retaliation, to further the conspiracy to remove and extort COURSER, and to deprive COURSER of equal protection and due process.

DePerno Law Office, PLLC • 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) • 269-353-2726 (Fax)

918.   Furthermore, COURSER's conduct which COTTER and THE HOUSE are retaliating against is constitutionally protected, to wit:

    a.    openly opposing and voting "no" on Proposal 15-1, the House Road Package, and other legislation favored by COTTER;

    b.    speaking out against COTTER's illegally abusing his official position in regards to the law on seating assignments;

    c.    maintaining allegiance to his district and not getting in line behind COTTER on efforts to advance his progressive legislation of increased taxation and diversion of State funds to Obamacare;

    d.    Standing against secret agreements to abrogate the votes of his district to COTTER personally through the Caucus Pledge;

    e.    Refusing to stay silent when COTTER demanded silence while THE HOUSE and COTTER worked to advance his own agenda/legislation using illegally obtained submission through the Caucus Pledge.

919.   It is the general practice of THE HOUSE to indemnify Representatives accused of similar misconduct; by way of example, THE HOUSE indemnified and settled claims against Representative Banks.

920.   Interestingly and ironically, sitting in THE HOUSE Chamber and voting on the expulsion was Representative Banks, who was involved in allegedly forcing a staff member to have sex with him as a condition of employment in THE HOUSE; yet he was indemnified and THE HOUSE paid his legal fees and paid to settle the claims against him.

921.   COTTER and THE HOUSE's decision not to indemnify COURSER is unconstitutional, violates the equal protection and due process of law and freedom of speech.

922.    COURSER is entitled to indemnification by COTTER and THE HOUSE.

923.   Upon information and belief, THE HOUSE paid over $100,000 to deal with the Banks indemnification and settlement

DePerno Law Office, PLLC • 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) • 269-353-2726 (fax)

924.     Representative Banks stands in stark contrast to COURSER who was not indemnified and has had to incur and pay his own attorney fees.

925.     As a direct and proximate cause of the violations described in this Complaint, COURSER has suffered and continues to suffer from, including but not limited to, severe and permanent emotional distress, embarrassment, legal expenses, and loss of earning capacity. COURSER is entitled to compensatory, exemplary, and punitive damages.

## COUNT 13
## FALSE IMPRISONMENT AND FALSE ARREST

### (as to The House, Cotter, Bowlin, Swartzle, Saari, McBroom, LaFontaine, VerHeulen, Beydoun, and Heise)

926.     COURSER restates and incorporates the preceding paragraphs as though set forth fully herein.

927.     Defendants COTTER and THE HOUSE intentionally and unlawfully restrained COURSER's personal liberties and freedom of movement.

928.     Defendants COTTER and THE HOUSE refused to allow COURSER and other Representatives to leave THE HOUSE floor until COURSER and Gamrat were removed from office.

929.     Defendants COTTER and THE HOUSE refused to allow COURSER and other Representatives to take bathroom breaks until COURSER and Gamrat were removed from office.

930.     Defendants COTTER and THE HOUSE had the Sergeant at Arms and security guards block exits on THE HOUSE floor while taking votes for COURSER's expulsions.

931.     The unlawful restraint, detention, and confinement was against COURSER's will.

932.     The acts of COTTER and THE HOUSE were committed with the intent of confining COURSER.

154

933.   The acts of COTTER and THE HOUSE directly or indirectly resulted in confinement of COURSER.

934.   COURSER was conscious of his confinement and knew he was not permitted to leave THE HOUSE floor until he resigned or was expelled.

935.   Further, the actions taken by COTTER and THE HOUSE amounted to an intentional arrest against COURSER.

936.   COURSER was aware of the arrest, which was against his will.

937.   The arrest was illegal. COTTER and THE HOUSE did not have the right or authority to confine COURSER to THE HOUSE floor until he resigned.

938.   Rather, COURSER should have been entitled to review the information presented, subpoena witnesses, and make a defense for the charges alleged. Further, COTTER and THE HOUSE were not permitted to continuously vote to expel COURSER until they achieved their result.

939.   In addition, COTTER forced COURSER to submit to being physically detained and searched in violation of each of his constitutional rights, before being allowed on THE HOUSE floor.

940.   Based on this illegal detainment that last for many hours and continued into the early hours of the morning, exhausted and illegally detained, COURSER was forced to resign his seat when COTTER and THE HOUSE were unable to mount the votes necessary for expulsion.

941.   This forced resignation was against his will and as a result of being illegally detained.

155

942. At all relevant times, the Defendants listed in this Count acted maliciously, recklessly, intentionally, or by reason of gross negligence or violation of the law and are therefore liable to COURSER.

943. As a direct and proximate cause of the violations described in this Complaint, COURSER has suffered and continues to suffer from, including but not limited to, severe and permanent emotional distress, embarrassment, legal expenses, and loss of earning capacity. COURSER is entitled to compensatory, exemplary, and punitive damages.

## COUNT 14
## INTENTIONAL OR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

### (as to All Defendants)

944. COURSER restates and incorporates the preceding paragraphs as though set forth fully herein.

945. The behavior by all Defendants and/or agents thereof was extreme and outrageous.

946. Said behavior by all Defendants and/or agents thereof was intentional or reckless.

947. If said behavior by all Defendants and/or agents thereof was not intentional, it was at least grossly negligent and with malice.

948. The events described above caused severe emotional distress to COURSER.

949. The emotional distress suffered by COURSER physically manifested itself in symptoms including, but not limited to, sleeplessness, increased anxiety, suicidal thoughts and other such physical manifestations as may appear during the course of discovery and trial in this matter.

DePerno Law Office, PLLC • 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) • 269-353-2726 (Fax)

950. At all relevant times, the Defendants listed in this Count acted maliciously, recklessly, intentionally, or by reason of gross negligence or violation of the law and are therefore liable to COURSER.

951. As a direct and proximate cause of the violations described in this Complaint, COURSER has suffered and continues to suffer from, including but not limited to, severe and permanent emotional distress, embarrassment, legal expenses, and loss of earning capacity. COURSER is entitled to compensatory, exemplary, and punitive damages.

## COUNT 15
## VIOLATIONS OF RICO; 18 U.S.C. § 1962(a), (b), and (c)

### (as to All Defendants)

952. COURSER restates and incorporates the preceding paragraphs as though set forth fully herein.

### CULPABLE RICO PERSONS

953. All Defendants in this matter are RICO persons.

### RICO ENTERPRISE

954. The RICO enterprise consists of all Defendants who, associated in fact, worked through the enterprise to commit a pattern of racketeering, which includes the specific predicate acts alleged herein.

### INTERSTATE OR FOREIGN COMMERCE

955. Defendants' racketeering activity affected interstate commerce.

956. Telephone conversations, correspondence, documentation, and other communication, as described herein, was used the U.S. Mail and interstate wires.

957. Also, the pattern of racketeering crossed state lines when Defendants provided financing, payments, U.S. Mail, and interstate wires in an effort to remove Courser from office

157

and to damage his livelihood, all with the intent to engage in illegal wiretapping and eavesdropping and to promote a sensational story for profit.

958.     Therefore, the activity of the enterprise and the predicate acts of racketeering affect interstate commerce.

## PATTERN OF RACKETEERING

959.     Defendants have engaged in a long-term pattern of racketeering activity, which has benefitted the criminal RICO enterprise and harmed COURSER.

960.     As described in this Complaint, some Defendants started the scheme to violate state laws and then spy on COURSER in order to "dig up dirt" on him. This scheme involved illegal wiretapping and eavesdropping and purchasing favors and information from RADISON HOTEL, RADISSON GROUP, and CARLSON. Information obtained was then used to extort COURSER. The illegally obtained information was then provided to LIVENGOOD and DETROIT NEWS for broadcast around the world. Eventually, this scheme resulted in MSP, BRITVEC, BREWER, DWYER, and SCHUETTE investigating and bringing charges against COURSER in order to provide cover to the conspiracy to defraud and extort. This was all done in order to deprive COURSER from his office, property, and livelihood. All Defendants joined and continued that fraudulent scheme in order to defraud COURSER.

961.     Defendants conspired to earn a profit through a process of fraud and misrepresentation of material facts, to advance their own careers, and to harm COURSER.

962.     Defendants conspired to provide misinformation to the general public in order to convert COURSER's HOUSE seat to their own in order to pass a tax increase.

## RACKETEERING ACTIVITY

158

963.    Defendants engaged in a pattern of racketeering activity that harmed COURSER, including additionally incurred legal costs, the inability to earn money, the loss of property rights and profits, and a violation of his due process, equal protection, and other Constitutional rights.

## VIOLATIONS OF MCL § 750.539C, 539D, 539E AND 750.540

964.    Defendants violated MCL 750.540 when they conspired to and did (in order to aid the conspiracy) willfully and maliciously tape or otherwise make unauthorized connections to an electronic medium of communication of COURSER.

965.    Defendants violated MCL 750.539c when they conspired to and did (in order to aid the conspiracy) willfully use a device to eavesdrop upon the conversations of COURSER without the consent of all parties to the conversation.

966.    Defendants violated MCL 750.539d when they conspired to and did (in order to aid the conspiracy) install listening devices in a private place without the consent of COURER (and others) who were entitled to privacy in order to observe, record, transmit, or eavesdrop upon the sounds and events in that place.

967.    Defendants violated MCL 750.539d when they conspired to and did (in order to aid the conspiracy) distribute and disseminate or transmit for access a recording they knew to be obtained in violation of such section.

968.    Defendants violated MCL 750.539e when they conspired to and did (in order to aid the conspiracy) use or divulge information they knew or reasonably knew or should have known was obtained in violation of MCL 750.539b, 539c, or 539d.

## VIOLATIONS OF 18 U.S.C. § 2511

969.    Defendants violated 18 U.S.C. 2511 when they conspired to and did (in order to aid the conspiracy) intentionally intercept, endeavor to intercept, or procure other people

159

(including other Defendants) to intercept or endeavor to intercept, wire, oral, and electronic communications of COURSER.

970.   Defendants violated 18 U.S.C. 2511 when they conspired to and did (in order to aid the conspiracy) intentionally use, endeavor to use, or procure other people (including other Defendants) to use or endeavor to use an electronic, mechanical or other device to intercept oral communications of COURSER.

971.   Defendants violated 18 U.S.C. 2511 when they conspired to and did (in order to aid the conspiracy) know or have reason to know that the recording devices (or any component) had been sent through the mail or transported in interstate or foreign commerce.

972.   Defendants violated 18 U.S.C. 2511 because (a) their actions to record and/or transmit conversations of COURSER took place on the premises of a business or commercial establishment the operation of which affects interstate or foreign commerce or (b) their actions to record and/or transmit conversations of COURSER where obtained for the purposes of obtaining information relating to the operations of any business or other commercial establishment the operations of which affect interstate or foreign commerce.

973.   Defendants violated 18 U.S.C. 2511 when they intentionally disclosed or endeavored to disclose to other people the contents of the wire, oral, or electronic communications, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of 18 U.S.C. § 2511.

974.   Defendants violated 18 U.S.C. 2511 when they intentionally used or endeavored to use the contents of the wire, oral, or electronic communications, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of 18 U.S.C. § 2511.

160

975.     Defendants violated 18 U.S.C. 2511 when they intentionally disclosed or endeavored to disclose the contents of the wire, oral, or electronic communications intercepted by authorized means but knowing or having reason to know that the information was obtained through the interception of such a communication in connection with a criminal investigation, having obtained or received the information in connection with a criminal investigation, and with intent to improperly obstruct, impede, or interfere with a criminal investigation.

## MAIL AND WIRE FRAUD – 18 U.S.C. §§ 1341, 1343

976.     Defendants committed mail fraud when they sent any correspondence, documents, recordings, or funds, throughout the commission of their fraudulent scheme, through the U.S Mail or through other wired communications, such as telephones, emails, and text messages.

977.     These actions and statements sent by U.S. Mail or by telephones, emails, and text messages were not only false, but misleading in such ways as to the Defendants' illegal benefit and to COURSER's detriment.

978.     Further, the Defendants' correspondence, to include recorded conversations, is fraudulent and part of a greater scheme to defraud COURSER because of the Defendants unethical desire for unilateral benefit.

979.     Thus, by sending correspondence, recordings, emails, and text message to through the U.S. Mail and wires, Defendants intended to mislead, defraud and extort COURSER and citizens of the world into believing the truth of their correspondence and documents in order to mislead, defraud, and extort COURSER.

980.     The aforementioned records, emails, and text messages were false, fraudulent, and misleading. They were sent in an attempt to conceal the on-going RICO enterprise and was part

of a greater "scheme or artifice to defraud" COURSER out of his rights to his office, property, business, and livelihood.

981.    The recordings, emails, and text messages were transmitted over the wires electronically via electronic mail and facsimile.

982.    Defendants knowingly transmitted their lies through the U.S. Mail and electronically via electronic mail and facsimile.

983.    Defendants' correspondence and documents were and are false, fraudulent, and misleading.

984.    Defendants utilized the mail and wires to perpetuate their misdeeds.

985.    Upon information and belief, Defendants engaged in other acts in furtherance of the schemes that involved use of interstate wire and the U.S. Mail, as identified in this Complaint

### VIOLATIONS OF 42 U.S.C. § 1983 AND

986.    Defendants, through the conspiracy, engaged in actions that violated COURSER's civil rights under 42 U.S.C. § 1983 and 1985, as described in this Complaint.

### VIOLATIONS OF MCL § 445.61, ET SEQ (INCLUDING MCL § 445.65, 445.67, 445.67A, 445.69, 445.71)

987.    Defendants, through the conspiracy, engaged in actions in violation of Michigan's Identity Theft Protection Act as described in this Complaint.

### VIOLATIONS OF MCL § 752.791, ET SEQ

988.    Defendants, through the conspiracy, engaged in actions in violation of Michigan's Fraudulent Access to Computers, Computer Systems, and Computer Networks Act as described in this Complaint.

### VIOLATIONS OF COMMON LAW INVASION OF PRIVACY

162

989.    Defendants, through the conspiracy, engaged in actions in violation of Michigan's common-law tort of invasion of privacy as described in this Complaint.

### *VIOLATIONS OF MCL § 750.213; EXTORTION AND BLACKMAIL*

990.    Defendants, through the conspiracy, engaged in actions of extortion and blackmail, in violation MCL 750.213 as described in this Complaint.

### *VIOLATIONS OF MCL § 750.505; MISCONDUCT*

991.    Defendants, through the conspiracy, engaged in actions of misconduct, in violation MCL 750.505 as described in this Complaint.

### *VIOLATIONS OF MCL § 750.349B; UNLAWFUL IMPRISONMENT*

992.    Defendants, through the conspiracy, engaged in actions of unlawful imprisonment, in violation MCL 750.349b as described in this Complaint.

### *INJURY*

993.    COURSER is a person who sustaining injuries to his business, property, and livelihood by reasons of the Defendants' violation of RICO and Defendants' commission of the predicate acts.

994.    COURSER has been harmed because, as a result of Defendants' actions, he has, to this day been deprived of business, property, and livelihood.

995.    COURSER has been harmed because he has been forced to incur substantial attorneys' fees in order to enforce his rights in the face of Defendants' predicate actions.

996.    COURSER has been harmed because he was forcibly removed and constructively expelled from office as a result of Defendants' predicate actions, causing him hardship, embarrassment, and loss of income and livelihood.

163

997.   COURSER has been harmed because he has suffered mental and emotional distress and attorneys' fees caused by Defendants actions against them.

998.   As a direct and proximate cause of the violations described in this Complaint, COURSER has suffered and continues to suffer from, including but not limited to, severe and permanent emotional distress, embarrassment, legal expenses, and loss of earning capacity. COURSER is entitled to compensatory, exemplary, and punitive damages.

### COUNT 16
### CONSPIRACY TO VIOLATE RICO; 18 U.S.C. § 1962(d)

#### (as to all Defendants)

999.   COURSER restates and incorporates the preceding paragraphs as though set forth fully herein.

1000.   Section 1962(d) makes it unlawful to conspire to violate subsections (a), (b) or (c) of Section 1962. 18 U.S.C. § 1962(d).

1001.   Each Defendant was a co-conspirator that knowingly joined the conspiracy and involved him or her, directly or indirectly, in the commission of at least two predicate offenses, including but not limited to the predicates of extortion, mail fraud and wire fraud, as alleged herein.

1002.   Defendants were each aware of their role as co-conspirators because they have been engaged in a quid-pro-quo relationship with the other Defendants.

1003.   Defendants knowingly and willingly involved themselves in a greater scheme to defraud, and commit the predicate acts alleged above, when they conspired to create a mutually beneficial business relationship whereby they attempted to deprive COURSER of his businesses, property, profits, livelihood, and value.

164

1004.  Defendants also knowingly and willingly committed the predicate acts of fraud, mail and wire fraud, illegal wiretapping and eavesdropping, extortion, blackmail, and other crimes and violations as described in this Complaint. Defendants also engaged in monetary transactions derived from unlawful activity of their conspiracy.

1005.  Defendants were each aware of their role as co-conspirators.

1006.  Defendants knowingly participated in a greater scheme to defraud, and commit the predicate acts alleged herein.

1007.  As a result of their conspiracy, the predicate acts and greater scheme to defraud, COURSER was harmed.

1008.  As a direct and proximate cause of the violations described in this Complaint, COURSER has suffered and continues to suffer from, including but not limited to, severe and permanent emotional distress, embarrassment, legal expenses, and loss of earning capacity. COURSER is entitled to compensatory, exemplary, and punitive damages.

**COUNT 17**
**LEGAL MALPRACTICE**

**(as to Swartzle and Beydoun)**

1009.  COURSER restates and incorporates the preceding paragraphs as though set forth fully herein.

1010.  SWARTZLE and BEYDOUN were attorneys for COURSER during his time as a Representative in THE HOUSE.

1011.  At all pertinent times, SWARTZLE and BEYDOUN were engaged in the practice of law and held themselves out to the public and to COURSER as skilled and competent attorneys capable of properly and skillfully representing, advising, counseling, and consulting

165

with individuals seeking their advice; including adherence to the standards and ethical constraints imposed by the Michigan Rules of Professional Conduct.

1012.  At all pertinent time, an attorney-client relationship existed between COURSER and SWARTZLE and BEYDOUN as SWARTZLE and BEYDOUN were rendering legal advice and counsel to COURSER and purportedly looking out for COURSER's best interests.

1013.  Accordingly, SWARTZLE and BEYDOUN owed COURSER the duty to possess the reasonable degree of learning and skill that is ordinarily possessed by attorneys in similar situations, licensed in the State of Michigan, and to use reasonable care and diligence in the exercise of skill and application of their learning to representation, advice, counseling, and consulting in accordance with the standard prevailing amongst attorneys in the State of Michigan and in conformity with the Michigan Rules of Professional Conduct.

1014.  Both SWARTZLE and BEYDOUN as attorneys for COURSER had a legal, ethical, and professional duty to COURSER and both violated that duty. They did this for their own personal and professional gain and in knowing violation of their ethical duties as attorneys.

1015.  SWARTZLE and BEYDOUN violated and disregarded their duties and obligations to COURSER and at variance with the prevailing standards, were negligent and committed malpractice in multiple ways, including but not limited to the following:

a.  Creating the appearance that SWARTZLE and BEYDOUN were looking out for COURSER's best interest and encouraging him to make statements against his interest; all the while working instead with other Defendants to have their client (COURSER) expelled.

b.  Rendering legal advice and counsel to COURSER although they had a direct conflict of interest in the matter; having previously met ALLARD, GRAHAM, and CLINE to obtain information against their client (COURSER) and working with COTTER and THE HOUSE to expel COURSER.

166

c.     Representing to COURSER that he would be censured and not expelled if he gave statements to BOWLIN and appeared at the committee hearings. This was knowingly false.

d.     Concealing from COURSER the truth of the claims being advanced by COTTER and THE HOUSE and failing to provide COURSER with all the information being presented against him.

e.     Failing to keep COURSER apprised of the investigation against him.

f.     Not properly advising COURSER regarding the illegality of the actions by COTTER regarding the Seating Law MCL 4.61.

g.     Not properly advising COURSER regarding the illegality of the actions of COTTER regarding his misuse of office by acting to procure the voting rights of COURSER (and other Representatives) via a secret and illegal agreement that forced COURSER to secretly pledge his voting rights to COTTER.

h.     Not properly advising COURSER that the "Caucus Pledge" was a violation of MCL 750.122 and 750.125 by COTTER and THE HOUSE.

i.     Not properly advising or informing COURSER that there were secretly meeting from January of 2015 through the summer of 2015 with ALLARD, GRAHAM, and CLINE (which meetings actually included SWARTZLE) to require them (in conjunction with COTTER) to act as spies or informants to build political ammunition against COURSER.

j.     Not properly informing COURSER that ALLARD, GRAHAM, and CLINE were acting as agents of COTTER.

k.     Not properly informing COURSER that SWARTZLE was also acting against COURSER's interests as a Michigan State Representatives.

l.     Not properly informing COURSER that SWARTZLE was also participating in the scheme to force COURSER to either submit to COTTER's agenda or to resign.

m.     Not properly advising COURSER that SWARTZLE was acting against COURSER's interests as a Michigan State Representative by withholding his awareness of the plot against COURSER and of the accusations by ALLARD, GRAHAM, and CLINE and of his use of ALLARD, GRAHAM and CLINE to do illegal surveillance against COURSER.

n.     Not properly presenting COURSER a so-called "Upjohn Warning" never explaining they were secretly working against COURER's interests as a Michigan State Representative while they were COURSER's attorney.

167

o.      Not properly obtaining permission from COURSER for SWARTZLE to testify against him during THE HOUSE select committee hearings regarding COURSER's character and fitness to hold office, violating their attorney-client privileged relationship with COURSER.

p.      Not properly advising COURSER of the need to obtain different counsel and never disclosing any conflict of interest.

r.      Not properly obtaining a waiver of any conflict of interest from COURSER (and COURSER never gave permission) for SWARTZLE or BEYDOUN to act contrary to his interests throughout the term or against his interests during the HBO investigations; violating their attorney-client privileged relationship with COURSER.

s.      Not properly obtaining a waiver of any conflict of interest from COURSER (and COURSER never gave permission) for SWARTZLE or BEYDOUN to act as a witness, testify, or otherwise hold meetings or discussions against or about COURSER during the Select Committee process; violating their attorney-client privileged relationship with COURSER.

t.      By assuring COURSER that his statements would remain confidential. This advice and guidance was false and misleading and was intended to trick COURSER into meeting with BOWLIN and then appearing at the committee hearing and making statements detrimental to himself.

u.      Not properly stating any concern or objection regarding the testimony used by COTTER or BOWLIN to remove COURSER. In fact SWARTZLE gave testimony that supported ALLARD and GRAHAM and was opposed to his own client COURSER.

v.      Not properly stating any concern regarding the rushed process used to forcibly and constructively expel COURSER and never properly or prudently asking for an adjournment so that COURSER could better prepare a defense.

w.      Not properly stating any concern regarding the rushed process used to forcibly and constructively expel COURSER.

x.      Not properly demanding that all information and evidence be turned over to COURSER so that he could better prepare a defense.

y.      Not properly demanding due process or equal protection for COURSER or asserting that his constitutional rights, including the right to free speech, be protected.

z.      Not properly demanding that COURSER be indemnified and that his legal fees be paid so that he could better prepare a defense.

168

aa.   Not properly deposing or questioning any witness on behalf of COURSER so that he could better prepare a defense.

bb.   Not properly objecting to the hand-picked select committee members, all of whom had an obvious bias against COURSER.

cc.   Other acts of malpractice that will be identified as discovery is completed.

1016.   SWARTZLE later acknowledged in the MSP/BRITVEC/SCHUETTE tapes that there was counter evidence that ALLARD and GRAHAM's word was not to be trusted; yet he refused to question ALLARD and GRAHAM during THE HOUSE committee hearings.

1017.   In fact, SWARTZLE and BEYDOUN intentionally and with malice kept ALLARD and GRAHAM from testifying or being cross-examined in THE HOUSE committee hearing to remove COURSER; violating COURSER's right to Due Process and a violation of the Sixth Amendment's "Right to Confrontation of Accusers."

1018.   SWARTZLE testified before THE HOUSE that COURSER misused state resources of upwards of ten thousand dollars; yet no missing resources were ever identified nor was any calculation offered. Further, SCHUETTE never charged COURSER with misuse of state resources. These statements by SWARTZLE were false and detrimental to his client (COURSER).

1019.   But for SWARTZLE and BEYDOUN's malpractice, COURSER's injuries would not have occurred. In fact, COURSER would not have appeared before BOWLIN or THE HOUSE committee and given the statements he gave.

1020.   At all relevant times, it was foreseeable that SWARTZLE and BEYDOUN's conduct would create detrimental reliance on the part of COURSER and that said conduct would lead to undue and irreparable financial hardship for COURSER.

1021.   As a result of SWARTZLE and BEYDOUN's conflict of interest and malpractice, COURSER was forcibly and constructively expelled from THE HOUSE.

169

1022.  As a direct and proximate cause of the violations described in this Complaint, COURSER has suffered and continues to suffer from, including but not limited to, severe and permanent emotional distress, embarrassment, legal expenses, and loss of earning capacity. COURSER is entitled to compensatory, exemplary, and punitive damages.

## COUNT 18
## FRAUDULENT MISREPRESENTAION

### (as to Swartzle and Beydoun)

1023.  COURSER restates and incorporates the preceding paragraphs as though set forth fully herein.

1024.  SWARTZLE and BEYDOUN made material misrepresentations to COURSER assuring COURSER that his interests would be properly protected, he would only be censured, and his statements would remain private.

1025.  SWARTZLE and BEYDOUN's representations were false because instead of providing competent legal advice, SWARTZLE and BEYDOUN secretly were working against COURSER and in conjunction with COTTER and THE HOUSE to remove COURSER from office.

1026.  SWARTZLE and BEYDOUN knew the representations and assurances they made to COURSER were false as they never intended to take any affirmative steps to protect COURSER's interests, instead acting in the interests of COTTER and THE HOUSE.

1027.  SWARTZLE and BEYDOUN intended that the representations and assurances made to COURSER would be relied upon as the purpose of those representations were to earn COURSER's trust and cooperation, and to prevent COURSER from otherwise asking questions or protecting his interests.

DePerno Law Office, PLLC ● 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) ● 269-353-2726 (Fax)

1028. COURSER did, in fact, rely on SWARTZLE and BEYDOUN's representations and assurances by trusting SWARTZLE and BEYDOUN, cooperating with BOWLIN and THE HOUSE and cooperating with SWARTZLE and BEYDOUN in an attorney-client relationship.

1029. By relying on SWARTZLE and BEYDOUN, COURSER was forcibly and constructively expelled from office.

1030. SWARTZLE and BEYDOUN engaged in fraud by representing to COURSER that his interests would be protected when, in fact, SWARTZLE and BEYDOUN had no intention to protect any interests other than COTTER and THE HOUSE.

1031. As a direct and proximate cause of the violations described in this Complaint, COURSER has suffered and continues to suffer from, including but not limited to, severe and permanent emotional distress, embarrassment, legal expenses, and loss of earning capacity. COURSER is entitled to compensatory, exemplary, and punitive damages.

## COUNT 19
## CONSPIRACY and CONCERT OF ACTIONS

### (as to All Defendants)

1032. COURSER restates and incorporates the preceding paragraphs as though set forth fully herein.

1033. Defendants acted tortiously.

1034. Defendants acted pursuant to a common design.

1035. At all relevant times, Defendants engaged in concerted activities described in the preceding paragraphs by express or implied agreement.

1036. COURSER is not able to identify all of the activities of Defendants due to the generic similarity of such activities engaged in and promoted by Defendants and/or an agent

DePerno Law Office, PLLC ● 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) ● 269-353-2726 (Fax)

thereof; but has provided details herein of the many activities engaged in and promoted by Defendants.

1037.  As a direct and proximate result of Defendants' concerted activities, COURSER has sustained, and will continue to sustain, severe injuries and damages.

1038.  Due to the concert of action among Defendants and/or an agent thereof, each is liable to COURSER for these injuries and damages even if there was no directed relation to the aforementioned activities conducted by any one particular person, party, or agent thereof.

1039.  Defendants are jointly, severally, and/or alternatively liable to COURSER for all of their injuries and damages.

1040.  COURSER is entitled to exemplary and punitive damages.

1041.  As a direct and proximate cause of the violations described in this Complaint, COURSER has suffered and continues to suffer from, including but not limited to, severe and permanent emotional distress, embarrassment, legal expenses, and loss of earning capacity. COURSER is entitled to compensatory, exemplary, and punitive damages.

## COUNT 20
## WRIT OF MANDAMUS

### (as to MSP, BRITVEC, BREWER, DWYER, and SCHUETTE)

1042.  COURSER restates and incorporates the preceding paragraphs as though set forth fully herein.

1043.  The United States Constitution and Michigan Constitution impose a clear duty upon MSP, BRITVEC, BREWER, DWYER, and SCHUETTE to provide constitutional and legal protects and benefits to COURSER.

1044.  COURSER has a clear legal right to the benefits of the United States Constitution and Michigan Constitution.

172

1045.   The obligations of the United States Constitution and Michigan Constitution are ministerial in nature. They impose duties that are clearly defined by law with precision and certainty and impose an unqualified duty on MSP, BRITVEC, BREWER, DWYER, and SCHUETTE and do not afford them any discretion as to whether they must provide the benefits.

1046.   MSP, BRITVEC, BREWER, DWYER, and SCHUETTE have clear evidence of the following criminal activities:

a.   COTTER violated Rule 41 by refusing to enter Gamrat's Life at Conception Bill during the proscribed period outlined by the HOUSE Rules. This violates MCL 750.505.

b.   Allard and Graham conducted surveillance on COURSER and Gamrat by following COURSER and Gamrat across the state during office hours to do surveillance to further their conspiracy. This is misuses of government resources and violates MCL 750.505.

c.   COTTER and McBROOM violated the seating law of MCL 4.61. This violates MCL 750.505.

d.   ALLARD, GRAHAM, CLINE, JOE GAMRAT, KRELL, and HORR engaged in extortion, in violation of MCL 750.213.

e.   ALLARD, GRAHAM, CLINE, JOE GAMRAT, KRELL, HORR, LIVENGOOD, and the DETROIT NEWS violated the wiretapping and eavesdropping statutes. MCL 750.539a, 539c, 539d, and 5393 and also 18 U.S.C. 2511.

f.   During the preliminary examination, CLINE admitted to forgery.

g.   During the preliminary examination, ALLARD and GRAHAM committed perjury.

h.   All Defendants have engaged in a conspiracy to remove COURSER from office. This included a conspiracy to violate the wiretapping and eavesdropping statutes, extortion, blackmail, mail and wire fraud, misuse of government resources, invasion of privacy and other crimes detailed and enumerated throughout this Complaint.

1047.   Despite having evidence of these crimes, MSP, BRITVEC, BREWER, DWYER, and SCHUETTE have refused to investigate or prosecute these crimes; presumably because

DePerno Law Office, PLLC ● 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) ● 269-353-2726 (Fax)

those committing the crimes are co-conspirators of MSP, BRITVEC, BREWER, DWYER, and SCHUETTE.

1048. A "mandamus" is a judicial remedy available to COURSER in the form of an order from the Court to the government body to do a specific act which that body is obligated under law to do; and which is in the nature of that government body and in this case, one of a statutory duty.

1049. COURSER asks this Court to issue a Writ of Mandamus commanding MSP, BRITVEC, BREWER, DWYER, and SCHUETTE to do their duty and investigate and charge the crimes detailed and set forth in this Complaint committed by the various and multiple Defendants.

## COUNT 21
## DECLARATORY RELIEF

### (as to all Defendants)

1050. COURSER restates and incorporates the preceding paragraphs as though set forth fully herein.

1051. COURSER seeks declaratory relief stating that he was unconstitutionally expelled from THE HOUSE.

1052. COURSER continues to have ongoing damage from the actions of Defendants that claimed COURSER violated the "qualifications" requirement of the Michigan Constitution by committing multiple felonies; COURSER seeks declaratory relief stating that he was unconstitutionally expelled from THE HOUSE.

1053. COURSER seeks declaratory relief stating that he was unconstitutionally deprived of his salary, official positions, right to represent his district and the right to vote in the legislature.

DePerno Law Office, PLLC • 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) • 269-353-2726 (fax)

1054. COURSER has been unable to practice law in any meaningful way due to the lies that he had committed multiple felonious acts. COURSER seeks declaratory relief that there has been no judicial finding of criminality and that such claims by Defendants are lies.

1055. COURSER seeks declaratory relief stating that Article IV, § 16 of the Michigan Constitution is unconstitutional on its face and it is vague, overbroad, and not sufficiently definite; or in the alternative is unconstitutional in its application.

1056. COURSER seeks declaratory relief stating that MCL § 750.505 is unconstitutional on its face and it is vague, overbroad, and not sufficiently definite; or in the alternative is unconstitutional in its application.

1057. Defendants COTTER and THE HOUSE's vote to expel Gamrat and COURSER from THE HOUSE violated the provisions of the United States Constitution and the Michigan Constitution which grant equal protection and due process rights to all.

1058. An actual controversy exists concerning whether the actions taken by COTTER and THE HOUSE were constitutional.

1059. COURSER contends that he was entitled to due process and equal protection and was therefore improperly expelled from THE HOUSE.

1060. Based on the foregoing, COURSER is entitled to indemnification. THE HOUSE is required to defend him against the lawsuit by ALLARD and GRAHAM and against the criminal charges brought by SCHUETTE.

1061. A judicial determination resolving this actual controversy is necessary and appropriate at this time.

DePerno Law Office, PLLC • 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) • 269-353-2726 (Fax)

**COUNT 22**
**INJUNCTIVE RELIEF**

**(as to all Defendants)**

1062.   COURSER restates and incorporates the preceding paragraphs as though set forth fully herein.

1063.   Defendants COTTER and THE HOUSE in conjunction with the other Defendants have illegally removed COURSER from his HOUSE seat.

1064.   Defendants COTTER and THE HOUSE continue to prohibit COURSER from being seated in THE HOUSE.

1065.   COURSER was duly elected by the citizens of his district.

1066.   Defendants COTTER and THE HOUSE's improper removal caused, and continues to cause irreparable harm to COURSER because his is prohibited from introducing legislation and are otherwise unable to fulfill his duties as a Representative for his districts.

1067.   In the event that the Court determines COURSER was improperly removed from his seat, the Court should issue an order to re-seat COURSER; or provide an alternative and equitable remedy.

1068.   COURSER does not have a plain, speedy, and adequate remedy in the ordinary course of law.

1069.   COURSER asks this Court for an order stating that THE HOUSE record shall be corrected to remove any record that COURSER committed misconduct in office and misuse of state resources.

1070.   COURSER asks this Court for an order stating that THE HOUSE shall indemnify and defend him against the lawsuit by ALLARD and GRAHAM and against the criminal charges brought by SCHUETTE.

DePerno Law Office, PLLC • 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) • 269-353-2726 (Fax)

## DAMAGES

1071.  As a result of the actions and omissions of Defendants as alleged herein, COURSER has suffered the loss of his liberty and dignity, have been treated by society with ridicule and indignity, and have suffered damages that exceed $1,000,000.00.

1072.  The actions and omissions of the Defendants as alleged herein are intentional and/or in reckless disregard of the rights of COURSER and so outrageous to warrant the imposition of punitive damages upon each of them that exceed $1,000,000.00.

1073.  COURSER respectfully requests judgment in his favor and against Defendants as follows:

A.  As to Count 1, determine that the Defendants listed in Count 1 violated 42 U.S.C. § 1983 by recklessly or intentionally, or by reason of negligence, disregarded provisions of the United States Constitution and Michigan Constitution, including any and all amendments thereunder and award COURSER an amount in excess of $10,000,000.00 to be determined at trial.

B.  As to Count 2, determine that the Defendants listed in Count 2 violated 42 U.S.C. § 1985 by recklessly or intentionally, or by reason of negligence, disregarded provisions of the United States Constitution and Michigan Constitution, including any and all amendments thereunder and award COURSER an amount in excess of $10,000,000.00 to be determined at trial.

C.  As to Count 3, declare that Article IV, § 16 of the Michigan Constitution is unconstitutionally vague and overbroad on its face and in its application.

D.  As to Count 4, declare that MCL § 750.505 is unconstitutionally vague and overbroad on its face and in its application.

E.  As to Count 5, determine that the Defendants listed in Count 5 are liable for negligence and negligent infliction of emotional distress for their actions and award COURSER an amount in excess of $10,000,000.00 to be determined at trial.

F.  As to Count 6, determine that the Defendants listed in Count 6 are liable for invasion of privacy and public disclosure of private facts and award COURSER an amount in excess of $10,000,000.00 to be determined at trial.

G.  As to Count 7, determine that the Defendants listed in Count 7 are liable for violations of the Federal wiretapping act and Michigan's eavesdropping

177

statute and award COURSER an amount in excess of $10,000,000.00 to be determined at trial.

H.    As to Count 8, determine that the Defendants listed in Count 8 are liable for identify theft, invasion of privacy, and hacking and award COURSER an amount in excess of $10,000,000.00 to be determined at trial.

I.    As to Count 9, determine that the Defendants listed in Count 9 are liable for extortion and blackmail and award COURSER an amount in excess of $10,000,000.00 to be determined at trial.

J.    As to Count 10, determine that the Defendants listed in Count 10 are liable for abuse of process, misconduct in office, and misuse of office and award COURSER an amount in excess of $10,000,000.00 to be determined at trial.

K.    As to Count 11, determine that the Defendants listed in Count 11 are liable for promissory estoppel and award COURSER an amount in excess of $10,000,000.00 to be determined at trial.

L.    As to Count 12, determine that COURSER is entitled to indemnification by THE HOUSE and require that THE HOUSE indemnify COURSER as to all attorney fees, costs, and damages resulting from the Whistleblower lawsuit and all criminal charges.

M.    As to Count 13, determine that the Defendants listed in Count 13 are liable for false imprisonment and false arrest and award COURSER an amount in excess of $10,000,000.00 to be determined at trial.

N.    As to Count 14, determine that the Defendants listed in Count 14 are liable for intentional or negligent infliction of emotional distress and award COURSER an amount in excess of $10,000,000.00 to be determined at trial.

O.    As to Count 15, determine that the Defendants listed in Count 15 are liable for violations of RICO, 18 U.S.C. § 1962(a), (b), and (c) and award COURSER an amount in excess of $10,000,000.00 to be determined at trial.

P.    As to Count 16, determine that the Defendants listed in Count 16 are liable for conspiracy to violate of RICO, 18 U.S.C. § 1962(d) and award COURSER an amount in excess of $10,000,000.00 to be determined at trial.

Q.    As to Count 17, determined that the Defendants listed in Count 17 are liable for legal malpractice and award COURSER an amount in excess of $10,000,000.00 to be determined at trial.

R.    As to Count 18, determine that the Defendants listed in Count 18 are liable for fraudulent misrepresentation and award COURSER an amount in excess of $10,000,000.00 to be determined at trial.

S.    As to Count 19, determine that the Defendants listed in Count 19 are liable for conspiracy and concert of actions and award COURSER an amount in excess of $10,000,000.00 to be determined at trial.

T.    As to Count 20, issue a Writ of Mandamus commanding MSP, BRITVEC, BREWER, DWYER, and SCHUETTE to do their duty and investigate and charge the crimes detailed and set forth in this Complaint committed by the various and multiple Defendants.

U.    As to Count 21, enter declaratory judgment stating that COURSER was unconstitutionally deprived of his salary, official positions, right to represent his district and the right to vote in the legislature; stating that there has been no judicial finding of criminality and that such claims by Defendants are lies; stating that Article IV, § 16 of the Michigan Constitution is unconstitutional on its face and it is vague, overbroad, and not sufficiently definite; or in the alternative is unconstitutional in its application; stating that MCL § 750.505 is unconstitutional on its face and it is vague, overbroad, and not sufficiently definite; or in the alternative is unconstitutional in its application; stating that COURSER's Constitutional rights were violated; and stating that COURSER is entitled to indemnification by THE HOUSE; and award COURSER an amount in excess of $10,000,000.00 to be determined at trial.

V.    As to Count 22, enter an order stating that THE HOUSE record shall be corrected to remove any record that COURSER committed misconduct in office and misuse of state resources and stating that THE HOUSE shall indemnify and defend COURSER against the Whistleblower lawsuit and any criminal charges.

W.    In addition to the damages set forth above, also award COURSER compensatory damages for his psychological and emotional distress, loss of standing in the community, damage to his reputation, and reimbursement for out of pocket expenses incurred in this matter, including attorney fees and costs.

X.    Award damages to COURSER against Defendants for funds lost that they would have otherwise been able to receive had he not been removed from office, in an amount to be determined by a jury;

Y.    Award punitive damages to COURSER in an amount to be determined by a jury.

Z.    Award statutory interest to COURSER on all damages.

AA.   Award cost and attorney's fees to COURSER for claims brought in this matter, pursuant to 42 U.S.C. § 1988 and any other applicable statute or Court rule.

179

BB.    Award any other relief that this Honorable Court finds just and equitable.

Respectfully submitted

DePERNO LAW OFFICE, PLLC

Dated: September 8, 2016

/s/ Matthew S. DePerno
Attorney for Plaintiff Todd Courser
251 N. Rose Street, Suite 200
Kalamazoo, MI 49007
(269) 321-5064

180

## <u>VERIFICATION</u>

I, TODD COURSER, being first duly sworn, deposes and says that I am the plaintiff in the above-entitled cause. I am familiar with the facts at issue in this case. I have read the foregoing Complaint and know its content, that to the best of my knowledge, information and belief, the contents thereof are true.


DATED: September 8, 2016          */s/ Todd Courser*
                                   Todd Courser

DePerno Law Office, PLLC ● 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) ● 269-353-2726 (Fax)

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff TODD COURSER

demands a trial by jury in this action of all issues so triable.

Respectfully submitted

DePERNO LAW OFFICE, PLLC

Dated: September 8, 2016

_/s/ Matthew S. DePerno_
Matthew S. DePerno (P52622)
Attorney for Plaintiff Todd Courser
251 N. Rose Street, Suite 200
Kalamazoo, MI 49007
(269) 321-5064