UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TODD COURSER
     Plaintiff

v.

KEITH ALLARD; BENJAMIN GRAHAM; JOSHUA CLINE; MICHIGAN HOUSE OF REPRESENTATIVES, KEVIN G. COTTER, in his official capacity as Speaker of the Michigan House of Representatives (District 99) and in his individual capacity; TIM L. BOWLIN, in his official capacity as Business Director/CFO and in his individual capacity; BROCK SWARTZLE, in his official capacity as Chief of Staff/General Counsel and in his individual capacity; NORM SAARI, in his official capacity as former Chief of Staff and in his individual capacity; EDWARD McBROOM, in his official capacity as Representative for District 108 and in his individual capacity; ANDREA LaFONTAINE, in her official capacity as Representative for District 32 and in her individual capacity; ROB VERHEULEN, in his official capacity as Representative for District 74 and in his individual capacity; HASSAN BEYDOUN, in his official capacity as legal counsel of the Michigan House of Representatives and in his individual capacity; KURT HEISE, in his official capacity as Representative for District 20 and in his individual capacity; CHAD LIVENGOOD, in his official capacity as a reporter for the Detroit News and in his individual capacity; THE DETROIT NEWS, INC.; the MICHIGAN STATE POLICE; KRAIG BRITVEC, in his official capacity as Detective with the Michigan State Police and in his individual capacity; JEREMY BREWER, in his official capacity as Detective with the Michigan State Police and in his individual capacity; DAVID DWYER, in his official capacity as Detective with the Michigan State Police and in his individual

Case No. 1:16-cv-01108

HON. GORDON J. QUIST

**AMENDED COMPLAINT**

**CLAIM OF CIVIL RIGHTS VIOLATION AND UNCONSTITUTIONALITY**

**JURY TRIAL DEMANDED**

capacity; and WILLIAM SCHUETTE, the
MICHIGAN ATTORNEY GENERAL, in his
official capacity and in his individual capacity,

      Defendants

---

## AMENDED COMPLAINT AND JURY DEMAND

NOW COMES Plaintiff, TODD COURSER ("COURSER"), by and through his
attorneys, DePERNO LAW OFFICE, PLLC and for his Amended Complaint ("Complaint")
against the KEITH ALLARD; BENJAMIN GRAHAM; MICHIGAN HOUSE OF
REPRESENTATIVES; KEVIN COTTER, in his official capacity as Speaker of the Michigan
House of Representatives (District 99) and in his individual capacity; TIM L. BOWLIN, in his
official capacity as Business Director/CFO and in his individual capacity; BROCK SWARTZLE,
in his official capacity as Chief of Staff/General Counsel and in his individual capacity; NORM
SAARI, in his official capacity as former Chief of Staff and in his individual capacity;
EDWARD McBROOM, in his official capacity as Representative for District 108 and in his
individual capacity; ANDREA LaFONTAINE, in her official capacity as Representative for
District 32 and in her individual capacity; ROB VERHEULEN, in his official capacity as
Representative for District 74 and in his individual capacity; HASSAN BEYDOUN, in his
official capacity as legal counsel of the Michigan House of Representatives and in his individual
capacity; KURT HEISE, in his official capacity as Representative for District 20 and in his
individual capacity; CHAD LIVENGOOD, in his official capacity as a reporter for the Detroit
News and in his individual capacity; THE DETROIT NEWS, INC.; the MICHIGAN STATE
POLICE; KRAIG BRITVEC, in his official capacity as Detective with the Michigan State Police
and in his individual capacity; JEREMY BREWER, in his official capacity as Detective with the
Michigan State Police and in his individual capacity; DAVID DWYER, in his official capacity

DePerno Law Office, PLLC ● 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) ● 269-353-2726 (Fax)

as Detective with the Michigan State Police and in his individual capacity; and WILLIAM SCHUETTE, the MICHIGAN ATTORNEY GENERAL, in his official capacity and his individual capacity, states as follows*:

## NATURE OF THE ACTION

1.      This is an action pursuant to 42 U.S.C. §§ 1983 and 1985 and the due process and equal protection clause of the Fourteenth Amendment to the United States Constitution and similar provisions of the Constitution of Michigan of 1963 seeking to redress the wrongful actions and the immediate consequences of the Defendants and other related torts under state law, including, but not limited to, the right to be free from unreasonable search and seizure.

2.      This is an action pursuant to the First Amendment of the United States Constitution and similar provisions of the Constitution of Michigan of 1963 seeking violation of the right to free speech.

3.      This action also arises out of COURSER's other claims, including, but not limited to selective enforcement of laws[1], selective indemnification (civilly and criminally)[2], false imprisonment[3], conspiracy[4], extortion[5], illegal wiretapping[6], misconduct in office[7], misuses of office[8], and other provisions of both Federal and State law.

4.      COURSER also requests Declaratory Relief as set forth herein.

---

*Defendants Joseph Gamrat, David Horr, Vincent Krell, Radisson Hotels International, Inc., Radisson Group, Inc., and Carlson Rezidor Hotel Group are dismissed without prejudice from this action by this amended complaint.
[1] *Id.*
[2] *Id.*
[3] MCL 750.349b
[4] MCL 750.157a and 18 U.S.C. 371
[5] MCL 750.213
[6] MCL 750.539c and 18 U.S.C. 119, and 18 U.S.C. Sec. 2511
[7] MCL 767.4 and 750.505c
[8] MCL 750.118 and MCL 750.505c

DePerno Law Office, PLLC ● 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) ● 269-353-2726 (Fax)

## JURISDICTION AND VENUE

5.     This Court also has jurisdiction pursuant to 28 U.S.C. Section § 1331 (as this action involves a federal question and the laws of the United States) and 28 U.S.C. Section § 1343 (as this action involves the right to recover damages for injury and the deprivation of rights and privileges.)

6.     Jurisdiction is also conferred upon this Court by 28 U.S.C. § 1343(a)(3) and (4), 28 U.S.C. § 2201 & 2202, and 42 U.S.C. § 1983, 1985, and 1988, this being an action for declaratory judgment and equitable relief authorized by law to redress deprivations and violations under color of law of rights, privileges, and immunities secured by the United States Constitution and Michigan Constitution of 1963, as amended[9]. COURSER also seeks declaratory and injunctive relief as authorized by Rules 57 and 65 of the Federal Rules of Civil Procedure and by the general legal and equitable powers of this Court.

7.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over COURSER's state-law claims that are related to, and form part of, the same case or controversy. It is appropriate that this Court exercise supplemental jurisdiction over the state law claims because they involve the same parties and operative facts as the federal claims. Therefore, the Court's exercise of supplemental jurisdiction will further economy, convenience, and fairness to the parties.

8.     Declaratory Relief is authorized Fed. R. Civ. P. 57.

9.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

10.    COURSER requests trial by jury, pursuant to Fed. R. Civ. P. 38.

---

[9]

4

11.     In this matter, any STATE DEFENDANTS (defined *infra*) are not entitled to immunity, whether absolute or qualified, because they have either intertwined impermissible conduct with statutorily conferred functions or they have acted with gross negligence.

## PARTIES

12.     Plaintiff TODD COURSER ("COURSER") is an individual residing in Lapeer County, Michigan. COURSER was the duly elected State Representative for the 82nd District and, as such, a member of the Michigan House of Representatives, until he was unlawfully forced to resign his position on September 11, 2015.

13.     Upon information and belief, Defendant KEITH ALLARD ("ALLARD") is a resident of Kent County, Michigan and was a staff member for the 80th District office, until the House terminated his employment on July 6, 2015.

14.     Upon information and belief, Defendant BENJAMIN GRAHAM ("GRAHAM") is a resident of Genesee County, Michigan and was a staff member for the 82nd District office, until the House terminated his employment on July 6, 2015.

15.     Joe GamratDefendant MICHIGAN HOUSE OF REPRESENTATIVES ("THE HOUSE") is one of two chambers of the legislative body of the State of Michigan created by the Michigan Constitution. THE HOUSE conducts its business in Lansing, Michigan, in Ingham County. Its members are elected from 110 districts covering the entire State of Michigan to represent constituents in each of those districts.

16.     Upon information and belief, Defendant KEVIN COTTER ("COTTER") is a resident of Isabella County, Michigan and was the duly elected State Representative for the 99th District and, as such, a member of the Michigan House of Representatives. He was also elected by the House membership as Speaker of the Michigan House of Representatives.

5

17.     Upon information and belief, Defendant TIM L. BOWLIN ("BOWLIN") is a resident of Ingham County, Michigan and was the duly appointed Business Director/CFO for the House.

18.     Upon information and belief, Defendant BROCK SWARTZLE ("SWARTZLE") is a resident of Ingham County, Michigan and was the duly appointed Chief of Staff/General Counsel to COTTER.

19.     Upon information and belief, Defendant NORM SAARI ("SAARI") is a resident of Ingham County, Michigan and was the duly appointed Chief of Staff to COTTER.

20.     Upon information and belief, Defendant EDWARD McBROOM ("McBROOM") is a resident of Vulcan, Michigan and was the duly elected State Representative for the 108th District and, as such, a member of the Michigan House of Representatives. McBROOM was the Chairman of the House Select Committee to examine the qualifications of COURSER.

21.     Upon information and belief, ANDREA LaFONTAINE ("LaFONTAINE") is a resident of Columbus Township, Michigan and was the duly elected State Representative for the 32nd District and, as such, a member of the Michigan House of Representatives. LaFONTAINE was a member of the House Select Committee to examine the qualifications of COURSER.

22.     Upon information and belief, ROB VERHEULEN ("VERHEULEN") is a resident of Walker, Michigan and was the duly elected State Representative for the 74th District and, as such, a member of the Michigan House of Representatives. VERHEULEN was a member of the House Select Committee to examine the qualifications of COURSER.

23.     Upon information and belief, HASSAN BEYDOUN ("BEYDOUN") is a resident of Ingham County, Michigan and was the duly appointed Majority Legal Counsel to THE HOUSE and specifically the attorney for COURSER.

6

24.     Upon information and belief, KURT HEISE ("HEISE") is a resident of Plymouth Township, Michigan and was the duly elected State Representative for the 20th District and, as such, a member of the Michigan House of Representatives. He was also the Vice-Chairman of the House Select Committee to examine the qualifications of COURSER.

25.     The HOUSE, COTTER, BOWLING, SWARTZLE, SAARI, McBROOM, LaFONTAINE, VERHEULEN, BEYDOUN, and HEISE may be referred to herein collectively as " THE HOUSE DEFENDANTS".

26.     Upon information and belief, Defendant CHAD LIVENGOOD ("LIVENGOOD") is a resident of Ingham County and is a reporter for the Detroit News.

27.     Upon information and belief, Defendant THE DETROIT NEWS, INC. ("DETROIT NEWS") is a corporation registered in the State of Michigan.

28.     Upon information and belief, Defendant MICHIGAN STATE POLICE ("MSP") is the body that investigated the incident of extortion against COURSER and the "matter" surrounding COURSER and Gamrat in THE HOUSE.

29.     Upon information and belief, Defendant KRAIG BRITVEC ("BRITVEC") is a resident of Ingham County and was a member of Capitol Security in Lansing with the MSP.

30.     Upon information and belief, Defendant JEREMY BREWER ("BREWER") is a resident of Ingham County and is a Detective Sergeant with the MSP.

31.     Upon information and belief, Defendant DAVID DWYER ("DWYER") is a resident of Ingham County and is a Special Agent with the Michigan Department of Attorney General.

32.     Defendant WILLIAM SCHUETTE ("SCHUETTE") is the Attorney General of the State of Michigan. He is responsible for the enforcement of state laws and the Michigan

7

Constitution. As Attorney General he is also responsible for defending state laws and the Michigan Constitution against challenges to their constitutionality. See MCL §§ 14.28 and 14.29. In addition, as Attorney General he is responsible for "supervis[ing] the work, consul[ing] and advis[ing] the prosecuting attorneys, in all matters pertaining to the duties of their office." MCL § 14.30. Defendant SCHUETTE is sued in his official capacity and individual capacity. COURSER reserves the right to name additional defendants as they become known through discovery.

## FACTS

### *OUTLINE OF THE INITIAL CONSPIRACY TO REMOVE COURSER FROM OFFICE*

33.     At all relevant times, the Defendants listed throughout this Complaint and in each individual Count acted maliciously, recklessly, intentionally, or by reason of gross negligence or violation of the law and are therefore liable to COURSER. They acted with gross disregard or negligence for the rights afforded to COURSER and they did so for their own financial and political goals.

34.     On September 11, 2015, THE HOUSE DEFENDANTS constructively, illegally, and unconstitutionally expelled COURSER from THE HOUSE by forcing him to resign his office.

35.     THE HOUSE DEFENDANTS were without power or authority to exclude from membership in THE HOUSE a person who has been duly elected by the voters as a Representative and who meets the age, citizenship, and criminal requirements. THE HOUSE DEFENDANTS illegally removed COURSER from office by forcing him to resign.

36.     This constructive expulsion took place based on the knowingly false testimony of ALLARD, GRAHAM, and CLINE. For instance, and only by way of example:

8

"You're f'ing liars." – BOWLIN as to ALLARD and GRAHAM, *MSP Interview Tape,* 46:40.

"It's clear that they tailor their testimony to what they thing the law is or isn't. I think he's one of those." – BEYDOUN as to ALLARD and GRAHAM, *MSP Interview Tape*, 44:20.

"I think Keith Allard is a piece of crap." SWARTZLE as to ALLARD, *MSP Interview Tape*, 41:48.

37.     This constructive expulsion took place based on the knowingly illegal information obtained through illegal wiretapping and eavesdropping, conducted and authorized by ALLARD, GRAHAM, CLINE, Joe GamratTHE HOUSE DEFENDANTS, and also potentially authorized by others, including Joe Gamrat, Vincent Krell, and David Horr. Defendants. For instance, and only by way of example:

"So I advised Ben I said, if you go, record it, record the conversation. And that happened. We were convinced Todd was going to resign. That was what we really thought, he was going to resign." – ALLARD, *MSP Interview Tape*, 22:22-25, dated November 2, 2015.

"It's because we – they found out we recorded stuff, the House leadership. They knew that I was not going to take their side against Ben. They, they – I was not going to be their bag mad and fire Ben Graham." -- ALLARD, *MSP Interview Tape*, 29:23-30:2, dated November 2, 2015.

"Josh and Keith both suggested that Benjamin record the conversation." *MSP Report 010-0000715-15 (DB)*, p. 4 of 16, dated September 11, 2015.

"Tim asked Keith if he knew the recordings were going to happen. Keith said yes, and that he had actually encouraged Ben to record the conversations." – BOWLIN report.

"Keith said because of Todd's possible mental state at the time he advised Benjamin to record the conversation." *MSS Supplemental Report*, dated November 9, 2015.

THE COURT: Okay, And you're not disputing you told Ben, or you advised Ben to record the conversation.
THE WITNESS [ALLARD]: That's the term I used when I discussed with the state police, your Honor.
        -- ALLARD testimony May 25, 2016, 230:21-24.

9

> Q [DePERNO]: Did Mr. Graham play you a copy of the recorded conversation?
> A [ALLARD]: At some point later that evening, he did.
> -- ALLARD testimony May 25, 2016, 231:16-18.

> Q [DePERNO]: When did he play this recording for you?
> A [ALLARD]: I heard it later that evening. It was, I assume, the early hours of May 20th. I heard portions of it over the phone.
> -- ALLARD testimony May 25, 2016, 232:12-13.

> THE COURT: Okay. Well, he already said that he used the term –
> MR. DePERNO: Okay
> THE COURT: -- yeah, that he advised him – advised Ben to record the conversation and it was done.
> MR. DePERNO: Thank you.
> THE COURT: He's not disputing he said it.
> -- ALLARD testimony May 25, 2016, 236:3-9.

38.     This constructive expulsion also took place based on the knowingly illegal information obtained through illegal and surreptitious surveillance and reporting conducted and authorized by ALLARD, GRAHAM, CLINE, Joe GamratTHE HOUSE DEFENDANTS, LIVENGOOD, and DETROIT NEWS, and also potentially authorized by others, including Joe Gamrat, Vincent Krell, and David Horr.

39.     THE STATE DEFENDANTS then completed the conspiracy when they illegally, unethically, and unconstitutionally charged COURSER with crimes, while not charging others with same or similar crimes THE STATE DEFENDANTS knew about, for the unconstitutional purpose of insulating and covering up the behavior of all Defendants.

40.     Given COURSER met the qualifications under the Michigan Constitution then the ability to remove a Representative rests solely with the district from which he derived his seat, through "a recall effort" as allowed under Michigan Law.[10]

---

1.      Article IV, § 7 of the Michigan Constitution sets forth the qualifications to be a Legislator and limits the scope of the Legislature's ability to decline or reject a legislator elected. This section states that:

> Each senator and representative must be a citizen of the United States, at least 21 years of age, and an elector of the district he represents . . . . No

DePerno Law Office, PLLC ● 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) ● 269-353-2726 (Fax)

41.     Prior to the expulsion actions against COURSER there was no independent finding by any judicial body of criminal conduct by COURSER. In fact, THE HOUSE DEFENDANTS unconstitutionally violated COURSER's constitutional and legal rights.

42.     This was the first time in Michigan history that a sitting Representative was removed prior to any criminal charges being brought or any conviction. In fact, other Representatives who had been convicted of crimes were never removed. This demonstrates a violation of the equal protection clause of the United States Constitution and Michigan Constitution. For instance:

a.      Representative Brian Banks currently is seated in THE HOUSE and had several felonies prior to being seated as a legislator. Then, while in office, he was sued for sexual harassment. He was also charged with felonies while in office, yet he was not expelled and there was no action by THE HOUSE to either expel him or judge his qualifications. THE HOUSE also paid his legal fees and provided funds to settle the lawsuit by the former staffer. All this occurred while THE HOUSE was working to expel COURSER. This fact alone demonstrates a high level of suspicion in the motivations of THE HOUSE, COTTER, BOWLIN, SWARTZLE, SAARI, McBROOM, LaFONTAINE, VERHEULEN, BEYDOUN, and HEISE.

b.      Senator Vigil Smith fired an AK-47 at his ex-wife in the street in front of his home. He was charged and pled to felonies but was not expelled from office. In total, he was charged with felonious assault, malicious destruction of property, possessing a firearm during the commission of a felony, and domestic violence. These charges stemmed from an incident when he fired a reported ten shots at his ex-wife.

c.      Milo Dakin was the first legislator in Michigan history to be expelled. He was expelled in 1887 for trying to bribe his colleagues. He was not expelled until AFTER charges were made. Then there was a trial on the floor and THE HOUSE appropriated money to Mr. Dakin for him to hire an attorney.

person who has been convicted of subversion or who has within the preceding 20 years been convicted of a felony involving a breach of public trust shall be eligible for either house of the legislature.

    d.    Monte Geralds was expelled from THE HOUSE in 1978, but only AFTER being convicted of embezzling from a law client.

    e.    David Jaye was expelled from the Senate in 2001, but only AFTER his second and third drunk driving convictions while in office and AFTER he was charged with criminal domestic assault for beating his girlfriend. To top it off, Mr. Jaye was accused of harassment of staffers and using his state computer to store sexually explicit photographs. However, he wasn't just removed from office; rather, THE HOUSE conducted a multiple day trial on the floor. Mr. Jaye was allowed to present a defense to counter the allegations.

43.    COURSER was and is being treated differently than Brian Banks, Virgil Smith, Milo Dakin, Monte Geralds, and David Jaye. COURSER was forced to endure a process that robbed him of his ability to defend himself in any meaningful way and the voters of his district were denied their right to representation. This was a violation of due process and equal protection.

44.    In every other expulsion case in this State's history the individual being expelled was given adequate notice, some amount of an independent investigation by those charged with law enforcement powers, fair arbiters of the facts conducting the investigation, time and access to review the facts that were being put forward, subpoena powers, the chance to cross examination, and the chance to defend themselves. In fact, during the hearings on Mr. Jaye, SCHUETTE, then a Michigan Senator, raised concerns that the Senate was setting a new standard by not requiring a felony conviction prior to expulsion.

45.    COURSER was treated as a criminal with regard to enforcement of THE HOUSE rules and criminalization of supposed "breaking of THE HOUSE rules". This is an illegal and unconstitutional act by THE HOUSE DEFENDANTS and STATE DEFENDANTS.

46.    THE HOUSE DEFENDANTS and STATE DEFENDANTS have tried to criminalize "breaking of HOUSE Rules" which they have never done against anyone else and will never do against anyone else in the future.

DePerno Law Office, PLLC ● 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) ● 269-353-2726 (Fax)

47.     In fact, COTTER and other Representatives have broken THE HOUSE Rules multiple times without prosecution.

48.     All of the Defendants in this case, working in conjunction with one-another created a plan of extortion, perjury, illegal wiretapping, and other illegal conduct (including malicious prosecution) all for political power, retribution, and personal gain. All Defendants have engaged in these conspiracies as described herein.

## COURSER AND CINDY GAMRAT CHALLENGE THE PROGRESSIVE GOP ESTABLISHMENT

49.     COURSER and Gamrat were elected to the HOUSE with the campaign promise that they would opposed tax increases, including Proposal 15-1 because it amounted to the largest tax increase in Michigan history.[11]

50.     Upon information and belief, before and at the time of their 2014 primary, COTTER was aware of COURSER and Gamrat's commitments to voting against and advocating against any tax or spending increases and fighting against any intrusions on civil liberties.

51.     During the general election campaign for Michigan State Representative in the fall of 2014, ALLARD volunteered and served on Gamrat's political campaign.

52.     During the election campaign for Michigan State Representatives and beyond, GRAHAM was a paid political consultant and served on both COURSER and Gamrat's political campaigns both during the primaries and the general elections.

---

[11] Proposal 15-1 was proposed tax increase designed to create funding to repair Michigan roads. It was heavily supported by Gov. Rick Snyder (R). Proposal 15-1 was put on the May 5, 2015 ballot and was overwhelmingly voted down by Michigan voters.

After Proposal 15-1 was overwhelmingly voted down by the people, COTTER (R) released the House Roads Package to the Republican controlled House of Representatives. The House Roads Package was a tax increase similar to Proposal 15-1. Initially, the House Roads Package was voted down by the Michigan House of Representative, primarily due opposition from Democrats and the critical "NO" votes of COURSER and Gamrat. After COURSER and Gamrat were removed from the House of Representatives, the House Roads Package passed by 1 vote; which in essence forced into effect a tax hike that had recently been voted down by the people of Michigan.

13

53.     During the election campaign for Michigan State Representatives and beyond, CLINE was a paid political consultant and served on both COURSER and Gamrat's political campaigns both during the primaries and the general elections.

## STAFFING DISTRICT OFFICES

54.     In November 2014, in anticipation of COURSER and Gamrat taking office, CLINE, a paid political consultant of COURSER and Gamrat, suggested that if ALLARD, GRAHAM, and CLINE were all hired by THE HOUSE and appointed to COURSER and Gamrat's separate District Offices, a "joint staffing arrangement" could be established which would overlap duties of staff, decrease overhead costs, save taxpayer dollars, and allow the staff to be compensated at a higher rate due to only having three staff members for two Representatives, rather than four staff members.

55.     On October 15, 2014, in anticipation of COURSER and Gamrat taking office, ALLARD requested that he be permitted to serve in the capacities as both the political campaign liaison for COURSER and Gamrat and also as the "District Office Chief of Staff" for both COURSER and Gamrat.

56.     On October 15, 2014, ALLARD sent an email to COURSER, Gamrat, GRAHAM, and CLINE laying out what he felt would be the appropriate political and official duties and expectations of ALLARD, GRAHAM, and CLINE under a "joint staffing" arrangement.

57.     ALLARD, GRAHAM, CLINE, COURSER, and Gamrat had multiple conversations in anticipation of this possible "joint staffing" arrangement and understood that political work could not be done in THE HOUSE office or on State time.

14

58.     ALLARD, GRAHAM and CLINE had their own outside (paid and non-paid) political endeavors while acting as State employees for COTTER and THE HOUSE.

59.     In fact, GRAHAM and CLINE operated a political consulting business out of COURSER's private office building. This business was called Bellwether Strategies, LLC. The registered office for Bellwether Strategies, LLC was the same address of COURSER's Lapeer law office.

60.     In fact, GRAHAM billed COURSER for this political consulting work, which work was separate from his work as a State employee. GRAHAM and CLINE also used COURSER's Lapeer law office to do political work through their political consulting business, Bellwether Strategies, LLC.

61.     In November and December 2014, ALLARD, GRAHAM, and CLINE assured COURSER and Gamrat that they wanted to work in both roles of assisting politically as well as working as staff for THE HOUSE officially, and they would do so following the standard of not overlapping political and official work during State time or on State property.

62.     ALLARD AND GRAHAM were employed by THE HOUSE from on or about January 2, 2015 until July 6, 2015. See H.R. Res. 1 (2015).  COTTER assigned ALLARD to the 80th District Office (Gamrat's office), which was located on the north side, 10th floor, of the House Anderson Building. COTTER assigned GRAHAM to the 82nd District Office (COURSER's office), which was located on the south side, 11th floor, of the House Anderson Building. COTTER also assigned CLINE, another HOUSE employee, to the 82nd District Office (COURSER's office).

DePerno Law Office, PLLC ● 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) ● 269-353-2726 (fax)

63.     COURSER and Gamrat agreed to try the joint staffing arrangement (suggested and advocated by CLINE) because ALLARD, GRAHAM, and CLINE had all been hired by THE HOUSE.

### COTTER STARTS PROCESS TO "DIG UP DIRT" ON COURSER AND GAMRAT

64.     Upon information and belief, unbeknownst to COURSER and Gamrat, shortly after the 2014 primary, COTTER began a process to "dig up dirt" against COURSER and Gamrat. He assigned this task to SAARI and SWARTZLE. This process included surveillance.

65.     Upon information and belief, during the second week of January, 2015, SAARI continued this plan when he initiated a private meeting with ALLARD, GRAHAM, and CLINE and other Defendants and directed them to issue reports directly to SAARI and SWARTZLE about COURSER and Gamrat.

66.     Upon information and belief, at these meetings throughout 2015, ALLARD, GRAHAM, and CLINE were actively seeking promotions from SAARI. In turn, SAARI required that ALLARD, GRAHAM and CLINE keep him informed regarding COURSER and Gamrat. This was a mutually beneficial arrangement. On the one hand, SAARI wanted the information. On the other hand, ALLARD, GRAHAM, and CLINE were more than happy to provide information because they were actively requesting and pursuing new employment positions within COTTER's team and THE HOUSE. Upon information and belief, ALLARD, GRAHAM, and CLINE accepted these conditions of employment because they wanted to advance their own political career.

67.     Upon information and belief, ALLARD and GRAHAM, as employees of THE HOUSE, were directed by COTTER, SAARI, SWARTZLE, and THE HOUSE to illegally and unethically gather information against COURSER and Gamrat and report that information back to COTTER, SAARI, SWARTZLE and THE HOUSE.

16

68.     Upon information and belief, after the meeting in January 2015, ALLARD, GRAHAM, and CLINE began to immediately and covertly issue reports to SAARI and SWARTZLE about COURSER and Gamrat.

69.     Upon information and belief, these reports turned into constant and continuous communications regarding the surveillance and extortion plot to remove COURSER and Gamrat from office. In fact, in early February 2015, ALLARD texted to others in the conspiracy that the first objective was to get COURSER removed from office.

70.     ALLARD, GRAHAM, and CLINE began to intensify their efforts by communicating with Joe Gamrat

71.     At or around February 11, 2015, Joe Gamrattold ALLARD, GRAHAM, and CLINE that he believed that Gamrat was having an affair with COURSER.

72.     Upon information and belief, since as early as the spring of 2014, Joe GamratJoe Gamrat and Vincent Krell had been secretly conducting wiretapping of Gamrat in her office, her purse, her car, her home, her bedroom, and her campaign headquarters by placing secret and illegal wiretapping devices in these locations. Joe GamratJoe Gamrat and Vincent Krell were also secretly monitoring phone calls, downloading emails both inbound and outbound, and voicemails between herself and anyone else. These wiretapping and eavesdropping efforts were illegal.

73.     Joe GamratJoe Gamrat then began to forward this information both directly and anonymously to people who knew Gamrat, including her friends, her pastor, and her colleagues in THE HOUSE, and began providing updates to THE HOUSE, COTTER, and SAARI through ALLARD, GRAHAM, CLINE and others.

17

74.     At the same time, ALLARD, GRAHAM, and CLINE were also obtaining information through illegal wiretapping and eavesdropping devices. ALLARD and GRAHAM have already admitted to engaging in illegal wiretapping and eavesdropping and have also acknowledged that the offices of COURSER and Gamrat were bugged.

75.     In exchange for the information provided by Joe GamratJoe Gamrat, ALLARD, GRAHAM, and CLINE provided information to Joe Gamrat Joe Gamratand David Horr.

76.     ALLARD, GRAHAM, and CLINE were directed by THE HOUSE, COTTER, SAARI, and SWARTZLE to illegally plant and retrieve wiretapping and eavesdropping devices around COURSER and Gamrat; making THE HOUSE, COTTER, SAARI, and SWARTZLE part of the illegal wiretapping and eavesdropping conspiracy.

77.     In addition, GRAHAM provided to Joe GamratJoe Gamrat, ALLARD, and CLINE most, if not all of COURSER and Gamrat's private passwords for their email accounts both personally and officially.

78.     Joe GamratALLARD and GRAHAM were desperate to keep their employment and knew through their various illegal wiretapping and eavesdropping operations that both COURSER and Gamrat were looking to replace ALLARD, GRAHAM, and CLINE.

79.     Because ALLARD, GRAHAM, and CLINE had access to all of COURSER and Gamrat's communications, phone, texts, and emails – without the knowledge of COURSER or Gamrat, they were well aware of COURSER and Gamrat's dissatisfaction with ALLARD and GRAHAM's work performance throughout 2015 and their active efforts to find suitable replacements.

80.     During these meetings, ALLARD, GRAHAM and CLINE claimed COURSER and Gamrat were misusing their offices, their staff and taxpayer resources. COURSER was, at

DePerno Law Office, PLLC ● 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) ● 269-353-2726 (Fax)

this point, relying on ALLARD, GRAHAM and CLINE as their staff and as their friends in THE HOUSE.

81.     Neither THE HOUSE, SAARI, COTTER, SWARTZLE, BEYDOUN, or anyone at their direction ever informed COURSER of the secretly held meetings with the staff members who were assigned to his office or of the allegations of wrongdoing that were being claimed by ALLARD, GRAHAM, and CLINE.

82.     This illegal and unethical scheme came to fruition when COTTER was able to withhold evidence of the conspiracy, withhold evidence of those involved, and convince members of THE HOUSE to deny the will of the voters by forcing COURSER to resign from public office, without due process, under excess distress, falsely imprisoned, and in violation of the United States Constitution and Michigan Constitution.

83.     In order to effectuate this process, THE HOUSE DEFENDANTS used the unsworn and unrecorded testimony of ALLARD, GRAHAM, and CLINE.

84.     THE HOUSE and COTTER and his staff later claimed that ALLARD, GRAHAM, and CLINE were liars; which demonstrates that the entire expulsion efforts were based on lies.

### EXTORTION TEXTS

85.     In early May of 2015 COURSER and Gamrat and selected members of their families and friends began to receive disturbingly intimate extortion texts requiring COURSER and Gamrat to resign. Between May and August of 2015 over 100 such texts were received. The texts displayed an intimate knowledge of their lives; their phone records, their communications, their travel, their pasts, and their family relationships.

DePerno Law Office, PLLC ● 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) ● 269-353-2726 (Fax)

*ILLEGAL SEATING ASSIGNMENTS – IN VIOLATION OF MCL 4.61*

86.    On or about January 14, 2015, the day COURSER and Gamrat were to be sworn into office as members of the Michigan House of Representatives, COTTER held a Republican Caucus[12] immediately before the swearing in ceremony. It was during this Republican Caucus that COTTER and McBROOM (Dean of THE HOUSE) unethically and unlawfully violated the law on seat assignments, being MCL § 4.61 (Act 58 of 1893) by intentionally and illegally violating the seat assignment provision in order to deceive the public and other members of the HOUSE.

*COTTER ABUSES HIS POWER AND AUTHORITY AGAIN AND DIRECTS REPRESENTATIVES TO CONCEDE THEIR VOTE TO HIM, VIOLATING MCL 750.122, 750.125, AND 750.505C*

87.    On January 15, 2015, the day after being sworn into office, all Republican members were directed to attend an offsite Republican Caucus.[13]

88.    At this initial off-site Caucus, COTTER forced the Republican Representatives to sign a secret pledge as a requirement for Republican Caucus membership (the "Caucus Pledge"). If a Republican Representative refused, he/she would not be allowed to be a part of the Republican Caucus in the State House.

89.    The Caucus Pledge included promises to (a) notify COTTER through the Whip[14] any time the Representative would be voting no; (b) notify COTTER in advance of any major action on legislation or events; (c) stand with the Caucus (COTTER) on any difficult issues or votes; and (d) never tell the public about the Caucus Pledge.

---

[12] A "Caucus" is when the Representatives from each party's membership meets together in a private room where they conduct meetings confidential from the public.

[13] There is a Republican and a Democrat Caucus that meets at times off-site of the Capitol and at times in the State House on State Property behind closed doors with the assistance of State paid employees – these meetings are not subject to FIOA.

[14] "Whips" are essentially a party's "enforcers," who typically offer inducements and threaten a parties' members to ensure that they vote according to the official party policy. The Whips would report back to COTTER and inform him how Representatives were going to vote on certain issues/bills before they were officially presented for vote on the House floor.

DePerno Law Office, PLLC ● 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) ● 269-353-2726 (Fax)

90.     The Caucus Pledge also required that everything said or done in Caucus was to remain confidential and secret, not to be revealed to the public, including the Caucus Pledge itself.

91.     The Caucus Pledge – mandated by COTTER – amounted to misconduct in office by COTTER and was done to secretly garner political leverage over the Republican Representatives without the public having any knowledge that their representation was compromised. In other words, COTTER required that all Republican Representatives submit their voting privileges to his authority. The voters were denied their right to representation.

92.     When COURSER refused to sign the Caucus Pledge, he was visited by COTTER and SWARTZLE and was pressured to sign. Upon information and belief, COTTER and SWARTZLE also visited Gamrat when she refused to sign the Caucus Pledge and pressured her to sign.

93.     COURSER was told by COTTER that he had to sign and turn in the Caucus Pledge before he could go home that day.

94.     COURSER then made modifications to the Caucus Pledge to put the people of his Districts first before the Republican Caucus. Only then did he sign the Caucus Pledge. Upon information and belief, Gamrat also made modifications to the Caucus Pledge before she signed it.

95.     Upon information and belief, COTTER took personal offense to this as an attack on his position as Speaker of the House.

96.     House Rule 74(2) states, "A Member shall not use his or her position in any matter to solicit or obtain anything of value for himself or herself, house employees or any other

DePerno Law Office, PLLC ● 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) ● 269-353-2726 (fax)

Member, which tends to influence the manner in which the Member performs his or her official duties."

97.     COTTER's actions of forcing, as a condition of membership in the Republican Caucus, the signing of a secret pledge of the votes of the Districts amounted to misconduct in office and violated House Rule 74(2).

98.     The actions of COTTER and MCBROOM both during the seating assignment situation and also with regard to the Caucus Pledge amounted to using their positions to garner personal and political advantage and breaking both State law and THE HOUSE Rules. This is misconduct in office. This is "pay-for-play" politics and political corruption.

### THE "LIBERTY RESPONSE"

99.     On January 22, 2015, COURSER and Gamrat publicly opposed Proposal 15-1, a tax increase that the Governor and Republican establishment favored.

100.     Upon information and belief, after this Liberty Response, SAARI and SWARTZLE met with ALLARD, GRAHAM, and CLINE and informed them that it was improper behavior to oppose Proposal 15-1 "on taxpayer time." This was a "get in line" message delivered by COTTER through SAARI to COURSER and Gamrat through their staff.

101.     Each Representative was asked to support the passage of Proposal 1 by doing mailings paid for by State funds. The mailers clearly advocated for the passage of Proposal 1, even though COURSER opposed it. This amounted to the misuse of government taxpayer funds to advocate for increased taxes and spending because it was directed by COTTER behind the unethical and illegal veil created by the Caucus Pledge.

102.     COURSER did not send out the mailers paid for by State funds because the mailers were a deception on the taxpayers.

DePerno Law Office, PLLC ● 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) ● 269-353-2726 (Fax)

### COTTER, SAARI, AND THE HOUSE CONDUCT ILLEGAL SURVEILLANCE ON COURSER

103.    Upon information and belief, unbeknownst to COURSER, during a period of time beginning almost immediately after he was sworn into office, ALLARD, GRAHAM, and CLINE began illegally taping COURSER's telephone, office, and personal conversations and they began accessing his personal emails and communications. They also broadcast access to COURSER's passwords and internal emails in the overall effort against COURSER. These actions by ALLARD, GRAHAM, and CLINE are described throughout this Complaint. Upon information and belief, these actions and illegal acts were also taken against Gamrat.

104.    The actions of each of the Defendants are so intertwined with the others that it is impossible to separate their efforts; these efforts must be construed as being the actions of an illegally integrated and cohesive conspiracy to remove COURSER (and Gamrat) from office and to develop a sensational story for personal gain and to further their political agendas.

105.    In fact, COTTER, SAARI, and SWARTZLE requested that ALLARD, GRAHAM, and CLINE act as listening agents to procure illegally obtained information regarding COURSER and Gamrat. ALLARD, GRAHAM, and CLINE concurrently developed relationships with Joe GamratJoe Gamrat, Vincent Krell, David Horr, LIVENGOOD, and the DETROIT NEWS to push the extortion ring outside of THE HOUSE. ALLARD, GRAHAM, CLINE, Joe GamratJoe Gamrat and David Horr also developed an illegal "electronic and physical net" surrounding COURSER and Gamrat to gather illegally obtained information and send it to THE HOUSE DEFENDANTS, LIVENGOOD, and DETROIT NEWS for political and personal use and for illegal distribution. Further, COTTER, SAARI, and SWARTZLE required that ALLARD, GRAHAM, and CLINE act as agents in their effort to remove COURSER and Gamrat.

23

106.     Upon information and belief, ALLARD, even though he was assigned to Gamrat's office as staff by COTTER, was acting as COTTER's agent to procure evidence to further COTTER's goal of gathering damaging information against COURSER and Gamrat.

107.     ALLARD stated on November 2, 2015 that there was illegal wiretapping and eavesdropping within THE HOUSE office of Gamrat; yet he did not inform COURSER or Gamrat of this this illegal wiretapping and eavesdropping.

### *RADISSON HOTELS, RADISSON GROUP, AND CARLSON ASSIST IN EXTORTION, WIRETAPPING, INVASION OF PRIVACY, AND ILLEGAL SURVEILLANCE AND GRANTS ILLEGAL ACCESS*

108.     In the winter of 2015, at the beginning of the first term of office for COURSER and Gamrat, it came to the attention of COURSER and Gamrat that surveillance was being conducted on them at the Radisson Hotel in Lansing, Michigan ("Radisson").

109.     The Radisson, during all of 2015, broke numerous laws and acted in a malicious and grossly negligent manner when it allowed access to both COURSER and Gamrat's separate accounts with the Radisson and their separate rooms to further surveillance of the conspiracy and the extortion plot. For instance,

    a.     Fictitious emails were added to each of their personal Radisson accounts several times compromising statements and access to their personal information.

    b.     An extortion text was sent to COURSER and Gamrat which revealed that staff members of the Radisson were being paid to provide information, monitor COURSER and Gamrat's rooms, and provide physical access to their rooms.

    c.     Text messages from different co-conspirators revealed that certain Defendants had access to emails from the hotel, physical access to the rooms and updates from the Radisson staff on the rooms themselves – even after both COURSER and Gamrat met separately with the Radisson management and were assured no information about their staying at the Radisson was being broadcast, the information and access was still being provided to the Defendants.

DePerno Law Office, PLLC • 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) • 269-353-2726 (Fax)

      d.      The Radisson staff were actively providing private information illegally to certain Defendants and hotel room access to certain Defendants.

      e.      Updates, provided to certain Defendants involved in the extortion plot by the Radisson employees, included emails to the Defendants regarding hotel accounts, temperature of hotel rooms, lights in the hotel rooms, curtains in the hotel rooms, luggage placements in the rooms, listening devices, audio and video, as well as physical entry and exiting the hotel.

110.    COURSER was told by Radisson staff that his personal information including reservations information, room number, and payment information were automatically sent to the unauthorized email addresses attached to his account.

111.    Upon information and belief, later through a MSP investigation it was determined that certain Defendants and others were gaining illegal access to COURSER's Radisson hotel rooms and hotel information via the staff of the hotel. Upon information and belief, the MSP also determined that that certain Defendants and others were gaining illegal access to Gamrat's Radisson hotel rooms and hotel information via the staff of the hotel.

112.    Deleted texts taken from Vincent Krell and Joe Gamrat's Joe Gamratphone by the MSP reveal the following texts in connection with the Radisson surveillance:

      a.      "I just think it's strange that both beds are used. I typically sleep in one and put my suitcase or bag on the other. You? Heat was high too which is just the way Cindy likes it."

      b.      "Housekeeping usually makes both beds when they clean each day so both beds used yesterday?"

      c.      "FYI She checked in at 1:29a and he checked in at 7:51a Tuesday morning."

      d.      "Hotel room is considered private."

      e.      "Hotel has now told me that his reservation is for Tuesday and Wednesday, not Monday and Tuesday. S"

      f.      "By the way, he obviously didn't take a shower this am as the shower curtain was ""out"" of the tub? Must have had a bath last night?"

25

113.    COURSER and Gamrat each met separately several times with the managers of the Radisson to share their concerns about the breach of security of their privacy.

114.    COURSER was assured that the failures and security breaches would not be repeated. However, COURSER's personal information continued to be released by the Radisson. Upon information and belief, Gamrat was also assured that the failures and security breaches would not be repeated. However, Gamrat's personal information continued to be released by the Radisson.

115.    Upon information and belief, Gamrat met with the Radisson manager and was instructed to use an alias and pay in cash in order to protect her privacy.

### *ALLARD, GRAHAM, AND CLINE'S POOR WORK PERFORMANCE*

116.    By the end of January, issues with substandard work performance of ALLARD, GRAHAM, and CLINE were apparent.

117.    Joe GamratUpon information and belief, in March and throughout the spring of 2015, SAARI continued to meet secretly with ALLARD, GRAHAM, and CLINE in order to gather information about COURSER and Gamrat.

118.    Upon information and belief, SAARI continued to direct that ALLARD and GRAHAM keep COTTER and THE HOUSE informed while at the same time SAARI and COTTER continued to promise ALLARD and GRAHAM that they would work on other employment advancement.

119.    Upon information and belief, during this time, ALLARD and GRAHAM continued seeking other positions in THE HOUSE but COTTER and THE HOUSE refused any transfer, wanting to keep ALLARD and GRAHAM in a position to illegally record conversations and report back to him.

26

120.    Upon information and belief, COTTER, SAARI, and SWARTZLE were using ALLARD, GRAHAM, and CLINE in order to gain political ammunition to stop COURSER and Gamrat from impeding COTTER's progressive legislative agenda of increased spending and taxes.

121.    Throughout this time, COURSER did not know that ALLARD, GRAHAM, and CLINE and possibly others, were secretly monitoring his communications, following him, and disseminating that information, including private emails that were between family members. Certainly, COURSER did not know this illegal surveillance and conspiracy was directed by COTTER, SAARI, SWARTZLE, and THE HOUSEJoe Gamrat.

### EXTENT OF THE CONSPIRACY AND EXTORTION PLOT; MOTIVES

122.    ALLARD, GRAHAM, and CLINE acted as employees and co-conspirators of the THE HOUSE DEFENDANTS under the leadership and direction of COTTER, SAARI, and SWARTZLE to gather information against COURSER and Gamrat and furthered their efforts with assistance both from and to Joe Gamrat, Vincent Krell, David Horr, and the Radisson. Joe Gamrat

123.    Joe GamratJoe GamratJoe GamratJoe GamratALLARD also stated to Joe Gamrat and other Defendants just after meeting with COTTER's team that "now that we are here the first thing we need to do is get COURSER impeached." Upon information and belief, ALLARD was working on a plan to remove COURSER from office.

124.    Joe GamratJoe Gamrat formed an alliance with THE HOUSE and with ALLARD, GRAHAM, CLINE, and David Horr who acted as a surveillance team for other Defendants.

125.    ALLARD, GRAHAM and CLINE, partnered with Joe GamratJoe Gamrat, Vincent Krell, and David Horr and participated both in conducting and directing illegal

27

wiretapping and eavesdropping; they also sent and received information from illegal wiretapping and eavesdropping from Joe GamratJoe Gamrat and other co-conspirators.

126.    Joe GamratJoe Gamrat also planted listening devices in their home, their bedroom, Gamrat's car, her campaign headquarters, and finally her official government office. He passed his surveillance information to ALLARD, GRAHAM, CLINE, and COTTER and they in turn passed back their surveillance to him. This conducted was illegal and violated Michigan's eavesdropping and wiretapping statutes; for example, MCL 750.539c, 750.539d, and 750.539e.

127.    Joe GamratJoe Gamrat was also accessing and downloading Gamrat's live calls, voicemails, emails (personal, professional, and political).

128.    Joe GamratUpon information and belief, the extortion texts came from a phone registered to LIVENGOOD. Upon information and belief, the phone used in the extortion plot was placed in LIVENGOOD's name in May of 2015.

129.    The person in possession of the phone, Joe Gamrattexted that he was in possession of audio and video tapes from the Radison of COURSER and Gamrat and that if COURSER and Gamrat did not resign that LIVENGOOD would "get it all"; including what ALLARD and GRAHAM had acquired on COURSER and Gamrat.

130.    In fact, ALLARD and GRAHAM later delivered the illegal wiretap tape to LIVENGOOD and the DETROIT NEWS in August of 2015, in violation of MCL 750.539d and 750.539e.

131.    Upon information and belief, this eventually led to Gamrat fearing for her life, extreme emotional and mental torment and destruction of her life including being afraid to live in

DePerno Law Office, PLLC ● 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) ● 269-353-2726 (Fax)

her own house and it forced her for a time to living in her car in Wal-Mart/Meijer parking lots out of fear of being recorded.

132.    Joe GamratJoe GamratJoe GamratALLARD, GRAHAM and CLINE were seeking promotions within THE HOUSE from the very first moments of January of 2015 – in their first meetings and throughout their efforts of providing illegally obtained information to THE HOUSE DEFENDANTS they were requesting promotions.

133.    COTTER, SAARI, and SWARTZLE were seeking information to further their own political agenda and were using their official positions over ALLARD, GRAHAM and CLINE and the potential of further employment to force them to continue the surveillance on COURSER and Gamrat (a violation of numerous state and federal laws).

134.    Joe GamratJoe Gamrat was furthering the conspiracy to force COURSER to resign from office.

135.    David Horr was a co-worker of Joe GamratJoe Gamrat and conspired to force COURSER and Gamrat to resign.

136.    Joe GamratUpon information and belief, David Horr and Joe GamratJoe Gamrat sent over 100 extortion texts to further the extortion plot to force COURSER and Gamrat to resign through this phone.

137.    Joe GamratJoe GamratJoe GamratOn August 31, 2015, THE HOUSE DEFENDANTS published a report called the "Report on the Investigation of Alleged Misconduct by Representative Todd Courser and Representative Cindy Gamrat" (the "HBO Report"). The statements set forth in this report were based on the illegally obtained wiretapping and eavesdropping conspiracy by the Defendants including lies concerning felonious conduct by

29

COURSER, misconduct in office, misuse of taxpayer resources, forced forgery, forcing staffers to lies, retribution against employees, and extortion and blackmail.

138. This report also rebroadcast the illegally obtained information, in violation of MCL 750.539d and 750.539e.

139. Between August of 2015 and December of 2015 LIVENGOOD and the DETROIT NEWS published a series of articles that included repeated rebroadcasting of the lies from the HBO Report and also rebroadcast of the illegally obtained information. These articles (based in part on illegally acquired information) were based on the illegally obtained wiretapping and eavesdropping conspiracy by the Defendants including lies embodied in the HBO Report, lies concerning felonious conduct by COURSER, misconduct in office, misuse of taxpayer resources, forced forgery, forcing staffers to lies, retribution against employees, and extortion and blackmail.

140. LIVENGOOD and the DETROIT NEWS violated the wiretapping and eavesdropping statutes and furthered the extortion conspiracy by using illegally obtained tapes of COURSER, that were made by GRAHAM at the direction of ALLARD, THE HOUSE, COTTER, SAARI, SWARTZLE, McBROOM, BEYDOUN (and potentially other Defendants), in a series of media stories. LIVENGOOD and the DETROIT NEWS violated MCL 750.539d and 750.539e.

141. LIVENGOOD, an agency of the DETROIT NEWS, was part of the group that obtained the illegal tapes. He was not just a reporter who acquired the information at a later date. This is evidenced by the fact that the telephone was registered in his name.

142. The DETROIT NEWS made millions of dollars in additional sales. These stories were broadcast around the world through every major media outlet worldwide.

DePerno Law Office, PLLC • 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) • 269-353-2726 (Fax)

143.   LIVENGOOD works as a reporter for the DETROIT NEWS and benefited by becoming an overnight media figure. He was invited on multiple media programs and received awards for his articles related to COURSER and Gamrat. He personally benefited from the defamatory statements in these stories.

    a.   LIVENGOOD was named as the person to whom the phone that sent the extortion texts was registered.

    b.   LIVENGOOD met with ALLARD, GRAHAM and CLINE.

    c.   It was stated by David Horr and Joe GamratJoe Gamrat that ALLARD and GRAHAM had other audio and video, which they would provide to LIVENGOOD if COURSER and Gamrat did not resign, including illegally obtained tapes, emails, and other materials.

    d.   ALLARD and GRAHAM provided the illegally obtained tapes to LIVENGOOD and the DETROIT NEWS, who then ran them in a series of news stories in the DETROIT NEWS in September 2015 and after, just as David Horr and Joe GamratJoe Gamrat stated they would.

144.   THE STATE DEFENDANTS were motivated to lock down the investigation and hide the evidence that showed that the extortion was anything more than a jealous husband.

145.   Upon information and belief, much of the information and evidence obtained by THE STATE DEFENDANTS has never been released.

146.   The failure to release information has denied COURSER his right to access the evidence against him and is a "Brady Violation" by SCHUETTE. This has done irreparable and ongoing harm to COURSER.

### CLINE RESIGNS

147.   In a private conversation, COURSER and Gamrat discussed asking THE HOUSE to reassign CLINE due to continued work performance issues.

31

148.     Unbeknownst to COURSER and Gamrat; ALLARD, GRAHAM, and CLINE were illegally "listening" to this communication and receiving intercepted conversations between them. These intercepted communications violated the wiretapping and eavesdropping statutes.

149.     Upon information and belief, through these illegal wiretaps, CLINE was "tipped off" about COURSER and Gamrat's dissatisfaction with his work.

150.     Upon information and belief, on April 14, 2014, CLINE, without warning, quit his position before he was potentially fired by THE HOUSE.

151.     Upon information and belief, CLINE then tried to get another job with THE HOUSE but no one would hire him.

152.     On or about April 15, 2015 COURSER and Gamrat instructed ALLARD and GRAHAM to remove CLINE's privileges and passwords to all legislative calendars, emails, and any other access.

153.     Upon information and belief, GRAHAM and ALLARD disregarded these instructions and continued to give CLINE access to unauthorized accounts.

### *COURSER FIGHTS PROPOSAL 1*

154.     As a representative, COURSER was in a daily conflict with COTTER's intention to assist the Governor in the passing of Proposal 1 and the largest budget in State history and the highest proposed tax increase in 40 years.

### *COTTER DEMANDS REPRESENTATIVES WHO OPPOSE PROPOSITION 1 REMAIN SILENT. PRESSURE BEGINS FOR REPRESENTATIVES TO SUPPORT TAX INCREASE LEGISLATION*

155.     After Proposal 15-1 was defeated, COTTER released his new proposal to fund road improvements on or about May 13, 2015. This new package was generally referred to as the "House Road Package" and consisted of House Bills 4605 through 4616. The House Road

DePerno Law Office, PLLC • 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) • 269-353-2726 (Fax)

156.    The House Road Package also drew criticism from COURSER and Gamrat who opposed the tax and fee increases as they had promised their constituents they would do if elected.

157.    At the time COTTER released his proposed House Road Package, there were 63 Republicans and 46 Democrats in the House.

158.    In May 2015 THE HOUSE was not close to passing the House Road Package, and Republican leadership began to intensify the pressure on getting the votes and cutting deals to get the necessary votes.

159.    As the legislative season progressed COURSER and Gamrat continued to be vocal opponents of the House Road Package, against COTTER's wishes.

### CONSPIRACY, ALLIANCES, AND UNDERCOVER SURVEILLANCE OPERATIONS

160.    During this time, GRAHAM and ALLARD alone, or in conjunction with others, gained access to COURSER and Gamrat's cellular phone, text messages, emails, and calendars without COURSER or Gamrat's permission.

161.    GRAHAM and ALLARD were illegally and secretly recording conversations involving COURSER and Gamrat.

162.    In some cases, GRAHAM and ALLARD were admittedly not part of the recorded conversations.

163.    In some cases, those people directing GRAHAM and ALLARD to record the conversations were not part of the recorded conversations.

164.    Upon information and belief, GRAHAM, ALLARD, or others were recording the conversations at the request of THE HOUSE leadership; including COTTER, McBROOM, SAARI, and/or SWARTZLE.

33

165.   On a number of occasions, ALLARD commented to COURSER and Gamrat and other staff that the District 80 office was "bugged".

166.   Upon information and belief, these illegally obtained recorded conversations, stolen communications, text messages, and the information therein, were delivered by the staffers to THE HOUSE DEFENDANTS.

167.   Some of this information was then used in an effort to force COURSER and Gamrat, to resign.

168.   Upon information and belief, although no longer an employee of THE HOUSE, CLINE continued to be copied on emails and had password access to COURSER's email accounts, in direct violation of state and federal law.

169.   Upon information and belief, CLINE acted as a go-between for ALLARD, GRAHAM, Joe GamratJoe Gamrat, David Horr, COTTER, SAARI, and SWARTZLE

170.   ALLARD, GRAHAM, and CLINE had also been secretly communicating with Joe Gamrat, on a regular basis; without knowledge of COURSER and Gamrat.

171.   Unbeknownst to COURSER or Gamrat, an alliance had been formed between ALLARD, GRAHAM, CLINE, and Joe Gamrat, who became another participant in the conspiracy that stemmed from COTTER's office through the staff to Joe Gamrat and David Horr; then to LIVENGOOD at the DETROIT NEWS. The information that was gleaned was eventually used in a series of extortion texts sent by "trigger man" David Horr.

172.   The MSP report details that ALLARD, GRAHAM, and CLINE were involved in the plot before, during, and after each text was sent.

34

173.    During the time of these secret meetings and recordings, COURSER and Gamrat did not know that ALLARD, GRAHAM, and CLINE had also been secretly communicating with Joe Gamrat, on a regular basis.

174.    ALLARD, GRAHAM, and CLINE kept these communications hidden from COURSER.

### *EXTORTION EFFORT BEGINS TO FORCE COURSER AND GAMRAT TO RESIGN*

175.    During this time COURSER and Gamrat began receiving what would be a series of anonymous extortion texts demanding that COURSER and Gamrat resign from office; which included personal and confidential information such as live call conversations, texts, information from private emails, and GPS locations of them and their families.

176.    Later in the fall of 2015, the MSP discovered that extortion texts were sent from a phone that was in the name of LIVENGOOD and in the possession of David Horr, whom neither COURSER nor Gamrat had ever met.

177.    The MSP reports shows that ALLARD, GRAHAM, and CLINE were regularly communicating with Joe Gamrat, who was relaying information they gathered to David Horr and Vincent Krell for the texts.

178.    The MSP report also shows that Joe Gamrat was in communication with THE HOUSE.

179.    The MSP and BRITVEC police report also documented the constant communication between ALLARD and Joe Gamrat before, during, and after the extortion texts. All these communications intentionally kept hidden by ALLARD and GRAHAM from COURSER; including the following:

      a.    May 16, 2015: David Horr sent a text to Joe Gamrat at 6:38 A.M. stating: "Burner phone audio evidence time to have an impartial party (ME!) reach out to Courser camp",

35

b.       May 16, 2015: Joe Gamrat responded at 6:46 A.M. asking, "How quick is the turn around on the audio do you think?"

c.       May 16: 2015: David Horr responded at 6:46 A.M., "Not sure."

d.       May 19, 2015: Police report shows that ALLARD calls Joe Gamrat at 3:57 P.M. during work time on a session day. The call lasts about 31 minutes.

e.       May 19, 2015: Police report shows that at 4:28 P.M., Joe Gamrat calls ALLARD. The call lasts about 42 minutes.

f.       May 19, 2015: Police report shows that Joe Gamrat and David Horr have communications back and forth.

g.       May 19, 2015: Police report shows extortion texts sent to Gamrat at 9:23 P.M.

h.       May 19, 2015: Police report shows extortion "burner phone" calls Gamrat's Lansing office at 9:30 P.M. and 9:32 P.M.

i.       May 19, 2015: Police report shows that Joe GamratJoe Gamrat and David Horr communicate at 9:34 P.M. and 9:36 P.M.

j:       May 19, 2015: Police report shows that Gamrat and COURSER receive extortion text at 9:41 P.M. which reads, "Boo! The phone is a burner . . . don't bother trying."

k.       May 19, 2015: Police Report shows that Gamrat and COURSER receive extortion text at 9:44 P.M. that reads, "Cindy sounds like she is great in the sheets. You however, have no stamina."

l.       May 19, 2015: Police Report shows that Gamrat and COURSER receive extortion text at 10:30 P.M. which reads, "Extortion texts to Todd and Cindy – Silence in this case can be VERY detrimental. Careers, political arena and of course families, Georgeann, Joe, Fon, Dan . . . whew, it could be disastrous really, and of course the kids."

m.       June 30, 2015: Joe Gamrat sent a text to ALLARD at 1:07 P.M. stating, "It isn't a lie if she meets with him for lunch. He 'is' a friend. If that happens I need a picture of the cars or something if he can do it. Thanks."

n.       June 30, 2105: Joe Gamrat sent another text to ALLARD at 11:52 P.M. asking, "Did you know where they were suppose to stay tonight? Or where the event sent them up? Thx."

o.       July 5, 2015: ALLARD sent a text to Joe Gamrat at 3:05 P.M asking, "Can I call you later today or evening." Joe Gamrat replied, "Yes."

o.      July 8, 2015: Joe Gamrat sent a text to ALLARD at 7:01 P.M. stating, "I told Cindy I would be 2+ hours tip home so not sure what you're going to text her. Maybe we can discuss that message when you get here?"

180.    Without having the knowledge of their covert and deceptive activities, COURSER and Gamrat felt compelled to recommend a raise for ALLARD and GRAHAM due to the increase workload of having only 2 staff members for 2 offices due to CLINE's departure.

181.    Upon information and belief, also on May 19, 2015, GRAHAM and ALLARD submitted requests for pay increases to THE HOUSE.

182.    Also on May 19, 2015, at the direction of ALLARD; GRAHAM secretly recorded an off-site, private after-hours conversation with COURSER at his law office where GRAHAM and CLINE still ran their political consulting business Bellwether Strategies, LLC.

183.    COURSER requested to meet with GRAHAM in his capacity as a consultant as COURSER had done numerous times before, at his office and in the evening, seeking advice on dealing with these extortion texts and a difficult personal situation, not knowing that GRAHAM was part of the conspiracy or that he would record the meeting.

184.    The MSP and BRITVEC police report shows that GRAHAM called CLINE before the meeting and went to his home immediately following. Unbeknownst to COURSER, GRAHAM was accessing his personal information in his personal email account and broadcasted items to other co-conspirators.

185.    CLINE stated during the investigation that GRAHAM called him regarding COURSER's request to meet and that he discussed with GRAHAM whether he should tape his meeting with COURSER. GRAHAM taped the conversation. This is illegal wiretapping, eavesdropping, and conspiracy. However, MSP, BRITVEC, and SCHUETE have refused to investigate or prosecute these claims.

37

186.   ALLARD, who was the direct supervisor over GRAHAM at the time of the taping of COURSER, stated multiple times that he directed GRAHAM to tape COURSER during the meeting. This is illegal wiretapping, eavesdropping, and conspiracy.

187.   After GRAHAM left COURSER's private office and his own private office, GRAHAM played the tape to CLINE and ALLARD. This act was illegal.

188.   This illegally obtained information was then used in the extortion texts by David Horr, Joe GamratJoe Gamrat and rebroadcast by LIVENGOOD and the DETROIT NEWS.

189.   MSP and BRITVEC stated in secret police tapings that they believed ALLARD directed GRAHAM to tape the conversation and also stated that ALLARD, GRAHAM, and CLINE were involved in the extortion plot against COURSER and Gamrat. However, they refused to charge any crime.

190.   The MSP and BRITVEC police report shows that communication between ALLARD, GRAHAM, CLINE, and Joe Gamrat continued surrounding the time frame of the extortion texts; which David Horr and Vincent Krell sent.

191.   There were also other texts that were deleted from the phones of David Horr and Joe Gamrat that were later recovered that also show evidence of stalking and extortion:

   a.   (from David Horr's phone): "Yes, actually just got off the phone. And what I can't tell you is get rid of it. But if you get rid of it, you wouldn't be doing it for me.

   b.   (from David Horr's phone): "I did this for 14 years with Target as a lead investigator . . . intrigues me even now, and I'm co-authoring the made-for-TV mini series . . . I wouldn't call it fun yet though."

   c.   (from David Horr's phone): "There may come a time to confess but stay strong."

   d.   (from David Horr's phone): "I worked wayyy to hard to buy a house for Amy and I only to have this bullshit happen . . . brainstorm some outs for me . . . helping a friend, he paid for everything, zero motive on both parts

38

(he simply wanted them to break it off and separate offices and staff) . . . fear of retaliation.

192.    Other deleted texts from David Horr's phone suggest he was working directly with individuals other than Joe Gamrat that were involved in the conspiracy against COURSER:

a.    (from David Horr's phone): "If Joe told him I did, he would have simply asked…I think he already knows where it was bought and maybe by whom…leading questions…mabey he's wondering why in the world would I use it…hence his "did you give joe the phone?"

193.    Many of these communications occurred during the day when ALLARD and GRAHAM were working for THE HOUSE and paid by THE HOUSE to conduct surveillance in furtherance of the conspiracy:

a.    May 20, 2015: Police report shows ALLARD calls or texts Joe Gamrat at 3:15 P.M. (during work hours).

b.    May 20, 2015: Police Report shows COURSER and Gamrat receive extortion text at 3:20 P.M. that reads, "Relax. I'm not leaking anything . . . yet. Pay people better to keep quiet. I pay them better for info. #Radisson"

c.    May 20th, 2015: Police Report shows at 3:39 P.M. Joe Gamrat calls ALLARD. The call lasts for 9 minutes.

d.    May 20, 2105: Police report shows that at 4:16 P.M. Joe Gamrat calls GRAHAM.

e.    May 20, 2015: Police report shows that at 4:23 P.M., COURSER and Gamrat receive text from extortionist that reads, "Let me make this CRYSTAL CLEAR. I need some open dialogue. I've heard from you Cindy...better tell Todd to man up. As long as I'm appeased, my cargo will never reach port so to speak. Can I please get confirmation."

194.    BRITVEC said there were 255 communications between ALLARD and Joe Gamrat. BRITVEC also stated that ALLARD might be named as the extortionist. BRITVEC also stated that he believed ALLARD directed GRAHAM to tape COURSER. ALLARD was the Chief of Staff over GRAHAM and CLINE. However, no charges were ever brought against these "key" witnesses.

39

195.    Upon information and belief, the next day, on May 21, 2015, ALLARD and GRAHAM met with SAARI, SWARTZLE, and COTTER again to provide secretly recorded information from GRAHAM's private meeting with COURSER and to provide information harvested from COURSER's private email account.

***COTTER AND HIS TEAM CONTINUE TO HAVE INFORMANT MEETINGS WITH ALLARD AND GRAHAM; THESE MEETINGS ARE HIDDEN FROM COURSER AND GAMRAT***

196.    COURSER later discovered, through an email sent by someone else, that the staff members engaged in this illegal activity were ALLARD and GRAHAM, working in conjunction with COTTER, to secretly provide the leadership with new information regarding both COURSER and Gamrat.

197.    SAARI continued to demand that ALLARD and GRAHAM keep COTTER informed. SAARI and COTTER continued to promise ALLARD and GRAHAM that they would work on other employment. ALLARD and GRAHAM continued to gather information on COURSER and Gamrat.

198.    During this time, ALLARD and GRAHAM continued to seek other positions in THE HOUSE but COTTER refused any transfer, wanting to keep ALLARD and GRAHAM in a position to illegally record conversations and report back to him.

199.    On June 3, 2015, after ALLARD and GRAHAM met with SAARI and SWARTZLE, they received raises from the House Business Office. These raises were approved by COTTER.

200.    ALLARD, GRAHAM, and CLINE continued as informants to COTTER's team to give COTTER political ammunition to stop his greatest impediments to passing a series of bills that increased spending and taxing and undermined his authority as leader of THE HOUSE.

40

201.    ALLARD, GRAHAM, and CLINE continued to secretly and illegally monitor COURSER's communications and whereabouts and broadcast this information, including but not limited to: accessing and broadcasting their private emails, following them to take pictures and then broadcasting that information to others. Some of this information were private conversations between family members.

202.    Many of ALLARD, GRAHAM, and CLINE's monitoring activities were done on State time, as agents of COTTER in furtherance of the conspiracy.

203.    ALLARD received communication from other Defendants to follow and take pictures of COURSER and Gamrat's vehicles. This monitoring activity was done without knowledge or authorization of COURSER.

204.    The surveillance conducted by COTTER, through his directions to his agents and employees, SAARI, SWARTZLE, ALLARD, GRAHAM, and CLINE was an abuse of his position and misconduct in office.

### *COTTER ABUSES HIS POWER IN THE LEGISLATIVE PROCESS BY TARGETING COURSER AND GAMRAT. COTTER ACTS WITH GROSS NEGLIGENCE.*

205.    It became very clear that COTTER had decided to treat COURSER differently than the other Representatives because he would not fall in line as COTTER demanded.

206.    COURSER believed he should work to follow through on his campaign promises that he made to the people in his District; however COTTER seemed only interested that COURSER do his bidding, regardless if it ran contrary to COURSER's conservative platform.

207.    COTTER abused his authority with how COURSER was treated. COTTER, SAARI, and SWARTZLE acted with malice and gross negligence; amounting to gross misconduct.

DePerno Law Office, PLLC ● 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) ● 269-353-2726 (Fax)

*ISSUES WITH ALLARD AND GRAHAM'S WORK PERFORMANCE MOUNT.*

208.    Throughout this time, issues regarding work productivity and quality of ALLARD and GRAHAM continued to worsen.

*NEW STAFF PLACED IN THE DISTRICT 80 AND 82 OFFICES; ALLARD AND GRAHAM WORK PROBLEMS CONTINUE*

209.    ALLARD and GRAHAM were employees of COTTER, being directed by COTTER. ALLARD and GRAHAM's objectives were to win the approval of COTTER, SAARI, and SWARTZLE so as to procure further employment by COTTER.

210.    In May, 2015, COURSER and Gamrat requested that their staff be separated.

211.    ALLARD and GRAHAM were alerted through illegal surveillance and recordings that COURSER and Gamrat were asking the House Business Office to move or replace ALLARD and GRAHAM.

212.    The MSP police report details that most of the communications between ALLARD and Joe Gamrat were initiated by ALLARD.

213.    Many of these communications ALLARD initiated took place during the day (work hours):

        a.      June 3, 2015: (A Session or work day) - Police report shows at 9:12 A.M. ALLARD calls Joe Gamrat and the call lasts about 19 minutes;

        b.      June 3, 2015: Police report shows at 9:40 A.M. Joe Gamrat called ALLARD which lasts about 12 minutes;

        c.      June 3, 2015: Police report shows at 3:03 P.M. Joe Gamrat calls/texts ALLARD, contact lasts about 26 seconds.

        d.      June 3, 2015: Police report shows ALLARD calls/texts Joe Gamrat at 4:43 P.M., contact lasts about 26 seconds.

        e.      June 3, 2015: Police report shows at 5:43 P.M. ALLARD calls/texts Joe Gamrat, contact lasts about 3 seconds

DePerno Law Office, PLLC ● 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) ● 269-353-2726 (Fax)

      f.      June 4, 2015: Police report shows at 8:39 A.M. ALLARD calls Joe Gamrat, call lasts about 9 minutes.

      g.      June 9, 2015: at 7:58 A.M. ALLARD calls Joe Gamrat, call lasts about 12 minutes.

      h.      June 11, 2015: Police report shows at 4:28 P.M. ALLARD calls Joe Gamrat, call lasts about an hour and 10 minutes;

      i.      June 15, 2015: Police report shows at 11:10 A.M. ALLARD calls Joe Gamrat, call lasts about 22 minutes;

      j.      June 18, 2015: Police report shows at 8:59 A.M. ALLARD calls Joe Gamrat, call lasts about 22 minutes.

214.    Between June 22, 2015 and July 6, 2015, the police report shows ALLARD had 21 separate communications with Joe Gamrat; 13 that ALLARD himself initiated. These communications lasted over a total of 408 minutes.

### ALLARD AND GRAHAM THREATEN NEW STAFF

215.    Upon information and belief, GRAHAM and ALLARD realized they were not going to be able to continue to get away with the things they had been doing and the way they had been doing them, including their surveillance activities, skipping work, and sloppy work habits.

216.    COURSER and Gamrat decided that it was time to bring in the House Business Office to address these matters with ALLARD and GRAHAM.

### ALLARD AND GRAHAM ARE FINALLY TERMINATED

217.    On July 6, 2015, Gamrat approached BOWLIN and asked how to deal with issues regarding staff.

218.    Pursuant to House Rule 9, which states that the Speaker (COTTER) has the sole authority to hire or fire any staff members, BOWLIN, the designee of COTTER, terminated the employment of ALLARD and GRAHAM.

43

219.   On July 6, 2015, BOWLIN escorted ALLARD to his office; whereby BOWLIN notified ALLARD that COTTER and THE HOUSE were terminating his employment.

220.   On July 6, 2015, BOWLIN also escorted GRAHAM to his office; whereby BOWLIN notified GRAHAM that COTTER and THE HOUSE were terminating his employment.

221.   At this time, COURSER did not know that the January and February 2015 meetings between SAARI, SWARTZLE, COTTER, ALLARD, and GRAHAM had taken place, nor of the directives from COTTER and his team.

222.   Upon information and belief, on July 6, 2015 just hours after their termination, ALLARD and GRAHAM again met with BOWLIN, SAARI, and SWARTZLE (via phone conference) and again reported information and discussed COURSER and Gamrat, including accusations of misuse of taxpayer dollars.

223.   SWARTZLE was at all relevant times the attorney for COURSER yet acted against COURSER's interests for his entire term in office; conspiring with ALLARD, GRAHAM, and CLINE and not informing COURSER of the accusations being made against them.

224.   Even after months of secret meetings and allegations between ALLARD, GRAHAM, CLINE, SAARI, SWARTZLE, COTTER, and BOWLIN, at no time was COURSER ever approached by leadership or Human Resources with concerns or complaints about the processes and procedures in his office, until COTTER demanded the investigation on August 7, 2015 immediately following the DETROIT NEWS release.

DePerno Law Office, PLLC ● 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) ● 269-353-2726 (Fax)

225.    During the time between July 6, 2015 and August 6, 2015, after GRAHAM and ALLARD were terminated, at no time did Human Resources or leadership approach COURSER with concerns or issues regarding the processes and procedures of his office.

226.    After the termination of ALLARD and GRAHAM, the office of COURSER ran much smoother and constituent issues were addressed more quickly and appropriately than ever before.

### *ALLARD AND GRAHAM FOLLOW THROUGH ON THE EXTORTIONISTS THREATS AND SET MEDIA STORM IN MOTION TO DESTROY COURSER AND GAMRAT*

227.    In early August 2015, ALLARD, GRAHAM, CLINE, Joe Gamrat, Vincent Krell, and David Horr followed through on the threat to take their illegal tapes of COURSER to LIVENGOOD and the DETROIT NEWS.

228.    The extortion texts threatened to expose personal information in the media, specifically to destroy COURSER and Gamrat, if they did not resign. Some of this information was illegally obtained.

229.    It was ALLARD, GRAHAM, and other Defendants who put in motion the media campaign against both COURSER and Gamrat.

230.    COURSER and Gamrat received a text from the extortionist on July 8, 2015 at 1:00 P.M. that read, "Wow! Firing staff...be careful, the boys have A TON on you...they know everything. I saw you recently. Flint then near Great Lakes Crossing later. You guys are easy but idiots. Oh the Speaker is meeting with me on 8/3."

231.    The phone used to send this text was registered in the name of LIVENGOOD.

232.    On August 3, 2015, COURSER was first notified by LIVENGOOD that he was writing a story about COURSER and GAMRAT; the same day the extortionist confirmed he would be meeting with COTTER.

45

233.    In September of 2015, LIVENGOOD and the DETROIT NEWS did a series of articles and then LIVENGOOD did multiple interviews claiming that COURSER had committed misconduct in office by misusing state resources. However, COURSER was never charged with misusing state resources, even after 9 months of investigation by THE HOUSE DEFENDANTS, LIVENGOOD, DETROIT NEWS, THE STATE DEFENDANTS.

234.    Upon information and belief, on or prior to August 3, 2015, GRAHAM, ALLARD, and CLINE fraudulently and intentionally reported information to LIVENGOOD and the DETROIT NEWS that they knew was false, inaccurate, and/or misleading about COURSER. This caused irreparable harm to COURSER including the destruction of his reputation, such as:

    a.      that COURSER retaliated against GRAHAM for not sending an email;

    b.      that COURSER misused taxpayer resources;

    c.      that COURSER required ALLARD and GRAHAM to do political work on state time

235.    The stories written by LIVENGOOD and the DETROIT NEWS were extremely detrimental to COURSER and were based upon the accusations from ALLARD and GRAHAM that were later determined to be false.

236.    The DETROIT NEWS and LIVENGOOD stories included false and misleading accusations from ALLARD and GRAHAM in order to paint a false and misleading persona of COURSER.

237.    The DETROIT NEWS and LIVENGOOD broadcast illegally obtained taped conversations of COURSER to the public, in violation of wiretapping and eavesdropping statutes.

DePerno Law Office, PLLC ● 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) ● 269-353-2726 (Fax)

238.    The DETROIT NEWS and LIVENGOOD issued the story knowing the information was false and that the recordings were done illegally and with malice and they were grossly negligent in using the illegally obtained recordings by GRAHAM and ALLARD.

239.    Given the severity and scandalous nature of the claims against COURSER, LIVENGOOD and the DETROIT NEWS were very aware that his story would explode and be picked up around the State and nation.

240.    On August 7, 2015 at 3:59 P.M., COURSER received a text that read, "It went global fast. Resign NOW Todd and Candy has asked...ASKED. You too Cindy, spare the kids and Joe. Resign, both of you, TODAY. Chad has scratched the surface...Ben has lots of audio...intriguing, damning. I have steamy audio, pics, video from DC. Resign, or Chad gets it all."

### COTTER CALLS FOR HIS OWN AGENTS AND CO-CONSPIRATORS TO INVESTIGATE COURSER AND GAMRAT

241.    Within moments of the DETROIT NEWS article breaking on August 7, 2015, COTTER requested and directed the House Business Office, specifically BOWLIN, to "investigate" and prepare a report on alleged misconduct by COURSER and Gamrat. COTTER did not ask the Sergeant at Arms to conduct the investigation of the alleged misconduct.

242.    Upon information and belief, COTTER and SWARTZLE had forewarned knowledge about the DETROIT NEWS and LIVENGOOD article before it was released.

243.    COTTER illegally acted as a police investigator.

244.    BOWLIN, at the direction of COTTER, did an investigation into the alleged misuse of taxpayer resources. He based his report, which was approved by COTTER, on the unsubstantiated and knowingly false testimony of ALLARD, GRAHAM, and CLINE. Weeks after the expulsion votes, in a secret MSP/BRITVEC/SCHUETTE interview, BOWLIN called

47

ALLARD and GRAHAM "f'ing liars"[15] who were not to be trusted, but by then it did not matter, because COURSER had been forced to resign and the new "highway funding bill" had been passed by 1 vote. This information was not part of the HBO Report.

245.    Upon information and belief, at the direction of COTTER, both BOWLIN and SWARTZLE stated (totally contradicting their committee testimony) in the secret MSP/BRITVEC/SCHUETTE tapes, that there was no illegality found in their investigation of COURSER.

246.    SWARTZLE also stated in the secret MSP/BRITVEC/SCHUETTE tapes that there was no forgery by COURSER, totally contradicting the report presented to the public and to the other members of THE HOUSE.

247.    Before THE HOUSE investigation, Gamrat had asked Chief Dixon to investigate the extortion plot; however, Chief Dixon turned the investigation over to BOWLIN, an employee of COTTER with no law enforcement authority.

248.    BOWLIN was acting totally under COTTER and THE HOUSE's authority. BOWLIN was given no law enforcement authority to investigate and had no subpoena power to compel testimony or evidence.

249.    BOWLIN refused to investigate the extortion plot, stating that it was "immaterial".

250.    BOWLIN then had ALLARD and GRAHAM interviewed together for the official investigation.

---

[15] "But since everyone was denying that they even knew, at least at certain times, it was we never knew, then it's we knew in February, then it's we didn't know, this is Allard and Graham, then we knew this after the husband told us and then well we didn't know definitively until he talked to us in May, I was like you're f'ing liars."

DePerno Law Office, PLLC ● 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) ● 269-353-2726 (Fax)

251.    In order to remove COURSER, COTTER was directing BOWLIN to investigate the very conspiracy that COTTER had put in place, yet none of the co-conspirators were investigated for their role in the conspiracy and BOWLIN refused to investigate the extortion.

252.    This was done despite the fact that HOUSE staff had been involved in the secret meetings.

253.    In essence, BOWLIN was investigating his own handling of the matter for COTTER, including his own terminations of ALLARD and GRAHAM.

254.    Shortly after COTTER called for the investigation, the computers and property in COURSER's office were illegally seized, without a warrant. This included computers used by ALLARD, GRAHAM, and CLINE and which contained illegal wiretapping and eavesdropping information, recordings, and emails.

255.    COURSER was never granted access to these items or the evidence from these items for either his defense during the ensuing expulsion hearing or the criminal cases against him.

256.    Upon information and belief, this information on these computers has disappeared.

257.    COURSER was not read his rights or "mirandized" even though BOWLIN knew at the beginning of his investigation that he was conducting a criminal investigation and COTTER was acting as law enforcement.

258.    Upon information and belief, in October of 2015, after the expulsion votes were complete, BOWLIN stated during his interview with the MSP/BRITVEC that during the

49

"investigation" BOWLIN asked COTTER and other Members how low they wanted the bar to be set for the expulsion of COURSER.[16]

259.    BOWLIN also later stated that he wanted more time to investigate but COTTER and THE HOUSE refused, only giving him a rushed two weeks to investigate.

260.    Upon information and belief, the HBO Investigation was not fair and impartial.

261.    Upon information and belief, prior to the expulsion votes, COTTER was aware that SCHUETTE was already investigating COURSER. SCHUETTE was also aware that COTTER was investigating COURSER. Yet SCHUETTE allowed COTTER to illegally obtain information, without a warrant, because he knew he could then get that information from COTTER.

262.    COTTER turned over illegally seized information to SCHUETTE, which SCHUETTE then used to prosecute COURSER.

263.    Upon information and belief, shortly after COTTER called for the investigation, BOWLIN directed staff members Anne Hill and Karen Couture to report directly and only to him.

264.    Upon information and belief, as part of the investigation, BOWLIN conducted a series of interviews with several of the key players but never recorded the interviews, but instead asked two staff members to "take notes".

265.    Upon information and belief, COTTER partially directed the questions that BOWLIN would ask in the interview.

---

[16] "In my mind on that issue the bar was pretty questionable as to what had to be the level for expulsion and I said to the people that I talked to, the members that I talked to, as to how low do you want that bar to be for a member's behavior to be set, it wasn't in the constitution as to be felonious behavior but where do you want that bar to be. They set it the way they wanted to set it but that wasn't my decision."

DePerno Law Office, PLLC ● 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) ● 269-353-2726 (Fax)

266.    Upon information and belief, on August 17, 2015 Gamrat met with BOWLIN, BEYDOUN, and two other House staff for her interview.

267.    Upon information and belief, on August 17, 2015 COURSER met with BOWLIN, BEYDOUN, and two other House staff for his interview.

268.    In these meetings, BOWLIN informed COURSER and Gamrat that he was simply taking statements at that time, that they were not under oath, and that they would not be released to the public, referencing that the legislature was exempt from disclosure. BOWLIN did not alert COURSER to the criminal investigation that BOWLIN was part of.

269.    Upon information and belief, BOWLIN told Andrew Abood, Gamrat's attorney that he could not tape the interviews, but instead assured Gamrat and Abood that two HOUSE staff were present to "take notes". From those notes, BOWLIN stated that he would prepare "statements."

270.    BOWLIN refused to initially give COURSER or Gamrat a copy of their alleged "statements".

271.    When Gamrat was able to see a copy of her "statement" produced by BOWLIN and THE HOUSE, she identified a number of errors and omissions from THE HOUSE produced statement from their "notes".

272.    When COURSER was able to see a copy of his "statement" produced by BOWLIN and THE HOUSE, he identified a number of errors and omissions from THE HOUSE produced statement from their "notes".

273.    COURSER's corrections were not included in the final copy of the statements. COURSER was not given a final copy of the statement prepared by BOWLIN before it was

DePerno Law Office, PLLC ● 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) ● 269-353-2726 (Fax)

submitted to the Select Committee. COURSER did not sign the statements that BOWLIN had prepared during his investigation.

274.    COURSER gave his statements in an attempt to work out a settlement and resolution with COTTER and THE HOUSE.

275.    Upon information and belief, at 9:00 A.M. On August 18, 2015, GRAHAM and ALLARD were interviewed together by BOWLIN, unlike all other parties who were interviewed separately.

276.    On August 19, 2015, under COTTER's direction and before the conclusion of BOWLIN's "investigation", THE HOUSE passed a Resolution (H.R. 129) to form a Select Committee by a voice vote. This prevented the Committee from having the authority to subpoena witnesses.

277.    This was done as a crucial step to keep ALLARD, GRAHAM, and CLINE (with whom COTTER, SAARI, and SWARTZLE had secret meeting) from being questioned in public under oath, and possibly exposing COTTER, SAARI, and SWARTZLE's involvement in the wiretapping, surveillance, misuse of state resources as well as to deprive COURSER of his constitutional rights.

*G̲A̲M̲R̲A̲T̲ A̲N̲D̲ C̲O̲U̲R̲S̲E̲R̲ A̲R̲E̲ D̲E̲N̲I̲E̲D̲ A̲C̲C̲E̲S̲S̲ T̲O̲ T̲H̲E̲ "E̲V̲I̲D̲E̲N̲C̲E̲"*

278.    As outlined by the National Conference of State Legislatures in Section 6, The General Legislative Process: "*Modern court cases establish that a legislator who is subject to disciplinary proceedings has the ̲r̲i̲g̲h̲t̲ ̲t̲o̲ ̲d̲u̲e̲ ̲p̲r̲o̲c̲e̲s̲s̲.* Therefore, any special procedures set by a legislative chamber should be built upon the basic elements of a fair disciplinary process."

279.    Upon information and belief, many Democrat Representatives, including Chirkin, Liberati, and Singh questioned the process, the lack of witnesses, the lack of subpoenas, the lack of due process, and the lack of any substantial evidence on the record.

DePerno Law Office, PLLC ● 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) ● 269-353-2726 (Fax)

280.    An article by the Michigan House Democrats on September 11, 2015 states "Among the many issues within the Select Committee to Examine the Qualifications of Representatives Cindy Gamrat and Todd Courser, key were the striking of significant testimony and the refusal to call necessary witnesses. Democratic committee members frequently requested more information and were denied by the Republican chair."

281.    Throughout the HBO investigation, the issuing of the HBO Report, the Select Committee Hearings on character and fitness of COURSER to serve, and finally through the expulsion votes that happened on September 10 and 11, 2015, COURSER was denied his right to a) due process, b) to have access to allegations and evidence against them, and c) to have copies of evidence to prepare a defense, d) to have adequate time to prepare a defense, e) to call witnesses, or f) to cross examine witnesses.

282.    COURSER was treated markedly different from other expulsion actions in the past and was treated without equal protection when compared to even current or recently departed Representatives from the House or those in the Senate. This is clearly in violation of both due process and equal protection.

283.    Although BOWLIN had informed COURSER that they would be allowed to know what the accusations were against him and see the evidence, multiple attempts made by COURSER and his attorneys to see the evidence were denied.

284.    Upon information and belief COTTER instructed BOWLIN and BEYDOUN, Majority Legal Counsel of the House of Representatives, to refuse COURSER access to the "evidence" portion of the HBO Report until it was all released to the public and just a few days before the committee.

DePerno Law Office, PLLC • 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) • 269-353-2726 (Fax)

285.     These actions by BOWLIN at the direction of COTTER denied COURSER any ability to know the charges being leveled against him before the charges broke in the public. At that point they had no access to the supposed evidence to defend themselves. This caused immeasurable and irreparable harm to COURSER.

286.     The actions of withholding the "evidence" by THE HOUSE, COTTER, BOWLIN, SWARTZLE, SAARI, McBROOM, LaFONTAINE, VERHEULEN, BEYDOUN, and HEISE; and even withholding the allegations against COURSER, clearly put COURSER at a disadvantage to be able to prepare any sort of defense for himself.

287.     On August 19, 2015, Gamrat texted BOWLIN requesting that her attorney would like a copy of her statement. At 1:40 P.M. BOWLIN texted back saying, "Sorry but I cannot let the documents off site at the time."

### *HOUSE REPORT RELEASED WITH FALSE AND MISLEADING STATEMENTS*

288.     On August 31, 2015, the House Business Office completed and delivered its report to COTTER.

289.     On August 31, 2015, following his review of the report, before COURSER had the opportunity to view the report or "evidence", COTTER issued a statement to the media saying "there is troubling evidence of misconduct".

290.     On August 31, 2015 The House Business Office released the "HBO Report".

291.     The HBO Report included only statements of findings and recommendations; it did not include an "evidence" packet to back up those findings.

292.     The HBO Report included statements made as fact which were directly from the allegations of ALLARD and GRAHAM.

293.     Upon information and belief, ALLARD and GRAHAM knew some of the statements they gave were false when they gave them.

DePerno Law Office, PLLC ● 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) ● 269-353-2726 (Fax)

294. Upon information and belief, THE HOUSE DEFENDANTS knew some of the statements by ALLARD and GRAHAM were false.

295. The HBO Report included many false statements and was produced from an investigation that was neither fair nor independent.

296. The HBO Report, issued by COTTER and put together by his agent BOWLIN, went to great lengths to protect COTTER, BOWLIN, SAARI, SWARTZLE, and THE HOUSE from any perception of wrongdoing.

297. COTTER, BOWLIN, SWARTZLE, and SAARI used the HBO Report to "investigate" their own conspiracy, insulate themselves and absolve themselves of wrongdoing, and deprive COURSER of his constitutional rights.

298. In the HBO Report COTTER, BOWLIN, SWARTZLE and SAARI falsely stated that COTTER "had no knowledge of work-related issues concerning GRAHAM or ALLARD prior to termination" even though he and his team had been secretly meeting with ALLARD, GRAHAM, and CLINE since the beginning of the term and met with them the day after BOWLIN sent COTTER his request to terminate their employment.

299. The HBO Report surmised that it was COURSER and Gamrat who were deceitful because their testimony did not match the testimonies of ALLARD and GRAHAM; but the "Report" refused to acknowledge the testimony of the other staffers who agreed with COURSER.

300. COTTER, BOWLIN, SWARTZLE and SAARI in Finding #1 in the HBO Report alleged that ALLARD and GRAHAM (the agents of COTTER and THE HOUSE) were credible witnesses and COURSER and Gamrat were not, but COTTER soon after the conclusion of the expulsion said, "In fact, during the criminal investigation by the Michigan State Police, it became

55

clear that Mr. Allard and Mr. Graham repeatedly lied to House Business Office investigators and lawyers about their knowledge and involvement in a convoluted, month-long extortion plot against their own supervisors." Yet it was based on these very lies that COTTER set in motion an expulsion vote and effort against COURSER and Gamrat. None of the Defendants have ever corrected or retracted the statements in the HBO Report.

301.    Upon information and belief, COTTER knew that ALLARD and GRAHAM had lied and that the basis for removing his political enemies was based on those lies. COTTER did not inform the committee or the public during the hearings or before the votes to remove that he knew ALLARD and GRAHAM had lied or were not trustworthy.

302.    Upon information and belief, COTTER and BOWLIN made ALLARD, GRAHAM, and CLINE (who were disgruntled, substandard employees who continuously lied to their supervisors and had been involved in nefarious surveillance operations and an extortion plot against their supervisors) as the standard of which to measure COURSER's honesty.

303.    Testimony from Anne Hill and Karen Couture which lined up with that of Gamrat and COURSER, and which also attested to the lack of credibility, bizarre behavior, and poor work performance of ALLARD and GRAHAM, was ignored.

304.    The HBO Report and THE HOUSE DEFENDANTS recklessly reported false and misleading statements made by ALLARD and GRAHAM regarding COURSER as if they were fact.

305.    Upon information and belief, these statements produced by THE HOUSE DEFENDANTS were then intentionally pushed out to the media to be reported around the world through press statements given by BOWLIN and COTTER.

DePerno Law Office, PLLC • 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) • 269-353-2726 (Fax)

306.    These false statements which brought clear and irreparable harm to COURSER were used as the foundation for his forced resignation.

307.    In the HBO Report, COTTER, BOWLIN, SWARTZLE and SAARI state that COURSER and Gamrat "misused their offices, the office staff, other state resources for their own political advantage. Testimony of Keith Allard and Graham and Joshua Cline document the misuse." Again, demonstrating the HBO findings were based on the allegations of ALLARD and GRAHAM.

308.    The HBO Report evidence and committee process were used to deny COURSER of his due process and equal protection.

309.    Upon information and belief, COTTER directed BOWLIN to use the words, "Deceptive, Deceitful, and Dishonest" in the HBO Report to describe COURSER, knowing these words would be quickly picked up and circulated in the media before COURSER ever had a chance to respond.

310.    THE HOUSE DEFENDANTS refused to investigate or even subpoena ALLARD and GRAHAM so that their involvement in the extortion plot could be vetted.

311.    Later when ALLARD and GRAHAM sued THE HOUSE and COTTER, COTTER stated in regards to ALLARD and GRAHAM: "In fact, during the criminal investigation by the Michigan State Police, it became clear that Mr. Allard and Mr. Graham repeatedly lied to House Business Office investigators and lawyers about their knowledge and involvement in a convoluted, months-long extortion plot against their own supervisors."

312.    However, earlier in the HBO Report, THE HOUSE DEFENDANTS claimed with gross negligence and with malice that staff were forced by COURSER to forge signatures, that

DePerno Law Office, PLLC ● 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) ● 269-353-2726 (Fax)

the staff were forced to do political work, that the staff was forced to enter official information in political databases, and that COURSER misused taxpayer resources.

313.    However, in its motion for summary judgment in a separate federal litigation against claims brought by ALLARD and GRAHAM, THE HOUSE stated, "The allegation that employees in the most political branch of government were asked to send 'political emails' during normal work hours is too vague to suggest a violation of law, and their doing so is not necessarily a violation of law, in any event." This position contradicts the HBO Report.

314.    In its motion for summary judgment THE HOUSE further states "that some legislative staff work is inherently (and legitimately) political in nature. Thus, claiming that someone is doing 'political work' is simply not sufficient to raise a claim of unlawful activity." This statement contradicts the HBO Report and the criminal charges brought against COURSER.

315.    The HBO Report also found that the terminations of ALLARD and GRAHAM were related to work performance and not retaliation.

### PRESSURE BUILDS FOR HOUSE TO PASS ROAD PACKAGE AND TAX HIKES

316.    On or around this time, the pressure from Governor Snyder and COTTER on the Representatives increased to pass the House Road Package that included huge tax and fee increases.

317.    Upon information and belief, during the time COTTER was pushing the Governor's Proposal 15-1, Governor Snyder had meetings with COTTER and a "roads task force committee" of selected Representatives.

318.    Upon information and belief, COTTER and Governor Snyder knew that no amount of political arm twisting would work to get COURSER to change his NO votes against tax and fee increases.

58

319.    Upon information and belief, COTTER and Governor Snyder knew the vote count to pass his road package was insufficient by only a slim margin of 1 or 2 votes via information gathered from the whip count of the members.

320.    COTTER took advantage of this as an opportunity to remove COURSER and Gamrat's votes against the tax and fee increase bills.

321.    Upon information and belief, as long as COURSER and Gamrat were in THE HOUSE publicly advocating to their voters and statewide grassroots network against raising taxes with this package, COTTER and his team would have trouble passing the House Road Package.

322.    Upon information and belief, COTTER and Governor Snyder would benefit if COURSER and Gamrat were removed from their seats because then the number of votes needed to pass the House Road Package would decrease to a manageable number.

323.    Shortly after COURSER was constructively expelled by THE HOUSE, COTTER, BOWLIN, SWARTZLE, SAARI, McBROOM, LaFONTAINE, VERHEULEN, BEYDOUN, and HEISE, the House Road Package that increased vehicle registration fees by 40% passed through the House of Representatives by only 1 vote.

324.    Had COURSER and Gamrat still been in office, the tax and fee increase legislation would not have passed.

## THE SELECT COMMITTEE TO EXAMINE THE QUALIFICATION OF GAMRAT AND COURSER FORMED

325.    On September 1, 2015 The House Select Committee, formed by HR 129, to examine the qualifications of COURSER and Gamrat met at 9:00 A.M. for 7 minutes to adopt the rules of the committee.

DePerno Law Office, PLLC ● 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) ● 269-353-2726 (Fax)

326.     Upon information and belief, all committee members were handpicked or approved by COTTER.

327.     The members of the committee were as follows: McBROOM, VERHEULIN, HEISE, LAFONTAINE, and Democrats Chirkin and Liberati.

328.     Upon information and belief, all the Republican committee members had prior legislation that COURSER and Gamrat could not support because they expanded government when COURSER and Gamrat had campaigned on platforms of decreasing government.

329.     In particular, upon information and belief, McBROOM who was the chair of the committee, had on their first day of swearing in instructed all the Representatives to obfuscate State law with the seating assignments. It was COURSER and Gamrat who spoke out against his illegal directive.

330.     Upon information and belief, earlier in the year, HEISE had attempted to pass what COURSER referred to as the "Warrantless Wiretapping Bill."

331.     When COURSER and Gamrat notified their grassroots network in Michigan, the calls and emails that poured in shut down HEISE's bill.

332.     Upon information and belief, LaFONTAINE and VERHEULIN were the main Sponsors of the bills to increase the road package taxes and fees, which COURSER and Gamrat adamantly opposed on behalf of the wishes of the majority of people in their respective districts.

333.     Upon information and belief, the rules of the committee that were adopted did not allow for COURSER or Gamrat to call, question, or cross examine witnesses.

334.     In an article in the Detroit Free Press by Kathleen Gray and Paul Egan on September 1, 2015, HEISE stated, "I don't want to see this drag on over the Labor Day holiday...It won't be done tomorrow, but certainly by the end of the week."

60

335.    Upon information and belief, HEISE, as a member on the Select Committee, was more interested in the hearing being finished for his Holiday, than he was of making sure a thorough discovery was allowed with due respect for the people of Michigan and especially for those in District 80 and 82.

336.    Upon information and belief, COURSER and Gamrat were slated for expulsion before the hearing began.

337.    Upon information and belief, the HBO Report was used by THE HOUSE for review of the Select Committee formed by COTTER to determine whether COURSER and Gamrat should be expelled from THE HOUSE. In other words, the HBO Report (which COTTER commissioned and instructed BOWLIN to prepare) was used by THE HOUSE Select Committee (which members were hand-picked by COTTER) in order to remove COURSER and Gamrat at a time when his tax increase package was two votes shy of passing. After removal, the tax increase passed by one vote.

### GAMRAT AND COURSER FIND FALSE AND MISLEADING "EVIDENCE" IN THE HOUSE BUSINESS REPORT "EVIDENCE"

338.    Upon information and belief, on September 4, 2015, Gamrat was finally permitted to see the "evidence" that had been collected during BOWLIN's "investigation" for limited time during business hours only.

339.    Gamrat was not allowed to make copies of the documents or audio.

340.    The limited time given was not adequate to review all the hours of audio and hundreds of pages of submitted documents.

341.    With no copy being afforded to her, a quick skim of the material was all that was allowed.

DePerno Law Office, PLLC ● 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) ● 269-353-2726 (Fax)

342.    The limited access and time prevented Gamrat from being able to prepare any sort of defense over the Holiday weekend before the committee hearings were to begin the following Tuesday.

343.    COURSER was not allowed to review the "evidence" until Friday September 4, 2015.

344.    COURSER was given the same instructions. He was not allowed to make copies of the evidence to allow him to prepare any sort of defense over the weekend before the committee hearings were to begin the following Tuesday.

345.    With no copy being afforded to COURSER, a quick skim of the material was all that was allowed.

346.    On September 4, 2015, BEYDOUN (as Majority Legal Counsel for THE HOUSE and counsel for COURSER) responded to COURSER's request for copies of interviews and documents found in the "evidence packet". BEYDOUN responded, "Pursuant to the Select Committee Rules, only evidence and testimony relevant to the objectives established in House Resolution 129 will be considered by the Committee. While you are free to examine the full evidentiary record, the record itself remains confidential. Accordingly, please state specifically which pages of the evidentiary record that you would like to request copies of, along with a statement for each stating the relevance of such to COURSER's qualifications."

347.    COURSER and Gamrat were not allowed access to, at any time, other evidence collected by THE HOUSE which could provide evidence for their defense such as the computers in their offices which were used by them and the staff members.

### *COURSER AND GAMRAT OFFERED CENSURE*

348.    Leading up to the committee hearings on September 10 and 11, 2015, both COURSER and Gamrat meet separately with BEYDOUN.

DePerno Law Office, PLLC ● 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) ● 269-353-2726 (fax)

349.   During this meeting BEYDOUN advised COURSER to sign and prepare a statement admitting to all of the alleged wrongdoing in exchange for censure. BEYDOUN told COURSER he needed to be contrite and offer an apology. Upon information and belief, BEYDOUN also requested the same from Gamrat.

350.   BEYDOUN told COURSER that THE HOUSE had the votes against him to expel him.

351.   COURSER believed this to be true because all the Representatives had signed the Caucus Pledge to vote according to what COTTER wanted.

352.   BEYDOUN stated that he believed that that censure was more appropriate for him than expulsion.

353.   COURSER was fatigued and under an incredible amount of pressure and stress and refused to sign BEYDOUN's prepared statement because the statement stated that all facts and findings set forth in the entire HBO Report were accurate.

354.   However, COURSER and BEYDOUN then worked jointly on a statement COURSER would read to THE HOUSE committee. BEYDOUN made changes to the statement and offered advice to COURSER.

355.   In the end, COURSER refused to admit to the entire HBO Report because there were many things he believed were untrue.

356.   BEYDOUN assured COURSER that censure was in play and appropriate.

357.   BEYDOUN also told COURSER that the audio recordings made by GRAHAM of him speaking with people in his office about personal matters broke House Rule 74 and was considered a misuse of state resources.

DePerno Law Office, PLLC ● 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) ● 269-353-2726 (Fax)

358.    Exhausted, broken, having undergone incredible emotional trauma over the past several weeks, and under extreme pressure from THE HOUSE, and under advised from BEYDOUN (his legal counsel), COURSER agreed to appear before THE HOUSE committee and read a statement, which had been revised by BEYDOUN.

359.    COURSER later found out after having the time to research on his own that House Rule 74 did not apply as BEYDOUN had fraudulently told him.

360.    Indeed, BEYDOUN did not show COURSER the House Rules or reveal that House Rule 74(a) allows for a personal privilege, and states, "Matters involving personal privilege are limited and include only the following (a) Anything tending to subject a Member to ridicule or contempt."

361.    Under House Rule 74(a) COURSER was permitted to discuss with his staff these personal matters that sure enough led to ridicule and contempt.

362.    Upon information and belief, BEYDOUN was aware of this personal exemption in House Rule 74(a) but did not tell COURSER and instead misled him to believe that he violated House Rule 74.

363.    COURSER had been misled regarding House Rule 74 so that THE HOUSE could now report that COURSER in some way admitted to misuse of taxpayer resources.

364.    McBROOM and BEYDOUN later advised COURSER that when it was his turn to testify, he should read a statement along with a sincere apology, and from the Republicans on the committee the questions would be light.

365.    McBROOM and BEYDOUN suggested that if COURSER was remorseful and contrite, it would all go fine and that he would be censured. This turned out to be false.

DePerno Law Office, PLLC ● 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) ● 269-353-2726 (Fax)

*Special Committee Hearings Take Place; Denies Due Process to COURSER and Gamrat*

366.     On Tuesday, September 8, 2015 at 10:30 A.M. the Special Committee Hearings began under the auspices to examine the qualifications of COURSER and Gamrat.

367.     Upon information and belief, although the committee is carried out to give the appearance of a fair hearing, the committee members have previously signed the Caucus Pledge to stand with COTTER.

368.     Upon information and belief, the votes of the Republican committee members were determined by the way COTTER directed them to vote, not on the basis of evidence.

369.     The special committee hearings were held in the Capitol with a very large media presence focused on Gamrat and COURSER.

370.     By the time the committee hearings begin on Tuesday, September 8, 2015, COURSER and Gamrat had each only been allowed a quick review of the hundreds of pages of documents and audio, and had been denied the opportunity to make copies of any of the evidence in the HBO Report that was now the foundational evidence of the special committee hearings of which they would have to testify to.

371.     The select committee was conducted Tuesday, September 8, 2015 for approximately 2 hours; as recorded in the committee minutes from 10:30 A.M. to 12:07 P.M. and then again from 1:07 P.M. to 1:30 P.M.

372.     SWARTZLE gave an opening statement to the committee where he repeated language used in the HBO Report to describe COURSER and Gamrat.

373.     On Wednesday, September 9, 2015 the Special Committee met from 10:30AM - 11:25AM, then again from 11:40AM - 1:00PM, and again from 4:30PM - 4:55PM.

DePerno Law Office, PLLC ● 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) ● 269-353-2726 (Fax)

374.    The committee hearing included the playing of some of the audio tape that had been secretly recorded by GRAHAM of a private conversation between him and COURSER at COURSER's law office and GRAHAM's business office.

375.    Upon information and belief, the small amount of evidence released to the public was selectively chosen to try and paint COURSER and Gamrat in a poor light to the public and to the committee.

376.    During the hearing on September 9, 2015, SAARI was called to give a statement and take questions. The Democrats asked questions.

377.    McBROOM and the Republicans objected to many of the questions asked by the Democrats.

378.    McBROOM then removed SAARI's statement from the record stating "irrelevance", even though SAARI had been one of the key people meeting secretly with ALLARD, GRAHAM, and CLINE for several months, the main accusers of COURSER and Gamrat.

379.    Upon information and belief, COTTER directed McBROOM to strike down the testimony of SAARI.

380.    Upon information and belief, COTTER directed SAARI's testimony to be stricken to protect him and SAARI regarding their involvement within the coordinated effort directed against Gamrat and COURSER.

381.    On Wednesday, September 9, 2015 COURSER was called to make a statement and answer questions from the committee.

382.    On Thursday, September 10, 2015, the last hour of committee hearings for COURSER and Gamrat was conducted, from 9:30 A.M. to 10:30 A.M.

DePerno Law Office, PLLC ● 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) ● 269-353-2726 (Fax)

383.    In Thursday's committee hearing McBROOM falsely stated that COURSER and Gamrat had both admitted to everything in the HBO Report.

384.    Actually, during the hearing, COURSER stated that he did not have time to read the entire report and so he could not admit to it.

385.    Upon information and belief, McBROOM was aware when he made these false statements that they were false and made with malice.

386.    Upon information and belief, BEYDOUN, who was assisting McBROOM during the hearings and seated at the left side of McBROOM during the committee, was also aware that McBROOM's statements were false.

387.    BEYDOUN did not correct McBROOM's false statements.

388.    BEYDOUN did not correct the statements of several of the other committee members who repeated that COURSER and Gamrat admitted to the entire HBO Report, even though he was aware that was false.

389.    COURSER was not given an opportunity in Thursday's committee hearing to address or correct McBROOM's false statements or the false statements repeated by several of the committee members.

390.    McBROOM's false statements were treated as fact and repeated as fact by (a) other members of the committee; (b) media outlets around the world; (c) McBROOM himself on the House floor when he advocated for his colleagues to expel COURSER and Gamrat; and (d) by other Representatives who were basing their votes on McBROOM's false statement.

391.    When the Democrat Representatives requested to question ALLARD, GRAHAM, and CLINE, they were told by McBROOM that ALLARD, GRAHAM, and CLINE refused to testify.

DePerno Law Office, PLLC ● 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) ● 269-353-2726 (Fax)

392.   Later, ALLARD and GRAHAM stated that they did not refuse to testify.

393.   Upon information and belief, McBROOM said that ALLARD and GRAHAM, if called would "claim the fifth" because of their criminal exposure.

394.   Later ALLARD and GRAHAM said that this was not true.

395.   The credibility of ALLARD, GRAHAM, and CLINE, as accusers, was not allowed to be questioned by any of the committee members, nor by COURSER and Gamrat.

396.   Upon information and belief, during the committee hearings, SWARTZLE in his testimony before the committee, claimed that the loss of misused taxpayer resources to be in the thousands, if not tens of thousands of dollars, but failed to show any missing funds nor did they call anyone to testify to account for said missing funds.

397.   Upon information and belief, during the committee hearings, SWARTZLE also stated that it would take more money to actually calculate any misuse of dollars than the actual misuse itself; indicating that the misuse of funds that COURSER and Gamrat were being charged with was negligible.

398.   Upon information and belief, no dollar amount was ever actualized as to the claims of misuse of taxpayer funds that were being leveled against COURSER and Gamrat.

399.   Upon information and belief, BOWLIN and SWARTZLE incorrectly interpreted emails as political and incorrectly took quotes out of context to fit their allegations in Exhibit 3 of the Report of the Select Committee to Examine the Qualifications of Representatives Cindy Gamrat and Todd Courser submitted by BOWLIN and SWARTZLE.

400.   Upon information and belief, when BOWLIN and SWARTZLE spoke to the Select Committee to explain their findings from their investigation, they misrepresented the

68

evidence that they cited as misuse of state funds as political, when it was actually regarding official HOUSE business.

401.    COURSER and Gamrat were never questioned on this evidence used to support THE HOUSE's claim of misuse of taxpayer funds to explain its erroneous application by BOWLIN and SWARTZLE.

402.    The HBO Report was based primarily upon the accusations alone of ALLARD, GRAHAM, and CLINE.

403.    These accusations of ALLARD, GRAHAM, and CLINE were not taken under oath, however they were accepted as sworn evidence in the HBO Report and also in the Committee hearings. ALLARD, GRAHAM, and CLINE were never called to take the stand or to be questioned under oath as to the veracity of their accusations.

404.    The HOUSE relied on these allegations made by ALLARD, GRAHAM, and CLINE when they were not under oath during the HBO "investigation".

405.    ALLARD, GRAHAM, and CLINE were never called to take the stand or to be questioned under oath as to their surveillance on COURSER and Gamrat as a condition of their employment for COTTER, which involved private information of the Representatives and their communications with their respective families.

406.    ALLARD, GRAHAM, and CLINE were never called to take the stand or to be questioned under oath as to their numerous calls between them and Joe Gamrat who was shown in a MSP investigation report to be conducting an extortion plot that said if COURSER and Gamrat did not resign he would send all audio, video, texts and emails to LIVENGOOD, who eventually broke the story.

DePerno Law Office, PLLC • 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) • 269-353-2726 (fax)

407.   ALLARD, GRAHAM, and CLINE were never called to take the stand or to be questioned under oath as to their multiple secretly conducted meetings with COTTER, SAARI, SWARTZLE, and BOWLIN.

408.   None of ALLARD, GRAHAM, and CLINE's nefarious and illegal activities, which would speak to their credibility as accusers, were presented to the committee, the public, or the other Representatives voting on expulsion.

409.   Upon information and belief, COTTER made false statements publicly denying that there was any conspiracy against COURSER. These statements were knowingly false and made with malice.

410.   Upon information and belief, COTTER was aware during the time he made these statements that they were false and made with malice.

411.   COURSER was not allowed to counter these accusations of ALLARD, GRAHAM, and CLINE. COURSER was not provided resources by THE HOUSE to hire an attorney or time to review the alleged evidence. COURSER was not indemnified.

412.   Upon information and belief, COTTER directed McBROOM to not allow ALLARD, GRAHAM, and CLINE to testify in order to cover up his conspiracy.

413.   Upon information and belief, COTTER, did not want ALLARD, GRAHAM, and CLINE to be questioned because they would have exposed the months of secret meetings and surveillance COTTER, SAARI, SWARTZLE, ALLARD, GRAHAM, Joe Gamrat, Vincent Krell, and David Horr had been conducting on COURSER and Gamrat. This cover-up was a misuse of state funds and resources.

414.   McBROOM later said, when asked what level of credibility ALLARD and GRAHAM had he responded, "Precious little." Yet these were the witnesses upon which

70

COTTER, BOWLIN, SWARTZLE, and McBROOM based all their decision to expel COURSER and Gamrat.

415. During the committee hearings, evidence and potential testimony by other staff Anne Hill and Karen Couture which corroborated COURSER and Gamrat and discredited ALLARD and GRAHAM was not presented by McBROOM, BEYDOUN, COTTER, SWARTZLE, or THE HOUSE.

416. Upon information and belief, COTTER directed that key information directly related to the allegations and evidence in the HBO Report be kept hidden by COTTER, SAARI, BOWLIN, and SWARTZLE and not divulged to COURSER, Gamrat, nor to the committee members, public, and voting Representatives such as:

a. The accusers ALLARD, GRAHAM, and CLINE whose testimony was the foundation of the House Business Report, had been having secret meetings with the Speaker and his team that had been ongoing for months;

b. The undercover surveillance and spying ALLARD, GRAHAM, and CLINE were involved in to relay private information regarding Representatives Courser and Gamrat to the Speaker and to additional individuals conducting further surveillance;

c. The false statement made by COTTER and reported by BOWLIN on page 2 of the House Business Report that states that COTTER did not know of any work related issues before the Detroit News article on August 7, 2015.

d. Belief of COTTER and THE HOUSE that the accusers ALLARD and GRAHAM had been repeatedly lying to THE HOUSE in the HBO Report. Once ALLARD and GRAHAM were fired and they filed suit against COTTER and THE HOUSE, COTTER stated, "In fact, during the criminal investigation by the Michigan State Police, it became clear that Mr. Allard and Mr. Graham repeatedly lied to the Home Business Office investigators and lawyers about their knowledge and involvement in the convoluted, months-long extortion plot against their own supervisors."

e. That the Republican committee members themselves and all the other Republican Representatives had already signed a pledge to stand with COTTER on all major issues which came before the caucus, which expulsion of two members would certainly qualify under.

71

417.     BOWLIN, McBROOM, SWARTZLE, SAARI, BEYDOUN, LaFONTAINE, HEISE, and VERHEULEN were not impartial but under the direct control of COTTER, appointed to their positions by COTTER, and under an illegal voting agreement (the Caucus Pledge).

418.     Upon information and belief, many Democrat Representatives, including Chirkin, Liberati, and Singh questioned the process, the lack of witnesses, the lack of subpoenas, lack of due process, and the lack of any substantial evidence on the record.

419.     Upon information and belief, in the Minutes of the House Select Committee to Examine the Qualifications of Representatives Cindy Gamrat and Todd Courser on Wednesday, September 9, 2015 at 9:30 A.M., there are omissions. Liberati stated that he talked with ALLARD who was willing to testify before the Select Committee. He was shut down by McBroom, and it was omitted from the Minutes.

420.     Upon information and belief, there was also a vote to subpoena ALLARD and GRAHAM as witnesses, which did not pass with the 4 Republicans voting no and the 2 Democrats voting yes, which was omitted from the committee minutes.

421.     On or around 10:30 A.M. on Wednesday September 10, 2015 McBROOM placed before the special committee HR 139 a resolution to expel COURSER.

422.     A roll call of HR 139 was taken. Voting YEAH were MCBROOM, HEISE, VERHEULEN, and LaFONTAINE. Voting NAY was none. Voting PASS was Representatives Chirkun and Liberati.

423.     The motion for HR 139 prevailed by a vote of 4-0-2.

424.     On or around 10:30 A.M. on Wednesday September 10, 2015 McBROOM placed before the special committee HR 141 a resolution to expel Gamrat.

DePerno Law Office, PLLC ● 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) ● 269-353-2726 (Fax)

425.    A roll call of HR 141 was taken. Voting YEAH was MCBROOM, HEISE, VERHEULEN, and LaFONTAINE. Voting NAY was none. Voting PASS was Representatives Chirkun and Liberati.

426.    The motion for HR 141 prevailed by a vote of 4-0-2.

427.    Upon information and belief, although BEYDOUN agreed that the committee would recommend censure for Gamrat during the prior meetings, the committee instead recommended expulsion for Gamrat.

428.    Upon information and belief, COTTER had directed BEYDOUN to obtain the censure statement from Gamrat under the guise of offering a censure in order to take her words on the statement out of context to be used against herself and COURSER during the committee.

*FULL HOUSE EXPULSION VOTE TAKEN*

429.    Session for the House of Representatives convened on Thursday, September 10, 2015 for the House of Representatives on or about an hour after the Select Committee recommended expulsion and adjourned.

430.    Both COURSER and Gamrat met the qualifications outlined under the Michigan Constitution and were therefore unlawfully and unconstitutionally removed from office.

431.    The proper process for removing a legislator "outside of the legislature's role" of being the sole judge of the "qualifications of the members," is for the voters to conduct a "recall action" of their representation.

432.    It had only been about 48 hours since the evidence was released for the full body of THE HOUSE, who were responsible for voting on the expulsion of COURSER and Gamrat, to review the 833 pages of submitted alleged evidence and hours of audio recordings. There was very little time given to all of the Representatives, especially given the severity of the decision to

DePerno Law Office, PLLC • 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) • 269-353-2726 (Fax)

expel two duly elected sitting Representatives and to take away the representation of over 180,000 Michigan citizens.

433.     Upon information and belief, COTTER did not want to allow for more time for people to review the evidence because the lack of evidence inside of the report would have been discovered and questioned.

434.     Upon information and belief, COTTER did not want to allow for more time in fear that his involvement along with that of SAARI, SWARTZLE and BOWLIN would have been discovered and exposed. COTTER wanted the expulsions to happen quickly before he was exposed.

435.     Upon information and belief, COTTER had the authority to a) determine leadership assignments of Representatives, b) determine committee assignments of representatives, c) determine representative's legislation that would be heard and allowed a vote, d) determine if representatives would have staff, and e) the office budget of each representative.

436.     Upon information and belief, all Republican Representatives had many potential incentives to vote according to COTTER's wishes and expel Gamrat and COURSER, while adversely, many disincentives to disobey COTTER's wishes.

437.     Upon information and belief, a number of Representatives did not want to vote for expulsion but felt they had to because of the Caucus Pledge and fear of losing what they had.

438.     The first Resolution to expel COURSER was put forward first before the Resolution to expel Gamrat.

439.     The first vote taken on the Resolution to expel COURSER failed to obtain the 2/3rds majority vote needed to pass the Resolution.

DePerno Law Office, PLLC ● 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) ● 269-353-2726 (Fax)

440.   The second vote taken on the Resolution to expel COURSER failed to obtain the 2/3rds majority vote needed to pass the Resolution.

441.   All Republicans voted in favor of expulsion except for Representative Howyrlack.

442.   Many Democrats withheld their vote as a protest speaking out against the lack of time and due process, lack of time devoted to consider the expulsions, and lack of time to even read the nearly 1,000 pages of supposed evidence put forward publicly less than 2 days before; the lack of access to interview witnesses; a lack of subpoena power; and the lack of criminal charges or otherwise levied against COURSER and Gamrat.

443.   Upon information and belief, Representatives who withheld their vote in protest were not allowed to use the bathroom until they voted.

444.   Upon information and belief, at midnight on Wednesday, September 10, 2015 the voting board was cleared and a new day was begun on Thursday September 11, 2015 in THE HOUSE at 12:01 A.M; however, the voting board had been left up from the previous day and not cleared.

445.   Upon information and belief, COTTER announced that the Representatives could not leave THE HOUSE floor and must stay in their seats. In essence the Representatives were under "lock down" and were not going to be allowed to leave until COTTER got what he wanted, which was the members to vote to expel COURSER and Gamrat.

446.   This put COURSER in jeopardy again, in violation of the United States and Michigan Constitutions, because the first two votes to expel had failed and because the voting board was not cleared.

DePerno Law Office, PLLC ● 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) ● 269-353-2726 (Fax)

447.     This second and third vote violated the House Rules which require the vote to be adjourned until the next day and that the same item could not be called for a vote twice in the same occurrence.

448.     Upon information and belief, COTTER intended to put forward the resolutions for expulsion and keep the Representatives in their seats until he obtained the votes he needed to get COURSER and Gamrat expelled.

449.     COTTER later reported to the Detroit News, "To me, it didn't make a difference of how we got there as we got to the result of both of these members no longer being a member of the body."

450.     On September 11, 2015, Representative Singh objected to the process used by COTTER. He stated that his members did not even have access to information until September 8, 2015. Rep. Singh further stated the following:

    a.    The constitution allows us the right to expel members, not staff . . . I don't believe it's the role of the staff to do that. Because again, that piece is really up to the member. It is our constitutional duty. I also was concerned with the flow of information.

    b.    We never had the opportunity to see [information] until the full report was actually presented to the media.

    c.    I had to go to a media site to get access to it. If people were sent it, I wasn't. I never received that. And then to expect all of us to read through the 800 pages and the 5 hours of video. I can't imagine unless you've been on the committee that you've had time since Tuesday to actually read every single page and listen to all 5 hours of the audio, and I have not had that opportunity and that's why it makes it very difficult for me to move that process forward at this time.

    d.    Also, there were people who were on the list of witnesses that we wanted to have come forward. Now, we've been told time and time again, 'Well everything is in the 800 pages.' We have two whistleblowers who had the opportunity obviously to speak with the legal counsel, as well as with our House Business Office Director, and put things into a record. They were not under oath, they did not have any members that I'm aware of that were part of that process. Again, we're expelling somebody and no member was

DePerno Law Office, PLLC ● 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) ● 269-353-2726 (Fax)

sitting in that and, Mr. Speaker, if you were sitting there, I apologize, but my understanding was there was not a single member in those conversations and those interviews. So how did we actually now get to a level of expulsion when not a single member has actually heard testimony from these individuals?

e.   Now, I keep hearing it's in the report, but these individuals, if you had subpoenaed them, would have been under oath. That to me is the most important piece. That is one of the pieces that is missing here today. That the two whistleblowers were not under oath, did not have an opportunity to testify. Again, we have talked a lot about the timeliness of information, we talked a lot about the time we have had to review this. So my question is why are we doing this today? This was not even on our agenda today, right? We did not know we were coming here today to vote on this. Why couldn't we have been given the weekend to go through the 800 pages and 5 hours of audio. Don't we owe that to this state, don't we owe it to 90,000 people before we nullify an election? I think so and that is why you have heard some of my members that are concerned.

f.   I think the last thing that was probably the most disturbing to me was the testimony we had yesterday. The testimony of the former chief of staff of the Speaker who came forward and then we struck out of the public record his comments.

g.   But until I have the two people that started this whole thing under oath, then I don't think we've done our due diligence. Then for the historical precedence, allow the Secretary of State, the Attorney General, and the State Police to do their work so we understand the criminal charges. Again, we're going to take the most extreme action, which is to nullify the vote of the people. We do not have all of the information, we do not know all of the facts, and we have time to make sure we do this right, that we have these facts, that we have people under oath, and we bring them in and subpoena.

h.   So our work is not done here today, it might be done in a week, two weeks, maybe three months, but we need to make sure we do all of our due diligence, because I will not make the most extreme action that the constitution allows without having all of the facts.

451.   Representative Singh stated on September 11, 2015 that there was not time to "do all of our due diligence."

452.   An article by LIVENGOOD and the DETROIT NEWS on September 11, 2015, reported, "Twenty-seven Democrats had withheld their votes in protest of how the GOP majority

77

had investigated and sought the ousters of the two freshmen Republicans. Democrats contended Republicans were rushing to expel Courser and Gamrat without forcing their former aides to testify under oath about misconduct in which the freshmen representatives engaged."

453.    THE HOUSE leaders under COTTER's direction took 14 hours and 3 votes, refusing the Representatives to go to the bathroom, to leave the chambers, or to eat unless they voted. The Democrats protested. As the third vote began in an incredibly hostile and caustic environment after 3:00 A.M. in the morning on September 11, 2015 in violation of House Rules, COURSER was forced to resign without due process, equal protection, and other violations of the United States and Michigan Constitutions; knowing that he was not allowed to leave.

454.    Within the hour at or around 4:00 A.M. on September 11, 2015 Gamrat was expelled from THE HOUSE membership.

455.    Under the conditions set forth in THE HOUSE Resolution to remove Gamrat, COTTER cut a deal with the Democrats. The Democrats would only vote for expelling Gamrat if COTTER submitted a request to SCHUETTE for SCHUETTE to investigate. Out of the SCHUETTE investigation, post expulsion, a series of interviews were conducted by THE STATE DEFENDANTS and what was said post expulsions differed greatly from what was being said by COTTER, SAARI, SWARTZLE and BOWLIN during their efforts to expel COURSER and Gamrat.

456.    During these interviews by the  THE STATE DEFENDANTS, the police completely glossed over the testimony and evidence of illegal conduct by the Defendants, including illegal wiretapping, eavesdropping, extortion, conspiracy, misuse of taxpayer resources, misconduct in office.

DePerno Law Office, PLLC • 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) • 269-353-2726 (Fax)

457.     ALLARD stated that he got a call from Joe Gamrat (his co-conspirator) and Joe Gamrat stated he was "listening" through a device to conversations in the State office building; yet MSP/BRITVEC/SCHUETTE did not then question Joe Gamrat on this or investigate it.

458.     ALLARD and GRAHAM stated they left work and followed COURSER to take pictures of him which furthered the extortion plot; yet there are no MSP/BRITVEC/SCHUETTE questions regarding this in their tapes.

459.     GRAHAM assisted in illegally accessing COURSER's emails and phone data and had been passing this information to ALLARD and CLINE; yet no MSP/BRITVEC/SCHUETTE questions regarding this in their tapes.

460.     Joe Gamrat also stated that GRAHAM and ALLARD had left work and had followed COURSER and Gamrat to Flint, then to Tim Horton's in Oxford, and Clarkston; yet no MSP/BRITVEC/SCHUETTE questions regarding this in their tapes.

461.     ALLARD and GRAHAM had a conversation witnessed by another staffer where they discussed following COURSER during work hours at the State HOUSE in hopes of taking pictures of him; yet no MSP/BRITVEC/SCHUETTE questions regarding this in their tapes.

462.     ALLARD and GRAHAM remove Anne Hill from THE HOUSE office building under false pretenses and they tried to intimidate her into quitting and told her that THE HOUSE offices she was working in were "bugged"; yet no MSP/BRITVEC/SCHUETTE questions or investigation into this.

463.     MSP/BRITVEC/SCHUETTE found ALLARD, GRAHAM and CLINE to have been involved in the extortion plot but then refused to seek warrants to get their phones, or phone records, or to pursue any other investigation into ALLARD, GRAHAM and CLINE's

DePerno Law Office, PLLC ● 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) ● 269-353-2726 (Fax)

involvement into the extortion plot. MSP/BRITVEC/SCHUETTE asked no questions regarding their involvement into the plot and sought no warrants to pursue further discovery.

464. MSP/BRITVEC/SCHUETTE questioned Joe Gamrat several times and he lied regarding his involvement in the extortion plot and his involvement with ALLARD, GRAHAM and CLINE; yet no charges have been brought.

465. Gamrat took several recording devices she had found to the MSP/BRITVEC/SCHUETTE and she was told that there was not a prosecutor in the state who would help her. No warrants have been sought and no charges have been brought.

466. David Horr destroyed the "Extortion Phone" and lied to MSP/BRITVEC/SCHUETTE and no charges have been brought and no warrants have been sought by the MSP/BRITVEC/SCHUETTE investigators.

### CRIMINAL CHARGES FILED TO COVER UP CONSPIRACY

467. On or about February 26, 2016 charges were filed against COURSER.

468. COURSER who was charged with four felony counts: one of perjury for unsworn statements in front of Select Committee and 3 counts of misconduct in office for a crime at common law under 750.505.

469. During the "swear to" hearing on February 26, 2016, BREWER and DWYER did not testify truthfully to the investigation that took place between August 1, 2015 and September 1, 2015. In particular, they stated:

      a.      That COURSER said "his staff told him they had engaged and checked with the House leadership and were told that it was acceptable for him, being an aide, to sign the representatives names to a blue back bill." COURSER never made such claims.

      b.      "This was not an acceptable practice with the Michigan House to sign a representative's name – an aide to sign a representative's name to a bill." To the contrary Allard testified both in the MSP police investigation and

in the preliminary conference that it was a practice among staff to sign on behalf of legislators.

c.    That COURSER lied under oath when he claimed that he (COURSER) had checked with CLINE if it was acceptable for CLINE to sign COURSER's name. In fact, COURSER never made this statement.

d.    That "Mr. Cline told him he had checked with the House Business Off or the House Rules Committee and said it was fine to sign his name." Again, COURSER never made such claims.

e.    That COURSER stated in the investigation by the HBO that "Ms. Gamrat did not know about a salacious email." This was false. COURSER never stated that Gamrat did not know about the email itself.

f.    That staff were instructed to sign the blue backs. No evidence was presented during the preliminary hearing to support this statement.

g.    That Josh Cline stated that he was "told to sign both of their names." During the preliminary hearing, CLINE stated that he was never instructed to sign the names of either COURSER or Gamrat.

h.    That the false flag email was sent from within the City of Lansing.

470.    Upon information and belief, BREWER and DWYER made these false statements in order to convince the district court judge to sign the warrants. These statements were not based on the truth or actual facts.

471.    Judge Clarke cleared COURSER on 2 of the 4 counts.

472.    Since that time, Judge Collete has cleared COURSER of another count of misconduct.

473.    During the Preliminary Conference it was shown by sworn testimony that COTTER had broken the same rule that COURSER was charged with breaking.

474.    Later, in mid-August, 2016, after a criminal report was filed against COTTER, the MSP issued a police report stating that "the breaking of HOUSE Rules is not a crime" and refused to prosecute COTTER; yet COURSER is still facing criminal prosecution under this very rule and is to stand trial on this very accusation as "misconduct in office" under MCL 750.505c.

81

If this is not a crime, then why hasn't SCHUETTE dismissed the charges. These false charges have caused COURSER irreparable harm to him, his business, and his family.

475.    During the preliminary hearing in Ingham County, in May of 2016, under Judge Clarke, in sworn testimony, GRAHAM perjured himself multiple times; yet law enforcement refused to investigate and SCHUETTE refused to prosecute the perjury of his own witnesses.

476.    Also during the preliminary hearing, CLINE admitted to forgery; yet MSP, BRITVEC, BREWER, and DWYER refused to investigate and SCHUETTE refused to prosecute the perjury of his own witnesses.

477.    Also during the preliminary hearing, ALLARD and GRAHAM admitted to illegal wiretapping and eavesdropping; yet law enforcement refused to investigate and SCHUETTE refused to prosecute the perjury of his own witnesses.

### *COURSER AND GAMRAT'S CONSTITUTIONAL RIGHTS ARE VIOLATED*

478.    Upon information and belief, the timeline for the expulsion was rushed to fit a political agenda and to cover up a conspiracy. In fact, BOWLIN has stated that he needed and wanted more time to conduct his investigation.

479.    The Representatives voted to remove two of their Members without time or access to read the supposed 833 pages of evidence.

480.    With the case of Representative Brian Banks as a backdrop, it is clear that COURSER and Gamrat were being singled out by the leadership in an arbitrary and capricious way for political elimination. This was a "political hit" to manipulate the Republican Caucus numbers in order to pass a tax increase.

481.    This process was in stark contrast to the processes used against David Jaye, Virgil Smith, or Brian Banks.

DePerno Law Office, PLLC ● 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) ● 269-353-2726 (Fax)

482.    COURSER was removed without an independent finding of any of the allegations for which THE HOUSE accused him and in a committee system that operated over 2.5 days without any due process or equal protection; nor any ability to defend themselves.

483.    In a prior expulsion case, Senator David Jaye's expulsion from Michigan's legislature, lasted 3 weeks had 8 committee hearing days encompassing on or around 30 hours of committee time to go through the process of removing 1 legislator. The Special Committee in the Jaye expulsion case allowed over 10 times the amount of time looking at evidence before recommending expulsion for David Jaye, who had a number of prior criminal convictions, than COURSER and Gamrat, who had no prior criminal records nor had any criminal charges been brought or criminal investigation been concluded. Upon information and belief, Jaye was afforded both subpoena power and was allowed to question both witnesses and testimony; whereas COURSER was not afforded subpoena power to call or question witnesses. Upon information and belief Jaye was afforded the due process to cross examine witnesses; whereas COURSER and Gamrat were not allowed to cross examine witnesses called by THE HOUSE during the committee hearings.

484.    However in the process for removing 2 legislators, COURSER and Gamrat, the special committee hearings spanned only 2.5 days and on or around 7 hours, or just 3.5 hours per each legislator. Reasonable expectations would expect that the process for the removal of 2 separate elected officials would take not less time but more than the removal of one.

485.    The MSP/BRITVEC report was held and not released until November 30, 2015 and then with only a small portion of the evidence collected released, which negatively and irreparably harmed COURSER.

DePerno Law Office, PLLC ● 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) ● 269-353-2726 (Fax)

486.    The MSP, BRITVEC, and SCHUETTE were in possession of the evidence to clear COURSER of involvement in the extortion plot and implicate ALLARD, GRAHAM, CLINE, and Joe Gamrat. However, this information was not released by the MSP, BRITVEC, or SCHUETTE until a few days before the special election primaries to fill COURSER's vacant seat on or about November 3, 2015.

### COTTER AND THE HOUSE FINALLY PASS THE HOUSE ROAD PACKAGE

487.    A few weeks after COURSER and Gamrat were removed, the House voted to pass the House Road Package by just one vote.

488.    This created 1.2 Billion in annual fee increases, a large portion of which deceptively went to fund Medicaid payments and Obamacare; not the roads. In fact, the voters were deceived and were denied their right to representation.

489.    Representative Singh stated on September 11, 2015 that there was time to "do all of our due diligence."

490.    What Representative Signh did not know or understand – and he acknowledged that he was kept out of meetings – was that COTTER, SWARTZLE, SAARI, and BOWLIN had long ago started a conspiracy to remove COURSER and Gamrat in order to pass this House Road Package.

491.    If COURSER and Gamrat were still members of THE HOUSE, the House Road Package would not have passed. Their removal was too important for COTTER and his co-conspirators to allow due process or the Constitution to get in the way.

DePerno Law Office, PLLC • 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) • 269-353-2726 (Fax)

## COUNT 1
## VIOLATION OF CONSTITUTIONAL AND CIVIL RIGHTS UNDER 42 U.S.C. § 1983
### (Due Process and Equal Protection)

### (as to the House Defendants and State Defendants)

492.    COURSER restates and incorporates the preceding paragraphs as though set forth fully herein.

493.    THE HOUSE DEFENDANTS are liable to COURSER for violation of his civil rights under 42 U.S.C. § 1983.

494.    THE HOUSE DEFENDANTS are all state actors acting under the color of law.

495.    The actions by THE HOUSE DEFENDANTS, as described in this Complaint, deprived COURSER of rights, privileges, or immunities guaranteed under federal law or the U.S. Constitution.

496.

497.    The conduct of THE HOUSE DEFENDANTS, under the color of law, offends the community's sense of fair play and decency.

498.    THE HOUSE DEFENDANTS acted maliciously, recklessly, intentionally, outside their state function, or by reason of gross negligence or violation of the law and are therefore liable to COURSER.

499.    COURSER was not afforded the same protections afforded to past legislators.

500.    COURSER was constructively expelled and forced to resign on September 11, 2015 after two failed votes and intense pressure of 15 hours of voting, during which he was not allowed to leave; even though he made request to leave. COURSER was forced to endure 15 hours on the floor while those Representatives who would not vote were not allowed to leave, eat or go to the bathroom. As the session progressed no one was allowed to leave their seat. No Representatives' health conditions were taken into account, such as COURSER's heart condition.

85

501.    Earlier that day, THE HOUSE was 73 votes short of the number needed to remove COURSER.

502.    Republicans then called for a reconsideration of the vote and the board stayed open until it was cleared shortly before midnight, so THE HOUSE could adjourn for the day and reconvene a minute later. In fact, Republicans invoked Rule 32, which requires members, including COURSER, to stay in their seats indefinitely.

503.    COTTER then repeatedly ran down the list of Democrat members who weren't voting to ask if they changed their mind. When the first vote failed 67-14, with 26 Democrats not voting and two Democrats absent, they tried again; reconsidering the vote and keeping the board open with the hopes that they could come up with the necessary 73 votes.

504.    The pressure and arm-twisting placed on COURSER came while the MSP was actively investigating the blackmail and extortion claims related to the text messages received by COURSER and Gamrat.

505.    In fact, on September 11, 2015, Magistrate Greg Wise of 71A District Court in Lapeer issued a search warrant at the request of the Michigan State Police, confirming that a police investigation into COURSER's blackmail claims was active as THE HOUSE deliberated over whether to expel COURSER and Gamrat.

506.    A legislative body, including THE HOUSE must provide procedural due process to a member, including COURSER, when considering whether to expel or discipline. This means the accused member must receive adequate notice, formal charges, and a public hearing with the right to cross-examine witnesses.

507.    These Defendants did not give COURSER adequate notice, did not file any formal charges against COURSER, and did not conduct a public hearing with the right to cross-

DePerno Law Office, PLLC • 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) • 269-353-2726 (Fax)

examine witnesses; thereby depriving COURSER of due process of law so comprehensively as to "shock the conscience" in violation of the due process clause of the United States Constitution and the Michigan Constitution.

508.    These Defendants violated COURSER's rights under the Fourteenth Amendment's guarantee that these Defendants, when acting under color of State law, must respect fundamental human rights and personal immunities.

509.    This guarantee was violated when Defendants' conduct deprived COURSER of liberty and failed to respect decencies of civilized conduct to the extent that it "shocks the conscience."

510.    These Defendants violated COURSER's substantive rights under the Due Process Clause of the Fourteenth Amendment not to be deprived of liberty and property without due process of law.

511.    These Defendants also violated COURSER's substantive rights under the Equal Protection Clause of the Fourteenth Amendment not to be deprived of equal protection of the laws.

512.    Further, Article I § 17 of the Michigan Constitution states that no person shall be compelled in any criminal case to be a witness against himself, nor deprived of life, liberty, or property, without due process of law. COURSER was not provided with due process of law.

513.    Article I § 17 further states that, "The right of all individuals, firms, corporations, and voluntary associations to fair and just treatment in the course of legislative and executive investigations and hearings shall not be infringed."

514.    These Defendants' process for expulsion of COURSER constituted disparate treatment compared to other equally situated past and present legislators.

87

515.     These Defendants also violated COURSER's rights under the Fourth Amendment to be secure in their person and property and free of unreasonable seizure over a tremendous length of time while COURSER was held by THE HOUSE and these Defendants during the expulsion vote on September 11 2015; which created unreasonable anxiety and duress and caused damages, both personal and professional.

516.     These Defendants also violated COURSER's rights under the Fourth Amendment to be secure in their person and property and free of unreasonable seizure when they illegally and unlawfully confiscated and seized COURSER's computers without a warrant or probable cause.

517.     COTTER wore down those who opposed him in his effort to remove COURSER. Until he got enough "yes" votes on COURSER, COTTER would not allow anyone to leave and had the Sergeant at Arms bar the doors.

518.     Further, COTTER had required all Republican Representatives to give him their vote, through the Caucus Pledge; essentially creating a pay-to-play atmosphere and political corruption within the caucus and THE HOUSE.

519.     COURSER was constructively removed after 15 hours of voting. There was no way for the other Representatives who were detained to say "no" or they were simply going to be forced to remain until COTTER got the "yes" votes he needed.

520.     COURSER was not "Mirandized" during the "investigation", which COTTER, THE HOUSE, SWARTZLE, SAARI, and BOWLIN all acknowledged was a criminal investigation from the start, conducted in conjunction with the  THE STATE DEFENDANTS.

521.     COURSER was not allowed to subpoena witnesses, testimony, or evidence. COURSER was not allowed to cross examine witnesses. COURSER was not given a copy of the so called "evidence" in order to prepare for the hearing or defend himself.

DePerno Law Office, PLLC • 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) • 269-353-2726 (Fax)

522.   COURSER was not allowed to see the HBO Report until it had been released to the public; bringing irreparable harm to him and his family, despite repeated requests.

523.   COURSER was not given adequate notice, an opportunity to conduct an independent investigation, time and access to review the facts that would be put forward, subpoena powers, rules to allow for cross examination, and rules that allowed him to defend himself. Rather, these Defendants refused COURSER every opportunity for due process, equal protection, or a fair hearing. It was clearly the intent of these Defendants to not permit due process or a fair hearing.

524.   Rather than have the Sergeant at Arms conduct the investigation, COTTER handpicked his team of investigators, which included BOWLIN, McBROOM, LaFONTAINE, VERHEULEN, and HEISE who conducted the investigation without due process.

525.   In fact, the entire investigation and process was rushed in order to get rid of COURSER before the deadline to create a special election and in time to pass the House Road Package.

526.   COURSER is being treated differently now with regard to criminalization of THE HOUSE Rules, which is now being raised to the level of a felony, even though the MSP has now admitted that violation of THE HOUSE rules cannot be criminal. SCHUETTE is now trying to criminalize the "breaking of a rule" so as to justify the removal of COURSER, because he was removed before any criminal charges had been brought.

527.   The equal protection clause of the Fourteenth Amendment requires that states treat in a similar manner all individuals who are similarly situated. Here, others within THE HOUSE, including COTTER, have violated Rule 41; yet SCHUETTE has decided only to prosecute COURSER. A vindictive police and prosecution that penalizes a defendant for

DePerno Law Office, PLLC ● 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) ● 269-353-2726 (Fax)

exercising a constitutional right by charging that defendant with a crime, violates the Due Process Clause.

528.    COURSER has not been indemnified, which is his right, and his legal fees have not been paid.

529.    Other public officials have been indemnified for acts while in public office and have had representation afforded to them for their actions while in office.

530.    Even though THE HOUSE and these Defendants claimed COURSER misused state resources in the amount of "upwards of ten thousand dollars" there was never any actual evidence submitted. Further, SCHUETTE didn't charge him with misusing state resources. These Defendants repeatedly lied in stating COURSER had misused state resources and none were ever found to have been missing.

531.    COTTER used his official position to secretly use staff both in his office and in the offices of COURSER as spies to build his political leverage.

532.    COTTER used other state employees to treat COURSER differently. This misuse of state resources in order to satisfy his own agenda (and possibly the agenda of others in positions of greater authority) is misconduct.

533.    COURSER was forced from office without due process or equal protection (and other Constitutional violations) and was forced to endure loss of salary, income, and future prospects, including loss of his seat for the remainder of the term.

534.    COURSER is now in jeopardy of losing his law license, his law practice, and his commercial building. His accounting practice/law practice has been completely destroyed by the actions of these Defendants. His practice is now in jeopardy due to the ongoing stain and stigma and the further actions by THE HOUSE and these Defendants to now arbitrarily and capriciously

DePerno Law Office, PLLC ● 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) ● 269-353-2726 (Fax)

criminalize "breaking the rules." He has suffered irreparable harm economically, mentally, emotionally, personally, and professionally.

535.    In this case, THE HOUSE DEFENDANTS and THE STATE DEFENDANTS are powerful public officials who picked on and fixation on COURSER out of sheer vindictiveness. The facts in this case show that this was an orchestrated campaign of official harassment and prosecution directed at him out of sheer malice or bad faith. The facts in this case demonstrate unlawful selective prosecution. Selective enforcement is a basis of an equal protection claim, even if there is no protected class.

536.    Equal protection precludes the use of purely personal and arbitrary power. The Equal Protection Clause protects COURSER when there is an element of intentional or purposeful discrimination against an individual victim, as in this case. The government must apply its laws in a rational and non arbitrary manner.

537.    Further, COURSER could even be culpable of some wrongdoing and still be subject to the equal protection principle.

538.    THE HOUSE DEFENDANTS and THE STATE DEFENDANTS are guilty of grave unfairness in the discharge of their responsibilities. The actions of the HOUSE DEFENDANTS and THE STATE DEFENDANTS were intended to accomplish injustice and enforcement of the law is the type of government conduct that is actionable through the Equal Protection Clause.

539.    Similarly situated people were not prosecuted by SCHUETTE in this case.

540.    The charging decision by SCHUETTE was invidious and in bad faith. *United States v Berrios*, 501 F.2d 1207 (2d Cir. 1974).

DePerno Law Office, PLLC • 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) • 269-353-2726 (Fax)

541.     Selective prosecution claims are appropriately judged by ordinary standards of equal protection. *Wayte v United States*, 470 U.S. 598, 608 (1985).

542.     A selective prosecution claim is "an independent assertion that the prosecution has brought the charge for reasons forbidden by the Constitution." *United States v Armstrong*, 517 U.S. 456, 463 (1996).

543.     These Defendants are jointly, severally, and/or alternatively liable to COURSER for all of his injuries and damages.

544.     As a direct and proximate cause of the violations described in this Complaint, COURSER has suffered and continues to suffer from, including but not limited to, severe and permanent emotional distress, embarrassment, legal expenses, and loss of earning capacity. COURSER is entitled to compensatory, exemplary, and punitive damages.

**COUNT 2**
**VIOLATION OF 42 U.S.C. § 1985**
**(Conspiracy to Violate Constitutional Rights)**

**(as to The House Defendants and State Defendants)**

545.     COURSER restates and incorporates the preceding paragraphs as though set forth fully herein.

546.     Based on the facts set forth herein and in the proceeding paragraphs, all of the Defendants are liable to COURSER for conspiracy to violate his constitutional rights under 42 U.S.C. § 1985.

547.     These Defendants acted maliciously, recklessly, intentionally, or by reason of gross negligence or violation of the law and are therefore liable to COURSER.

DePerno Law Office, PLLC • 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) • 269-353-2726 (Fax)

548.    The actions by these Defendants demonstrate a well-organized plan involving at least ten people to dig up "evidence" they needed to expel COURSER from office because he would not blindly support Proposal 1 and vote "yes" on increasing taxes on the House Road Bill.

549.    These Defendants and/or an agent thereof engaged in a concerted action.

550.    The action was designed to accomplish either a criminal or unlawful purpose, or a lawful purpose by criminal or unlawful means.

551.    These Defendants and/or an agent thereof illegally, maliciously, and wrongfully conspired with one another with the intent to and for the illegal purpose of conducting surveillance and disseminating information regarding COURSER.

552.    These Defendants and/or an agent thereof illegally, in combination, conspired to improperly obtain information, publicly humiliate, harass, embarrass, and otherwise cause COURSER to lose his employment as a Representative.

553.    This conspiracy resulted in the illegal, unlawful, or tortious activity of illegally surveying, improperly disseminating private information, and improper removal of Gamrat and COURSER from THE HOUSE.

554.    As a result of the conspiracy and Defendants and/or an agent thereof illegal, wrongful, or tortious acts, COURSER sustained damages.

555.    These Defendants are jointly, severally, and/or alternatively liable to COURSER for all of his injuries and damages.

556.    As a direct and proximate cause of the violations described in this Complaint, COURSER has suffered and continues to suffer from, including but not limited to, severe and permanent emotional distress, embarrassment, legal expenses, and loss of earning capacity. COURSER is entitled to compensatory, exemplary, and punitive damages.

DePerno Law Office, PLLC • 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) • 269-353-2726 (Fax)

## COUNT 3
## VIOLATION OF FEDERAL WIRETAPPING ACT AND MICHIGAN'S EAVESDROPPING STATUTE

### (as to Allard, Graham, Cline, the House Defendants, Livengood, Detroit News)

557.     Courser restates and incorporates the preceding paragraphs as though set forth fully herein.

558.     Throughout the aforementioned time frame, ALLARD, GRAHAM, CLINE, THE HOUSE DEFENDANTS, LIVENGOOD, and DETROIT NEWS, and other non-named parties, acting as co-conspirators, had been spying on COURSER and Gamrat.

559.     Upon information and belief, these Defendants and/or members of THE HOUSE were working with and/or directing Joe Gamrat, Vincent Krell, David Horr, ALLARD, and GRAHAM and other unidentified persons to conduct surveillance activities.

560.     Among other things, ALLARD, GRAHAM, CLINE, THE HOUSE DEFENDANTS and/or their agents at their direction, unlawfully placed listening devices, tracking devices, and engaged in other inappropriate and illegal surveillance activities. These actions occurred by agents or employees of THE HOUSE and at the direction of members, agents, and employees of THE HOUSE.

561.     THE HOUSE DEFENDANTS had a duty to exercise reasonable care and control over its employees and agents, including ALLARD, GRAHAM, CLINE,. They did not exercise reasonable care and control. THE HOUSE DEFENDANTS were negligent when they failed to properly supervise themselves or ALLARD, GRAHAM, CLINE, Joe Gamrat, Vincent Krell, and David Horr; or directed ALLARD, GRAHAM, CLINE, Joe Gamrat, Vincent Krell, or David Horr to place listening devices on and around COURSER in order to engage in illegal surveillance activities.

94

562.    Upon information and belief, surveillance activities began around June of 2014, before COURSER and Gamrat took office.

563.    Upon Information and belief, surveillance activities continued after COURSER and Gamrat took office on January 14, 2015.

564.    Upon information and belief, ALLARD, GRAHAM, CLINE, and THE HOUSE DEFENDANTS supplied COURSER and Gamrat's private information to third parties.

565.    Upon information and belief, ALLARD, GRAHAM, CLINE, and THE HOUSE DEFENDANTS and/or their agents, attempted to blackmail, extort, and threaten COURSER and Gamrat.

566.    Upon information and belief, ALLARD, GRAHAM, CLINE, and THE HOUSE DEFENDANTS and other agents of THE HOUSE spoke regularly with Joe Gamrat before, during, and after the surveillance and blackmail was occurring.

567.    Upon information and belief, ALLARD, GRAHAM, CLINE, and THE HOUSE DEFENDANTS and other agents of THE HOUSE spoke regularly with ALLARD and GRAHAM before, during, and after the surveillance and blackmail was occurring.

568.    Upon information and belief, ALLARD, GRAHAM, CLINE, and THE HOUSE DEFENDANTS also spoke directly with LIVENGOOD in whose name the extortion phone was registered, whom the extortionist repeatedly mentioned as the recipient of the illegally obtained information and whom the agents of THE HOUSE ultimately took their story for COTTER.

569.    ALLARD, GRAHAM, CLINE, and THE HOUSE DEFENDANTS violated MCL 750.540 when they, in conjunction with others (including other Defendants) and in order to aid the conspiracy described herein, willfully and maliciously tapped or otherwise made an unauthorized connection to an electronic medium of communication of COURSER.

95

570.    ALLARD, GRAHAM, CLINE, and THE HOUSE DEFENDANTS violated MCL 750.539c when they, in conjunction with others (including other Defendants) and in order to aid the conspiracy described herein, willfully used a device to eavesdrop upon the conversations of COURSER without the consent of all parties to the conversation.

571.    Further, ALLARD, GRAHAM, CLINE, and THE HOUSE DEFENDANTS each, at one time or another, knowingly aided, requested, or employed others (including other Defendants) to eavesdrop on the conversations of COURSER without the consent of all parties to the conversation.

572.    ALLARD, GRAHAM, CLINE, and THE HOUSE DEFENDANTS violated 18 U.S.C. § 2511 when they intentionally intercepted, endeavored to intercept, or procured other people (including other Defendants) to intercept or endeavor to intercept, wire, oral, and electronic communication of COURSER.

573.    ALLARD, GRAHAM, CLINE, and THE HOUSE DEFENDANTS further violated 18 U.S.C. § 2511, when they intentionally used, endeavored to use, or procured other people (including other Defendants) to use or endeavor to use an electronic, mechanical, or other device to intercept oral communications of COURSER. ALLARD, GRAHAM, CLINE, and THE HOUSE DEFENDANTS did so when they placed recording devices (or authorized the placement of recording devices) in COURSER's offices and other private places and then transmitted those communications through a wire, cable, or other connection.

574.    ALLARD, GRAHAM, CLINE, and THE HOUSE DEFENDANTS also violated 18 U.S.C. § 2511, because they knew or had reason to know that the recording devices (or any component) had been sent through the mail or transported in interstate or foreign commerce.

DePerno Law Office, PLLC ● 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) ● 269-353-2726 (Fax)

575.    ALLARD, GRAHAM, CLINE, and THE HOUSE DEFENDANTS also violated 18 U.S.C. § 2511, because (a) their actions to record and/or transmit conversations of COURSER took place on the premises of a business or commercial establishment the operation of which affects interstate or foreign commerce or (b) their actions to record and/or transmit conversations of COURSER where obtained for the purposes of obtaining information relating to the operations of any business or other commercial establishment the operations of which affect interstate or foreign commerce.

576.    ALLARD, GRAHAM, CLINE, and THE HOUSE DEFENDANTS violated MCL 750.539d when they installed listening devices in a private place without the consent of COURSER (and others) who were entitled to privacy in order to observe, record, transmit, or eavesdrop upon the sounds events in that place.

577.    ALLARD, GRAHAM, CLINE, and THE HOUSE DEFENDANTS further violated MCL 750.539d when they distributed and disseminated or transmitted for access a recording they knew to be obtained in violation of such section. For instance, this occurred when GRAHAM played the recording from COURSER's office to ALLARD and GRAHAM. Another violation occurred when ALLARD and GRAHAM transmitted the recordings to LIVENGOOD and the DETROIT NEWS.

578.    LIVENGOOD and the DETROIT NEWS violated MCL 750.539d when they distributed and disseminated or transmitted for access the same recordings they knew to be obtained in violation of such section. For instance, this occurred when LIVENGOOD and the DETROIT NEWS transmitted the recordings to the world. Further, LIVENGOOD, by himself and as an agent of the DETROIT NEWS, knew of the plan to obtain the illegal wiretaps before they were obtained and was involved in the extortion, having registered the phone in his name.

97

579.    ALLARD, GRAHAM, CLINE, Joe Gamrat, Vincent Krell, David Horr, THE
HOUSE DEFENDANTS, LIVENGOOD, and DETROIT NEWS violated MCL 750.539e when
they used or divulged information they knew or reasonably should have known was obtained in
violation of MCL 750.539b, 539c, or 539d.

580.    ALLARD, GRAHAM, CLINE, THE HOUSE DEFENDANTS, LIVENGOOD,
and DETROIT NEWS further violated 18 U.S.C. § 2511, when they intentionally disclosed or
endeavored to disclose to other people the contents of the wire, oral, or electronic
communications, knowing or having reason to know that the information was obtained through
the interception of a wire, oral, or electronic communication in violation of 18 U.S.C. § 2511.

581.    ALLARD, GRAHAM, CLINE, Joe Gamrat, Vincent Krell, David Horr, THE
HOUSE DEFENDANTS, LIVENGOOD, and DETROIT NEWS further violated 18 U.S.C. §
2511, when they intentionally used or endeavored to use the contents of the wire, oral, or
electronic communications, knowing or having reason to know that the information was obtained
through the interception of a wire, oral, or electronic communication in violation of 18 U.S.C. §
2511.

582.    ALLARD, GRAHAM, CLINE, Joe Gamrat, Vincent Krell, David Horr, THE
HOUSE DEFENDANTS, LIVENGOOD, and DETROIT NEWS further violated 18 U.S.C. §
2511, when they intentionally disclosed or endeavored to disclose the contents of the wire, oral,
or electronic communications intercepted by authorized means but knowing or having reason to
know that the information was obtained through the interception of such a communication in
connection with a criminal investigation, having obtained or received the information in
connection with a criminal investigation, and with intent to improperly obstruct, impede, or
interfere with a criminal investigation.

98

583.    At all relevant times, the Defendants listed in this Count acted maliciously, recklessly, intentionally, or by reason of gross negligence or violation of the law and are therefore liable to COURSER.

584.    As a direct and proximate cause of the violations described in this Complaint, COURSER has suffered and continues to suffer from, including but not limited to, severe and permanent emotional distress, embarrassment, legal expenses, and loss of earning capacity. COURSER is entitled to compensatory, exemplary, and punitive damages.

## COUNT 4
## EXTORTION and BLACKMAIL

### (as to the Allard, Graham, and Cline

585.    COURSER restates and incorporates the preceding paragraphs as though set forth fully herein.

586.    ALLARD, GRAHAM, and CLINE  and/or an agent thereof, harassed, extorted, blackmailed, and otherwise engaged in tortuous conduct against COURSER.

587.    Through a series of emails and/or texts, in order to achieve the goals of the conspiracy described herein, ALLARD, GRAHAM, and CLINE sent or caused to be sent text messages to COURSER demanding that he resign from office and take other actions against his will.

588.    These text messages were (1) a communication, (2) a threatening accusation of a crime or offenses or injury to COURSER and his family members and position as a representative, (3) with the intent thereby to extort money, a pecuniary advantage, or to compel COURSER to resign against his will.

589.    As a direct and proximate cause of the violations described in this Complaint, COURSER has suffered and continues to suffer from, including but not limited to, severe and

DePerno Law Office, PLLC ● 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) ● 269-353-2726 (Fax)

permanent emotional distress, embarrassment, legal expenses, and loss of earning capacity. COURSER is entitled to compensatory, exemplary, and punitive damages.

**COUNT 5**
**ABUSE OF PROCESS / MISCONDUCT IN OFFICE / MISUSE OF OFFICE**

**(as to the House Defendants and the State Defendants**

590.    COURSER restates and incorporates the preceding paragraphs as though set forth fully herein.

591.    THE HOUSE DEFENDANTS and THE STATE DEFENDANTS have abused their positions in government to exact political retribution without any effort to provide due process, equal protection, or Constitutional protections.

592.    THE HOUSE DEFENDANTS used state employees to illegally monitor, wiretap, eavesdrop, stalk, and required their agents (including ALLARD, GRAHAM, and CLINE) to conduct these illegal acts. THE STATE DEFENDANTS then used that information they knew to be illegally obtained, or should have known was illegally obtained after reasonable inquiry, for their own financial and political gain.

593.    THE HOUSE DEFENDANTS misused state employees (including ALLARD, GRAHAM, and CLINE) in an effort to turn them into their own surveillance team against COURSER and Gamrat. THE STATE DEFENDANTS then used that information they knew to be illegally obtained, or should have known was illegally obtained after reasonable inquiry, for their own financial and political gain.

594.    THE HOUSE DEFENDANTS misused state resources in their expulsion efforts when they failed to provide due process and equal protection to COURSER and Gamrat and forced them to endure unfounded allegations as the basis of their expulsions. THE STATE

DEFENDANTS then used that information they knew to be illegally obtained, or should have known was illegally obtained after reasonable inquiry, for their own financial and political gain.

595.    THE HOUSE DEFENDANTS abused their positions to break laws and to unfairly and unequally treat COURSER and Gamrat in an effort to cause destruction to them prior to, during, and after their positions as Representatives. THE STATE DEFENDANTS then used that information they knew to be illegally obtained, or should have known was illegally obtained after reasonable inquiry, for their own financial and political gain.

596.    At all relevant times, the Defendants listed in this Count acted maliciously, recklessly, intentionally, or by reason of gross negligence or violation of the law and are therefore liable to COURSER.

597.    THE HOUSE DEFENDANTS and THE STATE DEFENDANTS are public officers. Their conduct was in the exercise of the duties of the office or done under the color of the office. The acts were malfeasance, misfeasance, or nonfeasance. Their actions demonstrate a corrupt behavior.

598.    As a direct and proximate cause of the violations described in this Complaint, COURSER has suffered and continues to suffer from, including but not limited to, severe and permanent emotional distress, embarrassment, legal expenses, and loss of earning capacity. COURSER is entitled to compensatory, exemplary, and punitive damages.

## COUNT 6
## INDEMNIFICATION

### (as to the House)

599.    COURSER restates and incorporates the preceding paragraphs as though set forth fully herein.

101

600.    Pursuant to MCL § 691.1408(1), whenever a claim is made or a civil action is commenced against a Representative for injuries caused in the course of their employment, THE HOUSE shall compromise, settle, pay claims, compromise judgments, and otherwise indemnify the Representative.

601.    Pursuant to MCL § 691.1408(2), when a criminal action is commenced against a Representative based upon conduct in the course of their employment, THE HOUSE shall pay for, engage, furnish services of an attorney, and reimburse the Representative for legal expenses.

602.    COURSER has been sued by Defendants ALLARD and GRAHAM in State Court regarding Whistleblower and other claims derived from acts stemming from COURSER's employment as a Representative.

603.    Because the facts and circumstances regarding the Defendants ALLARD and GRAHAM's State Court claims stem from COURSER's actions as a member of the Michigan House of Representatives, COTTER and THE HOUSE are required to indemnify COURSER and provide him with a defense.

604.    COURSER is also being criminally prosecuted for actions stemming from his employment as a Representative.

605.    Because the facts and circumstances regarding the criminal charges against COURSER stem from his actions as a member of THE HOUSE, COTTER and THE HOUSE are required to indemnify COURSER.

606.    To date, COTTER and THE HOUSE have not indemnified or offered to indemnify COURSER.

102

607.    Upon information and belief, COTTER and THE HOUSE are refusing to indemnify COURSER in malicious retaliation, to further the conspiracy to remove and extort COURSER, and to deprive COURSER of equal protection and due process.

608.    Furthermore, COURSER's conduct which COTTER and THE HOUSE are retaliating against is constitutionally protected, to wit:

  a.    openly opposing and voting "no" on Proposal 15-1, the House Road Package, and other legislation favored by COTTER;

  b.    speaking out against COTTER's illegally abusing his official position in regards to the law on seating assignments;

  c.    maintaining allegiance to his district and not getting in line behind COTTER on efforts to advance his progressive legislation of increased taxation and diversion of State funds to Obamacare;

  d.    Standing against secret agreements to abrogate the votes of his district to COTTER personally through the Caucus Pledge;

  e.    Refusing to stay silent when COTTER demanded silence while THE HOUSE and COTTER worked to advance his own agenda/legislation using illegally obtained submission through the Caucus Pledge.

609.    It is the general practice of THE HOUSE to indemnify Representatives accused of similar misconduct; by way of example, THE HOUSE indemnified and settled claims against Representative Banks.

610.    Interestingly and ironically, sitting in THE HOUSE Chamber and voting on the expulsion was Representative Banks, who was involved in allegedly forcing a staff member to have sex with him as a condition of employment in THE HOUSE; yet he was indemnified and THE HOUSE paid his legal fees and paid to settle the claims against him.

611.    COTTER and THE HOUSE's decision not to indemnify COURSER is unconstitutional, violates the equal protection and due process of law and freedom of speech.

612.    COURSER is entitled to indemnification by COTTER and THE HOUSE.

103

613.    Upon information and belief, THE HOUSE paid over $100,000 to deal with the Banks indemnification and settlement

614.    Representative Banks stands in stark contrast to COURSER who was not indemnified and has had to incur and pay his own attorney fees.

615.    The HOUSE is required to indemnify COURSER because the decision to not indemnify him resulted from a constitutional violation and other misconduct as described in this complaint.

616.    As a direct and proximate cause of the violations described in this Complaint, COURSER has suffered and continues to suffer from, including but not limited to, severe and permanent emotional distress, embarrassment, legal expenses, and loss of earning capacity. COURSER is entitled to compensatory, exemplary, and punitive damages.

### COUNT 7
### FALSE IMPRISONMENT AND FALSE ARREST

#### (as to The House Defendants

617.    COURSER restates and incorporates the preceding paragraphs as though set forth fully herein.

618.    Defendants COTTER and THE HOUSE intentionally and unlawfully restrained COURSER's personal liberties and freedom of movement.

619.    Defendants COTTER and THE HOUSE refused to allow COURSER and other Representatives to leave THE HOUSE floor until COURSER and Gamrat were removed from office.

620.    Defendants COTTER and THE HOUSE refused to allow COURSER and other Representatives to take bathroom breaks until COURSER and Gamrat were removed from office.

104

621.    Defendants COTTER and THE HOUSE had the Sergeant at Arms and security guards block exits on THE HOUSE floor while taking votes for COURSER's expulsions.

622.    COURSER made requests to the HOUSE DEFENDANTS, collectively, to leave and notified THE HOUSE that he had a heart condition.

623.    The unlawful restraint, detention, and confinement was against COURSER's will.

624.    The acts of COTTER and THE HOUSE were committed with the intent of confining COURSER.

625.    The acts of COTTER and THE HOUSE directly or indirectly resulted in confinement of COURSER.

626.    COURSER was conscious of his confinement and knew he was not permitted to leave THE HOUSE floor until he resigned or was expelled.

627.    Further, the actions taken by COTTER and THE HOUSE amounted to an intentional arrest against COURSER.

628.    COURSER was aware of the arrest, which was against his will.

629.    The arrest was illegal. COTTER and THE HOUSE did not have the right or authority to confine COURSER to THE HOUSE floor until he resigned.

630.    Rather, COURSER should have been entitled to review the information presented, subpoena witnesses, and make a defense for the charges alleged. Further, COTTER and THE HOUSE were not permitted to continuously vote to expel COURSER until they achieved their result.

631.    In addition, COTTER forced COURSER to submit to being physically detained and searched in violation of each of his constitutional rights, before being allowed on THE HOUSE floor.

DePerno Law Office, PLLC ● 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) ● 269-353-2726 (Fax)

632.    Based on this illegal detainment that last for many hours and continued into the early hours of the morning, exhausted and illegally detained, COURSER was forced to resign his seat when COTTER and THE HOUSE were unable to mount the votes necessary for expulsion.

633.    This forced resignation was against his will and as a result of being illegally detained.

634.    At all relevant times, the Defendants listed in this Count acted maliciously, recklessly, intentionally, or by reason of gross negligence or violation of the law and are therefore liable to COURSER.

635.    As a direct and proximate cause of the violations described in this Complaint, COURSER has suffered and continues to suffer from, including but not limited to, severe and permanent emotional distress, embarrassment, legal expenses, and loss of earning capacity. COURSER is entitled to compensatory, exemplary, and punitive damages.

### COUNT 8
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### (as to All Defendants)

636.    COURSER restates and incorporates the preceding paragraphs as though set forth fully herein.

637.    The behavior by all Defendants and/or agents thereof was extreme and outrageous.

638.    Said behavior by all Defendants and/or agents thereof was intentional or reckless.

639.    If said behavior by all Defendants and/or agents thereof was not intentional, it was at least grossly negligent and with malice.

640.    The events described above caused severe emotional distress to COURSER.

106

641.     The emotional distress suffered by COURSER physically manifested itself in symptoms including, but not limited to, sleeplessness, increased anxiety, suicidal thoughts and other such physical manifestations as may appear during the course of discovery and trial in this matter.

642.     At all relevant times, the Defendants listed in this Count acted maliciously, recklessly, intentionally, or by reason of gross negligence or violation of the law and are therefore liable to COURSER.

643.     As a direct and proximate cause of the violations described in this Complaint, COURSER has suffered and continues to suffer from, including but not limited to, severe and permanent emotional distress, embarrassment, legal expenses, and loss of earning capacity. COURSER is entitled to compensatory, exemplary, and punitive damages.

## COUNT 9
## LEGAL MALPRACTICE

### (as to Swartzle and Beydoun)

644.     COURSER restates and incorporates the preceding paragraphs as though set forth fully herein.

645.     SWARTZLE and BEYDOUN were attorneys for COURSER during his time as a Representative in THE HOUSE.

646.     At all pertinent times, SWARTZLE and BEYDOUN were engaged in the practice of law and held themselves out to the public and to COURSER as skilled and competent attorneys capable of properly and skillfully representing, advising, counseling, and consulting with individuals seeking their advice; including adherence to the standards and ethical constraints imposed by the Michigan Rules of Professional Conduct.

DePerno Law Office, PLLC ● 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) ● 269-353-2726 (Fax)

647.    At all pertinent time, an attorney-client relationship existed between COURSER and SWARTZLE and BEYDOUN as SWARTZLE and BEYDOUN were rendering legal advice and counsel to COURSER and purportedly looking out for COURSER's best interests.

648.    Accordingly, SWARTZLE and BEYDOUN owed COURSER the duty to possess the reasonable degree of learning and skill that is ordinarily possessed by attorneys in similar situations, licensed in the State of Michigan, and to use reasonable care and diligence in the exercise of skill and application of their learning to representation, advice, counseling, and consulting in accordance with the standard prevailing amongst attorneys in the State of Michigan and in conformity with the Michigan Rules of Professional Conduct.

649.    Both SWARTZLE and BEYDOUN as attorneys for COURSER had a legal, ethical, and professional duty to COURSER and both violated that duty. They did this for their own personal and professional gain and in knowing violation of their ethical duties as attorneys.

650.    SWARTZLE and BEYDOUN violated and disregarded their duties and obligations to COURSER and at variance with the prevailing standards, were negligent and committed malpractice in multiple ways, including but not limited to the following:

   a.    Creating the appearance that SWARTZLE and BEYDOUN were looking out for COURSER's best interest and encouraging him to make statements against his interest; all the while working instead with other Defendants to have their client (COURSER) expelled.

   b.    Rendering legal advice and counsel to COURSER although they had a direct conflict of interest in the matter; having previously met ALLARD, GRAHAM, and CLINE to obtain information against their client (COURSER) and working with COTTER and THE HOUSE to expel COURSER.

   c.    Representing to COURSER that he would be censured and not expelled if he gave statements to BOWLIN and appeared at the committee hearings. This was knowingly false.

DePerno Law Office, PLLC ● 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) ● 269-353-2726 (Fax)

d.     Concealing from COURSER the truth of the claims being advanced by
       COTTER and THE HOUSE and failing to provide COURSER with all the
       information being presented against him.

e.     Failing to keep COURSER apprised of the investigation against him.

f.     Not properly advising COURSER regarding the illegality of the actions by
       COTTER regarding the Seating Law MCL 4.61.

g.     Not properly advising COURSER regarding the illegality of the actions of
       COTTER regarding his misuse of office by acting to procure the voting
       rights of COURSER (and other Representatives) via a secret and illegal
       agreement that forced COURSER to secretly pledge his voting rights to
       COTTER.

h.     Not properly advising COURSER that the "Caucus Pledge" was a
       violation of MCL 750.122 and 750.125 by COTTER and THE HOUSE.

i.     Not properly advising or informing COURSER that there were secretly
       meeting from January of 2015 through the summer of 2015 with
       ALLARD, GRAHAM, and CLINE (which meetings actually included
       SWARTZLE) to require them (in conjunction with COTTER) to act as
       spies or informants to build political ammunition against COURSER.

j.     Not properly informing COURSER that ALLARD, GRAHAM, and
       CLINE were acting as agents of COTTER.

k.     Not properly informing COURSER that SWARTZLE was also acting
       against COURSER's interests as a Michigan State Representatives.

l.     Not properly informing COURSER that SWARTZLE was also
       participating in the scheme to force COURSER to either submit to
       COTTER's agenda or to resign.

m.     Not properly advising COURSER that SWARTZLE was acting against
       COURSER's interests as a Michigan State Representative by withholding
       his awareness of the plot against COURSER and of the accusations by
       ALLARD, GRAHAM, and CLINE and of his use of ALLARD,
       GRAHAM and CLINE to do illegal surveillance against COURSER.

n.     Not properly presenting COURSER a so-called "Upjohn Warning" never
       explaining they were secretly working against COURER's interests as a
       Michigan State Representative while they were COURSER's attorney.

o.     Not properly obtaining permission from COURSER for SWARTZLE to
       testify against him during THE HOUSE select committee hearings
       regarding COURSER's character and fitness to hold office, violating their
       attorney-client privileged relationship with COURSER.

109

p.   Not properly advising COURSER of the need to obtain different counsel and never disclosing any conflict of interest.

r.   Not properly obtaining a waiver of any conflict of interest from COURSER (and COURSER never gave permission) for SWARTZLE or BEYDOUN to act contrary to his interests throughout the term or against his interests during the HBO investigations; violating their attorney-client privileged relationship with COURSER.

s.   Not properly obtaining a waiver of any conflict of interest from COURSER (and COURSER never gave permission) for SWARTZLE or BEYDOUN to act as a witness, testify, or otherwise hold meetings or discussions against or about COURSER during the Select Committee process; violating their attorney-client privileged relationship with COURSER.

t.   By assuring COURSER that his statements would remain confidential. This advice and guidance was false and misleading and was intended to trick COURSER into meeting with BOWLIN and then appearing at the committee hearing and making statements detrimental to himself.

u.   Not properly stating any concern or objection regarding the testimony used by COTTER or BOWLIN to remove COURSER. In fact SWARTZLE gave testimony that supported ALLARD and GRAHAM and was opposed to his own client COURSER.

v.   Not properly stating any concern regarding the rushed process used to forcibly and constructively expel COURSER and never properly or prudently asking for an adjournment so that COURSER could better prepare a defense.

w.   Not properly stating any concern regarding the rushed process used to forcibly and constructively expel COURSER.

x.   Not properly demanding that all information and evidence be turned over to COURSER so that he could better prepare a defense.

y.   Not properly demanding due process or equal protection for COURSER or asserting that his constitutional rights, including the right to free speech, be protected.

z.   Not properly demanding that COURSER be indemnified and that his legal fees be paid so that he could better prepare a defense.

aa.   Not properly deposing or questioning any witness on behalf of COURSER so that he could better prepare a defense.

110

       bb.    Not properly objecting to the hand-picked select committee members, all of whom had an obvious bias against COURSER.

       cc.    Other acts of malpractice that will be identified as discovery is completed.

651.    SWARTZLE later acknowledged in the MSP/BRITVEC/SCHUETTE tapes that there was counter evidence that ALLARD and GRAHAM's word was not to be trusted; yet he refused to question ALLARD and GRAHAM during THE HOUSE committee hearings.

652.    In fact, SWARTZLE and BEYDOUN intentionally and with malice kept ALLARD and GRAHAM from testifying or being cross-examined in THE HOUSE committee hearing to remove COURSER; violating COURSER's right to Due Process and a violation of the Sixth Amendment's "Right to Confrontation of Accusers."

653.    SWARTZLE testified before THE HOUSE that COURSER misused state resources of upwards of ten thousand dollars; yet no missing resources were ever identified nor was any calculation offered. Further, SCHUETTE never charged COURSER with misuse of state resources. These statements by SWARTZLE were false and detrimental to his client (COURSER).

654.    But for SWARTZLE and BEYDOUN's malpractice, COURSER's injuries would not have occurred. In fact, COURSER would not have appeared before BOWLIN or THE HOUSE committee and given the statements he gave.

655.    At all relevant times, it was foreseeable that SWARTZLE and BEYDOUN's conduct would create detrimental reliance on the part of COURSER and that said conduct would lead to undue and irreparable financial hardship for COURSER.

656.    As a result of SWARTZLE and BEYDOUN's conflict of interest and malpractice, COURSER was forcibly and constructively expelled from THE HOUSE.

DePerno Law Office, PLLC • 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) • 269-353-2726 (Fax)

657. As a direct and proximate cause of the violations described in this Complaint, COURSER has suffered and continues to suffer from, including but not limited to, severe and permanent emotional distress, embarrassment, legal expenses, and loss of earning capacity. COURSER is entitled to compensatory, exemplary, and punitive damages.

## COUNT 10
## FRAUDULENT MISREPRESENTAION

### (as to Swartzle and Beydoun)

658. COURSER restates and incorporates the preceding paragraphs as though set forth fully herein.

659. SWARTZLE and BEYDOUN made material misrepresentations to COURSER assuring COURSER that his interests would be properly protected, he would only be censured, and his statements would remain private.

660. SWARTZLE and BEYDOUN's representations were false because instead of providing competent legal advice, SWARTZLE and BEYDOUN secretly were working against COURSER and in conjunction with COTTER and THE HOUSE to remove COURSER from office.

661. SWARTZLE and BEYDOUN knew the representations and assurances they made to COURSER were false as they never intended to take any affirmative steps to protect COURSER's interests, instead acting in the interests of COTTER and THE HOUSE.

662. SWARTZLE and BEYDOUN intended that the representations and assurances made to COURSER would be relied upon as the purpose of those representations were to earn COURSER's trust and cooperation, and to prevent COURSER from otherwise asking questions or protecting his interests.

112

663.   COURSER did, in fact, rely on SWARTZLE and BEYDOUN's representations and assurances by trusting SWARTZLE and BEYDOUN, cooperating with BOWLIN and THE HOUSE and cooperating with SWARTZLE and BEYDOUN in an attorney-client relationship.

664.   By relying on SWARTZLE and BEYDOUN, COURSER was forcibly and constructively expelled from office.

665.   SWARTZLE and BEYDOUN engaged in fraud by representing to COURSER that his interests would be protected when, in fact, SWARTZLE and BEYDOUN had no intention to protect any interests other than COTTER and THE HOUSE.

666.   As a direct and proximate cause of the violations described in this Complaint, COURSER has suffered and continues to suffer from, including but not limited to, severe and permanent emotional distress, embarrassment, legal expenses, and loss of earning capacity. COURSER is entitled to compensatory, exemplary, and punitive damages.

## COUNT 11
## DECLARATORY RELIEF

### (as to all Defendants)

667.   COURSER restates and incorporates the preceding paragraphs as though set forth fully herein.

668.   COURSER seeks declaratory relief stating that he was unconstitutionally expelled from THE HOUSE.

669.   COURSER continues to have ongoing damage from the actions of Defendants that claimed COURSER violated the "qualifications" requirement of the Michigan Constitution by committing multiple felonies; COURSER seeks declaratory relief stating that he was unconstitutionally expelled from THE HOUSE.

DePerno Law Office, PLLC ● 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) ● 269-353-2726 (Fax)

670.    COURSER seeks declaratory relief stating that he was unconstitutionally deprived of his salary, official positions, right to represent his district and the right to vote in the legislature.

671.    COURSER has been unable to practice law in any meaningful way due to the lies that he had committed multiple felonious acts. COURSER seeks declaratory relief that there has been no judicial finding of criminality and that such claims by Defendants are lies.

672.    COURSER seeks declaratory relief stating that Article IV, § 16 of the Michigan Constitution is unconstitutional on its face and it is vague, overbroad, and not sufficiently definite; or in the alternative is unconstitutional in its application.

673.    COURSER seeks declaratory relief stating that MCL § 750.505 is unconstitutional on its face and it is vague, overbroad, and not sufficiently definite; or in the alternative is unconstitutional in its application.

674.    Defendants COTTER and THE HOUSE's vote to expel Gamrat and COURSER from THE HOUSE violated the provisions of the United States Constitution and the Michigan Constitution which grant equal protection and due process rights to all.

675.    An actual controversy exists concerning whether the actions taken by COTTER and THE HOUSE were constitutional.

676.    COURSER contends that he was entitled to due process and equal protection and was therefore improperly expelled from THE HOUSE.

677.    Based on the foregoing, COURSER is entitled to indemnification. THE HOUSE is required to defend him against the lawsuit by ALLARD and GRAHAM and against the criminal charges brought by SCHUETTE.

114

678.    A judicial determination resolving this actual controversy is necessary and appropriate at this time.

## COUNT 12
## INJUNCTIVE RELIEF

### (as to all Defendants)

679.    COURSER restates and incorporates the preceding paragraphs as though set forth fully herein.

680.    Defendants COTTER and THE HOUSE in conjunction with the other Defendants have illegally removed COURSER from his HOUSE seat.

681.    Defendants COTTER and THE HOUSE continue to prohibit COURSER from being seated in THE HOUSE.

682.    COURSER was duly elected by the citizens of his district.

683.    Defendants COTTER and THE HOUSE's improper removal caused, and continues to cause irreparable harm to COURSER because his is prohibited from introducing legislation and are otherwise unable to fulfill his duties as a Representative for his districts.

684.    In the event that the Court determines COURSER was improperly removed from his seat, the Court should issue an order to re-seat COURSER; or provide an alternative and equitable remedy.

685.    COURSER does not have a plain, speedy, and adequate remedy in the ordinary course of law.

686.    COURSER asks this Court for an order stating that THE HOUSE record shall be corrected to remove any record that COURSER committed misconduct in office and misuse of state resources.

DePerno Law Office, PLLC • 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) • 269-353-2726 (fax)

687.    COURSER asks this Court for an order stating that THE HOUSE shall indemnify and defend him against the lawsuit by ALLARD and GRAHAM and against the criminal charges brought by SCHUETTE.

## DAMAGES

688.    As a result of the actions and omissions of Defendants as alleged herein, COURSER has suffered the loss of his liberty and dignity, have been treated by society with ridicule and indignity, and have suffered damages in the amount of $1,000,000.00.

689.    The actions and omissions of the Defendants as alleged herein are intentional and/or in reckless disregard of the rights of COURSER and so outrageous to warrant the imposition of punitive damages upon each of them in the amount $1,000,000.00.

690.    COURSER respectfully requests judgment in his favor and against Defendants as follows:

A.    As to Count 1, determine that the Defendants listed in Count 1 violated 42 U.S.C. § 1983 by recklessly or intentionally, or by reason of negligence, disregarded provisions of the United States Constitution and Michigan Constitution, including any and all amendments thereunder and award COURSER an amount of $10,000,000.00 to be determined at trial.

B.    As to Count 2, determine that the Defendants listed in Count 2 violated 42 U.S.C. § 1985 by recklessly or intentionally, or by reason of negligence, disregarded provisions of the United States Constitution and Michigan Constitution, including any and all amendments thereunder and award COURSER an amount of $10,000,000.00 to be determined at trial.

D.    As to Count 3, determine that the Defendants listed in Count 3 are liable for violations of the Federal wiretapping act and Michigan's eavesdropping statute and award COURSER an amount of $10,000,000.00 to be determined at trial.

E.    As to Count 4, determine that the Defendants listed in Count 4 are liable for extortion and blackmail and award COURSER an amount of $10,000,000.00 to be determined at trial.

116

F.  As to Count 5, determine that the Defendants listed in Count 5 are liable for abuse of process, misconduct in office, and misuse of office and award COURSER an amount of $10,000,000.00 to be determined at trial.

G.  As to Count 6, determine that the Defendants listed in Count 6 are liable for promissory estoppel and award COURSER an amount of $10,000,000.00 to be determined at trial.

H.  As to Count 7, determine that COURSER is entitled to indemnification by THE HOUSE and require that THE HOUSE indemnify COURSER as to all attorney fees, costs, and damages resulting from the Whistleblower lawsuit and all criminal charges.

I.  As to Count 8, determine that the Defendants listed in Count 8 are liable for false imprisonment and false arrest and award COURSER an amount of $10,000,000.00 to be determined at trial.

J.  As to Count 9, determined that the Defendants listed in Count 9 are liable for legal malpractice and award COURSER an amount of $10,000,000.00 to be determined at trial.

K.  As to Count 10, determine that the Defendants listed in Count 10 are liable for fraudulent misrepresentation and award COURSER an amount of $10,000,000.00 to be determined at trial.

L.  As to Count 11, enter declaratory judgment stating that COURSER was unconstitutionally deprived of his salary and liberty; stating that COURSER's Constitutional rights were violated; and stating that COURSER is entitled to indemnification by THE HOUSE; and award COURSER an amount in excess of $10,000,000.00 to be determined at trial.

M.  As to Count 12, enter an order stating that THE HOUSE record shall be corrected to remove any record that COURSER committed misconduct in office and misuse of state resources and stating that THE HOUSE shall indemnify and defend COURSER against the Whistleblower lawsuit and any criminal charges.

N.  In addition to the damages set forth above, also award COURSER compensatory damages for his psychological and emotional distress, loss of standing in the community, damage to his reputation, and reimbursement for out of pocket expenses incurred in this matter, including attorney fees and costs.

O.  Award damages to COURSER against Defendants for funds lost that they would have otherwise been able to receive had he not been removed from office, in an amount to be determined by a jury;

117

P.      Award punitive damages to COURSER in an amount to be determined by a jury.

Q.      Award statutory interest to COURSER on all damages.

R.      Award cost and attorney's fees to COURSER for claims brought in this matter, pursuant to 42 U.S.C. § 1988 and any other applicable statute or Court rule.

S.      Award any other relief that this Honorable Court finds just and equitable.

Respectfully submitted

DePERNO LAW OFFICE, PLLC

Dated: December 12, 2016

/s/ Matthew S. DePerno
Attorney for Plaintiff Todd Courser
251 N. Rose Street, Suite 200
Kalamazoo, MI 49007
(269) 321-5064

118

## **VERIFICATION**

I, TODD COURSER, being first duly sworn, deposes and says that I am the plaintiff in the above-entitled cause. I am familiar with the facts at issue in this case. I have read the foregoing Amended Complaint and know its content, that to the best of my knowledge, information and belief, the contents thereof are true.

DATED: December 12, 2016          */s/ Todd Courser*_____
                                   Todd Courser

DePerno Law Office, PLLC ● 251 N. Rose Street, Suite 200, Kalamazoo, MI 49007
269-321-5064 (phone) ● 269-353-2726 (Fax)

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff TODD COURSER

demands a trial by jury in this action of all issues so triable.

Respectfully submitted

DePERNO LAW OFFICE, PLLC

Dated: December 12, 2016

*/s/ Matthew S. DePerno*
Matthew S. DePerno (P52622)
Attorney for Plaintiff Todd Courser
251 N. Rose Street, Suite 200
Kalamazoo, MI 49007
(269) 321-5064